# Justice officials fear nation's biggest wiretap operation may not be legal

Brad Heath and Brett Kelman, USA TODAY    5:40 p.m. EST November 11, 2015



*(Photo: Virginia State Police)*

RIVERSIDE, Calif. — Federal drug agents have built a massive wiretapping operation in the Los Angeles suburbs, secretly intercepting tens of thousands of Americans' phone calls and text messages to monitor drug traffickers across the United States despite objections from Justice Department lawyers who fear the practice may not be legal.

Nearly all of that surveillance was authorized by a single state court judge in Riverside County, who last year signed off on almost five times as many wiretaps as any other judge in the United States. The judge's orders allowed investigators — usually from the U.S. Drug Enforcement Administration — to intercept more than 2 million conversations involving 44,000 people, federal court records show.

The eavesdropping is aimed at dismantling the drug rings that have turned Los Angeles' eastern suburbs into what the DEA says is the nation's busiest shipping corridor (/story/news/crime_courts/2015/11/riverside-county-drug-trafficking/75232146/) for heroin and methamphetamine. Riverside wiretaps are supposed to be tied to crime within the county, but investigators have relied on them to make arrests and seize shipments of cash and drugs as far away as New York and Virginia, sometimes concealing the surveillance in the process.

The surveillance has raised concerns among Justice Department lawyers in Los Angeles, who have mostly refused to use the results in federal court because they have concluded the state court's eavesdropping orders are unlikely to withstand a legal challenge, current and former Justice officials said.

"It was made very clear to the agents that if you're going to go the state route, then best wishes, good luck and all that, but that case isn't coming to federal court," a former Justice Department lawyer said. The lawyer and other officials described the situation on the condition of anonymity because they were not authorized to discuss the department's internal deliberations.

Federal agents often prefer to seek permission to tap phones from state courts, instead of federal courts, because the process is generally faster and less demanding than seeking approval through the Justice Department. In addition, California law allows them to better conceal the identities of confidential informants they rely on to help investigate drug rings. Over the past decade, drug agents have more than tripled their use of wiretaps (/story/news/2015/06/02/dea-wiretap-surveillance-tripled-in-state-courts/28330503/), mostly by using state court orders.



**DESERT SUN**

How Riverside County became America's drug pipeline

(http://www.desertsun.com/story/news/crime_courts/2015/11/11/riverside-county-drug-trafficking/75232146/)

Wiretaps — which allow the police to secretly monitor Americans' communications — are among the most intrusive types of searches the police can conduct, and federal law imposes strict limits on when and how they can be used. The law requires that police use wiretaps only after they have run out of other tools to build a case.

In Riverside, the authorities' use of that last-ditch tool quadrupled over the past four years. Last year alone, Riverside County prosecutors and a local judge approved 624 wiretaps, far more than any other jurisdiction in the United States, according to records compiled by the federal court system. Nearly all were tied to drug investigations.

EXHIBIT

1

## AMERICA'S WIRETAP CAPITAL

A county court in Riverside, Calif. authorized far more police eavesdropping than any other court in the USA. Much of it was sought by federal drug agents.

Shown below are the 30 jurisdictions with the most wiretaps in the USA. Hover or tap for details

**Source:** Administrative Office of the U.S. Courts
**Credit:** Brad Heath, Mitchell Thorson, USA TODAY

"Those numbers — the totals, and just the size of some of those wiretaps — are huge red flags for us," said Dave Maass, an investigative researcher for the Electronic Frontier Foundation. "When there's this amount of secrecy it starts to raise serious concerns about accountability for electronic interceptions."

Because wiretap orders are sealed, there is no way to know precisely how many of them were sought by the DEA and the local officers it deputized to work on a drug task force. Some of the taps were sought by local police officers and officers in neighboring counties. Prosecutors acknowledged, however, that the drug agency plays a leading role in the wiretapping. The county's former district attorney, Paul Zellerbach, who presided over the rapid rise in wiretapping there before he left office in January, said the drug agency was "a significant player."

Riverside County's new district attorney, Mike Hestrin, said he found out about the county's wiretap numbers not long after taking office after other prosecutors approached him to suggest he look into the matter. He was concerned by what he found.

Hestrin said in an interview that he made a "series of reforms" to how wiretaps are handled, which he said will lead to fewer taps in the future. He said he personally evaluates new wiretap requests and insists that each one now must "have a strong investigative nexus" to the county. Asked if that had been the case in previous years, Hestrin replied: "You're going to have to extrapolate that."

Hestrin said prosecutors "follow the law to the letter" when seeking wiretaps, but he would not discuss the details. "This is an area of our law, an area of our law enforcement, where we can't be totally transparent, in the same way that the federal government can't be totally transparent about the massive intelligence operations they run," he said.



Riverside County District Attorney Mike Hestrin said he made a "series of reforms" to how county prosecutors handle wiretaps after he took office in January. (Photo: Jay Calderon/The Desert Sun)

DEA officials said it should not come as a surprise that so much of their surveillance work happens in the area around Riverside — a vast expanse of suburbs and desert east of Los Angeles, crisscrossed by freeways that have become key shipping routes for drugs moving from Mexico to the United States and for cash making the return journey.

"There are organizations here and we're working these organizations and we're trying to stay abreast of the technology and all the different ways these organizations are operating," said Stephen Azzam, the associate special agent in charge of DEA's Los Angeles division.

On paper, agents' choice of state court over federal should not matter: Federal law sets a minimum standard for police to obtain a wiretap, even when they are seeking one from a state-court judge. And California courts have repeatedly said the state's wiretaps are sufficient.

Justice officials fear nation's biggest wiretap operation may not be legal

But current and former Justice Department officials said prosecutors in Los Angeles repeatedly told the drug agency that they would not accept cases based on state-court wiretaps – and those from Riverside County in particular – because they believed the applications being approved by state judges fell short of what the federal law requires. Prosecutors were particularly concerned that the DEA was seeking state-court wiretap orders without adequately showing that it had first tried other, less intrusive, investigative techniques.

"They'd want to bring these cases into the U.S. Attorney's Office, and the feds would tell them no (expletive) way," a former Justice Department official said.

The result was that even seemingly significant drug cases stayed out of federal court.

In December, for example, court records show (https://www.documentcloud.org/documents/2511318-76k-complaint.html) DEA agents and local detectives in South Gate, Calif., near Los Angeles, used a state-court wiretap to target a man named Omar Salazar, who the DEA suspected was tied to a Mexican drug trafficking group. Between searches of Salazar's car and his house, officers seized $76,869.94, a gun and a cache of illegal drugs, including 36 pounds of methamphetamine and 5 pounds of heroin. Investigators found some of the drugs in a safe in Salazar's garage, along with a box of ammunition and probation paperwork from one of his previous arrests.

That should have been enough to build a significant federal case with a long mandatory prison sentence, but that was not what happened. Court records show the Justice Department prosecuted the $76,869.94 in a civil asset seizure case (https://www.documentcloud.org/documents/2511318-76k-complaint.html). But it did not prosecute Salazar. Instead, Salazar was booked into jail and released the same day; his lawyer, John Passanante, said he has not been charged as a result of the search. Neither the DEA nor prosecutors would explain why.

## PROLIFIC WIRETAPPING

Perhaps the only outward sign that Riverside has become America's most wiretapped place can be found on a deserted floor of the city's courthouse. On a recent Friday afternoon, a handful of officers in scruffy jeans and baseball caps waited there with sealed manila envelopes in their hands. After a few minutes, they disappeared inside Judge Helios Hernandez's locked courtroom for hearings that are closed to the public.

No judge in the United States has been so prolific in authorizing eavesdropping.



Riverside County Superior Court Judge Helios Hernandez approved nearly five times as many wiretaps last year as any other judge in the United States. *(Photo: Brett Kelman, The Desert Sun)*

Records compiled by the federal courts' administrative office show Hernandez authorized 624 wiretaps that ended last year, and another 339 that ended the year before. Hernandez approved three times more taps than all of the federal judges in California combined last year, and once received more wiretap applications in a day, 17, than most courts do in a year. (The court office counts wires based on when they end, rather than when they begin, to avoid revealing ongoing investigations.) The next-closest court was in Las Vegas, where judges approved 177 wiretaps that ended last year.

California law generally requires that each county court appoint one judge to handle wiretaps. For the past three years, that job fell to Hernandez, who was Riverside's chief narcotics prosecutor before he became a judge. The records do not indicate how many wiretaps, if any, Hernandez turned down.

Case 3:15-cr-00099-DJH   Document 27-1   Filed 02/16/16

· Hernandez declined to comment through a spokesman.

Riverside County's presiding judge, Harold Hopp, said judges do not decide how many eavesdropping applications are submitted to them; "they have to consider each one on its merits."

The county's wiretap numbers are so high that even investigators who helped supervise eavesdropping there were taken aback. "This can't be right," said Anthony Valente, who, until 2012, commanded the Inland Crackdown Allied Task Force, which uses wiretaps to investigate drug trafficking and gangs in Southern California.

Nearly all of Riverside's wiretaps – about 96% – were related to drug investigations.

Federal records show the taps that ended in 2014 cost more than $18 million. The records do not indicate who paid for them.

The figures are based on reports that judges and prosecutors are required to submit each year to the federal courts' administrative office. The reports include the number of wiretaps judges authorize, and the number of communications – including telephone calls, text messages and other electronic conversations – that investigators intercepted.

Those reports show the overwhelming majority of the more than 2 million communications investigators intercepted last year as a result of Riverside wiretaps had nothing to do with crime. Police are not supposed to record conversations that are not relevant to their investigations.



DEA officials said that the agency conducts its wiretaps wherever their investigations lead them. Its Riverside field office, which covers Riverside and neighboring San Bernardino counties, was responsible for a large share of the agency's methamphetamine and heroin seizures last year; therefore, it's only natural that investigators would focus there. "We don't pick a jurisdiction. We take the enforcement action where it's warranted and where we can do it effectively," DEA spokesman Timothy Massino said.

Nonetheless, Hernandez approved 20 times as many wiretaps as his counterparts in San Bernardino County. DEA officials said they could not explain that difference.

Zellerbach said Riverside's wiretaps multiplied during his tenure because prosecutors and the county's court became more "efficient and effective" in handling surveillance applications and word spread throughout the law enforcement community, bringing still more applications. Eventually, Zellerbach said, he learned the county was among the nation's wiretap leaders. "I thought we were doing a hell of a job," he said.



Zellerbach said the taps yielded significant arrests and seizures. And they paid other dividends. "We liked it because in these difficult economic times, my budget was being cut, and that was a way to somewhat supplement funding for my office," he said in an interview. Prosecutors would not say how much money they received.

Zellerbach said the operation grew under the leadership of an aggressive new lawyer, Deena Bennett, who still heads the wiretap unit today.

Bennett, a one-time contestant on the reality show *Survivor*, rebuffed attempts to contact her, telling a reporter that "the fact that you have my cellphone number is really harassment, and I'm going to report it."

Former Riverside County District Attorney Paul Zellerbach presided over a rapid increase in wiretaps. *(Photo: Richard Lui, The Desert Sun)*

**WIDESPREAD ARRESTS AND SEIZURES**

Investigators have used (https://www.documentcloud.org/documents/2511325-california-electronic-interceptions-report-2014.html#document/p22/a260422) wiretaps in Riverside to seize hundreds of pounds of drugs and millions of dollars in cash. The taps have helped agents pinpoint smuggling tunnels dug beneath the Mexican border and map the inner workings of South American trafficking groups.

But if the taps also produce arrests, they are difficult to find.

Prosecutors seldom make use of state-court wiretaps in the federal courts around Los Angeles. And defense lawyers in Riverside said they only rarely encounter cases with disclosed wiretaps in state court. The county's public defenders handle 40,000 criminal cases a year; no more than five involve disclosed wiretaps, said Steve Harmon, the head of that office.

Instead, court records and interviews with DEA officials and prosecutors show the drug agency has used the fruits of its Riverside wiretaps to help stop and seize shipments of drugs and cash elsewhere in the United States. In some of those cases, agents used wiretaps to identify drug couriers, then tipped off other investigators, who were told to find their own independent evidence to conduct a search. That practice, known within the agency as "parallel construction," is now the subject of an investigation by the Justice Department's inspector general.

"That approach ends up insulating dubious police practices from any kind of judicial review. That's what so pernicious about it," American Civil Liberties union lawyer Nathan Wessler said.

Riverside's District Attorney's Office reported approximately one arrest for every three wiretaps that concluded last year, among the lowest rates of any jurisdiction that conducted more than a handful of taps. That's a sign, Hestrin acknowledged, that many of the wiretaps may be leading to prosecutions in other jurisdictions.



Police seized heroin and cocaine from this truck after it was stopped in rural Virginia in 2013. The stop was based on a wiretap from Riverside, Calif. *(Photo: Unites States District Court)*

One surfaced last year after a state trooper stopped a tractor trailer on a remote stretch of interstate highway outside Harrisonburg, Va., ostensibly because some of the tiny LED bulbs around its cab had burned out. The trooper, Keith Miller, summoned a drug-sniffing dog, and within minutes, officers had pulled 32 kilograms of heroin and cocaine from compartments in the truck's cab. Federal prosecutors indicted the driver, George Covarrubaiz, on drug possession charges.

Miller testified during a court hearing – later described by a prosecutor as "a high-wire act" – that he had been tipped off by the DEA that the truck might be carrying drugs, but that the burnt-out lights were his "sole reason" for stopping the truck. The problem for prosecutors was that driving without those lights is not illegal in Virginia. The judge hearing the case warned that he was inclined to bar prosecutors from using the seized drugs as evidence because, if driving without the lights was legal, Miller had no valid reason to stop the truck.



Officers found 32 kilograms of heroin and cocaine in a truck George Covarrubaiz had been driving through rural Virginia. The search was captured on cameras mounted in one of the officers' car. *(Photo: Virginia State Police)*

So seven months after Covarrubaiz was stopped and sent to jail, the Justice Department returned to court and acknowledged there was more to its investigation (https://www.documentcloud.org/documents/2510859-ghc-52-wiretap-disclosure.html). Covarrubaiz, a government lawyer wrote, had been picked up in a "wiretap investigation of a significant California-based drug trafficking organization." Investigators had been monitoring his calls using a tap approved by Hernandez in Riverside County, and agents from the DEA's secretive Special Operations Division had been tracking his truck across the United States. During a 4 a.m. meeting at a nearby hotel, the agents directed Miller to find a reason to stop the truck and search it.

The agents' reports referred to the episode merely as a traffic stop because "that way they didn't have to provide the information for the directed stop later," agent Gregg Mervis later testified (https://www.documentcloud.org/documents/2511321-ghc-wiretap-testiomony.html#document/p41/a260419).

Justice Department lawyers later said they had intended to reveal the wire all along but had not done so sooner because police had not yet locked up some of the investigation's key targets. In particular, Assistant U.S. Attorney Grayson Hoffman pointed to the truck's owner, Everardo Amador Sr., who he described as "a grave threat to the safety and well-being of the people of the United States."

That's hardly how California police treated Amador, though. Agents arrested him last (https://www.documentcloud.org/documents/2511326-01-complaint-filed-imaged.html) year on charges that he had illegally possessed drug money – a far less serious charge than the federal narcotics case his driver faced in Virginia. A judge freed him the next day on $5,000 bail, at the prosecutor's request.

Amador's lawyer, Niicolas Estrada, called the Justice Department's

Case 3:15-cr-00099-DJH   Document 27-1   Filed 02/16/16   Page 7 of 247 PageID #: 108

characterization "an exaggeration."

Covarrubaiz's lawyer, Randy Cargill, accused the Justice Department in a court filing (https://www.documentcloud.org/documents/2510856-ghc-78-reply.html) of an "extraordinary strategy of doling out truth as it sees fit."

In the end, U.S. District Court Judge Michael Urbanski declared himself (https://www.documentcloud.org/documents/2510895-ghc-114-transcript.html#document/p3/a260418) "singularly unhappy with the way the government has conducted this case." And in March, the Justice Department abandoned it altogether, dismissing the charges (https://www.documentcloud.org/documents/2511320-ghc-126-motion-to-dismiss.html) against Covarrubaiz. Assistant U.S. Attorney Heather Carltontold Urbanski (https://www.documentcloud.org/documents/2510853-ghc-transcript.html#document/p2/a260420) that prosecutors had "re-evaluated the evidence" and concluded that "it would be best to terminate the investigation."



Everardo Amador Sr. right, leaves court in Riverside, Calif. on Oct. 21, 2015. The Justice Department said it could not reveal a state-court wiretap because Amador posed a "grave threat," but when he was arrested, he was immediately freed on bail. *(Photo: Brett Kelman, The Desert Sun)*

The rest of her explanation is sealed (https://www.documentcloud.org/documents/2510853-ghc-transcript.html#document/p6/a260421).

*Kelman also reports for The (Palm Springs, Calif.) Desert Sun. Contributing: Mark Hannan in McLean, Va.*

Follow Brad Heath on Twitter at @bradheath (http://twitter.com/bradheath), and Brett Kelman at @TDSbrettkelman (https://twitter.com/TDSbrettkelman).

Read or Share this story: http://usat.ly/1NL0unL

Police used apparently illegal wiretaps to make hundreds of arrests                    Page 1 of 5

# Police used apparently illegal wiretaps to make hundreds of arrests

Brad Heath and Brett Kelman, USA TODAY      5:03 a.m. PST November 20, 2015



RIVERSIDE, Calif. — Prosecutors in the Los Angeles suburb responsible for a huge share of the nation's wiretaps almost certainly violated federal law when they authorized widespread eavesdropping that police used to make more than 300 arrests and seize millions of dollars in cash and drugs throughout the USA.

The violations could undermine the legality of as many as 738 wiretaps approved in Riverside County, Calif., since the middle of 2013, an investigation by USA TODAY and *The Desert Sun*, based on interviews and court records, has found. Prosecutors reported that those taps, often conducted by federal drug investigators, intercepted phone calls and text messages by more than 52,000 people.

Federal law bars the government from seeking court approval for a wiretap unless a top prosecutor has personally authorized the request. Congress added that restriction in the 1960s, when the FBI had secretly monitored civil rights leaders, to ensure that such intrusive surveillance would not be conducted lightly.

(Photo: Unites States District Court)

In Riverside County — a Los Angeles suburb whose court and prosecutors approved almost one of every five U.S. wiretaps last year — the district attorney turned the job of reviewing the applications over to lower-level lawyers, interviews and court records show. That practice almost certainly violated the federal wiretapping law and could jeopardize prosecutors' ability to use the surveillance in court.

"A district attorney is playing with gunpowder if he ignores the potential implications of letting somebody else handle the entire process. That's potentially catastrophic," said Clifford Fishman, a Catholic University of America law professor who studies wiretapping.

That also creates a legal problem for Riverside's massive wiretapping operation, which had come under scrutiny from Justice Department lawyers. Last week, USA TODAY and *The Desert Sun* reported that the U.S. Drug Enforcement Administration had secretly helped turn the county into the nation's wiretap capital (http://preview.usatoday.com/story/news/2015/11/11/dea-wiretap-operation-riverside-california/75484076/), even though federal prosecutors repeatedly warned that the surveillance orders violated a separate part of the wiretapping law and would not withstand a legal challenge.

Federal drug agents used information from Riverside wiretaps to make arrests as far away as Kentucky and Virginia, sometimes concealing the surveillance from judges and defense lawyers.

Buy Photo





Riverside County District Attorney Paul Zellerbach at a press conference on metal theft on February 18, 2014. Wiretaps in the county quadrupled under his administration. (Photo: Crystal Chatham / The Desert Sun)

Wiretaps in Riverside more than quadrupled under the county's former district attorney, Paul Zellerbach, who left office in January. Despite a federal court ruling that only the district attorney himself should usually approve wiretaps, Zellerbach said in two interviews over the past month that he could not recall having reviewed or personally authorized any of the county's wiretap applications and said he was unaware of the details of the requests. Instead, he said, he delegated that job to one of his assistants.

"I didn't have time to review all of those," Zellerbach said. "No way."

By: JEFFREY A. VAN WA
ASSISTANT DISTRICT A
COUNTY OF RIVERSIDE

For: PAUL E. ZELLERBA
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

**A Riverside County wiretap application, approved by Assistant District Attorney Jeffrey Van Wagenen. (Photo: Obtained by USA TODAY)**

Because wiretap applications are secret, it is difficult to gauge how often they were approved by other lawyers. A report based on information Zellerbach's office submitted to federal court administrators lists an assistant, Jeffrey Van Wagenen, as the person who authorized nearly all of the county's wiretap applications. Van Wagenen's signature appears on a sealed wiretap application approved last year by a Riverside County judge and obtained by USA TODAY. Van Wagenen, who left the office last year, said it would be inappropriate for him to comment.

Delegating that job poses a legal problem because federal law — which regulates wiretap applications even in state courts — carefully restricts who must approve a surveillance request. The U.S. Supreme Court ruled in 1974 (https://scholar.google.com/scholar_case?case=13882476521514079694&) that those restrictions were serious enough that it threw out wiretap evidence in a drug case because the surveillance had been approved by the wrong senior official at the U.S. Justice Department.

The federal 9th Circuit Court of Appeals reiterated that point in 2013 (https://www.documentcloud.org/documents/2516883-12-50063.html#document/p7/a262477) after federal prosecutors sought to use evidence from a wiretap police obtained from a state court in San Bernardino County, just north of Riverside. The prosecutor who signed off on the wiretap was not the county's district attorney, Mike Ramos, but one of his deputies. That, the appeals court ruled, wasn't good enough: Wiretaps had to be signed by the district attorney himself unless he had turned over all of his powers to someone else while he was away from the office.

Since this decision, Ramos has begun signing all wiretap applications himself and urged other district attorneys to do the same. "This is our responsibility. We are talking about people's rights, the Fourth Amendment, cartels, drugs, gangs. It should be handled by the elected DA," he said.

Riverside County's new district attorney, Mike Hestrin, who replaced Zellerbach in January, instituted a similar policy. Hestrin said the 9th Circuit ruling makes clear that district attorneys have a "legal obligation" to approve wiretaps themselves, but his office will defend his predecessor's wires if they are challenged in court.

Ramos said in interviews that he warned Zellerbach about the implications of the 9th Circuit's decision. "We had a conversation about wiretaps, and he said that he had so many that it would be impossible for him to sign them all," Ramos said.

Records and interviews show no evidence that Zellerbach changed his approach. Records from the federal court administrative office show Riverside prosecutors obtained at least 738 wiretaps in the years after the appeals court's decision. They identify Van Wagenen as the person who authorized nearly all of the surveillance applications.

The scope of those apparent violations is "staggering," said defense lawyer Michael Garey, and the ramifications are "endless."

**Riverside County District Attorney Mike Hestrin said he made a "series of reforms" to how county prosecutors handle wiretaps after he took office in January.** *(Photo: Jay Calderon/The Desert Sun)*

"And what I mean by endless is, if you have a wiretap authorization that is invalid, all of the material that is obtained as a result of that wiretap is subject to suppression," he said, "and anything derived from that material is also subject to suppression."

American Civil Liberties Union lawyer Nathan Wessler said Riverside prosecutors should warn agencies that made use of the wires that the surveillance may have been illegal and notify the people whose conversations were recorded, even if they were never arrested as a result. "They should know that these were illegally obtained," he said.

## AMERICA'S WIRETAP CAPITAL

A county court in Riverside, Calif. authorized far more police eavesdropping than any other court in the USA. Much of it was sought by federal drug agents.

Shown below are the 30 jurisdictions with the most wiretaps in the USA. Hover or tap for details

**Source:** Administrative Office of the U.S. Courts

**Credit:** Brad Heath, Mitchell Thorson, USA TODAY

The 9th Circuit's decision left one exception: Lower-level officials can authorize wiretaps if the district attorney is "absent" and authorizes another lawyer in the office to act in his place.

Zellerbach said he "often was absent" because his job required him to travel across a county that stretches from the Los Angeles suburbs to the Arizona border.

Still, records show Riverside prosecutors routinely requested wiretaps on days when he was working. Federal court records show prosecutors applied for five wiretaps Feb. 18, 2014, for example, when Zellerbach appeared at a news conference to talk about metal thefts. The next week, prosecutors applied for nine more wiretaps on a day when Zellerbach's office posted a photo on Twitter of him meeting with a delegation of Chinese officials in his office conference room. In each case, reports by the federal court administrative office list Van Wagenen, not Zellerbach, as the person who approved the surveillance.

Case 3:15-cr-00099-DJH   Document 27-1   Filed 02/16/16   Page 11 of 247 PageID #: 112

DA Zellerbach speaks w/officials from the People's Procuratorate of Sichuan Province in China who visited Riverside. pic.twitter.com/yAnUKR85x8 (http://t.co/yAnUKR85x8)
— Riverside DA Office (@RivCoDA) February 27, 2014
(https://twitter.com/RivCoDA/status/439136956883017728)

Zellerbach declined to answer questions about his office's approval of wiretap applications. "I did nothing wrong other than have my office assist law enforcement in their effort to obtain a wiretap," he said Thursday.



It is impossible to know how often prosecutors in other jurisdictions improperly turned the job of approving wiretaps over to lower-level attorneys because those orders almost always remain secret. In submissions to the federal courts' administrative office, Los Angeles prosecutors reported that hundreds of wiretaps had been approved by the head of the office's drug crimes unit, not the district attorney. A spokesman said the information in those reports was incorrect.

Ramos, the president-elect of the National District Attorneys Association, said he planned to raise the issue with other top prosecutors at a meeting this week.

*Kelman also reports for The (Palm Springs, Calif.) Desert Sun. Contributing: Mark Hannan in McLean, Va.*

Read or Share this story: http://usat.ly/1O6Q0PR

San Bernardino County District Attorney Mike Ramos, pictured at a press conference, said he cautioned his counterparts in Riverside County about the need to personally approve wiretap requests. (Photo: James Quigg, AP)

**MORE STORIES**



Halloween scared up hotel biz in Oct. (/story/news/2015/11/20/hotel-occupancy-coachella-valley/76074128/) (/story/news/2015/11/20/hotel-occupancy-coachella-valley/76074128/)
Nov. 20, 2015, 8:02 a.m.



Blackhawks prep Thanksgiving lunch for first responders (/story/news/education/2015/11/20/blackhawks-prep-thanksgiving-lunch-first-responders/76077714/) (/story/news/education/2015/11/20/blackhawks-prep-thanksgiving-lunch-first-responders/76077714/)
Nov. 20, 2015, 7:38 a.m.



6 Reasons You May Be Forgetting Your Keys (/story/sponsor-story/desert-regional-medical-center/2015/11/15/desert-regional-forgetting-dementia/75817446/) (/story/sponsor-story/desert-regional-medical-center/2015/11/15/desert-regional-
Nov. 14, 2015, 9:31 p.m.

1  PAUL E. ZELLERBACH
   DISTRICT ATTORNEY
2  COUNTY OF RIVERSIDE
   Deena M. Bennett
3  Deputy District Attorney
   3960 Orange St.
4  Riverside, California 92501
   Telephone: (951) 955-5400
5  Fax: (951) 955-9673
6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                     IN AND FOR THE COUNTY OF RIVERSIDE

9  IN THE MATTER OF THE APPLICATION        )    **WIRETAP NO.  14-120**
   OF THE DISTRICT ATTORNEY OF THE         )
10 COUNTY OF RIVERSIDE FOR AN ORDER        )
   AUTHORIZING THE INTERCEPTION OF         )         **APPLICATION**
11 WIRE, PAGER AND ELECTRONIC              )
   COMMMUNICATIONS                         )
12 **Target Telephone #9,**  REDACTED       )
13 **Target Telephone #10, 502-492-1461**  )
   **Target Telephone #11, 951-570-0461**  )
14 **Target Telephone #12, 951-322-5805**  )
15 ─────────────────────────────────────────)

16      **APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**
17

18      I, Jeffery A. Van Wagenen Jr., Assistant District Attorney for the County of Riverside,

19 declare:

20      1.      Applicant is the District Attorney of the County of Riverside, Paul E. Zellerbach.

21 I am the Riverside County District Attorney's designee, as defined in California Penal Code

22 section 629.50(a).

23      2.      After reviewing the Affidavit In Support Of Application For An Order

24 Authorizing The Interception Of Wire And Electronic Communications of Riverside Police

25 Department, Detective Chris Carnahan, and relying thereon, I approve making this Application

26 and hereby apply to the Riverside County Superior Court for authorization to intercept wire,

27 pager and electronic communications to and from the communication devices (the "Target

28



EXHIBIT
3

                          1
              Application Wiretap #14-120

Device(s)") described below.  The Affidavit is attached hereto and incorporated herein by this reference.

3.     Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

4.     Detective Carnahan, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a).  He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.     Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Riverside Police Department Lt. Cook, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.     Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections 11351, 11352, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses.

1
2    There is probable cause to believe the **Target Subjects** possess information about the crimes
3    listed herein and will discuss these matters over the **Target Telephone**.
4        7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular
5    descriptions of the device(s) from which the communications are to be intercepted and their
6    locations:
7        A.      **Target Telephone #9:** [REDACTED] (TT #9) is an electronic cellular
8    telephone issued by Sprint Corporation. Subscriber information is unknown at this time. **TT #9**
9    is being utilized by [REDACTED]
10       B.      **Target Telephone #10: (502) 492-1461 (TT #10)** is an electronic cellular
11   telephone issued by AT&T.   There is no subscriber information due to the account being a
12   "prepaid customer". The user address is 17330 Preston Rd. Dallas, TX 75252. **TT #10** is being
13   utilized by an unidentified male known as **REY Last Name Unknown (LNU).**

14       C. **Target Telephone #11: (951) 570-0461 (TT# 11)** is an electronic cellular telephone
15   issued by Sprint Corporation with a subscriber name of Eudelia Gonzalez, with an address
16   1135 W. 7th St. Perris, CA 92570.  **TT #11** is being utilized by an unidentified male known as
17   **REY Last Name Unknown (LNU).**
18       D.      **Target Telephone #12: Target Telephone #12: (951) 322-5805 (TT#**
19   **12)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of
20   HITE3CH BOOST069, with an address PO Box 54988 Irvine, CA 92619. **TT #12** is being
21   utilized by an unidentified male known as **REY Last Name Unknown (LNU).**
22
23       8.      The actual interception and monitoring post will be in **Riverside County.**
24       9.      The communications to be intercepted are wire and electronic communications
25   between the Target Subjects and other known and unknown associates and/or co-conspirators
26   concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).
27
28

10.     I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

11.     Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to maintain this intercept be granted for **thirty (30) days** and request that the authority not be deemed to automatically terminate upon interception of the first communication of the type described above.

12.     I request that this Court order **Sprint Corporation,** Verizon Wireless, Virgin Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, **AT&T,** AT&T Wireless, AT&T California Products and Services, T-Mobile USA Inc., Cellco Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., Cingular Wireless, Nextel Communications, Metro PCS, Sprint Spectrum, L.P., Sprint PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any other affected telecommunications companies, subsidiaries, or entities (the "Telecommunications Companies") or electronic mail service providers (the "Email Service Providers") upon request of law enforcement, to provide the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference of the services being provided the Target Subjects.   The Telecommunications Companies or the Email Service Providers shall be compensated by the agency executing the court order for the reasonable costs of furnishing the facilities and technical assistance.

13.     I request this Court to order the Telecommunications Companies or the Email Service Providers not to disclose to the subscriber or any unauthorized person the fact that the court has authorized this wiretap.

14.     Applicant requests this Application, Review, Affidavit, Order and any/all incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the agency executing the Court Order or the District Attorney's Office and to be disclosed only upon a showing of good cause before a Judge of competent jurisdiction. (Penal Code Section 629.66)

15.     I am unaware of any previous relevant wiretaps other than those set forth in the Affidavit within the meaning of Penal Code Section 629.50(a)(6).

16.     Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED:    3·11·14

By: JEFFREY A. VAN WAGENEN JR.
ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For: PAUL E. ZELLERBACH
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

2

COUNTY OF RIVERSIDE

3

4

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ) | INTERCEPT ORDER |
| THE DISTRICT ATTORNEY OF THE COUNTY ) | |
| OF RIVERSIDE FOR AN ) | 14-120 |
| ORDER AUTHORIZING THE INTERCEPTION ) | |
| OF WIRE OR ELECTRONIC ) | REVIEW OF |
| COMMUNICATIONS, ) | CHIEF EXECUTIVE OFFICER |
| AN ORDER AUTHORIZING THE ) | DESIGNEE |
| INSTALLATION OF A PEN REGISTER TRAP ) | |
| AND TRACE DEVICE, AND ) | |
| AN ORDER AUTHORIZING THE OBTAINING OF ) | |
| GLOBAL POSITIONING SYSTEM (GPS) ) | |
| TRACKING AND/OR CELLULAR SITE DATA ) | |

11

**REVIEW OF THE CHIEF EXECUTIVE OFFICER DESIGNEE**

12

Assistant Chief Christopher Vicino of the Riverside Police Department, states:

13

     1.    The Chief Executive Officer for the Riverside Police Department is Sergio Diaz.

14

     2.    I am the Assistant Chief of Police in charge of the Riverside Police Department.

15

     3.    I am the Chief Executive Officer's designee for intercept orders, within the meaning

16

of California Penal Code section 629.70(a)(3).

17

     4.    Christopher Carnahan is a Detective with the Riverside Police Department and is

18

currently assigned to the Special Investigations Bureau – DEA TFG2.

19

     **5.**    I have reviewed the Affidavit of Christopher Carnahan, which sets forth the

20

circumstances in support of the application and which requests authority to install a pen register

21

trap and trace device, to obtain global positioning system (GPS) tracking and/or cellular site data

22

of and to intercept wire or electronic communications to and from **Target Telephone #9,** REDACTED

23

REDACTED **Target Telephone #10, 502-492-1461, Target Telephone #11, 951-570-0461, and Target**

24

**Telephone #12, 951-322-5805.**

25

26

27

28

I APPROVE THE APPLICATION.

Dated:      3-6-14

Riverside Police Department

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS | ) WIRETAP NO.: 14-120 ) AFFIDAVIT IN SUPPORT ) OF INTERCEPT ORDER ) ) ) ) |

| | | |
|---|---|---|
| REDACTED | Target Telephone #9 | ) |
| (502) 492-1461 | Target Telephone #10 | ) |
| (951) 570-0461 | Target Telephone #11 | ) |
| (951) 322-5805 | Target Telephone #12 | ) |

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC
CELLULAR TELEPHONE COMMUNICATIONS
AND
AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING
AND/OR CELLULAR SITE DATA
AND
AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE

I.
INTRODUCTION AND EXPERTISE

I, Christopher Carnahan, being duly sworn do hereby declare and state:

1.      Pursuant to Penal Code Section 629.50 (a), I am a Detective for the Riverside Police Department assigned to the Special Investigations Bureau, and I am currently assigned as a Task Force Officer (TFO) with the Riverside District Office of the Drug Enforcement Administration. I am the officer who is seeking authorization to intercept wire and electronic cellular telephone communications. I am an investigator, or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18 of the United States Code. I am empowered to conduct investigations of, and to make arrests for, the drug offenses enumerated in Title 18, United States Code, and Section 2516. Additionally, I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court ordered wiretaps. (Penal Code Section 629.50 et seq.)

2.      I have worked as a police officer with the City of Riverside Police Department for the past ten years. I have held the rank of detective and am currently assigned to the DEA Task Force. Prior to working for the Riverside Police Department, I worked for the Oceanside Police Department for approximately eight years. Prior to working for the Oceanside Police Department, I worked for the Los Angeles Police Department for approximately nine years. While employed by the Oceanside Police Department, I held the rank of Detective. I worked for a year as a gang detective and three years as a narcotic detective. The gang unit specializes in gathering intelligence information of gang-related crimes and investigating crimes involving gang members. While working as a narcotic detective, I was selected and assigned to the DEA MET Team. While assigned to the DEA MET Team, we targeted Los Angeles and Oceanside gang members who sold cocaine on North Coast Highway in the City of Oceanside. While employed by the Los Angeles Police Department, I worked approximately two and a half years with the South Bureau C.R.A.S.H. (Community Resources Against Street Hoodlums) Search Warrant Team. During my employment with Oceanside Police Department and the Los Angeles Police Department, I have participated in numerous narcotics investigations as well as physical and wire surveillance, executed search warrants, and arrested numerous drug traffickers. I have also spoken, on numerous occasions, to informants and suspects concerning the methods and practices of drug traffickers. I have received in excess of 360 hours of specialized training involving the use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, and conspiracy investigations regarding violations of California State narcotics laws. I currently investigate domestic and foreign large scale, multiple pound/kilo, poly-drug dealers, traffickers and organizations.   I have conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 843(b), 846, 952(a) and 963, and Title 18, United States Code, §§ 2, 1952, 1956 and 1957.

3.      Currently, I am assigned to the Drug Enforcement Administration- Task Force Group 2, which is a large scale narcotic investigation group. I am an investigative or law

1  enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is

2  empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18

3  U.S.C. § 2516.

4       4.      I am familiar with the facts and circumstances described herein. This Affidavit

5  is based upon the following: (1) personal knowledge I have derived from my participation in

6  this investigation; (2) conclusions I have reached based upon my training and experience; (3)

7  my conversations with other law enforcement investigators with whom I have discussed this

8  case; (4) and what I believe to be reliable information obtained from the following sources: oral

9  and written reports about this investigation and other investigations which I have received from

10 law enforcement officers; (5) law enforcement databases; (6) telephone records - toll records

11 and subscriber information; (7) public records; and (8) physical surveillances conducted by law

12 enforcement officers, which have been reported to me directly.

13      5.      Unless otherwise noted in this Affidavit, when I assert that a statement was

14 made, the information was provided to me by another law enforcement officer, or other source

15 of information with whom I have spoken or whose reports or statements I have reviewed.

16 Parenthetical explanations of coded or vague communications throughout this Affidavit are

17 based on my interpretation, derived from my training, experience and familiarity with this and

18 previous narcotics investigations.

19      6.      Based upon the information contained herein, I hereby make an application to

20 intercept the wire, pager, and electronic cellular telephone communications for **Target**

21 **Telephones #9, #10, #11, and #12** as described below:

22      A.      **Target Telephone #9:** <span>REDACTED</span> **(TT #9)** is an electronic cellular

23 telephone issued by Sprint Corporation. The subscriber information is still pending. **TT #9** is

24 being utilized by <span>REDACTED</span>

25      B.      **Target Telephone #10: (502) 492-1461 (TT #10)** is an electronic

26 cellular telephone issued by AT&T.  There is no subscriber information due to the account

27 being a "prepaid customer".  The user address is <span>REDACTED</span> Dallas, TX 75252.  The

28

Electronic Serial Number 355697052043860, the Mobile Station Identification Number 310410649733251. TT #11 is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

        C.     **Target Telephone #11: (951) 570-0461 (TT# 11)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of Eudelia Gonzalez, with an address [REDACTED] St. Perris, CA 92570. The **Electronic Serial Number 268435459707826755, the Mobile Station Identification Number 000002564064260. TT #12** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

        D.     **Target Telephone #12: (951) 322-5805 (TT# 12)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of HITE3CH BOOST069, with an address PO Box 54988 Irvine, CA 92619. The **Electronic Serial Number 268435462502699737, the Mobile Station Identification Number 000009122485578. TT #13** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

    7.    I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order. The listening post will be in the County of Riverside, California.

    8.    Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of possession for sale, transportation, and sale of a controlled substance in violation of sections 11351, 11352, 11378 and 11379 of the Health and Safety Code, with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
### (Penal Code sections 629.50(a) and 629.50(a) (2))

9.    Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #9:** REDACTED , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications and any background conversations while the telephone instrument is otherwise in use.

### B.
## PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA

10.    I also request the authorization for the installation of a pen register and trap and trace feature on **TT #9:** REDACTED , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.** I also request the authorization to obtain and receive cell site data and/or Global Positioning System (GPS) location information including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each target telephone and any and all cellular telephones called or being called by each target number without geographical limitations, related to **TT #9:** REDACTED , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.** The Target Telephone(s) is/are a mobile cellular

1  telephone(s), which makes surveillance difficult if not impossible because the location of the

2  person using the target telephone is often unknown.  However with the assistance of cell site

3  data and/or Global Positioning System (GPS) location information including, but not limited to,

4  cell site location (physical address) of call initiation, call termination, and call progress

5  locations (Automated Message Accounting Data) connected to the use of each target telephone

6  and any and all cellular telephones called or being called by each target number without

7  geographical limitations related to the target telephone(s), law enforcement officers would be

8  able to locate and conduct surveillance of the user of the target telephone(s).  Therefore, your

9  affiant requests an order to obtain and receive cell site data and/or Global Positioning System

10 (GPS) location information including, but not limited to, cell site location (physical address) of

11 call initiation, call termination, and call progress locations (Automated Message Accounting

12 Data) connected to the use of each target telephone and any and all cellular telephones called or

13 being called by each target number without geographical limitations related to the target

14 telephone.

15          a. Your affiant has learned through conversations with other law enforcement

16 officers and by personal knowledge that illegal narcotic traffickers have the potential to disable

17 the GPS function in their telephones if they are aware law enforcement can monitor their real

18 time movements.  Your affiant does not solely rely on GPS locations because your affiant

19 knows, often times GPS requests can fail or revert to cell towers with a 5000 meter locate.  I

20 also know there are many "dead spots" in Southern California as related to cellular service for

21 Verizon.  I have been told by Verizon employees if cellular telephones do not receive a signal, I

22 will receive a failed response when requesting GPS locations.

23          b. I also request that law enforcement officers be given the authorization to use

24 mobile electronic tracking devices to locate and identify. TT #9: **REDACTED** TT #10:

25 **(502) 492-1461, TT#11: (951) 570-0461, and TT#12: (951) 322-5805.** The Target

26 Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not

27 impossible because the location of the person using the target telephone is often unknown.

28 However with the assistance of mobile electronic tracking devices, law enforcement agents can

1  identify the location of a cellular telephone to a much finer detail than through cellular site data

2  alone.

### III.
### DURATION OF INTERCEPTION
(Penal Code section 629.50(a) (5))

5      11.      This Affidavit is in support of an Application to intercept wire and electronic

6  communications for **a period not to exceed thirty (30) days commencing on the day of the**

7  **initial intercept or ten (10) days after the issuance of the Order, whichever comes first,**

8  **pursuant to California Penal Code section 629.58.**  The goal of this investigation is to prove

9  the full scope, membership and methods of operation of the conspiracy.  I request that the Court

10  order that the interception not terminate when the communications described herein are first

11  intercepted, but may continue to the full extent of California Penal Code section 629.58 or until

12  the full scope of the enterprise is developed, including the identities of all participants, their

13  places and methods of operation and the various activities in which they are engaged in

14  furtherance of the enterprise, whichever comes first.  Based upon your affiant's training and

15  experience, narcotic traffickers extensively use their telephones to conduct their illegal

16  activities.  Therefore, your affiant believes that additional communications of the same type will

17  occur after the interception of the first communication to and from the target telephone(s).

### IV.
### TARGET TELEPHONE(S)
(Penal Code section 629.50(a)(4))

21      12.      The Target Telephones are described as follows:

22          1)      **Target Telephone #9:**  ███ REDACTED ███  (TT #9) is a Sprint wireless

23  telephone. **TT#10** is being utilized by ███████ REDACTED ███████.

24          2)      **Target Telephone #10: (502) 492-1461 (TT#10)** is an AT&T

25  telephone. **TT#11** is being utilized by **"REY"** (TS # 7).

26          3)      **Target Telephone #11: (951) 570-0461 (TT#11)** is a Sprint Wireless

27  telephone. **TT#12** is being utilized by **"REY"** (TS# 7).

28

1                 4)       **Target Telephone #12: (951) 322-5805 (TT#12) is** a Sprint Wireless

2 telephone. **TT#13 is being utilized by "REY" (TS# 7).**

3              A.           The term **"Target Telephone #9"**, **"Target Telephone #10"**,

4 **"Target Telephone #11", and "Target Telephone #12"** also refers to any changed telephone

5 number assigned to the same Electronic Serial Number (ESN) and/or International Mobile

6 Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number,

7 Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC),

8 ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target

9 telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same

10 telephone number(s) with the same subscriber information as the target telephone(s) or any

11 additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC

12 whether the changes occur simultaneously or consecutively, listed to the same subscriber and

13 wireless telephone account(s) as the target telephone(s)

14              B.          Based on my training and experience, persons often use fictitious

15 names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law

16 Enforcement.  This enables persons involved with criminal activity to operate with a level of

17 comfort knowing that their fictitious information will keep Law Enforcement from immediately

18 knowing their true identities.  This delay in identifying these suspects often allows them enough

19 time to either destroy or hide evidence of their crimes and also buys them time to flee the area

20 of the crime.

21

22                                      **V.**

                         **TARGET SUBJECTS**

23               (Penal Code section 629.50(a) (4))

24     13.     The known Target Subject(s) of this investigation are:

25

26                          *REDACTED*

27

28



REDACTED

g.  **(Target Subject 7)** is a Hispanic male identified only as **"REY"**, utilizing **TT#11 (502) 492-1461, and TT#12 (951) 570-0461,** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence.  There are no other known identifying characteristics about **REY Last Name Unknown (LNU)** and as a result a records check into the California Department of Motor Vehicles cannot be completed.

## VI.
### COURT'S JURISDICTION
#### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code section 629.52)

14.    *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...." Section 629.52 does not define the phrase "initially intercepted." However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...." In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey.  The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey.  The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held "for the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the taped telephone is located, but

also where the contents of the redirected communication are first to be heard." (*Ibid*, at page 136)  In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap was jurisdictionally defective because it was authorized by a judge outside the judicial district in which the defendants' telephones were located.  The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas.  The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We agree with the reasoning of the Second Circuit and now hold that the interception included both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders.  As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)  Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived and where the criminal conduct was being investigated, could issue a wiretap order for a cellular telephone which was thought to be used by the target subject regardless of where the cellular telephone or the listening post was located, even though the criminal conduct which being investigated was occurring in another district and the listening post was located in another district.  In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order to intercept cellular telephones which were assigned area codes located in another district, because the listening post was located in the same district as the judge who issued the order.

     15.    Based upon my training and experience, persons engaged in criminal conduct use cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining cellular phones as a means of preventing detection by law enforcement.  By using other persons' names and creating a fictitious prepaid account, a target subject acquires a

certain degree of anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those engaged in narcotics trafficking. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep law enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also provides them time to flee the area of the crime.

*REDACTED*

18. **Target Telephone #10: (502) 492-1461 (TT#10)** is an AT&T telephone. **TT#10** is subscribed to a prepaid customer located at *REDACTED* Dallas, TX 75252 and is being utilized by **"REY" (TS# 7).**

19. **Target Telephone #11: (951) 570-0461 (TT#11)** is a Sprint wireless telephone. **TT#12** is subscribed to *REDACTED* St Perris, CA 92570 and is being utilized by **"REY" (TS#7).**

20. **Target Telephone #12: (951) 322-5805** is a Sprint wireless telephone. **TT#12** is subscribed to HITE3CH BOOST069 located at PO Box 54988 Irvine, CA 92619 and is being utilized by **"REY" (TT# 7).**

21. Based on GPS pings of **TT #11** and **TT #12**, investigators have identified multiple residences within Riverside County associated to **REY** to include the subscriber address of **TT #12.**

22. Lastly, based on extensive toll analysis of all three target telephones utilized by **REY**, investigators determined that there are multiple connections to ongoing narcotics cases across the continental United States to include Missouri, Georgia, Texas and Kentucky. **REY**, operating in, around and/or through Riverside County which stretches from Orange County to the Colorado River and forms the state border with Arizona. Riverside County lies inland of Los Angeles County and is bordered by Orange County to the west, San Bernardino County to the north and San Diego County and Imperial County to the south. Major Highways that operate thru Riverside County include Interstates 10, 15, 215 and State Routes 60, 91 and 111. The above referenced highways will lead to the other, major counties of California previously mentioned as well as across state lines into Nevada.

23. The interception and listening post will be in **Riverside County**.

## VII.
### PRIOR APPLICATIONS
### (Penal Code section 629.50(a) (6))

24. On March 4, 2014, a review of the California Electronic Intercept Court Order System ("EICOS") and DEA/FBI electronic surveillance ("ELSUR") indices was conducted for **Target Telephone #10 (TT #10), Target Telephone #11 (TT# 11)** , and **Target Telephone # 12 (TT# 12).**



REDACTED

26. Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to

1   intercept wire, oral, or electronic communications involving any of the same persons, facilities,

2   or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

3

4

5

6

7                                          REDACTED

8

9

10

11

12

13

14

15

16

17

18                                         REDACTED

19

20

21

22

23

24

25

26                                         REDACTED

27

28

# VIII.
## OBJECTIVES OF THIS INVESTIGATION

27.     Your affiant believes interception of wire communications to and from **Target Telephones #9-12** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

      a.     The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

      b.     The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

      c.     The identity of the Target subject(s)' customers and the other unidentified conspirators;

      d.     The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

      e.     The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

      f.     The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

      g.     Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

# IX.
## STATEMENT OF PROBABLE CAUSE
### (Penal Code section 629.50(a)(4))

28.     The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

29.     Based upon the investigation in this case, set forth in detail below, I assert that:

a.      There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11351, 11352, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a))

b.      There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications. (Penal Code section 629.52(b).

30.     There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted. (Penal Code section 629.52(c))

31.     That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained below. (Penal Code section 629.52(d)).

32.     Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering,

will be obtained through the interception of wire communications over the **"Target Telephones"**.

33.     I make this Affidavit, in part, on personal knowledge derived from participation in this investigation and, in part, upon the information from the following sources:

a.     Oral and written reports about this and other investigations that I have received from the DEA and other law enforcement officers;

b.     Physical surveillance conducted by the West County Narcotic Task Force (WCNTF), Riverside Sheriff Department (RSD), and DEA RDO in this and other investigations, which has been reported to me either directly or indirectly;

c.     Pen register and trap and trace information, telephone tolls and other documentary evidence in this and other investigations and,

d.     Evidence gathered through other law enforcement investigations.

e.     Communications intercepted pursuant to court-authorized intercept orders.

f.     Evidence obtained through court-authorized intercept orders.

## A.
## IDENTIFICATION OF TARGET TELEPHONE #9



REDACTED



REDACTED

REDACTED

REDACTED

*REDACTED*

**B.**
**IDENTIFICATION OF TARGET TELEPHONE #10**

*REDACTED*

38.     The following intercepted communications made to or from **(502) 492-1461 (TT #10)** as intercepted over Riverside County Wire 14-79 are indicative of the types of narcotics activates associated with **REY** and indicate that **REY** is a narcotics broker for various distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to further his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **REY** and the target telephone which he utilizes.

a.          **On Monday, February 3, 2014,** at 4:24 p.m., "**REY**" utilizing **TT#10 (502) 492-1461** called *REDACTED* utilizing *REDACTED* *REDACTED* asked **REY** what was going on.  **REY** said the phone didn't have a good signal.

1    **REY** said he had to get a small phone, but was struggling with it. [REDACTED] said "okay". **REY**

2    asked if [REDACTED] friend could see them (**REY** and other unknown defendants). **REY** then

3    asked if [REDACTED] could meet with him. [REDACTED] asked where they would want to meet.

4    [REDACTED] said at the house. [REDACTED] also said his stuff (narcotics) had not arrived yet. **REY**

5    then asked [REDACTED] if his buddy had some (referring to narcotics). [REDACTED] said "yes" but it

6    was going to be a little more expensive. [REDACTED] further said that it would be $200 more, but

7    was the same quality as his ([REDACTED]). **REY** said it was alright and [REDACTED] asked **REY**

8    how many he wanted. **REY** said he wanted "three". [REDACTED] said he would call the guy and

9    would let **REY** know. **REY** also told [REDACTED] to call him on this one (phone TT# 11).

10   [REDACTED] said okay.

11              b.        **On Monday, February 3, 2014,** at 5:02 p.m., [REDACTED]

12   [REDACTED] utilizing Target Telephone # [REDACTED] called "**REY**" utilizing **TT #10 (502)**

13   **492-1461.** "**REY**" asked [REDACTED] what was going on. [REDACTED] said that the (narcotics) was

14   ready, but the other guy would be calling soon and let him know when he would be able to

15   bring the (narcotics) either today or tomorrow. **REY** said it would be better the next morning.

16   [REDACTED] said it would depend on when "they" (other dealer) could bring it. **REY** said it

17   "they" could do it within the next hour of so then it would be okay. [REDACTED] said he would let

18   **REY** know when "they" call him. **REY** then told [REDACTED] to let him know if possible an hour

19   before it would happen and he (**REY**) would make arrangements.

20                                  **C.**
21                   **IDENTIFICATION OF TARGET TELEPHONE #11**

22            39.      On January 14, 2014, the Honorable Judge Helios J. Hernandez of the Riverside

23   County Superior Court issued Riverside County Intercept Order 14-11, authorizing the

24   interception of the electronic cellular telephone communications to and from Target Telephone

25   [REDACTED] and used by [REDACTED]

26            40.      The following intercepted communications made to or from **(951) 570-0461 (TT**

27   **#11)** as intercepted over Riverside County Wire 14-11 are indicative of the types of narcotics

28   activates associated with **REY** and indicate that **REY** is a narcotics broker for various

1   distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to

2   further his narcotics related activities for the DTO. Based on my training an experience, the

3   following pertinent aspects of intercepted communications and parenthetical explanations of

4   language contained therein, are related to and indicative of the narcotics activities associated

5   with **REY** and the target telephone which he utilizes.

6          a.          **On Sunday, January 19, 2014,** at 1:37 p.m., ▮REDACTED▮

7   ▮REDACTED▮ utilizing Target Telephone # 4 ▮REDACTED▮ called "**REY**" utilizing

8   **TT#11 (951) 570-0461.** ▮REDACTED▮ asked for Rey. **REY** said hello. ▮REDACTED▮ and **REY**

9   greeted. ▮REDACTED▮ asked what the message was about. ▮REDACTED▮ said he was running out but he

10  was setting some away for him (**REY**). **REY** said everything was calm (possibly slow), so he

11  would have to see, but he (**REY**) did have enough to pay for one part (one unit of narcotics).

12  **REY** said he had been up and down, and had not been around. ▮REDACTED▮ said he only had six

13  left. ▮REDACTED▮ said they (narcotics) were flying out the door, at that price. **REY** said they

14  (**REY** and others) had gotten an offer for a "ventilator" (twenty), for super cheap, but said he

15  (**REY**) was not too interested. ▮REDACTED▮ asked for what type. **REY** said it was of the same

16  kind (▮REDACTED▮ had). ▮REDACTED▮ said he had already sold like six, to one guy. **REY** said he was

17  about to call him (▮REDACTED▮), but they (**REY** and others) had gotten a call from those guys

18  (third parties/with the "ventilator"), since they (**REY** and others) had worked with those other

19  guys (third party) before. **REY** said he had told them (third parties) they (**REY** and others)

20  were not working. **REY** said they (third parties) would be a good opportunity for ▮REDACTED▮,

21  since he was working. ▮REDACTED▮ said that was good, and cheap. **REY** said he told the guy

22  (third party) he (**REY**) really did not want to deal with those (possibly types of narcotics)

23  because they were too much trouble. ▮REDACTED▮ agreed it was too much at once, even though it

24  was a good deal. **REY** agreed it was always a better price when you got a lot at once.

25  ▮REDACTED▮ said the deal was not the same for them (▮REDACTED▮ and **REY**) who dealt with small

26  amounts. **REY** insisted it would be a good deal for ▮REDACTED▮. **REY** said VICTOR could get

27  them (possibly narcotics) for only three, when ▮REDACTED▮ was getting them for three-something.

28

1   **REY** said he would take one (possibly narcotics), for Wednesday or Thursday. ▮REDACTED▮ said

2   okay, he would pre-pay it. **REY** said okay.

3         b.       **On Sunday January 19, 2014,** ▮REDACTED▮

4   utilizing Target Telephone #4 ▮REDACTED▮ called "**REY**" utilizing TT#11 **(951) 570-0461.**

5   ▮REDACTED▮ identified himself as ▮REDACTED▮ and told **REY** that there was a guy who had it (possibly

6   narcotics) at that moment, but he (guy) was giving it (possibly narcotics) three points higher

7   (possibly higher price). **REY** said they (third party and others) had already seen somebody

8   yesterday. **REY** said he told them (third party and others) to better wait for the one that

9   belonged to ▮REDACTED▮ (possibly narcotics), adding that he (**REY**) would wait for it (possibly

10  ▮REDACTED▮ narcotics). ▮REDACTED▮ said okay. **REY** mentioned the guy (third party) wanted the

11  "same thing" and **REY** had the same thing that belonged to ▮REDACTED▮ so he gave it to them

12  (third party and others), but **REY** was left almost dry (possibly without narcotics). ▮REDACTED▮

13  said he would call **REY** back when he got... **REY** interrupted and asked ▮REDACTED▮ to call him

14  when ▮REDACTED▮ was ready with his stuff (possibly narcotics). ▮REDACTED▮ said all right.

15        c.       **On Thursday January 23, 2014,** ▮REDACTED▮

16  ▮REDACTED▮utilizing Target Telephone # 4 ▮REDACTED▮ called "**REY**" utilizing TT#11 **(951) 570-**

17  **0461.** ▮REDACTED▮ asked **REY** what he was doing. **REY** said nothing and asked who was calling.

18  ▮REDACTED▮ cursed and identified himself as "Pollo". **REY** said he was having a hard time

19  understanding ▮REDACTED▮. ▮REDACTED▮ said he (▮REDACTED▮) had a dude who had some there, because

20  his (▮REDACTED▮) have not arrived. ▮REDACTED▮ then said those (possibly narcotics) were cheaper

21  than the ones he (▮REDACTED▮) had told **REY** about. **REY** said it was not about being cheaper, he

22  (**REY**) was most interested in getting something that was good. ▮REDACTED▮ said these ones

23  (possibly narcotics) were also good. **REY** said he would need to talk to his buddy because the

24  other guys have not said anything because the lady had not arrived yet. **REY** said he was far

25  right now; he was about two hours away. ▮REDACTED▮ said to call him back and let him

26  (▮REDACTED▮) know how many he (**REY**) needed. **REY** asked if he should jot down this number

27  or should he keep the other one (phone number). ▮REDACTED▮ told **REY** to jot this one (phone

28  number) down since this one was the good one. **REY** asked if this was the one for business or

1  home (phone).  REDACTED  said this one was his business (phone).  **REY** said okay, he would jot

2  it down and would call  REDACTED  from another one.

### D.
### IDENTIFICATION OF TARGET TELEPHONE #12

REDACTED

42.     The following intercepted communications made to or from **(951) 322-5805 (TT**

**#12)** as intercepted over Riverside County Wire 14-11 are indicative of the types of narcotics

activates associated with **REY** and indicate that **REY** is a narcotics broker for various

distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to

further his narcotics related activities for the DTO. Based on my training an experience, the

following pertinent aspects of intercepted communications and parenthetical explanations of

language contained therein, are related to and indicative of the narcotics activities associated

with **REY** and the target telephone which he utilizes.

a.        **On Thursday January 16, 2014,**  REDACTED

REDACTED utilizing Target Telephone TT #4  REDACTED  received an incoming call from "**REY**"

utilizing **Target Telephone TT#12 (951) 322-5805,**  REDACTED  told REY  he called a dude

(possibly  REDACTED  and he ( REDACTED ) was going to check.  **REY** asked in how many days  REDACTED

would be ready.  REDACTED  said he ( REDACTED  did not know.  REDACTED  said they (third parties)

told him ( REDACTED  there was a problem before crossing (possibly border).  **REY** said okay.

**REY** asked if  REDACTED  had his (**REY**) other phone.  REDACTED  said yes and told **REY** he had

two (phone numbers for **REY**).  **REY** said for  REDACTED  to give him a call on the other one

(phone) because where he (**REY**) was going to be at, he (**REY**) was not going to get (any

reception).  **REY** said for  REDACTED  to try this one (phone number) first.  REDACTED  said he was

going to give the number to the guy (possibly  REDACTED  so they (**REY** and  REDACTED  could meet.

**REY** asked where he was going to see him (possibly  REDACTED ).  REDACTED  said close by to **REY's**

1  house by the Kikirikis (possibly chicken restaurant).  **REY** asked if the guy ( ▮REDACTED▮ was

2  around there. ▮REDACTED▮ said he ( ▮REDACTED▮ was not there but he told him ( ▮REDACTED▮ somewhat

3  where it was.  **REY** said for the guy to go there so they (**REY** and ▮REDACTED▮ would not be

4  struggling. ▮REDACTED▮ said he was going to call him right now and to meet around there.

5  ▮REDACTED▮ said right now he ( ▮REDACTED▮ was going to let him know if there was one (possibly

6  narcotics). **REY** told ▮REDACTED▮ to give him (**REY**) around 20, 30 minutes to get ready and have

7  the money on hand. ▮REDACTED▮ said he would give **REY** a call when everything was ready.

8  **REY** said okay.

9          b.      **On Thursday, January 30, 2014,** ▮REDACTED▮

10 ▮REDACTED▮ utilizing Target Telephone (TT#4) ▮REDACTED▮ called "**REY**" utilizing Target

11 Telephone **TT#12 (951)-322-5805.** ▮REDACTED▮ told REY, he called a dude ( ▮REDACTED▮ ) and

12 he ( ▮REDACTED▮ was going to check.  **REY** asked in how many days ▮REDACTED▮ would be ready.

13 ▮REDACTED▮ said he ( ▮REDACTED▮ ) did not know. ▮REDACTED▮ said they (third parties) told him

14 ▮REDACTED▮ ) there was a problem before crossing (possibly border).  **REY** said okay.  **REY** asked

15 if ▮REDACTED▮ had his (**REY**) other phone. ▮REDACTED▮ said yes, and told **REY** he had two (phone

16 numbers for **REY**).  **REY** said for ▮REDACTED▮ to give him a call on the other one (phone) because

17 where he (**REY**) was going to be at, he (**REY**) was not going to get (any reception).  **REY** said

18 for ▮REDACTED▮ to try this one (phone number) first. ▮REDACTED▮ said he was going to give the

19 number to the guy (possibly ▮REDACTED▮ ) so they (**REY** and ▮REDACTED▮ could meet. **REY** asked where

20 he was going to see him (possibly ▮REDACTED▮ ). ▮REDACTED▮ said close by to **REY's** house by the

21 Kikirikis (possibly chicken restaurant).  **REY** asked if the guy ( ▮REDACTED▮ was around there.

22 ▮REDACTED▮ said he ( ▮REDACTED▮ was not there but he told him ( ▮REDACTED▮ somewhat where it was.  **REY**

23 said for the guy to go there so they (**REY** and ▮REDACTED▮ would not be struggling. ▮REDACTED▮ said

24 he was going to call him right now and to meet around there. ▮REDACTED▮ said right now he

25 ( ▮REDACTED▮ was going to let him know if there was one (possibly narcotics).  **REY** told ▮REDACTED▮

26 to give him (**REY**) around 20, 30 minutes to get ready and have the money on hand. ▮REDACTED▮

27 said he would give **REY** a call when everything was ready.  **REY** said okay.

28

43.     The above listed calls and parenthetical explanations are based on my training, experience, and intelligence gained during this investigation and is related to narcotics distribution.

## XI.
## SIGNIFICANT EVENTS / SEIZURES

44.     The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations.  While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related.  Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

a.     On **12-12-13**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore.  California Highway Patrol K-9 unit alerted to the rear of the vehicle.  Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds).  Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

b.     On **01-02-14**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

c.     On **03-03-14**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona.  Vehicle was impounded for 30 days and driver released.  Investigators recovered approximately 9.8 pounds of methamphetamine from vehicle truck area.

## X.
## NECESSITY AND EXHAUSTION
### (Penal Code section 629.50(a) (4))

45.     Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather

evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous. Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

a.      The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.      The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.      The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.      The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.      The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.      The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

46.      The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

**INTERVIEWS**

47.      Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the

1   location of records and drugs and other pertinent information regarding the named crimes.

2   Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would

3   provide agents with a significant number of untruthful statements, diverting the investigation

4   with false leads or otherwise frustrating the investigation.  Additionally, any such interviews

5   would also have the effect of alerting the members of the conspiracy, thereby compromising the

6   investigation and resulting in the possible destruction or concealment of documents and other

7   evidence, and the possibility of harm to confidential sources whose identity may become known

8   or whose existence may otherwise be compromised.

9                          **CONFIDENTIAL INFORMANTS**

10          48.      It appears that this organization is a close-knit organization whose members

11   are either blood relatives, mutual friends and/or very familiar with one another.  Your affiant is

12   aware that it is a common concern of large-scale narcotic organizations that neither customers,

13   would-be thieves, nor the police learn the identity of all members of the organization, or the

14   locations where they store large amounts of narcotics or illicit proceeds.  Therefore, lower

15   echelon members shield those members higher up on the distribution chain from potential

16   customers, and multiple locations are used to store lesser amounts of narcotics, and/or its

17   proceeds, and additional locations are used to meet with customers.  This method of operation

18   allows suspects to minimize the risk of discovery and loss to the organization in the event the

19   customer is an informant.

20          49.      Since it appears that no single informant or informants are available or

21   expected to become available, your affiant is currently unable to determine the scope of this

22   criminal enterprise, the identity of other co-conspirators, the sources and location of the

23   narcotics, and their methods of operation.

24                        **UNDERCOVER OFFICERS / AGENTS**

25          50.      Because the seller of narcotics usually receives a fee for brokering the sale of

26   narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier.  If

27   the seller were to introduce the customer to the supplier and the customer were able to deal

28

directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

51.     Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation. Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants. Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know. Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

52.     As previously noted, it is a common practice for individuals involved in large scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions. If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant. Therefore, it is not reasonable to believe that the introduction of an undercover agent by an informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

## CONTROLLED PURCHASES

53.     Your affiant has considered the benefits and risks associated with a controlled purchase. It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

54.      If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement.   Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

55.      Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

56.      The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown.   However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s).   Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

57.      As described herein, physical surveillance has been used and will continue to be used during this investigation.

58.      Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a.         On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his

1  identification. The subject was unable to produce any identification, but verbally identified

2  himself as [REDACTED] with a date of birth of [REDACTED] and address of [REDACTED]

3  [REDACTED] where the CI had previously picked up Heroin with [REDACTED]. [REDACTED] also

4  provided a cellular phone number of [REDACTED] Deputy Wicker took

5  a picture of [REDACTED] with his consent, for identification, and subsequently released him. TFO

6  Layos conducted further investigation of [REDACTED] identity. Via Riverside

7  County Sheriff's Departments data base, revealed contacts for [REDACTED]

8  [REDACTED] with a date birth of [REDACTED] and address of [REDACTED] TFO

9  Layos also found DMV records Index number X8725114 for [REDACTED]

10  [REDACTED] with a date of [REDACTED] and address of [REDACTED] Wildomar. Based on the

11  above information, Investigators identified that the person Deputy Wicker stopped was in fact

12  [REDACTED].

13       b.     On **December 12, 2013** members of the DEA TFG-2 and Riverside

14  Sheriff's Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF),

15  conducted surveillance of [REDACTED] residence, located at [REDACTED] Wildomar.

16  During the surveillance, a black Jaguar with paper plates was observed leaving [REDACTED]

17  residence and ultimately stopped by CHP interdiction unit. During this operation, DEA TFG2

18  and SWCNTF seized approximately 5lbs of Methamphetamine, $8,553 in US Currency, and a

19  black 2010 Jaguar. The driver and sole occupant of the vehicle, [REDACTED]

20  [REDACTED] was arrested by CHP Officer Mendenhall for state felony violations of 11378 HS

21  and 11379 HS, CHP agency case # F-532-801-13. A secondary search of the vehicle revealed

22  additional 5 lbs of Heroin and 2 lbs of Methamphetamine, during asset forfeiture proceeding.

23       c.     On **February 27, 2014**, SWNCTF investigators conducted

24  surveillance in the city of Temecula, California to identify a male intercepted over Riverside

25  County Wire Intercept [REDACTED] Investigators identified [REDACTED] as the user of [REDACTED]

26  [REDACTED]

27       d.     On **March 3, 2014**, DEA and SWCNTF conducted surveillance on

28  [REDACTED] in the city of Riverside, California pursuant to intercepted

1  text message conversations as authorized by Riverside County Wire [REDACTED] which indicated that

2  [REDACTED] was to acquire narcotics. On the same date, investigators followed [REDACTED] to

3  Carson, California and back to Riverside County where an interdiction unit made contact and

4  investigators seized 9.8 pounds of methamphetamine.

5      e.      On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and

6  1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators

7  followed two Hispanic adult males to a home depot consistent with GPS pings on multiple

8  phones used by **REY**. One of the subjects was identified as [REDACTED] DOB:

9  [REDACTED]. Investigators are still working on determining if [REDACTED] is **REY** and the user of

10 TT #10-12. Note: [REDACTED] has been the subject of investigation on secondary DEA narcotics

11 investigations.

12     59.     Surveillance operations have been successful to the extent they have established

13 persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

14 scope of the investigation to additional locations and co-conspirators.  However, surveillance

15 operations cannot establish the purpose of any observed meetings, nor identify other

16 conspirators who do not make personal appearances.  Therefore, surveillance appears unlikely

17 to yield the sources of the supply of narcotics, fully identify each of the conspirators, their

18 places of operation and the manner in which their operation is conducted.

19     60.     Surveillance of the targets subjects and their associates will not enable the

20 government to achieve its objectives in this investigation.  To date, surveillance has failed to

21 allow law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the

22 co-conspirators.  While surveillance may show subjects of this investigation with packages

23 suspected to be drugs, it will not identify the contents of these packages or what is being said as

24 packages are exchanged.  Surveillance is an investigative technique that is used to confirm

25 meetings and other suspected activities between alleged participants, but often leaves the

26 investigators with insufficient evidence to prove the purpose of the meetings and activities.

27     61.     Your affiant knows from training and experience, and from speaking with other

28 experienced agents and officers, that physical surveillance of high-level members of narcotic

64.     Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s).   If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed.   The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities.   By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

65.     Based on the above-stated facts and on my training and experience, your affiant does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

## SEARCH WARRANTS

66.     On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

67.     On **2-25-14**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

68.     There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant.   Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation.   Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

69.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation.   However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation.   Although a seizure of an

1    intermediate quantity of narcotics and/or controlled substances might result, such action would

2    not likely lead to a successful conclusion of this investigation since the primary objective of this

3    investigation is to identify all members of this organization, all locations used to store narcotics

4    and/or controlled substances and/or illicit proceeds, and the organization's source of supply.

5    The execution of a search warrant would in all probability terminate the present investigation.

6    Experience has demonstrated that large-scale narcotic traffickers adapt their routines to

7    investigative procedures utilized by law enforcement.   This includes utilizing multiple locations

8    to store narcotics and/or controlled substances and money, and the use of other locations to

9    conduct business.   Execution of a search warrant at one or more locations would in all

10   probability terminate the present investigation and preclude identification of other associates,

11   additional locations, and the organization's sources of supply.

12       70.    Your affiant believes that the execution of search warrants at this stage of the

13   investigation would unlikely reveal the total scope of the illegal operation and produce evidence

14   which would identify the members of drug trafficking organization, the organizational structure,

15   the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled

16   substances, the sources of supply, and the customers or the money launderers.   Your affiant is

17   aware that higher-level members of narcotics organizations usually do not store narcotics and/or

18   controlled substances at their residences.   Although surveillance has identified residence(s),

19   your affiant does not know at this time whether or not the target subject(s) store narcotics

20   and/or controlled substances and proceeds from the sale thereof at his/their home(s).   Moreover,

21   assuming investigators do locate one or more "stash" locations, without intercepted wire

22   communications, the investigators will be unable to determine when a given location will

23   contain contraband.   Even if identifiable locations were searched and narcotics records were

24   seized, those records are often in code and rarely contain information beyond that necessary for

25   the maintenance of the particular location to which they relate.   Moreover, even if items such as

26   large amounts of currency, documents listing addresses and telephone numbers and other papers

27   are seized, they generally have far less probative value by themselves than when they are

28   introduced in conjunction with conversations between the conspirators, which give full meaning

1    to the documents and currency.  Additionally, if locations were targeted for the execution of

2    search warrants and the warrants were served, the members of the targeted organization would

3    likely be placed on notice regarding the existence of the investigation.  At this time, it would be

4    counterproductive to make the existence of the investigation public.  Rather, it would be more

5    productive to execute search warrants at the end of the investigation, once the goals of the

6    investigation are met.

7                    **PEN REGISTERS AND TELEPHONE TOLLS**

8           71.    The analysis of data derived from the use of a pen register and telephone tolls are

9    one of the techniques that have been utilized during this investigation.  It has been helpful in

10   determining patterns, if any, of telephone activity and confirming the volume of telephone calls

11   between telephones, suspects and locations already identified in this investigation through

12   surveillance, as well as new locations.  Your affiant has also learned that members of this

13   organization communicate primarily through the use of pagers and cellular telephones.

14   Although the review of those records reveal the names of subscribers to the number called,

15   your affiant knows from experience that drug traffickers often list their residential telephones,

16   cellular telephones, and pagers in the names of other persons in an attempt to avoid

17   identification from law enforcement personnel.  In addition, the information derived from the

18   pen register and telephone tolls are insufficient as a basis for successful prosecution, especially

19   in light of the familial structuring of this organization.  Specifically, the details of the

20   involvement of the participants, and the dates, times, and places that narcotics transactions are

21   to occur must be revealed before successful surveillance operations, prosecutions or both may

22   be initiated.

23          72.    Based on the above, your affiant believes that pen registers, toll analysis, and

24   subscriber information, without the aid of a wire intercept, will not help your affiant achieve the

25   objectives of the investigation.

26                  **CLOSED CIRCUIT TELEVISION MONITORING**

27          73. Exterior closed circuit monitoring shows that people who are entering or leaving the

28   location. It is your affiant's opinion that this type of monitoring does not gather evidence as to

1  conversations, agreements, and other arrangements necessary for this investigation.
2  Additionally, this type of monitoring will not provide identifying information on the individuals
3  entering and exiting the location, making it difficult if not impossible to determine the level of
4  involvement within the organization, if any.

5  ### TRASH SEARCHES OF TARGET LOCATIONS

6  74.    Your affiant believes that a trash search could be conducted at some of the
7  locations identified thus far as being associated with the targets subject(s), however, it would
8  risk the detection of law enforcement. Your affiant is aware that high-level narcotics traffickers
9  and their associates go to great lengths to destroy possible incriminating evidence and are
10  unlikely to use their residence trash containers to dispose of such information. Your affiant has
11  conferred with other experienced agents and officers who told me that narcotic traffickers will
12  often carry trash away from their residences and place it in commercial dumpsters to avoid
13  having it examined by law enforcement. Furthermore, investigators have considered conducting
14  trash searches of identified residences of known Targets of the investigation and believe that, in
15  considering each location, it would be difficult to conduct a trash search because the
16  neighborhoods are situated where trash cans are placed at the curb in front of the residence for
17  dumping or are located in a rural area where the search would draw suspicion on the law
18  enforcement officers. A trash search would surely draw the attention of neighbors, who would
19  possibly report this to police, and/or notify the target subject(s) or his/their associates. Such
20  discovery would likely alert target subjects and his/their associates to the existence of this
21  investigation and risk having it prematurely terminated before the government's objectives have
22  been achieved. It is difficult for law enforcement officers to justify their presence to any
23  neighbor, without identifying themselves and their purpose for conducting the trash search.
24  Even if trash searches were conducted and evidence of narcotics trafficking was obtained from
25  the trash at this location, the evidence would probably not establish (1) the roles of all
26  participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the
27  conspiracy.

28

75.     Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction.   Additionally, any time a trash search is conducted; it is possible that officers will be spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

76.     Based on my training and experience, there are great risks associated with conducting trash searches, usually for very minimal possible gain.  For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated.   This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc.  Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation.  Further, the risks of such action in this investigation far outweigh any potential rewards.

77.     In addition, I have found that not only are trash searches risky, they are also usually worthless.   I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information.  I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.  I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

78.     I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators.  For instance, a trash search might help identify the wrappings used to transport

narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

79.     At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation. If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

## FINANCIAL INVESTIGATION

80.     Even if investigators are able to locate accounts and financial records for the members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and often do not use traditional banking methods. I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns. I know that drug traffickers do not usually maintain records of their illicit earnings. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail.

## GRAND JURY

81.     The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings. It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors. In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity. In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the targets of this investigation.

82.     I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons:  (1) the Target Subject, and any other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.

## CONCLUSION

83.     Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

84.     Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

85.     For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

86.     Your affiant requests that the Court order that Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as

1  listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications

2  Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet

3  Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon

4  request of the law enforcement agency executing the intercept order:

5        a.    Authorize the installation and/or use of all facilities to enable the

6  interception and monitoring of all functions and capabilities of the Target Device(s), including

7  but not limited to, all wireless digital functions, wireless analog functions, direct connect/digital

8  dispatch/direct dispatch functions, automatic mode switching functions, and "short message

9  service." This includes interception of cellular communications occurring outside California

10  where the contents of the redirected communications are first heard or accessed in the Riverside

11  County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S.

12  1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997),

13  *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471

14  F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

15        b.    Authorize the installation and/or use of equipment known as pen registers

16  or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones

17  connected to the targeted numbers.

18        c.    Authorize the installation and/or use of equipment to trap and trace

19  Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to

20  and from the target telephone numbers.

21        d.    Authorize the installation and/or use of trap equipment to trace and

22  identify the telephone numbers of persons placing calls to the Target Telephone numbers to

23  include the activation of "caller ID" and any calling features such as "call forwarding" and

24  "speed dialing" currently assigned to the Target Telephone numbers.

25        e.    Your affiant requests the Court to order Verizon upon request of the

26  applicant, to provide the technical assistance necessary to accomplish this interception

27  unobtrusively and with a minimum of interference with the services said company provides the

28  people whose communications are to be intercepted, and to provide records identifying

1   subscribers and providing subscriber information on any and all telephone and pager numbers

2   identified through this intercept/pen register, and any changed numbers whether published or

3   not, including, but not limited to past telephone bills and records.

4        87.    Your affiant requests the Court order Verizon and any and all

5   telecommunications providers subject to regulation by the Federal Communications

6   Commission to provide telecommunications services within the United States of America, as

7   listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications

8   Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet

9   Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon

10  request of the law enforcement agency executing the intercept order, within 48 hours (including

11  after-business hours, weekends, and holidays), and without delay:

12        a.    Provide any and all information related to any telephone(s), pager(s), text

13  messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication

14  device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted

15  conversation, or otherwise identified in this investigation and the subscriber(s) of any such

16  communication devices(s).  Such information shall include, but not be limited to, all numbers

17  and accounts associated with the primary number/account, billing information (billed and

18  unbilled), activation date, credit information, co-signer information, contact address(es) and

19  telephone number(s), and all information identifying the communication device(s) such as

20  electronic serial number (ESN) international mobile subscriber identifier (IMSI), international

21  mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other

22  identifier.

23        b.    Provide Call Data Records (CDR) information, including any and all

24  historical data, originating and terminating call detail, extended dialed digit information, dialed

25  digit extraction, and/or post cut-through digits from any and all telephones called or being

26  called by each Target Telephone number, identified in an intercepted conversation, or otherwise

27  identified in the investigation.

28

1              c.      Provide any and all cell site data, pinging data, and/or GPS location

2 information, including, but not limited to, cell site location (physical address) of call initiation,

3 call termination, and call progress locations (Automated Message Accounting Data) connected

4 to the use of each Target Telephone, without geographical limitations, pursuant to Title 18 USC

5 section 2703(D).

6              d.      Provide any and all cell site data, including, but not limited to, cell site

7 location (physical address) of call initiation, call termination, and call progress locations

8 (Automated Message Accounting Data) connected to the use of any and all cellular telephones,

9 which called each Target Telephone, which was called by each Target Telephone, which was

10 identified in an intercepted conversation, or which was otherwise identified in the investigation,

11 without geographical limitations, pursuant to Title 18 USC section 2703(D).

12             e.      Provide access and the access codes to voice mail and voice mail

13 features.

14             f.      Provide all information related to pre-paid cellular telephones called or

15 being called by each Target Telephone number, identified in an intercepted conversation, or

16 otherwise identified in the investigation, including historical, past, present, current, and on-

17 going activity related to hours, minutes, and money left on the pre-paid telephone account.

18       88.      Your affiant requests the Court to order Verizon and any and all

19 telecommunications providers providing service to the Target Telephone(s) to continue to

20 provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid

21 balances.   Additionally, your affiant requests that if the Telecommunication Companies

22 continue to provide service to the Target Telephone(s) regardless of unpaid balances, the

23 Telecommunication Companies be ordered to not disclose to the Target Subject(s) the fact that

24 the service was continued in spite of unpaid balances.  In the event the Telecommunication

25 Companies continue to provide service to the Target Telephone(s) regardless of unpaid

26 balances, and the Target Subject(s) do not pay for the continued service, the

27 Telecommunication Companies shall be compensated by the agency executing the court order

28

1  for the cost of the service that was continued regardless of unpaid balances, pursuant to the

2  court's order.

3       89.     Your affiant requests the Court to order Verizon and any and all

4  telecommunications providers not to disclose to the subscriber or any unauthorized person the

5  fact that the order has authorized this wire interception, or of its existence.

6       90.     Your affiant requests the Court to authorize law enforcement officers use

7  mobile electronic tracking devices to locate and identify the target telephone(s).

8       91.     Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace

9  officers of the Drug Enforcement Administration and other assisting peace officers be ordered

10  to execute such intercept order.

11       92.     Your affiant requests that, prior to the sealing of this Application, its

12  affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its

13  affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

14       93.     Your affiant requests that, pursuant to Penal Code section 629.66, this

15  Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the

16  Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed

17  only upon a showing of good cause before a court of competent jurisdiction.

18       I declare under penalty of perjury that the foregoing is true and correct.  Executed at

19  Riverside, California.

20

21

22  Dated: March ___|| ___, 2014

23  Detective Christopher Carnahan
     Riverside Police Department

24

25  Sworn to and subscribed before me on March _____| | _____, 2014.

26

27  _____
     HONORABLE HELIOS J. HERNANDEZ

28       COUNTY OF RIVERSIDE

1   PAUL E. ZELLERBACH
2   DISTRICT ATTORNEY
    COUNTY OF RIVERSIDE
3   Deena M. Bennett
    Deputy District Attorney
4   3960 Orange St.
    Riverside, California 92501
5   Telephone: (951) 955-5400
    Fax: (951) 955-9673
6

7                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                        IN AND FOR THE COUNTY OF RIVERSIDE

9   IN THE MATTER OF THE APPLICATION          )    **WIRETAP NO. 14-183**
10  OF THE DISTRICT ATTORNEY OF THE           )
    COUNTY OF RIVERSIDE FOR AN ORDER          )
11  AUTHORIZING THE INTERCEPTION OF           )         **APPLICATION**
    WIRE, PAGER AND ELECTRONIC                )
12  COMMMUNICATIONS                           )
    **Target Telephone #13: 502-609-5937**    )
13  **Target Telephone #14: 702-885-7486**    )
    **Target Telephone #15:** REDACTED        )
14  **Target Telephone #16: 951-322-0063**    )
15  _____ )

16          **APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

17

18          I, Jeffery A. Van Wagenen Jr., Assistant District Attorney for the County of Riverside,

19  declare:

20          1.      Applicant is the District Attorney of the County of Riverside, Paul E. Zellerbach.

21  I am the Riverside County District Attorney's designee, as defined in California Penal Code

22  section 629.50(a).

23          2.      After reviewing the Affidavit In Support Of Application For An Order

24  Authorizing The Interception Of Wire And Electronic Communications of Riverside Drug

25  Enforcement Administration, Special Agent Emilio Baca, and relying thereon, I approve making

26  this Application and hereby apply to the Riverside County Superior Court for authorization to

27  intercept wire, pager and electronic communications to and from the communication devices

28

**EXHIBIT**
4

(the "Target Device(s)") described below.  The Affidavit is attached hereto and incorporated herein by this reference.

3.    Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

4.    Special Agent Baca, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a).  He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.    Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office, Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Special Agent in Charge Anthony D. Williams, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.    Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections 11351, 11352, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses.

1
2

There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone**.

3
4
5
6

7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:

7
8

A.      **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

9
10

B.      **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

11
12

C.      **Target Telephone #15 ▮▮REDACTED▮▮ (TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364.**

13
14
15

D.      **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU.**

16

8.      The actual interception and monitoring post will be in **Riverside County.**

17
18
19

9.      The communications to be intercepted are wire and electronic communications between the Target Subjects and other known and unknown associates and/or co-conspirators concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

20
21
22

10.     I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

23
24
25
26

11.     Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to maintain this intercept be granted for **thirty (30) days** and request that the authority not be

27
28

1   deemed to automatically terminate upon interception of the first communication of the type
2   described above.

3       12.     I request that this Court order **Sprint Corporation,** Verizon Wireless, Virgin
4   Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, **AT&T,**
5   AT&T Wireless, AT&T California Products and Services**, T-Mobile USA Inc.,** Cellco
6   Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., **Cingular**
7   **Wireless,** Nextel Communications, Metro PCS, Sprint Spectrum, L.P., Sprint PCS, Sprint-
8   Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-Mobile,
9   Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any other
10  affected telecommunications companies, subsidiaries, or entities (the "Telecommunications
11  Companies") or electronic mail service providers (the "Email Service Providers") upon request
12  of law enforcement, to provide the technical assistance necessary to accomplish the interception
13  unobtrusively and with a minimum of interference of the services being provided the Target
14  Subjects.   The Telecommunications Companies or the Email Service Providers shall be
15  compensated by the agency executing the court order for the reasonable costs of furnishing the
16  facilities and technical assistance.

17      13.     I request this Court to order the Telecommunications Companies or the Email
18  Service Providers not to disclose to the subscriber or any unauthorized person the fact that the
19  court has authorized this wiretap.

20      14.     Applicant requests this Application, Review, Affidavit, Order and any/all
21  incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the
22  agency executing the Court Order or the District Attorney's Office and to be disclosed only upon
23  a showing of good cause before a Judge of competent jurisdiction.  (Penal Code Section 629.66)

24      15.     I am unaware of any previous relevant wiretaps other than those set forth in the
25  Affidavit within the meaning of Penal Code Section 629.50(a)(6).

26

27

28

1

2      16.    Applicant designates any California Department of Justice certified person(s),

3   selected and supervised by the investigative or law enforcement officer/agency, to provide

4   linguistic interpretation for interception of wire, electronic digital pager and electronic cellular

5   telephone communications, pursuant to Penal Code Section 629.94.

6      I declare under penalty of perjury under the laws of the State of California that the

7   foregoing is true and correct, except as to those matters declared on information and belief,

8   which matters I believe to be true, and that this Application was executed in Riverside,

9   California.

10  DATED: _4.8.14_

11                                              By: JEFFREY A. VAN WAGENEN JR.
                                                ASSISTANT DISTRICT ATTORNEY
12                                              COUNTY OF RIVERSIDE

13                                              For: PAUL E. ZELLERBACH
                                                DISTRICT ATTORNEY
14                                              COUNTY OF RIVERSIDE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF RIVERSIDE**

| | |
|---|---|
| 3    IN THE MATTER OF THE APPLICATION | )   **WIRETAP NO.: 14-183** |
| 4    OF THE DISTRICT ATTORNEY OF THE | )   **AFFIDAVIT IN SUPPORT OF** |
|    COUNTY OF RIVERSIDE FOR AN ORDER | )   **INTERCEPT ORDER** |

3    IN THE MATTER OF THE APPLICATION            )    **WIRETAP NO.: 14-183**

4    OF THE DISTRICT ATTORNEY OF THE             )    **AFFIDAVIT IN SUPPORT OF**
     COUNTY OF RIVERSIDE FOR AN ORDER           )    **INTERCEPT ORDER**

5    AUTHORIZING THE INTERCEPTION OF             )
     WIRE ELECTRONIC CELLULAR                    )

6    TELEPHONE COMMUNICATIONS                     )
     **(502) 609-5937**     Target Telephone #13    )

7    **(702) 885-7486**     Target Telephone #14    )
     ~~REDACTED~~         Target Telephone #15    )

8    **(951) 322-0063**     Target Telephone #16    )

9    ----------------------------------------------------------

10

**AFFIDAVIT IN SUPPORT OF APPLICATION**
**FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC**

11

**CELLULAR TELEPHONE COMMUNICATIONS**
**AND**

12

**AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING**
**AND/OR CELLULAR SITE DATA**

13

**AND**
**AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE**

14

15

**I.**
**INTRODUCTION AND EXPERTISE**

16    I, Emilio J. Baca, being duly sworn do hereby declare and state:

17         1.     I am a Special Agent with the United States Drug Enforcement Administration

18    (DEA), and I am an investigative or law enforcement officer of the United States within the

19    meaning of Section 2510 (7) of Title 18 of the United States Code.

20         2.     I am empowered by law to conduct investigations and to make arrests for felony

21    offenses as enumerated in 18 U.S.C. 2516. I have been so employed since February 2010 and I am

22    currently assigned to the Riverside District Office Task Force Group 2. I primarily investigate

23    narcotic trafficking and distribution organizations operating in and around Riverside County in

24    California

25         3.     I have received approximately 19 weeks of training at the DEA Academy in

26    Quantico, Virginia and was trained in all aspects of conducting narcotics investigations as well as

27    the methods and techniques commonly used by major narcotics traffickers. I have attended special

28    training in wire and electronic interceptions, toll analysis, and the use of wire and electronic

interception equipment. I am certified by the California State Attorney General's Office in the practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

4.     During my employment with the DEA, I have participated in narcotics investigations through the surveillance, execution of search warrants, and arrests of drug traffickers. In addition, I have spoken to informants and suspects regarding the methods and means of drug traffickers. I have debriefed persons arrested for controlled substance trafficking and have debriefed informants on the methods for gathering controlled substance intelligence. I have spoken with experienced narcotics investigators concerning the methods and practices of narcotics traffickers. Through my training, experience and interaction with other Special Agents, Task Force Officers, and other narcotics investigators, I have become familiar with narcotic traffickers' methods of operation, including the distribution, transportation, collection of proceeds and methods of laundering used in an attempt to conceal the nature of narcotic related proceeds. Through these interactions I have become familiar with and developed an understanding for the manner in which controlled substances are imported, manufactured, distributed, and sold, to include the methods of avoiding detection and apprehension by law enforcement officers. I am familiar with the manner in which narcotics traffickers use wireless communication equipment such as cellular telephone technology, pagers, coded communications, false identities, and counter surveillance to determine the presence of law enforcement and other means to facilitate their illegal activities and avoid detection or mislead a narcotics investigation.

5.     I am familiar with the facts and circumstances described herein and make this affidavit based upon the following: (1) personal knowledge I have gained from my participation in this investigation; (2) conclusions I have reached based upon my training, experience, and conversations with other law enforcement investigators with whom I have discussed this case; (3) and what I believe to be reliable information obtained from the following sources: oral and written reports about this investigation, received from law enforcement officers; (4) law enforcement databases; (5) Pen register and trap and trace information as well as telephone records - toll records and subscriber information; (6) public records; and (7) physical surveillances conducted by DEA, West County Narcotics Task Force - Riverside County Sheriff's Department, and other law

enforcement officers, which have been reported to me directly.

6.    Unless otherwise noted in this Affidavit, when I assert that a statement was made, the information was provided to me by another law enforcement officer, or other source of information with whom I have spoken or whose reports or statements I have reviewed.    Parenthetical explanations of coded or vague communications throughout this Affidavit are based on my interpretation, derived from my training, experience and familiarity with this and previous narcotics investigations.

7.    Based upon the information contained herein, I hereby make an application to intercept the wire, pager, and electronic cellular telephone communications for **Target Telephones** as described below:

A.    **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

B.    **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

C.    **Target Telephone #15** ▮▮▮REDACTED▮▮▮ **(TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364.**

D.    **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU.**

8.    Probable cause exists to believe that **CHRIS LNU** (user of **TT #13** and **TT #14**), **UM8364** (user of **TT #15**) and **REY LNU** (user of **TT#16**) and other identified and unidentified co-conspirators, have committed, are committing, or are about to commit, the crimes as discussed below, and that their communications relate to those and other ongoing crimes.

9.    I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order.  The listening post will be in the County of Riverside, California.

10.    Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of  possession for sale, transportation, and sale of a controlled substance in violation of sections 11351, 11352, 11378 and 11379 of the Health and Safety Code,

with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code sections 629.50(a) and 629.50(a) (2))

11.     Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #13: 502-609-5937, TT #14: 702-885-7486, TT #15** REDACTED REDACTED **and TT #16: 951-322-0063** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications and any background conversations while the telephone instrument is otherwise in use.

### B.
### PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA
(18 .S.C. Sections 3121 through 3126)

12.     I also request the authorization for the installation of a pen register and trap and trace feature on **TT #13: 502-609-5937, TT #14: 702-885-7486, TT #15** REDACTED **and TT #16: 951-322-0063.** I also request the authorization to obtain and receive cell site data and/or Global

1

2          b. I also request that law enforcement officers be given the authorization to use

3     mobile electronic tracking devices to locate and identify **TT #13: 502-609-5937, TT #14: 702-885-**

4     **7486, TT #15** ▮▮▮REDACTED▮▮▮ **and TT #16: 951-322-0063.** The Target Telephone(s) is/are a mobile

5     cellular telephone(s), which makes surveillance difficult if not impossible because the location of

6     the person using the target telephone is often unknown.   However with the assistance of mobile

7     electronic tracking devices, law enforcement agents can identify the location of a cellular telephone

8     to a much finer detail than through cellular site data alone.

9
                                        **III.**
10                          **DURATION OF INTERCEPTION**
                            (Penal Code section 629.50(a) (5))
11
         13.    This Affidavit is in support of an Application to intercept wire and electronic
12
      communications for **a period not to exceed thirty (30) days commencing on the day of the initial**
13
      **intercept or ten (10) days after the issuance of the Order, whichever comes first, pursuant to**
14
      **California Penal Code section 629.58**.   The goal of this investigation is to prove the full scope,
15
      membership and methods of operation of the conspiracy.   I request that the Court order that the
16
      interception not terminate when the communications described herein are first intercepted, but may
17
      continue to the full extent of California Penal Code section 629.58 or until the full scope of the
18
      enterprise is developed, including the identities of all participants, their places and methods of
19
      operation and the various activities in which they are engaged in furtherance of the enterprise,
20
      whichever comes first.
21
         14.    Based upon your affiant's training and experience, narcotic traffickers extensively
22
      use their telephones to conduct their illegal activities.   Therefore, your affiant believes that
23
      additional communications of the same type will occur after the interception of the first
24
      communication to and from the target telephone(s).
25

26

27

28

## IV.
## TARGET TELEPHONE(S)
### (Penal Code section 629.50(a)(4))

15. The Target Telephones are described as follows:

a. **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU)**.

b. **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU)**.

c. **Target Telephone #15 ▮REDACTED▮ (TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364**.

d. **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU**.

1. The term **"Target Telephone #13-16"** also refers to any changed telephone number assigned to the same Electronic Serial Number (ESN) and/or International Mobile Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number, Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC), ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same telephone number(s) with the same subscriber information as the target telephone(s) or any additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC whether the changes occur simultaneously or consecutively, listed to the same subscriber and wireless telephone account(s) as the target telephone(s)

2. Based on my training and experience, persons often use fictitious names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law Enforcement. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep Law Enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also buys them time to flee the area of the crime.

# V.
## TARGET SUBJECTS
(Penal Code section 629.50(a) (4))

16.   The known Target Subject(s) of this investigation are:

*REDACTED*

*REDACTED*

REDACTED

g. **REY LNU (Last Name Unknown-Target Subject 7)** is a Hispanic male identified only as **"REY"** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. There are no other known identifying characteristics about **REY LNU** and as a result a records check into the California Department of Motor Vehicles cannot be completed. Investigators are working on the identification of **REY LNU** through various surveillances both physical and electronic.

h. **CHRIS LNU (Las Name Unknown – Target Subject 8)**  is a Hispanic male identified only as **CHRIS** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. Investigators believe CHRIS is a coordinator for the [REDACTED] and possible cell head with connections to Kentucky. Investigators are working to identify CHRIS LNU and are communicating with Kentucky DEA case agents.

i. **UM8364 (Target Subject 9)** is a Hispanic male identified only as **UM8364** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. In March of 2014, investigators intercepted **UM8364** as a narcotics source of supply that provided approximately 10 pounds of suspected heroin to [REDACTED]

j.

1

**VI.**
**COURT'S JURISDICTION**

2

**A.**

3

**WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE**
**COMMUNICATIONS INTERCEPT ORDER**

4

(Penal Code section 629.52)

5

17.     *California Penal Code* section 629.52, in part, states "The judge may enter an ex

6

parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone

7

communications initially intercepted within the territorial jurisdiction of the court in which the judge

8

is sitting...."  Section 629.52 does not define the phrase "initially intercepted."  However, federal

9

courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings,

10

stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral,

11

or electronic communications within the territorial jurisdiction of the court in which the judge is

12

sitting...."  In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847,

13

113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an

14

intercept order for the telephones of a cafe located in New Jersey.  The defendants contended that

15

the intercept order was improperly issued and argued that only a New Jersey magistrate could issue

16

an intercept order for a telephone located in New Jersey.  The court rejected the defendant's

17

contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held "for

18

the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the

19

tapped telephone is located, but also where the contents of the redirected communication are first to

20

be heard."  (*Ibid*, at page 136)  In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert.*

21

*denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap

22

was jurisdictionally defective because it was authorized by a judge outside the judicial district in

23

which the defendants' telephones were located.  The wiretap order was issued by a judge in the

24

Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were

25

located in Houston within the Southern District of Texas.  The court rejected the defendant's

26

contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We

27

agree with the reasoning of the Second Circuit and now hold that the interception included both the

28

location of a tapped telephone and the original listening post, and that judges in either jurisdiction

1    have authority under Title III to issue wiretap orders.   As the *Rodriguez* court noted, this

2    interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge

3    to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)

4    Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118

5    S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived

6    and where the criminal conduct was being investigated, could issue a wiretap order for a cellular

7    telephone which was thought to be used by the target subject regardless of where the cellular

8    telephone or the listening post was located, even though the criminal conduct which being

9    investigated was occurring in another district and the listening post was located in another district.

10   In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d

11   371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order

12   to intercept cellular telephones which were assigned area codes located in another district, because

13   the listening post was located in the same district as the judge who issued the order.

14       18.    Based upon my training and experience, persons engaged in criminal conduct use

15   cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining

16   cellular phones as a means of preventing detection by law enforcement.  By using other persons'

17   names and creating a fictitious prepaid account, a target subject acquires a certain degree of

18   anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those

19   engaged in narcotics trafficking.  This enables persons involved with criminal activity to operate

20   with a level of comfort knowing that their fictitious information will keep law enforcement from

21   immediately knowing their true identities.  This delay in identifying these suspects often allows

22   them enough time to either destroy or hide evidence of their crimes and also provides them time to

23   flee the area of the crime.

24       19.    **Target Telephone #13 and #14** used by **CHRIS LNU (TS #8)** are Cingular

25   Wireless telephones. Subscriber information pending. **TT #13 and #14** are being utilized by **CHRIS**

26   **LNU (TS #8)**.   Since March 2014, investigators began to monitor wire communications of REY

27   LNU (TS #7) as authorized by Riverside County Wire Intercept 14-120. During these intercepted

28   communications, investigators determined that **CHRIS LNU** was a principle member of the

1
2  [REDACTED] specifically a segment operated by REY LNU, and that CHRIS operates as a load

3  driver coordinator and possible cell head in the state of Kentucky. During this period of interception,

4  **CHRIS LNU** coordinated between REY LNU, cell head in the county of Riverside, and an

5  unidentified subject delivery proceeds from an unknown origin into Riverside County, specifically,

6  Perris, California.  Investigators have initiated contact with DEA Kentucky to determine if the user

7  of **TT #13**, identified as Chris LEONARD in Kentucky is in fact **TS #7**. Although **CHRIS LNU**

8  may operate a cell in Kentucky, the framework if his illegal narcotics activity originates in Riverside

9  County through REY LNU who operates as a source of supply. Additionally, proceeds acquired

   through sales of narcotics in Kentucky are eventually transported back into Riverside County.

10      20.    **Target Telephone #15** used by **UM8364 (TS #9)** is a T-Mobile telephone.

11  Subscriber information pending. **TT #15** is being utilized by **UM8364**. Since December of 2013,

12  investigators have been monitoring multiple phones utilized by [REDACTED] authorized

13  by several Riverside County Wire Intercepts. Currently, investigators are monitoring [REDACTED] as

14  authorized by Riverside County Wire [REDACTED]. In March of 2014, investigators

15  intercepted communications between [REDACTED] and **UM8364 (TS #9)** who was identified as a

16  narcotics source of supply for the [REDACTED] Based on these intercepted communications,

17  investigators initiated GPS pings of **TT #15** as authorized by Riverside County Search Warrant

18  03191403. Investigators identified a possible address for **TS #9** in the city of South Gate, California.

19  Although **TS #9** possibly resides in Los Angeles County, it should be noted that the narcotics **TS #9**

20  distributed were destined to [REDACTED] in Riverside County. Additionally, on March 20, 2014,

21  investigators identified a vehicle operated by a courier for **UM8364 (TS #9)** who met with

22  [REDACTED] off the 15 interstate and Bundy Canyon Road in Riverside County.

23      21.    **Target Telephone #16** used by **REY LNU (TS #7)** is a Sprint telephone. Subscriber

24  information pending. **TT #16** is being utilized by **REY LNU (TS #7).** Since March 2014,

25  investigators have been monitoring communications on multiple target telephones utilized by **TS #7**

26  as authorized by Riverside County Wire Intercept 14-120. **REY** has been identified as a cell head

27  for the [REDACTED] responsible for acquiring and distributing narcotics to various points in the

28  domestic US. **REY** resides at 1135 W. 7th Street, Perris, California and has multiple properties

within Riverside County. **REY** acquires narcotics from various sources, to include ████ ████ and subsequently distributes them from Riverside County.

    22. Lastly, the narcotics distributed and transported by **CHRIS LNU (TS #8)**, **UM8364 (TS #9)** and **REY LNU (TS #7)** and the DTO members they work for, to include ████ are distributed in, around and/or through Riverside County, in example **CHRIS LNU (TS #9)** has coordinated a proceeds courier into **Riverside County**. **UM8364 (TS #9)** provided narcotics to ████ and coordinated the delivery into Riverside County. Lastly, **REY LNU (TS #7)** resides in Riverside County and distributes therefrom.

    23. The interception and listening post will be in **Riverside County**.

## VII.
## PRIOR APPLICATIONS
### (Penal Code section 629.50(a) (6))

    24.    On April 1, 2014, your affiant requested checks of the California Department of Justice reference the Electronic Intercept Court Order System for **TT #13-16.**

    25.    On April 1, 2014, your affiant requested checks of the United States Department of Justice wiretap database to determine if any Federal applications had been made to initiate a Title III wiretap intercept of **TT #13-16.**

    26.  Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

████████████████████████████████████
████████████ REDACTED ████████████
████████████████████████████████████

*REDACTED*

*REDACTED*

f.    **Riverside County Wire Intercept Order 14-120:** On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court, State of California granted and issued Riverside County Intercept Order 14-120, which authorized the interception of the communication to and from **TT #9:** *REDACTED* , **TT #10: (502) 492-1461** , **TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.**

*REDACTED*

REDACTED

## VIII.
## OBJECTIVES OF THIS INVESTIGATION

27.     Your affiant believes interception of wire communications to and from **Target Telephone #13-16** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

a.     The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.     The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.     The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.     The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.     The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.     The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.     Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

## IX.
## STATEMENT OF PROBABLE CAUSE
### (Penal Code section 629.50(a)(4))

28.     The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

29.     Based upon the investigation in this case, set forth in detail below, I assert that:

a.     There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11351, 11352, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a))

b.     There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications.  (Penal Code section 629.52(b)

30.     There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted.  (Penal Code section 629.52(c))

31.     That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained below. (Penal Code section 629.52(d)).

32.     Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering, will be obtained

through the interception of wire communications over the **Target Telephones**.

33.    I make this Affidavit, in part, on personal knowledge derived from participation in this investigation and, in part, upon the information from the following sources:

a.    Oral and written reports about this and other investigations that I have received from the DEA and other law enforcement officers;

b.    Physical surveillance conducted by the West County Narcotic Task Force (WCNTF), Riverside Sheriff Department (RSD), and DEA RDO in this and other investigations, which has been reported to me either directly or indirectly;

c.    Pen register and trap and trace information, telephone tolls and other documentary evidence in this and other investigations and,

d.    Evidence gathered through other law enforcement investigations.

e.    Communications intercepted pursuant to court-authorized intercept orders.

f.    Evidence obtained through court-authorized intercept orders.

**A.**
**IDENTIFICATION OF TARGET TELEPHONE #13**

34.    On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court issued Riverside County Intercept Order 14-120, authorizing the interception of the electronic cellular telephone communications to and from TT #9: [REDACTED], TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.

35.    Based on intercepted communications between REY (TS #7) and **CHRIS (TS #8)**, investigators determined that **TS #8** was the user of **TT #13**.

36.    The following intercepted communications made to or from **502-609-5937 Target Telephone #13** as intercepted over Riverside County Wire 14-120 are indicative of the types of narcotics activities associated with **TT #13** and indicate that **CHRIS LNU (TS #8)** will use **TT #13** to facilitate his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of

language contained therein, are related to and indicative of the narcotics activities associated with **CHRIS (TS #9)** and the target telephone which he utilizes.

a.        On March 17, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity.    At approximately 10:53 a.m., during session number 582, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120). REY and **CHRIS** greeted.    **CHRIS** said he had been working.    REY asked if **CHRIS** went to Ripley (Possibly Kentucky).    **CHRIS** said yes, he won three and lost his fourth one (referring to rooster fights).    **CHRIS** told REY about the rooster fight he lost.    REY asked if **CHRIS** was fighting a Mexican one (possibly rooster).    **CHRIS** said yes.    **CHRIS** and REY talked about the blades and boots **CHRIS** used for the fights.    **CHRIS** said he used the ones (blades/knife) Richard sent him. REY asked where **CHRIS** was.    **CHRIS** said he was not around and would be back later tonight, then asked if he could call REY later tonight. REY said okay.    **CHRIS** said he did not have his bill (referring to U.S. Currency) with him.    REY asked if that meant that **CHRIS'** buddy (proceeds courier) was going to come (to REY's area-Perris, California) tomorrow.    **CHRIS** said yes, and reminded REY that he told **CHRIS** he (REY) needed him (courier) to be there this weekend. REY said yes, he wanted him there (REY's location) as soon as possible, they needed. REY interrupted himself and asked **CHRIS** to call him U/I (Voices overlapped).    **CHRIS** said he would call REY back tonight. REY said all right.

b.        On March 21, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity.    At approximately 10:49 a.m., during session number 970, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120).    **CHRIS** said everything was going good, there was no problem.    REY asked if **CHRIS** knew when he (REY) was going to see him (referring to proceeds courier).    **CHRIS** said probably the day they were planning on.    REY said okay.    REY asked **CHRIS** to just let him know if he (courier-UM0441) did leave.    **CHRIS** said that was no problem.    **CHRIS** told REY not to get riled up. REY

said they (REY and others) just wanted to know (Thought unfinished).  **CHRIS** said REY had already told him what day it (currency) needed to be there.  REY said that was good.

     c.        On March 22, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity.  At approximately 3:04 p.m., during session number 1085, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120).  **CHRIS** said he got an ass whooping at the rooster fights.  **CHRIS** and REY talked about losing at the rooster fights.  REY said they (REY and others) had not done well either.  REY asked what was going on.  **CHRIS** said he (**CHRIS**) talked to the guy (proceeds courier), and he (possibly UM0441) only had 600 dollars left to spend (referring to miles to cover).  REY said he was going to be earlier that he thought then.  REY said that was about six... REY said he would be there, and was only going about an hour away because he... (Thought left unfinished).  **CHRIS** said it was no problem.  REY said he would have somebody there though (to receive the courier).  **CHRIS** said alright.  REY said he would talk to **CHRIS** tomorrow.

     d.        The above listed calls and parenthetical explanations are based on my training, experience, and intelligence gained during this investigation and are related to narcotics distribution.

## B.
## IDENTIFICATION OF TARGET TELEPHONE #14

    37.    On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court issued Riverside County Intercept Order 14-120, authorizing the interception of the electronic cellular telephone communications to and from TT #9: ▓▓▓REDACTED▓▓▓, TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.

    38.    Based on intercepted communications between REY (TS #7) and **CHRIS (TS #8)**, investigators determined that **TS #8** was the user of **TT #14**.

    39.    The following intercepted communications made to or from **702-885-7486 Target**

1   **Telephone #14** as intercepted over Riverside County Wire 14-120 are indicative of the types of

2   narcotics activities associated with **TT #14** and indicate that **CHRIS LNU (TS #8)** will use **TT #14**

3   to facilitate his narcotics related activities for the DTO.  Based on my training an experience, the

4   following pertinent aspects of intercepted communications and parenthetical explanations of

5   language contained therein, are related to and indicative of the narcotics activities associated with

6   **CHRIS (TS #8)** and the target telephone which he utilizes.

7

8           a.         On March 22, 2014, **CHRIS LNU (TS #8)** was intercepted

9   communicating with **REY LNU (TS #7)** regarding a narcotics proceeds related activity.   At

10  approximately 3:04 p.m., during session number 1085, **CHRIS** received an incoming call on **TT**

11  **#13** from **REY** who was using 951-570-0461 (**TT #11**-Riverside County Wire 14-120).  **CHRIS**

12  asked what was **REY** needing.  **REY** asked how much did **CHRIS** have of their's (**REY**'s and

13  possible third party) then said (how much did he have) of his (**REY**'s).  **CHRIS** said he had the one

14  that he (third party-courier) had brought and whenever **REY** was ready, they (**CHRIS** and others)

15  could send whatever **REY** needed.  **CHRIS** said they could send 2, but since he (**REY**) had not been

16  ready to send it, he (**CHRIS**) had been using it, giving it to them, but there was no problem.  **REY**

17  said he did not need it all, but did want the 195 9referinf to narcotics proceeds).  **CHRIS** said okay,

18  and then asked if they could send it the beginning of next week.  **REY** said it would be best on the

19  weekend.  **CHRIS** said they (courier) had to go out there (unspecified location) to visit family, so it

20  would be perfect and cool.  **REY** asked if it was the same one (courier) that was coming.  **CHRIS**

21  said yes.  **REY** asked **CHRIS** to tell him (third party/possible driver) to go around where he had told

22  **CHRIS** and cut through another freeway and come down through New Mexico.  **CHRIS** said he

23  told him.  **REY** said a few guys had gone down there and everybody was getting stopped (referring

24  to Law Enforcement).  **REY** said it did not matter, but he had wanted to see him (courier) this

25  weekend so it could leave this Monday and that was what he needed the money.  **CHRIS** said they

26  (courier) could not leave until Monday.  **REY** said alright, and then they would wait until next

27  Monday.  **REY** said he would talk to his brother in law, because he (brother in law) wanted to send a

28  little bit (referring currency).  **CHRIS** said he had two (possible money) with that (unspecified).

1    REY said he (brother in law) would not want to send two, adding he (REY) needed the 195.  REY

2    then asked if **CHRIS** was going to send 20.  **CHRIS** said right.  REY said he did not want to send

3    that much; he needed around two, but would wait a little bit.  **CHRIS** said he would send REY 195,

4    adding that was close to two.  REY said that was fine.  REY said his 195 and (unintelligible) would

5    be perfect.  **CHRIS** said 195 and asked REY for a repeat.  REY said (195) and **CHRIS'** 20.  REY

6    said the 20 for the shipping.  **CHRIS** said okay.  REY said that way he (**CHRIS**) would get his and

7    REY would pay his.  **CHRIS** said he understood.  REY said he would be talking to him (brother in

8    law) this weekend and let **CHRIS** know.  **CHRIS** said okay.  REY asked if **CHRIS** had two for

9    him.  **CHRIS** said yes and if they (possibly brother in law) wanted to send Lasador (ph / Possible

10   Lazaro) it would be no problem.  REY said okay and told **CHRIS** that he had not talked to him

11   (brother in law) for a while, since they had gone over there.

12

13          b.        Based on my training, experience and knowledge about this ongoing

14   wiretap investigation, the calls made by/or to **CHRIS** collectively between **TT #13** and **TT #14**

15   indicate that he coordinated with a courier the transportation of proceeds into Riverside County.

16   Additionally, based on information obtained from multiple wiretaps on ▮REDACTED▮ and REY LNU,

17   investigators know that REY acquires multi-pound quantities of narcotics from various sources and

18   that he operates a cell in the state of Kentucky.

19

20                              **C.**
                  **IDENTIFICATION OF TARGET TELEPHONE #15**

21

22

23                          *REDACTED*

24

25

26          41.        Based on intercepted communications between **UM8364 (TS #9)** and ▮REDACTED▮

27   ▮REDACTED▮, investigators determined that **TS #9** was the user of **TT #15**.

28

42.     The following intercepted communications made to or from **REDACTED** **Target Telephone #15** as intercepted over Riverside County Wire **REDACTED** (to include Extension 1) are indicative of the types of narcotics activities associated with **TT #15** and indicate that **UM8364 (TS #9)** will use **TT #15** to facilitate his narcotics related activities for the DTO.  Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **UM8364 (TS #9)** and the target telephone which he utilizes.

REDACTED

REDACTED



*REDACTED*

*REDACTED*

**D.**
**IDENTIFICATION OF TARGET TELEPHONE #16**

*REDACTED*

REDACTED

44.   Based on intercepted communications between **REY (TS #7)** and REDACTED investigators determined that **TS #7** was the user of **TT #16**.

a.        On March 18, 2014, **REY (TS #7)** was intercepted communicating with REDACTED regarding a narcotics related activity.  At approximately 4:07 p.m., during session number 2673, REY placed an outgoing call on **TT #16** to REDACTED who was using REDACTED REDACTED.  **REY** said REDACTED got lost.  REDACTED said **REY** could not imagine what happened (referring to narcotics seizures) to him.  **REY** said he did not want to know. REDACTED said **REY** could imagine.  REDACTED said he was about to call **REY** the other day to find out if **REY** needed those (narcotics) because his buddy had some, but truth was that ugly things were happening there (REDACTED seizures).  **REY** said for REDACTED to take it easy.  REDACTED said for a while.  REDACTED said he could tell his buddy (about narcotics).  REDACTED said the "jalecillo" (narcotics type) **REY** took belonged to him (secondary source of narcotics).  REDACTED said he could ask him to take it (narcotics) to **REY**.  REDACTED told **REY** the price was two higher.  **REY** asked if he (buddy) did not have issues (referring to LEO contacts/investigation).  REDACTED said he did not have issues.  **REY** said he would let REDACTED know later.  REDACTED asked **REY** to call back so he (REDACTED) can call the buddy.

b.        On March 19, 2014, **REY (TS #7)** was intercepted communicating with REDACTED regarding a narcotics related activity.  At approximately 5:20 p.m., during session number 2763, REY placed an outgoing call on **TT #16** to REDACTED who was using REDACTED REDACTED.  REDACTED said the guy (narcotics supplier) that was supposed to call had not called yet.  **REY** said for REDACTED to call him.  REDACTED said he talked to his nephew and they might give him a few (narcotics units) so they (REDACTED and **REY**) would not struggle.  **REY** asked when.  REDACTED said he did not know but he (nephew) told him there might be some (narcotics) around and he would let him (REDACTED) have them (narcotics).  REDACTED said he would let **REY** know.  **REY** said he needed to find out about it because he had been dry for a few days and if not, then he would look elsewhere (secondary source) because he was in need of

something (narcotics). [REDACTED] said that was right, but he would have an answer for **REY** by tomorrow. **REY** asked if anything would get done with the guy (courier). [REDACTED] said he would call **REY** back if he called him.

        c.        On March 21, 2014, **REY (TS #7)** was intercepted communicating with [REDACTED] regarding a narcotics related activity. At approximately 9:04 a.m., during session number 2838, REY received an incoming text message on **TT #16** from [REDACTED] who was using [REDACTED]. The following is the direct text: "Hay un vato ke tiene por hay pero las da un poko mas caras wey es que todo aya Abajo subio wey" or "There is a guy (secondary source of narcotics) who has it somewhere around, but he gives it a little more expensive dude. The thing is that everything went up down there, dude.

# XI.
## SIGNIFICANT EVENTS / SEIZURES

45.     The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations. While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related. Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

        a.        On **12-12-13**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore. California Highway Patrol K-9 unit alerted to the rear of the vehicle. Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds). Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

        b.        On **01-02-14**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

c.      On **03-03-14**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona.  Vehicle was impounded for 30 days and driver released.   Investigators seized approximately 9.8 pounds of methamphetamine from vehicle truck area.

d.      On **03-14-2014**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle in Riverside County. Investigators seized approximately 10 pounds of methamphetamine from the vehicle.

## X.
## NECESSITY AND EXHAUSTION
### (Penal Code section 629.50(a) (4))

46.      Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous.  Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

a.      The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.      The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.      The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.      The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.      The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.      The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.     Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

47.     The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

## INTERVIEWS

48.     Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the location of records and drugs and other pertinent information regarding the named crimes.  Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would provide agents with a significant number of untruthful statements, diverting the investigation with false leads or otherwise frustrating the investigation.  Additionally, any such interviews would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to confidential sources whose identity may become known or whose existence may otherwise be compromised.

## CONFIDENTIAL INFORMANTS

49.     It appears that this organization is a close-knit organization whose members are either blood relatives, mutual friends and/or very familiar with one another.  Your affiant is aware that it is a common concern of large-scale narcotic organizations that neither customers, would-be thieves, nor the police learn the identity of all members of the organization, or the locations where they store large amounts of narcotics or illicit proceeds.  Therefore, lower echelon members shield those members higher up on the distribution chain from potential customers, and multiple locations are used to store lesser amounts of narcotics, and/or its proceeds, and additional locations are used to meet with customers.  This method of operation allows suspects to minimize the risk of discovery

and loss to the organization in the event the customer is an informant.

50.     Since it appears that no single informant or informants are available or expected to become available, your affiant is currently unable to determine the scope of this criminal enterprise, the identity of other co-conspirators, the sources and location of the narcotics, and their methods of operation. See Confidential Hobbs section.

## UNDERCOVER OFFICERS / AGENTS

51.     Because the seller of narcotics usually receives a fee for brokering the sale of narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier. If the seller were to introduce the customer to the supplier and the customer were able to deal directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

52.     Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation. Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants. Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know. Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

53.     As previously noted, it is a common practice for individuals involved in large scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions. If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant. Therefore, it is not reasonable to believe that the introduction of an undercover agent by an

informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

## CONTROLLED PURCHASES

54.     Your affiant has considered the benefits and risks associated with a controlled purchase. It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

55.     If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement. Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

56.     Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

57.     The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown. However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s). Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

58.     As described herein, physical surveillance has been used and will continue to be used during this investigation.

59.     Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a.      On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his identification. The subject was unable to produce any identification, but verbally identified himself as [REDACTED] with a date of birth of [REDACTED], and address of [REDACTED] where the CI had previously picked up Heroin with [REDACTED]. [REDACTED] also provided a cellular phone number of [REDACTED] [REDACTED]. Deputy Wicker took a picture of [REDACTED] with his consent, for identification, and subsequently released him. TFO Layos conducted further investigation of [REDACTED] identity. Via Riverside County Sheriff's Departments data base, revealed contacts for [REDACTED] with a date birth of [REDACTED] and address of [REDACTED] Wildomar. TFO Layos also found DMV records Index number X8725114 for [REDACTED] with a date of [REDACTED] and address of [REDACTED] [REDACTED], Wildomar. Based on the above information, Investigators identified that the person Deputy Wicker stopped was in fact [REDACTED]

b.      On **December 12, 2013** members of the DEA TFG-2 and Riverside Sheriff's Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF), conducted surveillance of [REDACTED] residence, located at [REDACTED] Wildomar. During the surveillance, a black Jaguar with paper plates was observed leaving [REDACTED] residence and ultimately stopped by CHP interdiction unit. During this operation, DEA TFG2 and SWCNTF seized approximately 5lbs of Methamphetamine, $8,553 in US Currency, and a black 2010 Jaguar. The driver and sole occupant of the vehicle, [REDACTED] was arrested by CHP Officer Mendenhall for state felony violations of 11378 HS and 11379 HS, CHP agency case # F-532-801-13. A secondary search of the vehicle revealed additional 5 lbs of Heroin and 2 lbs of Methamphetamine, during asset forfeiture proceeding.

c.     On **February 27, 2014**, SWNCTF investigators conducted surveillance in the city of Temecula, California to identify a male intercepted over Riverside County Wire [REDACTED] Investigators identified [REDACTED] as the user of [REDACTED]

d.     On **March 3, 2014**, DEA and SWCNTF conducted surveillance on [REDACTED] in the city of Riverside, California pursuant to intercepted text message conversations as authorized by Riverside County Wire 14-79 which indicated that **GUSMAN** was to acquire narcotics. On the same date, investigators followed [REDACTED] to Carson, California and back to Riverside County where an interdiction unit made contact and investigators seized 9.8 pounds of methamphetamine.

e.     On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and 1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators followed two Hispanic adult males to a home depot consistent with GPS pings on multiple phones used by **REY**. One of the subjects was identified as [REDACTED] DOB: [REDACTED]. Investigators are still working on determining if [REDACTED] is **REY** and the user of TT #10-12. Note: [REDACTED] has been the subject of investigation on secondary DEA narcotics investigations.

f.     On **March 19, 2014**, investigators conducted surveillance eon **UM8364** pursuant to GPS pings of TT #15. Investigators identified a possible residence for **UM8364** and an associated vehicle (silver Honda Civic bearing California plate 7ADV247). Additionally, on the same date, investigators located the user of **TT #15 (UM8364)** at a shopping plaza located off Atlantic and Clara. Surveillance units observed **UM8364** and an unidentified Hispanic male conduct counter techniques such as squaring the block and looking into parked vehicle to identify possible surveillance by law enforcement.

g.     On **March 20, 2014**, investigators conducted a brief surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to identify the vehicle operated by the narcotics courier working for **UM8364**. On the same date, investigators acquired the vehicle information.

60.     Surveillance operations have been successful to the extent they have established persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

scope of the investigation to additional locations and co-conspirators.   However, surveillance operations cannot establish the purpose of any observed meetings, nor identify other conspirators who do not make personal appearances.   Therefore, surveillance appears unlikely to yield the sources of the supply of narcotics, fully identify each of the conspirators, their places of operation and the manner in which their operation is conducted.

61.   Surveillance of the targets subjects and their associates will not enable the government to achieve its objectives in this investigation.   To date, surveillance has failed to allow law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the co-conspirators.   While surveillance may show subjects of this investigation with packages suspected to be drugs, it will not identify the contents of these packages or what is being said as packages are exchanged.   Surveillance is an investigative technique that is used to confirm meetings and other suspected activities between alleged participants, but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and activities.

62.   Your affiant knows from training and experience, and from speaking with other experienced agents and officers, that physical surveillance of high-level members of narcotic trafficking organizations is limited to placing individuals together without knowing the significance of their meeting or the role of each trafficker.   Furthermore, based on my training and experience, surveillance of major narcotics traffickers is often difficult without detection.   Physical surveillance is often limited to watching suspects from a distance, which as an investigative technique, can be problematic.   Your affiant believes that excess random surveillance of a location without knowledge when a narcotics transaction will be taking place, could expose the identity of the officers and thereby compromise the investigation.   Even if blanket, twenty-four hour surveillance were feasible, it would still be limited to providing information only on the movements and whereabouts of the Target Subject(s).   If the Target Subject(s) suspected he was being watched by law enforcement personnel, he could abandon his phone and move his activities to a different location, thus effectively ending the current on-going investigation until he was located again.   A wire intercept would greatly assist the agents because they could be deployed more effectively knowing about a future narcotics transaction.   This would allow surveillance to be set up on strategic locations,

1   thereby lessening the risk of compromising the investigation.

2       63.     Furthermore, your affiant knows from past investigations that narcotics traffickers

3   use various counter-surveillance driving techniques.   These techniques include frequent u-turns,

4   stopping in parking lots to observe traffic, waiting at traffic lights to allow traffic to pass, speed

5   variations, and taking circuitous routes through residential neighborhoods.  All of these methods are

6   used for the sole purpose of determining the presence of law enforcement personnel.  These methods

7   are frequently successful, as it is extremely difficult to follow suspects who employ these methods

8   without being detected.  Once detected, these suspects usually abandon their activities, which mean

9   they may shut down their cellular phones, pagers, and other phones, and flee the jurisdiction or area

10  only to resurface at another unknown location at a later date.

11      64.     When physical surveillance is combined with interception of wire communications,

12  the purpose of meetings can be revealed and may constitute admissible evidence if the meetings

13  relate to an intercepted conversation of criminal behavior.

14      65.     Your affiant believes that without the aid of wire intercepts, regular surveillance

15  will  compromise  the  investigation  because  prolonged,  regular  surveillance  increases  the

16  opportunities for detection by the Target Subject(s).  If surveillance were to be detected, I believe

17  the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations

18  would in their minds be confirmed.  The subjects would not only likely flee the area, they would

19  also engage in wholesale abandonment of their communication facilities.  By using the wiretap,

20  agents will be able to initiate selective surveillance when it appears that criminal activity is taking

21  place. This selectivity will reduce the chances of having surveillance compromised and will help

22  maintain the integrity of the investigation.

23      66.     Based on the above-stated facts and on my training and experience, your affiant

24  does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target

25  Telephone, will enable the government to achieve the objectives of this investigation.

26                      **SEARCH WARRANTS**

27      67.     On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target

28  telephone associated with this ongoing investigation, signed by Judge David Gunn.

68.     On **2-25-14**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

69.     On **02-27-214**, SA Baca acquired search warrant #02271412 for a target telephone utilized by members of the REDACTED

70.     On **03-11-214**, SA Baca acquired search warrant #03111409 for multiple target telephone utilized by members of the REDACTED

71.     On **03-19-2014**, SA Baca acquired search warrant #03191403 for multiple target telephone utilized by members of the REDACTED

72.     On **03-26- 2014**, Detective Carnahan wrote search warrant #03261411 for a target telephone associated with this ongoing investigation.

73.     There is always a danger associated with the service of search warrants.  That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant.  Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation.  Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

74.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation.  However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation.  Although a seizure of an intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply.  The execution of a search warrant would in all probability terminate the present investigation.  Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement.  This includes utilizing multiple locations to store narcotics and/or controlled

substances and money, and the use of other locations to conduct business.  Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

75.     Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers.  Your affiant is aware that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences.  Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s).  Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband.  Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate.  Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning to the documents and currency.  Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the existence of the investigation.  At this time, it would be counterproductive to make the existence of the investigation public.  Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

## PEN REGISTERS AND TELEPHONE TOLLS

76.     The analysis of data derived from the use of a pen register and telephone tolls are

one of the techniques that have been utilized during this investigation. It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations. Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones. Although the review of those records does reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel. In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial structuring of this organization. Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

77.     Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

## CLOSED CIRCUIT TELEVISION MONITORING

78.     Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to conversations, agreements, and other arrangements necessary for this investigation. Additionally, this type of monitoring will not provide identifying information on the individuals entering and exiting the location, making it difficult if not impossible to determine the level of involvement within the organization, if any. However, investigators have incorporated this type of monitoring for **REY LNU** in order to gather vehicle information entering and exiting the property/residence. This, in conjunction with wire information can lead to the identification of narcotics and/or proceeds load drivers working for **REY LNU**.

## TRASH SEARCHES OF TARGET LOCATIONS

79.     Your affiant believes that a trash search could be conducted at some of the locations

identified thus far as being associated with the targets subject(s), however, it would risk the detection of law enforcement.  Your affiant is aware that high-level narcotics traffickers and their associates go to great lengths to destroy possible incriminating evidence and are unlikely to use their residence trash containers to dispose of such information.  Your affiant has conferred with other experienced agents and officers who told me that narcotic traffickers will often carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. Furthermore, investigators have considered conducting trash searches of identified residences of known Targets of the investigation and believe that, in considering each location, it would be difficult to conduct a trash search because the neighborhoods are situated where trash cans are placed at the curb in front of the residence for dumping or are located in a rural area where the search would draw suspicion on the law enforcement officers.  A trash search would surely draw the attention of neighbors, who would possibly report this to police, and/or notify the target subject(s) or his/their associates.  Such discovery would likely alert target subjects and his/their associates to the existence of this investigation and risk having it prematurely terminated before the government's objectives have been achieved.  It is difficult for law enforcement officers to justify their presence to any neighbor, without identifying themselves and their purpose for conducting the trash search. Even if trash searches were conducted and evidence of narcotics trafficking was obtained from the trash at this location, the evidence would probably not establish (1) the roles of all participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the conspiracy.

80.     Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction.  Additionally, any time a trash search is conducted; it is possible that officers will be spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

81.     Based on my training and experience, there are great risks associated with conducting trash searches, usually for very minimal possible gain.  For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe

and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated.  This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc.  Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation.  Further, the risks of such action in this investigation far outweigh any potential rewards.

82.     In addition, I have found that not only are trash searches risky, they are also usually worthless.  I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information.  I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.  I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

83.     I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators.  For instance, a trash search might help identify the wrappings used to transport narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

84.     At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation.  If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

### FINANCIAL INVESTIGATION

85.     Even if investigators are able to locate accounts and financial records for the members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and

often do not use traditional banking methods. I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns. I know that drug traffickers do not usually maintain records of their illicit earnings. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail. It should be noted that investigator shave acquired some back account information over intercepted communications for **REY LNU**. Investigators have begun an inquiry into these accounts to determine the extent of monetary transactions, however, it should be noted that based on intercepted communications, your affiant is aware that **REY LNU** operates and transports proceeds in bulk cash.

### GRAND JURY

86.     The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings. It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors. In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity. In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the targets of this investigation.

87.     I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons: (1) the Target Subject, and any other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.
## CONCLUSION

88.     Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

89.     Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

90.     For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

91.     Your affiant requests that the Court order that Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order:

a.     Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), including but not limited to,

all wireless digital functions, wireless analog functions, direct connect/digital dispatch/direct dispatch functions, automatic mode switching functions, and "short message service." This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in the Riverside County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

       b.    Authorize the installation and/or use of equipment known as pen registers or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to the targeted numbers.

       c.    Authorize the installation and/or use of equipment to trap and trace Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to and from the target telephone numbers.

       d.    Authorize the installation and/or use of trap equipment to trace and identify the telephone numbers of persons placing calls to the Target Telephone numbers to include the activation of "caller ID" and any calling features such as "call forwarding" and "speed dialing" currently assigned to the Target Telephone numbers.

       e.    Your affiant requests the Court to order Sprint/Nextel and Verizon upon request of the applicant, to provide the technical assistance necessary to accomplish this interception unobtrusively and with a minimum of interference with the services said company provides the people whose communications are to be intercepted, and to provide records identifying subscribers and providing subscriber information on any and all telephone and pager numbers identified through this intercept/pen register, and any changed numbers whether published or not, including, but not limited to past telephone bills and records.

       92.    Your affiant requests the Court order Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to

provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order, within 48 hours (including after-business hours, weekends, and holidays), and without delay:

   a.   Provide any and all information related to any telephone(s), pager(s), text messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted conversation, or otherwise identified in this investigation and the subscriber(s) of any such communication devices(s). Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other identifier.

   b.   Provide Call Data Records (CDR) information, including any and all historical data, originating and terminating call detail, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation.

   c.   Provide any and all cell site data, pinging data, and/or GPS location information, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone, without geographical limitations, pursuant to Title 18 USC section 2703(D).

   d.   Provide any and all cell site data, including, but not limited to, cell site

location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of any and all cellular telephones, which called each Target Telephone, which was called by each Target Telephone, which was identified in an intercepted conversation, or which was otherwise identified in the investigation, without geographical limitations, pursuant to Title 18 USC section 2703(D).

        e.     Provide access and the access codes to voice mail and voice mail features.

        f.     Provide all information related to pre-paid cellular telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation, including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

      93.     Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers providing service to the Target Telephone(s) to continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances. Additionally, your affiant requests that if the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, the Telecommunication Companies be ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances.  In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the court order for the cost of the service that was continued regardless of unpaid balances, pursuant to the court's order.

      94.     Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers not to disclose to the subscriber or any unauthorized person the fact that the order has authorized this wire interception, or of its existence.

      95.     Your affiant requests the Court to authorize law enforcement officers use mobile electronic tracking devices to locate and identify the target telephone(s).

      96.     Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace

1  officers of the Drug Enforcement Administration and other assisting peace officers be ordered to
2  execute such intercept order.
3
4       97.      Your affiant requests that, prior to the sealing of this Application, its affidavit,
5  and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the
6  Court Order be kept in the custody of the Drug Enforcement Administration.
7       98.      Your affiant requests that, pursuant to Penal Code section 629.66, this
8  Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug
9  Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a
10 showing of good cause before a court of competent jurisdiction.
11      I declare under penalty of perjury that the foregoing is true and correct.   Executed at
12 Riverside, California.
13
14 Dated: April __7__, 2014
15                                              _____
16                                              Special Agent Emilio J. Baca
                                                Drug Enforcement Administration
17
18 Sworn to and subscribed before me on April _____, 2014.
19
20
21
22                                              _____
                                                HONORABLE HELIOS J. HERNANDEZ
23                                              COUNTY OF RIVERSIDE
                                                STATE OF  CALIFORNIA
24
25
26
27
28

Affidavit – Wiretap Order No. 14-183
Page 44

1
PAUL E. ZELLERBACH
DISTRICT ATTORNEY
2
COUNTY OF RIVERSIDE
Deena M. Bennett
3
Deputy District Attorney
4
3960 Orange St.
Riverside, California 92501
5
Telephone: (951) 955-5400
Fax: (951) 955-9673
6

7                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                         IN AND FOR THE COUNTY OF RIVERSIDE

9   IN THE MATTER OF THE APPLICATION       )   **WIRETAP NO.  14-558**
    OF THE DISTRICT ATTORNEY OF THE        )
10  COUNTY OF RIVERSIDE FOR AN ORDER       )
    AUTHORIZING THE INTERCEPTION OF        )   **APPLICATION**
11  WIRE, PAGER AND ELECTRONIC             )
    COMMMUNICATIONS                        )
12  **Target Telephone #31:** REDACTED     )
13  **Target Telephone #32: 909-994-2290** )
    **Target Telephone #33:**              )
14  **Target Telephone #34:** REDACTED     )
    **Target Telephone #35:**              )
15

16       **APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

17       I, CREG G. DATIG, Assistant District Attorney for the County of Riverside, declare:

18       1.    Applicant is the District Attorney of the County of Riverside, Paul E. Zellerbach.

19  I am the Riverside County District Attorney's designee, as defined in California Penal Code

20  section 629.50(a).

21       2.    After reviewing the Affidavit In Support Of Application For An Order

22  Authorizing The Interception Of Wire And Electronic Communications of Riverside Drug

23  Enforcement Administration, Special Agent Emilio Baca, and relying thereon, I approve making

24  this Application and hereby apply to the Riverside County Superior Court for authorization to

25  intercept wire, pager and electronic communications to and from the communication devices

26  (the "Target Device(s)") described below.  The Affidavit is attached hereto and incorporated

27  herein by this reference.

28

1

EXHIBIT
5

3.   Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

4.   Special Agent Baca, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a). He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.   Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Special Agent in Charge Anthony D. Williams, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.   Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections 11351, 11352, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses. There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone**.

7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:



REDACTED

b.      **Target Telephone #32: (909) 994-2290 (TT #32)** is a SPRINT cellular phone being utilized by **Raymundo CARILLO (TS #7)** and subscribed to Perris QVIS at PO Box 54988, Perris, California.

REDACTED

8.      The actual interception and monitoring post will be in **Riverside County**.

9.      The communications to be intercepted are wire and electronic communications between the Target Subjects and other known and unknown associates and/or co-conspirators concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

10.      I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

11.      Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to

1    maintain this intercept be granted for **thirty (30) days** and request that the authority not be

2    deemed to automatically terminate upon interception of the first communication of the type

3    described above.

4         12.    I request that this Court order **Sprint Corporation, Verizon Wireless**, Virgin

5    Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, AT&T,

6    AT&T Wireless, AT&T California Products and Services, T-Mobile USA Inc., Cellco

7    Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., Cingular

8    Wireless, Nextel Communications, **Metro PCS**, Cricket Wireless, Sprint Spectrum, L.P., Sprint

9    PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-

10   Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any

11   other affected telecommunications companies, subsidiaries, or entities (the

12   "Telecommunications Companies") or electronic mail service providers (the "Email Service

13   Providers") upon request of law enforcement, to provide the technical assistance necessary to

14   accomplish the interception unobtrusively and with a minimum of interference of the services

15   being provided the Target Subjects.  The Telecommunications Companies or the Email Service

16   Providers shall be compensated by the agency executing the court order for the reasonable costs

17   of furnishing the facilities and technical assistance.

18        13.    I request this Court to order the Telecommunications Companies or the Email

19   Service Providers not to disclose to the subscriber or any unauthorized person the fact that the

20   court has authorized this wiretap.

21        14.    Applicant requests this Application, Review, Affidavit, Order and any/all

22   incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the

23   agency executing the Court Order or the District Attorney's Office and to be disclosed only upon

24   a showing of good cause before a Judge of competent jurisdiction.  (Penal Code Section 629.66)

25        15.    I am unaware of any previous relevant wiretaps other than those set forth in the

26   Affidavit within the meaning of Penal Code Section 629.50(a)(6).

27

28

16.   Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED: _10/22/14_

By: CREG G. DATIG
ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For:  PAUL E. ZELLERBACH
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

1   PAUL E. ZELLERBACH
    DISTRICT ATTORNEY
2   COUNTY OF RIVERSIDE
    Deena M. Bennett
3   Deputy District Attorney
    3960 Orange St.
4   Riverside, California 92501
    Telephone: (951) 955-5400
5   Fax: (951) 955-9673
6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
                  IN AND FOR THE COUNTY OF RIVERSIDE
8

9   IN THE MATTER OF THE APPLICATION        )   WIRETAP NO.: 14-558
    OF THE DISTRICT ATTORNEY OF THE         )   AFFIDAVIT IN SUPPORT OF
10  COUNTY OF RIVERSIDE FOR AN ORDER        )   INTERCEPT ORDER
    AUTHORIZING THE INTERCEPTION OF         )
11  WIRE ELECTRONIC CELLULAR               )
    TELEPHONE COMMUNICATIONS                )
12  [REDACTED]          Target Telephone #31 )
    (909) 994-2290      Target Telephone #32 )
13                      Target Telephone #33 )
    [REDACTED]          Target Telephone #34 )
14                      Target Telephone #35 )

15

16              AFFIDAVIT IN SUPPORT OF APPLICATION
           FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC
17                 CELLULAR TELEPHONE COMMUNICATIONS
                                  AND
18  AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING
                      AND/OR CELLULAR SITE DATA
19                                AND
           AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE
20

21                                 I.
                    INTRODUCTION AND EXPERTISE
22
           I, Emilio J. Baca, being duly sworn do hereby declare and state:
23
           1.      I am a Special Agent with the United States Drug Enforcement Administration
24
    (DEA), and I am an investigative or law enforcement officer of the United States within the
25
    meaning of Section 2510 (7) of Title 18 of the United States Code.
26
           2.      I am empowered by law to conduct investigations and to make arrests for felony
27
    offenses as enumerated in 18 U.S.C. 2516. I have been so employed since February 2010 and I am
28
    currently assigned to the Riverside District Office Task Force Group 2. I primarily investigate

1  narcotic trafficking and distribution organizations operating in and around Riverside County in
2  California

3      3.      I have received approximately 19 weeks of training at the DEA Academy in
4  Quantico, Virginia and was trained in all aspects of conducting narcotics investigations as well as
5  the methods and techniques commonly used by major narcotics traffickers. I have attended special
6  training in wire and electronic interceptions, toll analysis, and the use of wire and electronic
7  interception equipment. I am certified by the California State Attorney General's Office in the
8  practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

9      4.      During my employment with the DEA, I have participated in narcotics investigations
10 through the surveillance, execution of search warrants, and arrests of drug traffickers.  In addition, I
11 have spoken to informants and suspects regarding the methods and means of drug traffickers. I have
12 debriefed persons arrested for controlled substance trafficking and have debriefed informants on the
13 methods for gathering controlled substance intelligence.  I have spoken with experienced narcotics
14 investigators concerning the methods and practices of narcotics traffickers.  Through my training,
15 experience and interaction with other Special Agents, Task Force Officers, and other narcotics
16 investigators, I have become familiar with narcotic traffickers' methods of operation, including the
17 distribution, transportation, collection of proceeds and methods of laundering used in an attempt to
18 conceal the nature of narcotic related proceeds.  Through these interactions I have become familiar
19 with and developed an understanding for the manner in which controlled substances are imported,
20 manufactured, distributed, and sold, to include the methods of avoiding detection and apprehension
21 by law enforcement officers.  I am familiar with the manner in which narcotics traffickers use
22 wireless communication equipment such as cellular telephone technology, pagers, coded
23 communications, false identities, and counter surveillance to determine the presence of law
24 enforcement and other means to facilitate their illegal activities and avoid detection or mislead a
25 narcotics investigation.

26     5.      I am familiar with the facts and circumstances described herein and make this
27 affidavit based upon the following: (1) personal knowledge I have gained from my participation in
28 this investigation; (2) conclusions I have reached based upon my training, experience, and
   conversations with other law enforcement investigators with whom I have discussed this case; (3)

and what I believe to be reliable information obtained from the following sources: oral and written reports about this investigation, received from law enforcement officers; (4) law enforcement databases; (5) Pen register and trap and trace information as well as telephone records - toll records and subscriber information; (6) public records; and (7) physical surveillances conducted by DEA, West County Narcotics Task Force - Riverside County Sheriff's Department, and other law enforcement officers, which have been reported to me directly.

6.      Unless otherwise noted in this Affidavit, when I assert that a statement was made, the information was provided to me by another law enforcement officer, or other source of information with whom I have spoken or whose reports or statements I have reviewed.   Parenthetical explanations of coded or vague communications throughout this Affidavit are based on my interpretation, derived from my training, experience and familiarity with this and previous narcotics investigations.

7.      Based upon the information contained herein, I hereby make an application to intercept the wire, pager, and electronic cellular telephone communications for **Target Telephones** as described below:

*REDACTED*

b.      **Target Telephone #32: (909) 994-2290 (TT #32)** is a SPRINT cellular phone being utilized by **Raymundo CARILLO (TS #7)** and subscribed to Perris QVIS at PO Box 54988, Perris, California.

*REDACTED*

REDACTED

8.    Probable cause exists to believe that [REDACTED] **CARILLO** (**TS #7 user of TT #32**), [REDACTED] [REDACTED] and other identified and unidentified co-conspirators, have committed, are committing, or are about to commit, the crimes as discussed below, and that their communications relate to those and other ongoing crimes.

9.    I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order.  The listening post will be in the County of Riverside, California.

10.    Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of  possession for sale, transportation, and sale of a controlled substance in violation of sections 11351, 11352, 11378 and 11379 of the Health and Safety Code, with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code sections 629.50(a) and 629.50(a) (2))

11.    Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #31:** [REDACTED] **TT #32: 909-994-2290, TT #33:** [REDACTED] [REDACTED] **TT #34:** [REDACTED] and **TT #35:** [REDACTED] between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all

communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications and any background conversations while the telephone instrument is otherwise in use.

## B.
## PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA
(18 .S.C. Sections 3121 through 3126)

12.    I also request the authorization for the installation of a pen register and trap and trace feature on TT #31: [REDACTED] TT #32: 909-994-2290, TT #33: [REDACTED] TT #34: [REDACTED] [REDACTED] and TT #35: [REDACTED] I also request the authorization to obtain and receive cell site data and/or Global Positioning System (GPS) location information including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each target telephone and any and all cellular telephones called or being called by each target number without geographical limitations, related to TT #31: [REDACTED] TT #32: 909-994-2290, TT #33 [REDACTED], TT #34: [REDACTED] [REDACTED] and TT #35: [REDACTED] The Target Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the target telephone is often unknown.  However with the assistance of cell site data and/or Global Positioning System (GPS) location information including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each target telephone and any and all cellular telephones called or being called by each target number without geographical limitations related to the target telephone(s), law enforcement officers would be able to locate and conduct surveillance of the user of the target telephone(s).  Therefore, your affiant requests an order to obtain and receive cell site data and/or Global Positioning System (GPS) location information including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each target telephone and any and all cellular telephones called or being called by each target number without

1   geographical limitations related to the target telephone.

2           a. Your affiant has learned through conversations with other law enforcement

3   officers and by personal knowledge that illegal narcotic traffickers have the potential to disable the

4   GPS function in their telephones if they are aware law enforcement can monitor their real time

5   movements.  Your affiant does not solely rely on GPS locations because your affiant knows, often

6   times GPS requests can fail or revert to cell towers with a 5000 meter locate.  I also know there are

7   many "dead spots" in Southern California as related to cellular service for Sprint/Nextel.  I have

8   been told by Sprint/Nextel employees if cellular telephones do not receive a signal, I will receive a

9   failed response when requesting GPS locations.

10          b. I also request that law enforcement officers be given the authorization to use

11  mobile electronic tracking devices to locate and identify **TT #31:** ▓▓REDACTED▓▓ **TT #32: 909-994-**

12  **2290, TT #33:** ▓▓REDACTED▓▓ **TT #34:** ▓▓REDACTED▓▓ **and TT #35:** ▓▓REDACTED▓▓ The Target

13  Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not

14  impossible because the location of the person using the target telephone is often unknown.

15  However with the assistance of mobile electronic tracking devices, law enforcement agents can

16  identify the location of a cellular telephone to a much finer detail than through cellular site data

17  alone.

18                                    **III.**
                            **DURATION OF INTERCEPTION**
19                          (Penal Code section 629.50(a) (5))

20      13.    This Affidavit is in support of an Application to intercept wire and electronic

21  communications for **a period not to exceed thirty (30) days commencing on the day of the initial**

22  **intercept or ten (10) days after the issuance of the Order, whichever comes first, pursuant to**

23  **California Penal Code section 629.58.**  The goal of this investigation is to prove the full scope,

24  membership and methods of operation of the conspiracy.  I request that the Court order that the

25  interception not terminate when the communications described herein are first intercepted, but may

26  continue to the full extent of California Penal Code section 629.58 or until the full scope of the

27  enterprise is developed, including the identities of all participants, their places and methods of

28  operation and the various activities in which they are engaged in furtherance of the enterprise,

    whichever comes first.

14.    Based upon your affiant's training and experience, narcotic traffickers extensively use their telephones to conduct their illegal activities.    Therefore, your affiant believes that additional communications of the same type will occur after the interception of the first communication to and from the target telephone(s).

# IV.
## TARGET TELEPHONE(S)
### (Penal Code section 629.50(a)(4))

15.    The Target Telephones are described as follows:



REDACTED

b.    **Target Telephone #32: (909) 994-2290 (TT #32)** is a SPRINT cellular phone being utilized by **Raymundo CARILLO (TS #7)** and subscribed to Perris QVIS at PO Box 54988, Perris, California.

REDACTED

1.    The term **"Target Telephone #31-35"** also refers to any changed telephone number assigned to the same Electronic Serial Number (ESN) and/or International Mobile Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number, Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC), ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target telephone(s), and/or

1    any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same telephone number(s) with

2    the same subscriber information as the target telephone(s) or any additional changed telephone

3    number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC whether the changes occur

4    simultaneously or consecutively, listed to the same subscriber and wireless telephone account(s) as

5    the target telephone(s).

6            2.      Based on my training and experience, persons often use fictitious names

7    when obtaining Pre-Paid cellular phones as a means of preventing detection by Law Enforcement.

8    This enables persons involved with criminal activity to operate with a level of comfort knowing that

9    their fictitious information will keep Law Enforcement from immediately knowing their true

10   identities.  This delay in identifying these suspects often allows them enough time to either destroy

11   or hide evidence of their crimes and also buys them time to flee the area of the crime.

12
13                                      **V.**
                                 **TARGET SUBJECTS**
14                          (Penal Code section 629.50(a) (4))

15           16.     The known Target Subject(s) of this investigation are:





REDACTED

REDACTED

g. **Raymundo CARILLO aka CEJAS (Target Subject 7)** previously listed as Daniel Navarro CHAVEZ.   Investigators previously had identified the target subject known as "REY" as CHAVEZ based on information obtained from GPS pings, secondary narcotics investigation indicating CHAVEZ was associated with 1135 W. 7th Street, Perris, California, the residence identified from GPS pings on phones utilized by "REY" and physical surveillances. It should be noted that CHAVEZ has a listed address of 1111 W. 7th Street, Perris, California 92570.

1  However, further investigative analysis indicated the subject known as "REY" was actually
2  **CARILLO**. On October 23, 2014, investigators initiated surveillance in Perris, California pursuant
3  to GPS pings of **TT #32**, used by **CARILLO**. On the same date, investigators positively identified
4  "REY" as **CARILLO** from a state of California booking photo. It should be noted that surveillance
5  observations on CARILLO's movements were also concurrent to GPS pings of **TT #32**.
6  **CARILLO** is a Hispanic male with a Date of Birth of [REDACTED] and has been the subject of
7  Riverside County Wire Intercepts 14-120, 14-183 and [REDACTED] **CARILLO's** criminal history
8  includes arrests for HS 11377 from 2001 and records indicate police contacts for **CARILLO** at
9  23802 Lake Drive, Perris, California. Investigators have obtained vehicle plates observed at this
10 residence which come back to [REDACTED] a member of this DTO.

      h.  **CHRIS LNU (Las Name Unknown – Target Subject 8)**   is a Hispanic male
11
12 identified only as **CHRIS** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of
13 residence. Investigators believe CHRIS is a coordinator for the [REDACTED] and possible cell
14 head with connections to Kentucky. Investigators are working to identify CHRIS LNU and are
15 communicating with Kentucky DEA case agents.

16
17
18                    REDACTED
19

20       j.  **Ronald Ashley SHEWMAKER (Target Subject 10):** is described as a White
21 male, with a date of birth of [REDACTED] Hair: Red, Eyes: Brown, Weight: 220 lbs., Height: 5, 7."
22 According to Department of Motor Vehicles, **SHEWMAKER** is issued Kentucky Driver's License #
23 [REDACTED] with an address of [REDACTED] Lebanon Jct, Kentucky 40150. Your
24 affiant found no documented criminal history for **SHEWMAKER**.

25
26
27                    REDACTED
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*REDACTED*



REDACTED

REDACTED



REDACTED

# VI.
## COURT'S JURISDICTION
### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code section 629.52)

17.     *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...." Section 629.52 does not define the phrase "initially intercepted." However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...." In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey. The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey. The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders. The court held "for

the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." (*Ibid*, at page 136)   In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap was jurisdictionally defective because it was authorized by a judge outside the judicial district in which the defendants' telephones were located.   The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas.   The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We agree with the reasoning of the Second Circuit and now hold that the interception included both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders.   As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)   Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived and where the criminal conduct was being investigated, could issue a wiretap order for a cellular telephone which was thought to be used by the target subject regardless of where the cellular telephone or the listening post was located, even though the criminal conduct which being investigated was occurring in another district and the listening post was located in another district. In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order to intercept cellular telephones which were assigned area codes located in another district, because the listening post was located in the same district as the judge who issued the order.

18.    Based upon my training and experience, persons engaged in criminal conduct use cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining cellular phones as a means of preventing detection by law enforcement.   By using other persons' names and creating a fictitious prepaid account, a target subject acquires a certain degree of anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those

engaged in narcotics trafficking.  This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep law enforcement from immediately knowing their true identities.  This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also provides them time to flee the area of the crime.

19.    This investigation into the ████REDACTED████ specifically the segment operated by **CARILLO (TS #7)** and ████REDACTED████ encompasses the distribution of narcotics to multiple states across the continental United States to include, but not limited to, Missouri, Texas, Georgia and Kentucky. There are several narcotics investigations involving multiple segments/cells for this DTO currently being investigated by DEA (St. Louis and Lexington) as well as by Local Narcotics Teams (Louisville, KY area). Although the primary jurisdiction for **TT #31-35** is based on the listening post, as outlined above, key members of this DTO operate within the Perris area of Riverside County wherefrom narcotics and proceeds originate and/or are destined for. This affidavit is made in furtherance of multiple members of the DTO operating across the US whose narcotics activities filter back to Riverside and surrounding counties.

████████████████ REDACTED ████████████████

21.    **Target Telephone #32** used by **CARILLO (TS #7)** was identified over wire communications for BETO (TS #20, as authorized by Riverside County Wire Intercept 14-508. A Riverside County Search Warrant, RI102020149, requesting GPS pings of **TT #32** was granted on October 20, 2014. GPS pings place **TT #32** in Perris, California. In May of 2014, investigators seized approximately $420,000 US Currency in Perris, California which was destined to be received by CARILLO.

████████████████ REDACTED ████████████████

1

2

3

4

5    *REDACTED*

6

7

8

9

10    25.    The interception and listening post will be in **Riverside County**. This is sufficient in

11  and of itself to confer jurisdiction to this court.

12

13                                          **VII.**
                                  **PRIOR APPLICATIONS**
14                            **(Penal Code section 629.50(a) (6))**

15    26.    On October 24, 2014, your affiant requested checks of the California Department of

16  Justice reference the Electronic Intercept Court Order System for **TT #31-35.**

17    27.    On October 24 2014, your affiant requested checks of the United States Department

18  of Justice wiretap database to determine if any Federal applications had been made to initiate a Title

19  III wiretap intercept of **TT #31-35.**

20    28.  Other than those Applications described herein, your affiant is not aware of any other

21  applications that have been made to any court in the United States for authorization to intercept

22  wire, oral, or electronic communications involving any of the same persons, facilities, or places

23  specified in this Application, within the meaning of *Penal Code* section 629.50(f).

24

25

26    *REDACTED*

27

28

1

2

3

4

5

6    *REDACTED*

7

8

9

10

11

12

13

14

15   *REDACTED*

16

17

18

19

20        f.        **Riverside County Wire Intercept Order 14-120:** On March 11, 2014,

21   the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court, State of

22   California granted and issued Riverside County Intercept Order 14-120, which authorized the

23   interception of the communication to and from **TT #9:** *REDACTED* , **TT #10: (502) 492-1461** ,

24   **TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.**

25

26

27   *REDACTED*

28

1

2          h.   **Riverside County Wire Intercept Order 14-183**: on April 7, 2014, the

Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed wire

3

Order 14-183, authorizing the initiation of State wire intercept for 30 days for **Target Telephone**

4

**#13 502-609-5967, Target Telephone #14 702-885-7486, Target Telephone #15** REDACTED

5

and **Target Telephone #16 951-322-0063.**

6

    i.   **Riverside County Wire Intercept Order 14-120 Extension 1:** On April

7

8, 2014, Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed

8

wire Order 14-120 Ext 1, authorizing the initiation of State wire intercept for 30 days for **Target**

9

**Telephone #11 951-570-0461.**

10

REDACTED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED

# VIII.
## OBJECTIVES OF THIS INVESTIGATION

29.     Your affiant believes interception of wire communications to and from **Target Telephone #31-35** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

      a.     The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

      b.     The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

      c.     The identity of the Target subject(s)' customers and the other unidentified conspirators;

      d.     The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

      e.     The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

      f.     The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.       Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

## IX.
### STATEMENT OF PROBABLE CAUSE
**(Penal Code section 629.50(a)(4))**

30.       The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

31.       Based upon the investigation in this case, set forth in detail below, I assert that:

a.       There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11351, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a).

b.       There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications. (Penal Code section 629.52(b))

32.       There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted. (Penal Code section 629.52(c))

33.       That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained below. (Penal Code section 629.52(d)).

34.       Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence

regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering, will be obtained through the interception of wire communications over the **Target Telephones**.

35.   I make this Affidavit, in part, on personal knowledge derived from participation in this investigation and, in part, upon the information from the following sources:

a.   Oral and written reports about this and other investigations that I have received from the DEA and other law enforcement officers;

b.   Physical surveillance conducted by the Riverside Sheriff Department (RSD), and DEA RDO in this and other investigations, which has been reported to me either directly or indirectly;

c.   Pen register and trap and trace information, telephone tolls and other documentary evidence in this and other investigations and,

d.   Evidence gathered through other law enforcement investigations.

e.   Communications intercepted pursuant to court-authorized intercept orders.

f.   Evidence obtained through court-authorized intercept orders.

**A.**

**IDENTIFICATION OF TARGET TELEPHONE #31**



REDACTED



REDACTED

REDACTED

a. **Investigators Note:** In October of 2014, your affiant learned that HIDTA 51 of the DEA Los Angeles Field Division is working a source of information (SOI) into this segment of the DTO. Your affiant learned that on October 19, 2014, investigators seized approximately 250,000 US Currency which, based on SOI information, originated from the Kentucky cell operated by Chris MATTINGLY at the direction of REDACTED and CARILLO (TS #7). The currency was seized in in Barstow, California. Based on this information, your affiant asserts that the above listed call coincides with SOI information and that **UM4265** coordinated the

Affidavit – Wiretap Order No. 14-558
Page 22

bulk cash smuggling.

40.     The above listed calls and parenthetical explanations are based on my training, experience, and intelligence gained during this investigation and are related to narcotics distribution.

## B.
## IDENTIFICATION OF TARGET TELEPHONE #32

REDACTED

42.     Based on intercepted communications between [REDACTED] and **CARILLO aka CEJAS (TS #7)**, investigators determined that **TS #7** is the user of **TT #32**.

43.     The following intercepted communications made to or from **909-994-2290 (TT #32)** as intercepted over 678-542-7349 and authorized by Riverside County Wire 14-508, are indicative of the scope of narcotics related activities associated with the use of the target telephone used by **CARILLO**.  Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics related activities associated with **CARILLO** and the target telephone which he utilizes.

44.     On October 18, 2014, at approximately 4:04 p.m., **Target Telephone #32**, used by **CARILLO (TS #7)** received an incoming call from telephone number [REDACTED], session number 530, used by [REDACTED].  **CARILLO** asked if [REDACTED] had talked with [REDACTED].  [REDACTED] said he had his ([REDACTED]) number but he ([REDACTED]) had not called him ([REDACTED]).  [REDACTED] asked **CARILLO** what they told them (**CARILLO** and others).  **CARILLO** asked if [REDACTED] was referring to the ones (possibly narcotics) that were sent over there.  [REDACTED] said yes.  **CARILLO** said supposedly they went (sold) for nine because the dude complained about them (narcotics) being bad and ugly (quality).  **CARILLO** said he met with the other guy and gave him (third party) the same ones (narcotics) and he (guy) said they were pretty (referring to quality).  **CARILLO** said they might have gotten messed up in the car...(unfinished thought by **CARILLO**).  **CARILLO** said the other guys said they (narcotics) were pretty (referring to quality) but [REDACTED] (phonetic) were ugly (referring to quality).  [REDACTED] asked if [REDACTED] was given some (narcotics).  **CARILLO** said no,

1   they gave [REDACTED] (phonetic) eight, and mentioned that he (**CARILLO**) had not seen his

2   "Compadre" (pal) [REDACTED] who was not given anything either.  **CARILLO** told [REDACTED] to charge that

3   dude because he kept five (narcotic units). [REDACTED] said okay.  **CARILLO** said to tell him to take the

4   money from there and for [REDACTED] to ask 1 peso (referring to 1 thousand) for them.  **CARILLO** said

5   he asked that son of bitch what number (price) they had given him, and he said he did not know.

6   **CARILLO** said he told him the deal was done and mentioned they (**CARILLO** and others) were

7   not going to make any profit.  **CARILLO** said he knew how they were (quality) because he

8   (**CARILLO**) was the one that sent (coordinated transport) them (narcotics) but he (**CARILLO**) was

9   not going to argue about it. [REDACTED] said what happened was they (narcotics) were closed up for

10  several days and it was too hot.  **CARILLO** said he believed so. [REDACTED] said they (narcotics) fucken

11  stink up.  **CARILLO** said they were brownish. [REDACTED] said that was why, because of the heat.

12  **CARILLO** said the dude had not said anything to him (**CARILLO**) about the money; supposedly

13  he (third party) was going to get the asking price.  **CARILLO** said he would give them

14  (**CARILLO**) nine and he would keep 100. [REDACTED] cursed and said it was not enough for sodas.

15  **CARILLO** said all those people over there were difficult to work with, **CARILLO** said he was

16  afraid to go over there (possibly Kentucky). [REDACTED] said he was told to put (possibly send) some in

17  Tene, about eight or 10 (narcotics units). [REDACTED] said he would look into it later.  **CARILLO** said

18  alright, that dude had not said anything to him (**CARILLO**), he just asked if they (**CARILLO** and

19  others) needed the money but he (**CARILLO**) was embarrassed.  **CARILLO** mentioned that dude

20  had to leave and he (**CARILLO**) was afraid that maybe he (dude) did not sell it (narcotics) after all.

21  [REDACTED] asked who **CARILLO** was referring to.  **CARILLO** said [REDACTED] (phonetic) buddy. [REDACTED]

22  asked if he (dude) sold it.  **CARILLO** said supposedly he (dude) had already sold it but he (dude)

23  had an emergency and **CARILLO** was not sure if he (dude) ended up selling it. [REDACTED] told

24  **CARILLO** they should ask for the paper (currency).  **CARILLO** said that other dude offered it

25  (possibly money) to him (**CARILLO**) but he (**CARILLO**) told him (other dude) to wait.

26  **CARILLO** said they would see what happens. [REDACTED] said alright.

27                                    **C.**

28              **IDENTIFICATION OF TARGET TELEPHONE #33**

[REDACTED]



REDACTED

REDACTED

REDACTED



*REDACTED*

*REDACTED*

## D.
## IDENTIFICATION OF TARGET TELEPHONE #34

*REDACTED*



*REDACTED*

*REDACTED*

### E.
### IDENTIFICATION OF TARGET TELEPHONE #35

*REDACTED*



REDACTED

REDACTED

REDACTED



*REDACTED*

## XI.
## SIGNIFICANT EVENTS / SEIZURES

61.     The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations.  While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related.  Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

        a.     On **December 12, 2013**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore.  California Highway Patrol K-9 unit alerted to the rear of the vehicle.     Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds).  Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

        b.     On **January 1, 2014**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

1

2     c.      On **March 3, 2014**, California Highway Patrol stopped [REDACTED]

3     [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona.  Vehicle was

4     impounded for 30 days and driver released.   Investigators seized approximately 9.8 pounds of

5     methamphetamine from vehicle truck area.

6     d.      On **March 14, 2014**, California Highway Patrol stopped [REDACTED]

7     [REDACTED] vehicle in Riverside County. Investigators seized approximately 10 pounds of

      methamphetamine from the vehicle.

8     e.      On **May 4, 2014**, Riverside County Sheriff's Department stopped Ronald

9     SHEWMAKER in Perris, California pursuant to information developed from wire communications

10    on Daniel Navarro "REY" CHAVEZ (TS #7) which indicated that proceeds were to be delivered.

11    On the same date, investigators seized approximately $420,000 U.S. Currency concealed within the

12    vehicle operated by SHEWMAKER. In addition to the currency, investigator seized the transport

13    vehicle.

14    f.      On **June 18, 2014**, pursuant to information developed through this

15    investigation, a search warrant was executed at the residence of [REDACTED]

16    located at 27680 Irma Street, Perris, California. The search produced approximately 1 pound of

17    methamphetamine.

18    g.      On **July 2, 2014**, pursuant to information developed through this

19    investigation into [REDACTED] a search warrant was executed at three locations

20    identified as narcotics, proceeds and processing locations for [REDACTED]. The search produced

21    approximately 5 pounds of methamphetamine and small amounts of heroin and marijuana. Addition

22    to the narcotics, investigators seized three vehicles.

23    h.      On **July 15, 2014**, investigators initiated surveillance in the vicinity of 422

24    Devener, Riverside, California on [REDACTED] Surveillance units observed

25    [REDACTED] operating a follow vehicle in tandem with a secondary vehicle believe to be a load

26    car. On the same date, investigators seized approximately 40 pounds of marijuana and arrested one

27    target subject.

28    i.      On **July 18, 2014**, investigators initiated surveillance in the vicinity of

      Whittier Blvd., and Gerhart in the city of Los Angeles, California pursuant to intercepted

communications on ▇▇REDACTED▇▇, Riverside County Wire Intercept ▇REDACTED▇, which indicated that ▇REDACTED▇ was to receive a narcotics shipment. On the same date, investigators conduct a vehicle stop of a white BMW and executed a Los Angeles County search warrant at the primary residence of ▇REDACTED▇ identified as 757 Hendricks Avenue, los Angeles, California. At the residence, investigators seized approximately $30,000.00 US Currency, 3 guns, and small amounts of methamphetamine and arrested PACAS identified as ▇▇▇REDACTED▇▇▇. On July 21, 2014, a search of the vehicle produced approximately 45 pounds of methamphetamine concealed within the floorboard of the vehicle and accessed through aftermarket trap compartment from the driver and passenger side floorboards.

## X.
## NECESSITY AND EXHAUSTION
(Penal Code section 629.50(a) (4))

62.     Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous.  Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

> a.     The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

> b.     The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

> c.     The identity of the Target subject(s)' customers and the other unidentified conspirators;

> d.     The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

> e.     The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

> f.     The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal

narcotics to various states; and

g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

63.      The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

## INTERVIEWS

64.      Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the location of records and drugs and other pertinent information regarding the named crimes.  Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would provide agents with a significant number of untruthful statements, diverting the investigation with false leads or otherwise frustrating the investigation.  Additionally, any such interviews would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to confidential sources whose identity may become known or whose existence may otherwise be compromised.

## CONFIDENTIAL INFORMANTS

65.      It appears that this organization is a close-knit organization whose members are either blood relatives, mutual friends and/or very familiar with one another.  Your affiant is aware that it is a common concern of large-scale narcotic organizations that neither customers, would-be thieves, nor the police learn the identity of all members of the organization, or the locations where they store large amounts of narcotics or illicit proceeds.  Therefore, lower echelon members shield those members higher up on the distribution chain from potential customers, and multiple locations are used to store lesser amounts of narcotics, and/or its proceeds, and additional locations are used to meet with customers.  This method of operation allows suspects to minimize the risk of discovery

and loss to the organization in the event the customer is an informant.

66.     In October of 2014, your affiant became aware that a Confidential Source has information on members of this DTO and was capable of providing information on members of this DTO.  Your affiant has been communicating with respective Law Enforcement Officers directing the CS to gather Intel on members of this DTO. Based on my communications with CS controlling investigators it appears that the CS will be unable to determine the scope of this criminal enterprise, the sources and location of the narcotics, and their full methods of operation. The [REDACTED] and is a compartmentalized DTO that layers its distribution network between organizational members across various states. At this time, it appears the CS can affirm the identity of key members of the DTO, however, investigators cannot obtain enough information on the modus operandi for the importation, distribution, acquisition of narcotics proceeds, and the identity of cell heads operating on their behalf in California, Texas, Kentucky, Georgia, Missouri etc. A wire intercept on key members of this DTO, coupled with CS information can provide the best result for obtaining the goals of this investigation.

## UNDERCOVER OFFICERS / AGENTS

67.     Because the seller of narcotics usually receives a fee for brokering the sale of narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier.  If the seller were to introduce the customer to the supplier and the customer were able to deal directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

68.     Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation.  Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants.  Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know.  Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

69.     As previously noted, it is a common practice for individuals involved in large

scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions. If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant. Therefore, it is not reasonable to believe that the introduction of an undercover agent by an informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

## CONTROLLED PURCHASES

70.     Your affiant has considered the benefits and risks associated with a controlled purchase. It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

71.     If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement. Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

72.     Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

73.     The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone

is often unknown. However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s). Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

74.     As described herein, physical surveillance has been used and will continue to be used during this investigation.

75.     Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a.     On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his identification. The subject was unable to produce any identification, but verbally identified himself as **Victor Arredondo**, with a date of birth of ~~REDACTED~~, and address of ~~REDACTED~~ where the CI had previously picked up Heroin with ~~REDACTED~~. ~~REDACTED~~ also provided a cellular phone number of ~~REDACTED~~ **Target Telephone #3**. Deputy Wicker took a picture of ~~REDACTED~~ with his consent, for identification, and subsequently released him. TFO Layos conducted further investigation of ~~REDACTED~~ identity. Via Riverside County Sheriff's Departments data base, revealed contacts for ~~REDACTED~~ with a date birth of ~~REDACTED~~ and address of ~~REDACTED~~ Wildomar. TFO Layos also found DMV records Index number X8725114 for ~~REDACTED~~ with a date of ~~REDACTED~~ and address of ~~REDACTED~~ ~~REDACTED~~ Wildomar. Based on the above information, Investigators identified that the person Deputy Wicker stopped was in fact ~~REDACTED~~

b.     On **December 12, 2013** members of the DEA TFG-2 and Riverside Sheriff's Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF), conducted surveillance of ~~REDACTED~~ residence, located at ~~REDACTED~~ Wildomar. During the surveillance, a black Jaguar with paper plates was observed leaving ~~REDACTED~~ residence and ultimately stopped by CHP interdiction unit. During this operation, DEA TFG2 and SWCNTF seized approximately 5lbs of Methamphetamine, $8,553 in US Currency, and a black 2010 Jaguar. The driver and sole

occupant of the vehicle, [REDACTED] was arrested by CHP Officer Mendenhall for state felony violations of 11378 HS and 11379 HS, CHP agency case # F-532-801-13. A secondary search of the vehicle revealed additional 5 lbs of Heroin and 2 lbs of Methamphetamine, during asset forfeiture proceeding.

c.      On **February 27, 2014**, SWNCTF investigators conducted surveillance in the city of Temecula, California to identify a male intercepted over Riverside County Wire Intercept [REDACTED] [REDACTED] Investigators identified [REDACTED] as the user of [REDACTED]

d.      On **March 3, 2014**, DEA and SWCNTF conducted surveillance on [REDACTED] in the city of Riverside, California pursuant to intercepted text message conversations as authorized by Riverside County Wire 14-79 which indicated that [REDACTED] was to acquire narcotics. On the same date, investigators followed [REDACTED] to Carson, California and back to Riverside County where an interdiction unit made contact and investigators seized 9.8 pounds of methamphetamine.

e.      On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and 1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators followed two Hispanic adult males to a home depot consistent with GPS pings on multiple phones used by **REY**. One of the subjects was identified as [REDACTED] DOB: [REDACTED] Investigators are still working on determining if [REDACTED] is **REY** and the user of TT #10-12. Note: [REDACTED] has been the subject of investigation on secondary DEA narcotics investigations.

f.      On **March 19, 2014**, investigators conducted surveillance eon **UM8364** pursuant to GPS pings of TT #15. Investigators identified a possible residence for **UM8364** and an associated vehicle (silver Honda Civic bearing California plate 7ADV247). Additionally, on the same date, investigators located the user of **TT #15 (UM8364)** at a shopping plaza located off Atlantic and Clara. Surveillance units observed **UM8364** and an unidentified Hispanic male conduct counter techniques such as squaring the block and looking into parked vehicle to identify possible surveillance by law enforcement.

g.      On **March 20, 2014**, investigators conducted a brief surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order

1   to identify the vehicle operated by the narcotics courier working for **UM8364**. On the same date,

2   investigators acquired the vehicle information.

3            h.     On **June 25, 2014**, investigators conducted a follow up with Motel 6 off the

4   210 and the 215 freeways pursuant to information obtained from wire communications which

5   indicated that [REDACTED] was to acquire narcotics at that location. Investigators identified

6   [REDACTED] through information provided to Motel 6 staff and subsequently conducted a drive

7   by of the listed address to acquire additional information.

8            i.     In **June and July of 2014**, investigators conducted surveillance on [REDACTED]

9   [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to refresh

10  information used in furtherance of a Riverside County search warrant for his residence and

11  associated locations. On July 1, 2014, investigators observed a vehicle enter [REDACTED] residence,

12  and deliver two 5 gallon bails. On the same date, intercepted communication indicated that

13  [REDACTED] was in possession of narcotics.

14           j.     On **July 2, 2014**, investigators conducted surveillance on [REDACTED] in

15  the vicinity of Bundy Canyon between the 15 and 215 freeways pursuant to information obtained

16  from wire communications which indicated that [REDACTED] was to acquire narcotics from an

17  unidentified third party. On the same date, investigators observed a Hispanic male operating a red

18  Mercedes enter the [REDACTED] residence. Shortly thereafter, investigators executed a Riverside

19  County search warrant on three locations associated with [REDACTED]

20           k.     On **July 15, 2014**, investigators conducted surveillance in the vicinity of [REDACTED]

21  [REDACTED], Riverside, California on [REDACTED]. Investigators ultimately seized

22  approximately 40 pounds of marijuana.

23           l.     On **July 17, 2014**, investigators initiated surveillance in the vicinity of [REDACTED]

24  [REDACTED] Los Angeles, California, the primary residential location of [REDACTED]

25  [REDACTED] as identified by Global Positioning System (GPS) pings of Target Telephone #23, authorized

26  by Riverside County Wire Intercept 14-369, as well as in the vicinity of the K-mart/ Dearden's

27  parking lot located off Whittier Blvd., and S. Gerhart Avenue, Los Angeles, California. At the

28  residence was a black lifted Yukon consistent with intercepted communications during which

[REDACTED] states that he drives a "black lift Yukon". At approximately 4:15 p.m., surveillance units of

7CPL313 leave the target residence and proceed west on 4th street. Investigators followed the vehicle to a Subway restaurant located off 4th Street and Wilkerson Ave, Perris, California. Investigators G. Rohn of SWCNTF conducted foot surveillance and observed CARILLO (TS #7) inside the Subway restaurant, consistent with GPS results on **TT #32.** At that point surveillance was terminated.

76.     Surveillance operations have been successful to the extent they have established persons and/or vehicles arriving at, and/or departing from principal locations; and extended the scope of the investigation to additional locations and co-conspirators. However, surveillance operations cannot establish the purpose of any observed meetings, nor identify other conspirators who do not make personal appearances. Therefore, surveillance appears unlikely to yield the sources of the supply of narcotics, fully identify each of the conspirators, their places of operation and the manner in which their operation is conducted.

77.     Surveillance of the targets subjects and their associates will not enable the government to achieve its objectives in this investigation. To date, surveillance has failed to allow law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the co-conspirators. While surveillance may show subjects of this investigation with packages suspected to be drugs, it will not identify the contents of these packages or what is being said as packages are exchanged. Surveillance is an investigative technique that is used to confirm meetings and other suspected activities between alleged participants, but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and activities.

78.     Your affiant knows from training and experience, and from speaking with other experienced agents and officers, that physical surveillance of high-level members of narcotic trafficking organizations is limited to placing individuals together without knowing the significance of their meeting or the role of each trafficker. Furthermore, based on my training and experience, surveillance of major narcotics traffickers is often difficult without detection. Physical surveillance is often limited to watching suspects from a distance, which as an investigative technique, can be problematic. Your affiant believes that excess random surveillance of a location without knowledge when a narcotics transaction will be taking place, could expose the identity of the officers and thereby compromise the investigation. Even if blanket, twenty-four hour surveillance were feasible,

it would still be limited to providing information only on the movements and whereabouts of the Target Subject(s). If the Target Subject(s) suspected he was being watched by law enforcement personnel, he could abandon his phone and move his activities to a different location, thus effectively ending the current on-going investigation until he was located again. A wire intercept would greatly assist the agents because they could be deployed more effectively knowing about a future narcotics transaction. This would allow surveillance to be set up on strategic locations, thereby lessening the risk of compromising the investigation.

79.     Furthermore, your affiant knows from past investigations that narcotics traffickers use various counter-surveillance driving techniques. These techniques include frequent u-turns, stopping in parking lots to observe traffic, waiting at traffic lights to allow traffic to pass, speed variations, and taking circuitous routes through residential neighborhoods. All of these methods are used for the sole purpose of determining the presence of law enforcement personnel. These methods are frequently successful, as it is extremely difficult to follow suspects who employ these methods without being detected. Once detected, these suspects usually abandon their activities, which mean they may shut down their cellular phones, pagers, and other phones, and flee the jurisdiction or area only to resurface at another unknown location at a later date.

80.     When physical surveillance is combined with interception of wire communications, the purpose of meetings can be revealed and may constitute admissible evidence if the meetings relate to an intercepted conversation of criminal behavior.

81.     Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s). If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed. The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities. By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

82.     Based on the above-stated facts and on my training and experience, your affiant

does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

## SEARCH WARRANTS

83.    On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

84.    On **02-25-2014**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

85.    On **02-27-2014**, SA Baca acquired search warrant #02271412 for a target telephone utilized by members of the [REDACTED]

86.    On **03-11-2014**, SA Baca acquired search warrant #03111409 for multiple target telephone utilized by members of the [REDACTED]

87.    On **03-19-2014**, SA Baca acquired search warrant #03191403 for multiple target telephone utilized by members of the [REDACTED]

88.    On **03-26- 2014**, TFO Carnahan wrote search warrant #03261411 for a target telephone associated with this ongoing investigation.

89.    On **July 1, 2014**, TFO Carnahan wrote search warrant #RI0701201413 for two target telephones associated with this ongoing investigation.

90.    On **July 2, 2014**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force, investigators acquired a Riverside County Search warrant of for [REDACTED] [REDACTED] Wildomar, California and [REDACTED] Wildomar, California. Investigators seized approximately 5 pounds of methamphetamine, small amounts of heroin and 4 pounds of marijuana. In addition to the narcotics, investigators seized three vehicles.

91.    On **July 18, 2014**, SA Emilio Baca write and signed search warrant #RI071820141 for **Target Telephone #25** utilized by [REDACTED].

92.    On **July 18, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of [REDACTED] later identified as [REDACTED] located at [REDACTED] [REDACTED] Los Angeles, California.

93.    On **August 13, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of [REDACTED] located at [REDACTED] Los

Angeles, California. This search was a follow up search based on information that developed through intercepted communications.

94.     There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant. Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation. Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

95.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation. However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation. Although a seizure of an intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply. The execution of a search warrant would in all probability terminate the present investigation. Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement. This includes utilizing multiple locations to store narcotics and/or controlled substances and money, and the use of other locations to conduct business. Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

96.     Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers. Your affiant is aware

that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences.  Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s).  Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband.  Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate.  Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning to the documents and currency.  Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the existence of the investigation.  At this time, it would be counterproductive to make the existence of the investigation public.  Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

## PEN REGISTERS AND TELEPHONE TOLLS

97.     The analysis of data derived from the use of a pen register and telephone tolls are one of the techniques that have been utilized during this investigation.  It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations.  Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones.  Although the review of those records does reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel.  In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial

structuring of this organization. Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

98.     Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

## CLOSED CIRCUIT TELEVISION MONITORING

99.     Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to conversations, agreements, and other arrangements necessary for this investigation. Additionally, this type of monitoring will not provide identifying information on the individuals entering and exiting the location, making it difficult if not impossible to determine the level of involvement within the organization, if any.

## TRASH SEARCHES OF TARGET LOCATIONS

100.     Your affiant believes that a trash search could be conducted at some of the locations identified thus far as being associated with the targets subject(s), however, it would risk the detection of law enforcement. Your affiant is aware that high-level narcotics traffickers and their associates go to great lengths to destroy possible incriminating evidence and are unlikely to use their residence trash containers to dispose of such information. Your affiant has conferred with other experienced agents and officers who told me that narcotic traffickers will often carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. Furthermore, investigators have considered conducting trash searches of identified residences of known Targets of the investigation and believe that, in considering each location, it would be difficult to conduct a trash search because the neighborhoods are situated where trash cans are placed at the curb in front of the residence for dumping or are located in a rural area where the search would draw suspicion on the law enforcement officers. A trash search would surely draw the attention of neighbors, who would possibly report this to police, and/or notify the target subject(s) or his/their associates. Such discovery would likely alert target subjects and his/their associates to the existence of this investigation and risk having it prematurely terminated before the government's

objectives have been achieved.  It is difficult for law enforcement officers to justify their presence to any neighbor, without identifying themselves and their purpose for conducting the trash search. Even if trash searches were conducted and evidence of narcotics trafficking was obtained from the trash at this location, the evidence would probably not establish (1) the roles of all participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the conspiracy.

101.    Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction.  Additionally, any time a trash search is conducted; it is possible that officers will be spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

102.    Based on my training and experience, there are great risks associated with conducting trash searches, usually for very minimal possible gain.  For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated.  This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc.  Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation.  Further, the risks of such action in this investigation far outweigh any potential rewards.

103.    In addition, I have found that not only are trash searches risky, they are also usually worthless.  I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information.  I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.  I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

104.     I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators.  For instance, a trash search might help identify the wrappings used to transport narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

105.     At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation.  If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

### FINANCIAL INVESTIGATION

106.     Even if investigators are able to locate accounts and financial records for the members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and often do not use traditional banking methods.  I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns.  I know that drug traffickers do not usually maintain records of their illicit earnings.  At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions.  However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail and that the majority of the proceeds is transported in bulk via passenger vehicles.

### GRAND JURY

107.     The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings.  It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors.  In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity.  In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the

targets of this investigation.

108.    I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons:  (1) the Target Subject, and any other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.
## CONCLUSION

109.    Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

110.    Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

111.    For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

112.    Your affiant requests that the Court order that Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications

1   Commission to provide telecommunications services within the United States of America, as listed

2   on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications

3   Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet

4   Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon

5   request of the law enforcement agency executing the intercept order:

6            a.      Authorize the installation and/or use of all facilities to enable the interception

7   and monitoring of all functions and capabilities of the Target Device(s), including but not limited to,

8   all wireless digital functions, wireless analog functions, direct connect/digital dispatch/direct

9   dispatch functions, automatic mode switching functions, and "short message service." This includes

10  interception of cellular communications occurring outside California where the contents of the

11  redirected communications are first heard or accessed in the Riverside County area. (See *United

12  States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137

13  L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118

14  S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied*

15  552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

16           b.      Authorize the installation and/or use of equipment known as pen registers or

17  dialed number recorders to detect and record all numbers dialed or pulsed by the telephones

18  connected to the targeted numbers.

19           c.      Authorize the installation and/or use of equipment to trap and trace Direct

20  Connect/Dispatch Service and identify the telephone numbers of persons placing calls to and from

21  the target telephone numbers.

22           d.      Authorize the installation and/or use of trap equipment to trace and identify

23  the telephone numbers of persons placing calls to the Target Telephone numbers to include the

24  activation of "caller ID" and any calling features such as "call forwarding" and "speed dialing"

25  currently assigned to the Target Telephone numbers.

26           e.      Your affiant requests the Court to order Sprint/Nextel and Verizon upon

27  request of the applicant, to provide the technical assistance necessary to accomplish this interception

28  unobtrusively and with a minimum of interference with the services said company provides the

people whose communications are to be intercepted, and to provide records identifying subscribers

and providing subscriber information on any and all telephone and pager numbers identified through this intercept/pen register, and any changed numbers whether published or not, including, but not limited to past telephone bills and records.

113.    Your affiant requests the Court order Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order, within 48 hours (including after-business hours, weekends, and holidays), and without delay:

a.    Provide any and all information related to any telephone(s), pager(s), text messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted conversation, or otherwise identified in this investigation and the subscriber(s) of any such communication devices(s).  Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other identifier.

b.    Provide Call Data Records (CDR) information, including any and all historical data, originating and terminating call detail, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation.

c.    Provide any and all cell site data, pinging data, and/or GPS location information, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use

117.     Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace officers of the Drug Enforcement Administration and other assisting peace officers be ordered to execute such intercept order.

118.     Your affiant requests that, prior to the sealing of this Application, its affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

119.     Your affiant requests that, pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a showing of good cause before a court of competent jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct.   Executed at Riverside, California.

Dated: November ____5____, 2014

Special Agent Emilio J. Baca
Drug Enforcement Administration


Sworn to and subscribed before me on November ____5____, 2014.


HONORABLE HELIOS J. HERNANDEZ
COUNTY OF RIVERSIDE
STATE OF CALIFORNIA

1  MICHAEL A. HESTRIN
   DISTRICT ATTORNEY
2  COUNTY OF RIVERSIDE
3  Deena M. Bennett
   Deputy District Attorney
4  3960 Orange St.
   Riverside, California 92501
5  Telephone: (951) 955-5400
   Fax: (951) 955-9673
6

7           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              IN AND FOR THE COUNTY OF RIVERSIDE

9  IN THE MATTER OF THE APPLICATION    )    **WIRETAP NO. 15-108**
   OF THE DISTRICT ATTORNEY OF THE     )
10 COUNTY OF RIVERSIDE FOR AN ORDER    )
   AUTHORIZING THE INTERCEPTION OF     )         **APPLICATION**
11 WIRE, PAGER AND ELECTRONIC          )
   COMMMUNICATIONS                     )
12 **Target Telephone #38:**           )
13 **Target Telephone #39:** REDACTED  )
   **Target Telephone #40: 502-609-5937**  )
14

15      **APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

16      I, John Aki., Chief Assistant District Attorney for the County of Riverside, declare:

17      1.      Applicant is the District Attorney of the County of Riverside, Michael A. Hestrin.

18 I am the Riverside County District Attorney's designee, as defined in California Penal Code

   section 629.50(a).
19
20      2.      After reviewing the Affidavit In Support Of Application For An Order

21 Authorizing The Interception Of Wire And Electronic Communications of Riverside Drug

22 Enforcement Administration, Special Agent Emilio Baca, and relying thereon, I approve making

23 this Application and hereby apply to the Riverside County Superior Court for authorization to

24 intercept wire, pager and electronic communications to and from the communication devices

25 (the "Target Device(s)") described below.  The Affidavit is attached hereto and incorporated

   herein by this reference.
26
27      3.      Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her

28 substitute, to physically present this Application to the Court and to make the required periodic

   reports required by Penal Code section 629.60.

                              1
                  Application Wiretap #15-108

                                        **EXHIBIT**
                                           6

4.      Special Agent Baca, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a).  He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.      Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office, Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Special Agent in Charge Anthony D. Williams, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.      Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses. There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone.**

7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:

REDACTED

REDACTED

c.   **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

8.   The actual interception and monitoring post will be in **Riverside County**.

9.   The communications to be intercepted are wire and electronic communications between the Target Subjects and other known and unknown associates and/or co-conspirators concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

10.   I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

11.   Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to maintain this intercept be granted for **thirty (30) days** and request that the authority not be deemed to automatically terminate upon interception of the first communication of the type described above.

12.   I request that this Court order Sprint Corporation, Verizon Wireless, Virgin Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, AT&T, AT&T Wireless, AT&T California Products and Services, T-Mobile USA Inc., Cellco Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., Cingular Wireless, Nextel Communications, Metro PCS, Cricket Wireless, Sprint Spectrum, L.P., Sprint PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-

1   Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any

2   other affected telecommunications companies, subsidiaries, or entities (the

3   "Telecommunications Companies") or electronic mail service providers (the "Email Service

4   Providers") upon request of law enforcement, to provide the technical assistance necessary to

5   accomplish the interception unobtrusively and with a minimum of interference of the services

6   being provided the Target Subjects. The Telecommunications Companies or the Email Service

7   Providers shall be compensated by the agency executing the court order for the reasonable costs

8   of furnishing the facilities and technical assistance.

9       13.     I request this Court to order the Telecommunications Companies or the Email

10  Service Providers not to disclose to the subscriber or any unauthorized person the fact that the

11  court has authorized this wiretap.

12      14.     Applicant requests this Application, Review, Affidavit, Order and any/all

13  incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the

14  agency executing the Court Order or the District Attorney's Office and to be disclosed only upon

15  a showing of good cause before a Judge of competent jurisdiction. (Penal Code Section 629.66)

16      15.     I am unaware of any previous relevant wiretaps other than those set forth in the

17  Affidavit within the meaning of Penal Code Section 629.50(a)(6).

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

16.   Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED: 2/19/15

By: JOHN AKI
CHIEF ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For: MICHAEL A. HESTRIN
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

1   MICHAEL A. HESTRIN
    DISTRICT ATTORNEY
2   COUNTY OF RIVERSIDE
    Deena M. Bennett
3   Deputy District Attorney
    3960 Orange St.
4   Riverside, California 92501
    Telephone: (951) 955-5400
5   Fax: (951) 955-9673
6

7

8     **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
    **IN AND FOR THE COUNTY OF RIVERSIDE**
9

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION** | **WIRETAP NO.: 15-108** |
| **OF THE DISTRICT ATTORNEY OF THE** | **AFFIDAVIT IN SUPPORT OF** |
| **COUNTY OF RIVERSIDE FOR AN ORDER** | **INTERCEPT ORDER** |
| **AUTHORIZING THE INTERCEPTION OF** | |
| **WIRE ELECTRONIC CELLULAR** | |
| **TELEPHONE COMMUNICATIONS** | |
| ~~REDACTED~~    **Target Telephone #38** | |
|          **Target Telephone #39** | |
| **(502) 609-5937**   **Target Telephone #40** | |

15

16     **AFFIDAVIT IN SUPPORT OF APPLICATION**
**FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC**
17       **CELLULAR TELEPHONE COMMUNICATIONS**
**AND**
18  **AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING**
**AND/OR CELLULAR SITE DATA**
19              **AND**
**AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE**

20                **I.**
21        **INTRODUCTION AND EXPERTISE**

22     I, Emilio J. Baca, being duly sworn do hereby declare and state:

23     1.     I am a Special Agent with the United States Drug Enforcement Administration

24  (DEA), and I am an investigative or law enforcement officer of the United States within the

25  meaning of Section 2510 (7) of Title 18 of the United States Code.

26     2.     I am empowered by law to conduct investigations and to make arrests for felony

27  offenses as enumerated in 18 U.S.C. 2516. I have been so employed since February 2010 and I am

28  currently assigned to the Riverside District Office Task Force Group 2. I primarily investigate

narcotic trafficking and distribution organizations operating in and around Riverside County in California

3.     I have received approximately 19 weeks of training at the DEA Academy in Quantico, Virginia and was trained in all aspects of conducting narcotics investigations as well as the methods and techniques commonly used by major narcotics traffickers. I have attended special training in wire and electronic interceptions, toll analysis, and the use of wire and electronic interception equipment. I am certified by the California State Attorney General's Office in the practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

4.     During my employment with the DEA, I have participated in narcotics investigations through the surveillance, execution of search warrants, and arrests of drug traffickers. In addition, I have spoken to informants and suspects regarding the methods and means of drug traffickers. I have debriefed persons arrested for controlled substance trafficking and have debriefed informants on the methods for gathering controlled substance intelligence. I have spoken with experienced narcotics investigators concerning the methods and practices of narcotics traffickers. Through my training, experience and interaction with other Special Agents, Task Force Officers, and other narcotics investigators, I have become familiar with narcotic traffickers' methods of operation, including the distribution, transportation, collection of proceeds and methods of laundering used in an attempt to conceal the nature of narcotic related proceeds. Through these interactions I have become familiar with and developed an understanding for the manner in which controlled substances are imported, manufactured, distributed, and sold, to include the methods of avoiding detection and apprehension by law enforcement officers. I am familiar with the manner in which narcotics traffickers use wireless communication equipment such as cellular telephone technology, pagers, coded communications, false identities, and counter surveillance to determine the presence of law enforcement and other means to facilitate their illegal activities and avoid detection or mislead a narcotics investigation.

5.     I am familiar with the facts and circumstances described herein and make this affidavit based upon the following: (1) personal knowledge I have gained from my participation in this investigation; (2) conclusions I have reached based upon my training, experience, and

conversations with other law enforcement investigators with whom I have discussed this case; (3) and what I believe to be reliable information obtained from the following sources: oral and written reports about this investigation, received from law enforcement officers; (4) law enforcement databases; (5) Pen register and trap and trace information as well as telephone records - toll records and subscriber information; (6) public records; and (7) physical surveillances conducted by DEA, West County Narcotics Task Force - Riverside County Sheriff's Department, and other law enforcement officers, which have been reported to me directly.

6.     Unless otherwise noted in this Affidavit, when I assert that a statement was made, the information was provided to me by another law enforcement officer, or other source of information with whom I have spoken or whose reports or statements I have reviewed.   Parenthetical explanations of coded or vague communications throughout this Affidavit are based on my interpretation, derived from my training, experience and familiarity with this and previous narcotics investigations.

7.     Based upon the information contained herein, I hereby make an application to intercept the wire, pager, and electronic cellular telephone communications for **Target Telephones** as described below:

*REDACTED*

c.     **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

8.      Probable cause exists to believe that **BETO LNU (TS #20** user of **TT #38 and TT #39), Chris MATTINGLY (TS #8** user of **TT #40)** and other identified and unidentified co-conspirators, have committed, are committing, or are about to commit, the crimes as discussed below, and that their communications relate to those and other ongoing crimes.

9.      I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order.  The listening post will be in the County of Riverside, California.

10.      Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of  possession for sale, transportation, and sale of a controlled substance in violation of sections 11350, 11351, 11378 and 11379 of the Health and Safety Code, with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code sections 629.50(a) and 629.50(a) (2)))

11.      Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #38:** REDACTED **TT #39:** REDACTED **and TT #40: 502-609-5937** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice

1   communications and any background conversations while the telephone instrument is otherwise in
2   use.
3

4                                                **B.**
5   **PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL
    POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA**
6                           (18 .S.C. Sections 3121 through 3126)
7          12.   I also request the authorization for the installation of a pen register and trap and trace
8   feature on **TT #38:** [REDACTED] **TT #39:** [REDACTED] **and TT #40: 502-609-5937** I also
9   request the authorization to obtain and receive cell site data and/or Global Positioning System (GPS)
10  location information including, but not limited to, cell site location (physical address) of call
11  initiation, call termination, and call progress locations (Automated Message Accounting Data)
12  connected to the use of each target telephone and any and all cellular telephones called or being
13  called by each target number without geographical limitations, related to **TT #38:** [REDACTED]
14  **TT #39:** [REDACTED] **and TT #40: 502-609-5937.** The Target Telephone(s) is/are a mobile
15  cellular telephone(s), which makes surveillance difficult if not impossible because the location of
16  the person using the target telephone is often unknown.  However with the assistance of cell site
17  data and/or Global Positioning System (GPS) location information including, but not limited to, cell
18  site location (physical address) of call initiation, call termination, and call progress locations
19  (Automated Message Accounting Data) connected to the use of each target telephone and any and
20  all cellular telephones called or being called by each target number without geographical limitations
21  related to the target telephone(s), law enforcement officers would be able to locate and conduct
22  surveillance of the user of the target telephone(s).  Therefore, your affiant requests an order to obtain
23  and receive cell site data and/or Global Positioning System (GPS) location information including,
24  but not limited to, cell site location (physical address) of call initiation, call termination, and call
25  progress locations (Automated Message Accounting Data) connected to the use of each target
26  telephone and any and all cellular telephones called or being called by each target number without
27  geographical limitations related to the target telephone.
28          a. Your affiant has learned through conversations with other law enforcement
    officers and by personal knowledge that illegal narcotic traffickers have the potential to disable the

GPS function in their telephones if they are aware law enforcement can monitor their real time movements. Your affiant does not solely rely on GPS locations because your affiant knows, often times GPS requests can fail or revert to cell towers with a 5000 meter locate. I also know there are many "dead spots" in Southern California as related to cellular service for Sprint/Nextel. I have been told by Sprint/Nextel employees if cellular telephones do not receive a signal, I will receive a failed response when requesting GPS locations.

        b. I also request that law enforcement officers be given the authorization to use mobile electronic tracking devices to locate and identify **TT #38:** REDACTED **TT #39:** REDACTED REDACTED **and TT #40: 502-609-5937.** The Target Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the target telephone is often unknown. However with the assistance of mobile electronic tracking devices, law enforcement agents can identify the location of a cellular telephone to a much finer detail than through cellular site data alone.

### III.
### DURATION OF INTERCEPTION
(Penal Code section 629.50(a) (5))

13.    This Affidavit is in support of an Application to intercept wire and electronic communications for **a period not to exceed thirty (30) days commencing on the day of the initial intercept or ten (10) days after the issuance of the Order, whichever comes first, pursuant to California Penal Code section 629.58**. The goal of this investigation is to prove the full scope, membership and methods of operation of the conspiracy. I request that the Court order that the interception not terminate when the communications described herein are first intercepted, but may continue to the full extent of California Penal Code section 629.58 or until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation and the various activities in which they are engaged in furtherance of the enterprise, whichever comes first.

14.    Based upon your affiant's training and experience, narcotic traffickers extensively use their telephones to conduct their illegal activities. Therefore, your affiant believes that additional communications of the same type will occur after the interception of the first

communication to and from the target telephone(s).

## IV.
## TARGET TELEPHONE(S)
### (Penal Code section 629.50(a)(4))

15. The Target Telephones are described as follows:

*REDACTED*

c. **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

1. The term **"Target Telephone #38-40"** also refers to any changed telephone number assigned to the same Electronic Serial Number (ESN) and/or International Mobile Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number, Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC), ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same telephone number(s) with the same subscriber information as the target telephone(s) or any additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC whether the changes occur simultaneously or consecutively, listed to the same subscriber and wireless telephone account(s) as the target telephone(s).

2. Based on my training and experience, persons often use fictitious names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law Enforcement. This enables persons involved with criminal activity to operate with a level of comfort knowing that

their fictitious information will keep Law Enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also buys them time to flee the area of the crime.

## V.
## TARGET SUBJECTS
### (Penal Code section 629.50(a) (4))

16.     The known Target Subject(s) of this investigation are:

REDACTED

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



REDACTED

REDACTED

16    g.  **Raymundo CARILLO aka CEJAS (Target Subject 7)** previously listed as

17  Daniel Navarro CHAVEZ.  Investigators previously had identified the target subject known as

18  "REY" as CHAVEZ based on information obtained from GPS pings, secondary narcotics

19  investigation indicating CHAVEZ was associated with 1135 W. 7th Street, Perris, California, the

20  residence identified from GPS pings on phones utilized by "REY" and physical surveillances. It

21  should be noted that CHAVEZ has a listed address of 1111 W. 7th Street, Perris, California 92570.

22  However, further investigative analysis indicated the subject known as "REY" was actually

23  **CARILLO**. On October 23, 2014, investigators initiated surveillance in Perris, California pursuant

24  to GPS pings of **TT #32**, used by **CARILLO**. On the same date, investigators positively identified

25  "REY" as **CARILLO** from a state of California booking photo. It should be noted that surveillance

26  observations on CARILLO's movements were also concurrent to GPS pings of **TT #32**.

27  **CARILLO** is a Hispanic male with a Date of Birth of ░REDACTED░ and has been the subject of

28  Riverside County Wire Intercepts 14-120, 14-183 and ░REDACTED░ **CARILLO's** criminal history

1  includes arrests for HS 11377 from 2001 and records indicate police contacts for **CARILLO** at

2  23802 Lake Drive, Perris, California. Investigators have obtained vehicle plates observed at this

3  residence which come back to [REDACTED] a member of this DTO.

4       h.  **Chris MATTINGLY (Target Subject 8)**  is a described as a white male with a

5  Date of Birth: [REDACTED] Hair: Blonde, Eyes: Blue, Weight: 250, Height: 6'3, and listed residence

6  of 661 Old Highway 245, Shepherdsville, KY.

7

8

9  REDACTED

10

11       j.  **Ronald Ashley SHEWMAKER (Target Subject 10):** is described as a White

12  male, with a date of birth of [REDACTED] Hair: Red, Eyes: Brown, Weight: 220 lbs., Height: 5, 7."

13  According to Department of Motor Vehicles, **SHEWMAKER** is issued Kentucky Driver's License #

14  [REDACTED] with an address of [REDACTED] Lebanon Jct, Kentucky 40150. Your

15  affiant found no documented criminal history for **SHEWMAKER.**

16

17

18

19

20

21

22  REDACTED

23

24

25

26

27

28



REDACTED

REDACTED

REDACTED

*REDACTED*

*REDACTED*

*REDACTED*



*REDACTED*

# VI.
## COURT'S JURISDICTION
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
### (Penal Code section 629.52)

17.     *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...."  Section 629.52 does not define the phrase "initially intercepted."  However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...."  In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey.  The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey.  The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held "for

1    the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the

2    tapped telephone is located, but also where the contents of the redirected communication are first to

3    be heard." (*Ibid*, at page 136)  In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert.*

4    *denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap

5    was jurisdictionally defective because it was authorized by a judge outside the judicial district in

6    which the defendants' telephones were located.  The wiretap order was issued by a judge in the

7    Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were

8    located in Houston within the Southern District of Texas.  The court rejected the defendant's

9    contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We

10   agree with the reasoning of the Second Circuit and now hold that the interception included both the

11   location of a tapped telephone and the original listening post, and that judges in either jurisdiction

12   have authority under Title III to issue wiretap orders.  As the *Rodriguez* court noted, this

13   interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge

14   to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)

15   Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118

16   S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived

17   and where the criminal conduct was being investigated, could issue a wiretap order for a cellular

18   telephone which was thought to be used by the target subject regardless of where the cellular

19   telephone or the listening post was located, even though the criminal conduct which being

20   investigated was occurring in another district and the listening post was located in another district.

21   In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d

22   371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order

23   to intercept cellular telephones which were assigned area codes located in another district, because

24   the listening post was located in the same district as the judge who issued the order.

25          18.    Based upon my training and experience, persons engaged in criminal conduct use

26   cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining

27   cellular phones as a means of preventing detection by law enforcement.  By using other persons'

28   names and creating a fictitious prepaid account, a target subject acquires a certain degree of

anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those engaged in narcotics trafficking. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep law enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also provides them time to flee the area of the crime.

19. This investigation into the ████ REDACTED ████ specifically the segment operated by **CARILLO (TS #7)** encompasses the distribution of narcotics to multiple states across the continental United States to include, but not limited to, Missouri, Texas, Georgia and Kentucky. There are several narcotics investigations involving multiple segments/cells for this DTO currently being investigated by DEA (St. Louis and Lexington) as well as by Local Narcotics Teams (Louisville, KY area).

*REDACTED*

21. **Target Telephone #40** used by **Christopher MATTINGLY (TS #8),** identified as Kentucky cell head for the ████ REDACTED ████ working with CARILLO (TS #7). Although **MATTINGLY** is physically in Kentucky, he routine coordinates with DTO members operating out of Riverside County and which transport narcotics from Riverside County to Kentucky. Additionally, the proceeds from the sale of narcotics filters back to Riverside County via proceeds couriers operating passenger vehicles. In May of 2014, investigators seized approximately $420,000 which was sent by **MATTINGLY**.

22. The interception and listening post will be in **Riverside County**. This is sufficient in and of itself to confer jurisdiction to this court.

# VII.
## PRIOR APPLICATIONS
### (Penal Code section 629.50(a) (6))

23.    On February 13, 2015, your affiant requested checks of the California Department of Justice reference the Electronic Intercept Court Order System for **TT #38-40.**

24.    On February 13, 2015, your affiant requested checks of the United States Department of Justice wiretap database to determine if any Federal applications had been made to initiate a Title III wiretap intercept of **TT #38-40.**

25.   Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

*REDACTED*

*REDACTED*

1

2

3

*REDACTED*

4

5

6

f.        **Riverside County Wire Intercept Order 14-120:** On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court, State of California granted and issued Riverside County Intercept Order 14-120, which authorized the interception of the communication to and from **TT #9:** *REDACTED* **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.**

11

12

13

*REDACTED*

14

15

16

h.        **Riverside County Wire Intercept Order 14-183:** on April 7, 2014, the Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed wire Order 14-183, authorizing the initiation of State wire intercept for 30 days for **Target Telephone #13 502-609-5967, Target Telephone #14 702-885-7486, Target Telephone #15** *REDACTED* and **Target Telephone #16 951-322-0063.**

i.        **Riverside County Wire Intercept Order 14-120 Extension 1:** On April 8, 2014, Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed wire Order 14-120 Ext 1, authorizing the initiation of State wire intercept for 30 days for **Target Telephone #11 951-570-0461.**

25

26

*REDACTED*

27

28



r.        **Riverside County Wire Intercept Order 14-558:** On November 5, 2014, the Honorable Judge Helios J. Hernandez of the Superior Court, County of Riverside, signed wire Order 14-558, authorizing the initiation of State wire intercept for 30 days for **TT #31:** REDACTED REDACTED **TT #32: 909-994-2290, TT #33:** REDACTED **TT #34:** REDACTED **and TT #35:** REDACTED

REDACTED

# VIII.
## OBJECTIVES OF THIS INVESTIGATION

26.    Your affiant believes interception of wire communications to and from **Target Telephone #38-40** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

a.    The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.    The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.    The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.    The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.    The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.    The methods and routes used by the Target subject(s)' illegal narcotics

trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

        g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

## IX.
## STATEMENT OF PROBABLE CAUSE
### (Penal Code section 629.50(a)(4))

27.    The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

28.    Based upon the investigation in this case, set forth in detail below, I assert that:

a.      There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11350, 11351, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a).

b.      There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications. (Penal Code section 629.52(b)

29.    There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted. (Penal Code section 629.52(c))

30.    That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained

1  below. (Penal Code section 629.52(d)).

2      31.    Based upon the investigation in this case, set forth in detail below, I further assert

3  that there is probable cause to believe evidence of the aforementioned offenses including evidence

4  regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money

5  laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in

6  furtherance of the narcotics trafficking and money laundering activities; (4) the methods of

7  distribution of contraband and money laundering and the identities of the persons and places

8  involved in the manufacturing and distribution of narcotics and money laundering, will be obtained

9  through the interception of wire communications over the **Target Telephones**.

10      32.    I make this Affidavit, in part, on personal knowledge derived from participation in

11  this investigation and, in part, upon the information from the following sources:

12      a.    Oral and written reports about this and other investigations that I have

13  received from the DEA and other law enforcement officers;

14      b.    Physical surveillance conducted by the Riverside Sheriff Department (RSD),

15  and DEA RDO in this and other investigations, which has been reported to me either directly or

16  indirectly;

17      c.    Pen register and trap and trace information, telephone tolls and other

18  documentary evidence in this and other investigations and,

19      d.    Evidence gathered through other law enforcement investigations.

20      e.    Communications intercepted pursuant to court-authorized intercept orders.

21      f.    Evidence obtained through court-authorized intercept orders.

## A.

## IDENTIFICATION OF TARGET TELEPHONE #38 and #39

*REDACTED*



REDACTED

REDACTED



REDACTED

REDACTED

REDACTED



REDACTED

REDACTED

REDACTED



*REDACTED*

*REDACTED*

*REDACTED*



*REDACTED*

*REDACTED*

**A.**

## IDENTIFICATION OF TARGET TELEPHONE #40

39.     On April 7, 2014 the Honorable Judge Helios J. Hernandez signed Riverside County Wire Intercept 14-183 for TT #13 (**502-609-5937-now TT #40**) used by **Christopher MATTINGLY**. Investigators monitored the communications for **MATTINGLY** while using **TT #40** (marked TT #13 for Wire Intercept 14-183) for a 30 day period. During that interception period, investigators seized approximately $420,000 US Currency from a narcotics proceeds courier identified as Ronald SHEWMAKER. The proceeds transport was coordinated between CARILLO (TS #7) and **MATTINGLY (TS #8)**.   Since the last interception period on **MATTINGLY**, investigators have been coordinating with DEA Louisville and Lexington in an effort to dismantle these cells working under the ▮▮▮REDACTED▮▮▮ and at the direction of CARILLO. Investigators determined that **TT #40** is still active and is being utilized by **MATTINGLY** based on GPS pings initiated by a local Narcotics Task Force investigating **MATTINGLY**.   The below reference calls are outlined to demonstrate historical narcotics communications on **TT #40**. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics related activities associated with **MATTINGLY** and the target telephone which he utilizes.

a.        On April 9, 2014, at approximately 10:33 a.m., **Target Telephone #40**, used by **Christopher MATTINGLY (TS #8)** received an incoming call from telephone number 270-547-9757, session number 223 used by UM9757. UM9757 asked where **MATTINGLY** was. **MATTINGLY** said he was at his house, and then asked where UM9757 was.  UM9757 said he was at the office. **MATTINGLY** asked UM9757 to go up there (to **MATTINGLY'** location) because he (**MATTINGLY**) had gotten some nicer shit (narcotics) for UM9757.  UM9757 said he had some deals and some cash, then asked where **MATTINGLY** wanted him to put it. **MATTINGLY** said to give it to Leslie, because she would be back here and that she (Leslie) should be there (at UM9757's location) in a second because she was walking back there (to UM9757's location) from the house. UM9757 said alright.

b.        On April 19, 2014, at approximately 7:46 a.m., **Target Telephone #40**, used by **Christopher MATTINGLY (TS #8)** received an incoming call from telephone number 270-859-0111, session number 665 used by UM0111. UM0111 said he (third party) had made him

(UM0111) a shot. **MATTINGLY** asked what he (third party) said. UM0111 said he (third party) wanted one of those Hardinsburg specials, and laughed. UM0111 said 1,590, 100 of them (ph). **MATTINGLY** said 1,700 for 100 of them. UM0111 said U/I. **MATTINGLY** said they would not be U/I. **MATTINGLY** said 1,700 and if he did not want them, it was alright. UM0111 said okay.

   c.   On May 4, 2014, at approximately 10:42 a.m, **MATTINGLY** placed and outgoing call to Raymundo CARILLO (TS #7). The following highlights the pertinent aspects of the conversation which, based on my training and experience relates to narcotics activity. REY asked what was happening. **MATTINGLY** said not a whole lot. **MATTINGLY** said he meant to call REY last night, but he had gotten busy. REY said he went to a party. **MATTINGLY** asked if REY had gotten wild. **REY** asked if **MATTINGLY** knew how long... (thought not finished by REY). REY asked if **MATTINGLY** knew where RONNIE (proceeds courier) was at that moment. **MATTINGLY** said not exactly and he (RONNIE) probably would not tell him exactly. REY said alright. **MATTINGLY** said he (RONNIE) would be there (at **REY's** area) later this afternoon for sure. REY said that was what he was thinking. REY said he had to go out to do something right now, but would try to be there (at REY's location) U/I. **MATTINGLY** said there was no problem. **REY** said he would call **MATTINGLY** back when he (Ronnie) was there (REY's location). **MATTINGLY** said alright

   1)   **Investigators Note:** On May 4, 2014, investigators seized approximately 420,000 US Currency from Ronald SHEWMAKER in Perris, California. This currency was coordinated between CARILLO and MATTINGLY.

  40. Although, the aforementioned intercepted communications are dated, recent investigative information and seizures indicate that **MATTINGLY** continues to operate as a cell head in Kentucky. In November of 2014, investigators were monitoring intercepted communications for Raymundo CARILLO as authorized by Riverside County Wire Intercept 14-558. On or about November 11, 2014, investigators began to intercept communications between CARILLO and a proceeds courier for the DTO. The courier was provided the following address: 521 Old Highway 60, Hardinsburg, Kentucky. On the same date, your affiant, working with agents in Kentucky, learned that the aforementioned address was a property owned by **MATTINGLY**. Investigators in Kentucky

1  initiated surveillance and ultimately conducted a vehicle stop which contained approximately 60,000
2  US Currency. Based on intercepted communications, surveillance and proceeds seizure, your affiant
3  believes that **MATTINGLY** continues to distribute narcotics for the DTO.
4  **Toll Analysis of TT #40:**
5       41.   On January 29, 2015, your affiant conducted a telephone toll analysis of **Target**
6  **Telephone #40. TT #40** placed or received 24 calls between 01-07-2015 and 01-26-2014 to 502-921-
7  0299, which is associated to [REDACTED] a multi-pound methamphetamine trafficker in
8  Louisville, Kentucky.

## XI.
## SIGNIFICANT EVENTS / SEIZURES

11       42.   The information described in this section exhibits law enforcement's activity and/or
12  actions taken while investigating drug trafficking organizations.  While the described events may
13  not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all
14  seizures described herein are associated with these drug trafficking organizations to which the
15  Target Subject(s) are related.  Investigators believe the following events demonstrate the activity,
16  sophistication, and ability of these organizations.

17       a.   On **December 12, 2013**, California Highway Patrol conducted a vehicle stop
18  at Highway 15 in Lake Elsinore.  California Highway Patrol K-9 unit alerted to the rear of the
19  vehicle.   Investigators recovered 5 individually wrapped packages of methamphetamine
20  (approximately 5 pounds).  Investigators also recovered $8,553.00 from arrestee in his front pants
21  pocket.

22       b.   On **January 1, 2014**, investigators made a subsequent search of the vehicle
23  impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of
24  heroin.

25       c.   On **March 3, 2014**, California Highway Patrol stopped [REDACTED]
26  [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona.  Vehicle was
27  impounded for 30 days and driver released.  Investigators seized approximately 9.8 pounds of
28  methamphetamine from vehicle truck area.

1

2

3

         d.      On **March 14, 2014,** California Highway Patrol stopped [REDACTED] [REDACTED] vehicle in Riverside County. Investigators seized approximately 10 pounds of methamphetamine from the vehicle.

4

5

6

7

8

9

         e.      On **May 4, 2014,** Riverside County Sheriff's Department stopped Ronald SHEWMAKER in Perris, California pursuant to information developed from wire communications on Daniel Navarro "REY" CHAVEZ (TS #7) which indicated that proceeds were to be delivered. On the same date, investigators seized approximately $420,000 U.S. Currency concealed within the vehicle operated by SHEWMAKER. In addition to the currency, investigator seized the transport vehicle.

10

11

12

13

         f.      On **June 18, 2014,** pursuant to information developed through this investigation, a search warrant was executed at the residence of [REDACTED] located at [REDACTED] Perris, California. The search produced approximately 1 pound of methamphetamine.

14

15

16

17

18

         g.      On **July 2, 2014,** pursuant to information developed through this investigation into [REDACTED] a search warrant was executed at three locations identified as narcotics, proceeds and processing locations for [REDACTED] The search produced approximately 5 pounds of methamphetamine and small amounts of heroin and marijuana. Addition to the narcotics, investigators seized three vehicles.

19

20

21

22

23

         h.      On **July 15, 2014,** investigators initiated surveillance in the vicinity of [REDACTED] [REDACTED] Riverside, California on [REDACTED] Surveillance units observed [REDACTED] operating a follow vehicle in tandem with a secondary vehicle believe to be a load car. On the same date, investigators seized approximately 40 pounds of marijuana and arrested one target subject.

24

25

26

27

28

         i.      On **July 18, 2014,** investigators initiated surveillance in the vicinity of Whittier Blvd., and Gerhart in the city of Los Angeles, California pursuant to intercepted communications on [REDACTED] Riverside County Wire Intercept [REDACTED] which indicated that [REDACTED] was to receive a narcotics shipment. On the same date, investigators conduct a vehicle stop of a white BMW and executed a Los Angeles County search warrant at the primary residence of

REDACTED identified as REDACTED los Angeles, California. At the residence, investigators seized approximately $30,000.00 US Currency, 3 guns, and small amounts of methamphetamine and arrested REDACTED identified as REDACTED On July 21, 2014, a search of the vehicle produced approximately 45 pounds of methamphetamine concealed within the floorboard of the vehicle and accessed through aftermarket trap compartment from the driver and passenger side floorboards.

j.      In **November of 2014**, investigators of DEA Louisville, Kentucky DEA seized approximately 60,000 US Currency from proceeds runner directed by **CARILLO**. The information was developed by Riverside County Wire Intercept 14-558, Target Telephone #32, used by **CARILLO**.

k.      On **December 3, 2014**, investigators seized approximately 60 pounds marijuana, 5 grams of methamphetamine, 5 firearms and arrest 3 subjects, to include REDACTED REDACTED

l.      On **February 11, 2015**, investigators executed a Riverside County Warrant at REDACTED Perris, California at the residence of REDACTED On the same date, investigators seized one (1) pound of methamphetamine and 1 firearm.

## X.
## NECESSITY AND EXHAUSTION
### (Penal Code section 629.50(a) (4))

43.      Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous.  Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

a.      The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.      The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.      The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.      The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.      The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.      The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

44.      The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

**INTERVIEWS**

45.      Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the location of records and drugs and other pertinent information regarding the named crimes.  Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would provide agents with a significant number of untruthful statements, diverting the investigation with false leads or otherwise frustrating the investigation.  Additionally, any such interviews would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to confidential sources whose identity may become known or whose existence may otherwise be compromised.

### CONFIDENTIAL INFORMANTS

46.     It appears that this organization is a close-knit organization whose members are either blood relatives, mutual friends and/or very familiar with one another. Your affiant is aware that it is a common concern of large-scale narcotic organizations that neither customers, would-be thieves, nor the police learn the identity of all members of the organization, or the locations where they store large amounts of narcotics or illicit proceeds. Therefore, lower echelon members shield those members higher up on the distribution chain from potential customers, and multiple locations are used to store lesser amounts of narcotics, and/or its proceeds, and additional locations are used to meet with customers. This method of operation allows suspects to minimize the risk of discovery and loss to the organization in the event the customer is an informant.

47.     In October of 2014, your affiant became aware that a Confidential Source has information on members of this DTO and was capable of providing information on members of this DTO. Your affiant has been communicating with respective Law Enforcement Officers directing the CS to gather Intel on members of this DTO. Based on my communications with CS controlling investigators it appears that the CS will be unable to determine the scope of this criminal enterprise, the sources and location of the narcotics, and their full methods of operation. The **REDACTED** and is a compartmentalized DTO that layers its distribution network between organizational members across various states. At this time, it appears the CS can affirm the identity of key members of the DTO, however, investigators cannot obtain enough information on the modus operandi for the importation, distribution, acquisition of narcotics proceeds, and the identity of cell heads operating on their behalf in California, Texas, Kentucky, Georgia, Missouri etc. A wire intercept on key members of this DTO, coupled with CS information can provide the best result for obtaining the goals of this investigation. As of today, the aforementioned CS has become unavailable to provide information on this DTO. Your affiant has learned that the CS has been held account for seized proceeds is currently not in a position to provide investigators with investigative or enforcement information.

### UNDERCOVER OFFICERS / AGENTS

48.     Because the seller of narcotics usually receives a fee for brokering the sale of

narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier. If the seller were to introduce the customer to the supplier and the customer were able to deal directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

49.     Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation. Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants. Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know. Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

50.     As previously noted, it is a common practice for individuals involved in large scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions. If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant. Therefore, it is not reasonable to believe that the introduction of an undercover agent by an informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

## CONTROLLED PURCHASES

51.     Your affiant has considered the benefits and risks associated with a controlled purchase. It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

52.     If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement.  Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

53.     Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

54.     The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown.  However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s). Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

55.     As described herein, physical surveillance has been used and will continue to be used during this investigation.

56.     Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

        a.     On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his identification. The subject was unable to produce any identification, but verbally identified himself as ████ REDACTED ████ with a date of birth of ██ REDACTED ██ and address of ████ REDACTED ████, where the CI had previously picked

1  up Heroin with . REDACTED also provided a cellular phone number of REDACTED

2  REDACTED Deputy Wicker took a picture of REDACTED with his consent, for

3  identification, and subsequently released him. TFO Layos conducted further investigation of

4  REDACTED identity. Via Riverside County Sheriff's Departments data base,

5  revealed contacts for REDACTED with a date birth of REDACTED and

6  address of REDACTED Wildomar. TFO Layos also found DMV records Index number

7  X8725114 for REDACTED with a date of REDACTED and address of REDACTED

8  REDACTED Wildomar. Based on the above information, Investigators identified that the person

9  Deputy Wicker stopped was in fact REDACTED

10        b.      On **December 12, 2013** members of the DEA TFG-2 and Riverside Sheriff's

11  Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF), conducted surveillance

12  of REDACTED residence, located at REDACTED Wildomar. During the surveillance, a black

13  Jaguar with paper plates was observed leaving REDACTED residence and ultimately stopped by

14  CHP interdiction unit. During this operation, DEA TFG2 and SWCNTF seized approximately 5lbs

15  of Methamphetamine, $8,553 in US Currency, and a black 2010 Jaguar. The driver and sole

16  occupant of the vehicle, REDACTED was arrested by CHP Officer

17  Mendenhall for state felony violations of 11378 HS and 11379 HS, CHP agency case # F-532-801-

18  13. A secondary search of the vehicle revealed additional 5 lbs of Heroin and 2 lbs of

19  Methamphetamine, during asset forfeiture proceeding.

20        c.      On **February 27, 2014,** SWNCTF investigators conducted surveillance in the

21  city of Temecula, California to identify a male intercepted over Riverside County Wire Intercept 11-

22  79. Investigators identified REDACTED as the user of REDACTED.

23        d.      On **March 3, 2014,** DEA and SWCNTF conducted surveillance on

24  REDACTED in the city of Riverside, California pursuant to intercepted text

25  message conversations as authorized by Riverside County Wire 14-79 which indicated that

26  REDACTED was to acquire narcotics. On the same date, investigators followed REDACTED to Carson,

27  California and back to Riverside County where an interdiction unit made contact and investigators

28  seized 9.8 pounds of methamphetamine.

e.     On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and 1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators followed two Hispanic adult males to a home depot consistent with GPS pings on multiple phones used by **REY**. One of the subjects was identified as Daniel Navarro CHAVEZ, DOB: [REDACTED] Investigators are still working on determining if CHAVEZ is **REY** and the user of TT #10-12. Note: CHAVEZ has been the subject of investigation on secondary DEA narcotics investigations.

f.     On **March 19, 2014**, investigators conducted surveillance eon **UM8364** pursuant to GPS pings of TT #15. Investigators identified a possible residence for **UM8364** and an associated vehicle (silver Honda Civic bearing California plate 7ADV247). Additionally, on the same date, investigators located the user of **TT #15 (UM8364)** at a shopping plaza located off Atlantic and Clara. Surveillance units observed **UM8364** and an unidentified Hispanic male conduct counter techniques such as squaring the block and looking into parked vehicle to identify possible surveillance by law enforcement.

g.     On **March 20, 2014**, investigators conducted a brief surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to identify the vehicle operated by the narcotics courier working for **UM8364**. On the same date, investigators acquired the vehicle information.

h.     On **June 25, 2014**, investigators conducted a follow up with Motel 6 off the 210 and the 215 freeways pursuant to information obtained from wire communications which indicated that [REDACTED] was to acquire narcotics at that location. Investigators identified [REDACTED] through information provided to Motel 6 staff and subsequently conducted a drive by of the listed address to acquire additional information.

i.     In **June and July of 2014**, investigators conducted surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to refresh information used in furtherance of a Riverside County search warrant for his residence and associated locations. On July 1, 2014, investigators observed a vehicle enter [REDACTED] residence, and deliver two 5 gallon bails. On the same date, intercepted communication indicated that [REDACTED] was in possession of narcotics.



1

2         j.      On **July 2, 2014**, investigators conducted surveillance on ▮REDACTED▮ in

3   the vicinity of Bundy Canyon between the 15 and 215 freeways pursuant to information obtained

from wire communications which indicated that ▮REDACTED▮ was to acquire narcotics from an

4   unidentified third party. On the same date, investigators observed a Hispanic male operating a red

5   Mercedes enter the ▮REDACTED▮ residence. Shortly thereafter, investigators executed a Riverside

6   County search warrant on three locations associated with ▮REDACTED▮

7         k.      On **July 15, 2014**, investigators conducted surveillance in the vicinity of ▮REDACTED▮

8   ▮REDACTED▮ Riverside, California on ▮REDACTED▮ Investigators ultimately seized

9   approximately 40 pounds of marijuana.

10        l.      On **July 17, 2014**, investigators initiated surveillance in the vicinity of ▮REDACTED▮

11  ▮REDACTED▮ Los Angeles, California, the primary residential location of ▮REDACTED▮

12  ▮REDACTED▮ as identified by Global Positioning System (GPS) pings of Target Telephone ▮REDACTED▮ authorized

13  by Riverside County Wire Intercept ▮REDACTED▮ as well as in the vicinity of the K-mart/ Dearden's

14  parking lot located off Whittier Blvd., and S. Gerhart Avenue, Los Angeles, California. At the

15  residence was a black lifted Yukon consistent with intercepted communications during which

16  PACAS states that he drives a "black lift Yukon". At approximately 4:15 p.m., surveillance units of

17  CAL-MET observed a black Expedition in the K-Mart/Dearden's lot bearing California plate

18  4EUG401 (Target Vehicle 1) operated by an unidentified Hispanic male (HM#1) in the vicinity.

19  Surveillance units maintained constant surveillance of TV#1. Shortly thereafter, surveillance units

20  observed an unidentified Hispanic male (HM#2) arrive in a pedal bicycle approach the vehicle, meet

21  with HM#1, open the trunk space of TV#1 and look into the rear trunk space of TV#1. Shortly

22  thereafter, HM#2 entered the driver seat of TV#1 and leaves the K-Mart/Dearden's lot. Surveillance

23  units maintained observations on TV#1 and followed TV#1 to ▮REDACTED▮ Los Angeles,

24  California, the primary residence of ▮REDACTED▮ consistent with intercepted communications

25  which indicated that ▮REDACTED▮ was to take possession of ▮REDACTED▮ vehicle to load it with narcotics.

26  Shortly thereafter, surveillance units observed an unidentified Hispanic male move a work vehicle

27  form the driveway and place TV#1 into the garage of ▮REDACTED▮ Los Angeles,

28  California. Surveillance units lost the primary load vehicle.

1

2
        m.     On **July 18, 2014**, investigators initiated surveillance in Los Angeles,

California pursuant to intercepted communications that ████████ was to receive a

3
narcotics shipment. On the same date, investigators seized approximately 30 pounds of

4
methamphetamine and arrested ████████

5
        n.     On **October 6, 2014**, investigators initiated surveillance in the vicinity of ████

6
████ Perris, California, residence of ████████ On the same date,

7
investigators followed a Hispanic male driver and female passenger (identified as ████ west

8
on 4th Street from the residence in a silver Nissan Pathfinder to a school. Shortly thereafter,

9
investigators continued surveillance as the vehicle continued west on 4th Street and began

10
conducting counter surveillance driving techniques. The operator of the vehicle conducted multiple

11
U-turns and drove into and through desolate streets to identify any follow vehicles. At that point

12
investigators pulled surveillance. Shortly thereafter, your affiant observed ████ and the

13
Hispanic male operator walks back to the residence from 7th street. Your affiant believes that

14
████ and unidentified male subject ditched the vehicle to avoid law enforcement.

15
        o.     On **October 14, 2014**, South West Corridor Narcotics Taskforce and DEA

16
Taskforce Group 2, conducted surveillance at the ████████ address. Your affiant observed

17
the White Nissan Altima license plate # 5UUN878 driver up to the residence and park on the street.

18
A male Hispanic exited the driver's door and walked into the house. Your affiant identified this

19
subject as the same person who was observed at ████████ residence on

20
October 9, 2014. During the surveillance, team member utilized current electronic technology to

21
obtain the driver of the white Nissan Altima's phone number, authorized by Riverside County

22
Superior Judge, on October 10, 2014, SW # R1101020147

23
        p.     On **October 23, 2014**, investigators conduct surveillance in the vicinity of

24
Ellis and Burton Road, pursuant to GPS pings of **TT #32** in order to confirm the user of **TT #32** as

25
**CARILLO (TS #7).** On the same date, investigators observed an Arcadia bearing California plate

26
7CPL313 leave the target residence and proceed west on 4th street. Investigators followed the

27
vehicle to a Subway restaurant located off 4th Street and Wilkerson Ave, Perris, California.

28
Investigators G. Rohn of SWCNTF conducted foot surveillance and observed **CARILLO (TS #7)**

1   inside the Subway restaurant, consistent with GPS results on **TT #32**. At that point surveillance was

2   terminated.

3          q.        On **February 10, 2105**, investigators conducted surveillance in Perris,

4   California in an attempt to identify the user of [REDACTED] Investigators have GPS surveillance

5   on the aforementioned phone and are working to identify the user. Surveillance was terminated after

6   an extended period of time and the phone could not be located.

7          57.       Surveillance operations have been successful to the extent they have established

8   persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

9   scope of the investigation to additional locations and co-conspirators.   However, surveillance

10  operations cannot establish the purpose of any observed meetings, nor identify other conspirators

11  who do not make personal appearances.   Therefore, surveillance appears unlikely to yield the

12  sources of the supply of narcotics, fully identify each of the conspirators, their places of operation

13  and the manner in which their operation is conducted.

14         58.       Surveillance of the targets subjects and their associates will not enable the

15  government to achieve its objectives in this investigation.   To date, surveillance has failed to allow

16  law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the co-

17  conspirators.  While surveillance may show subjects of this investigation with packages suspected to

18  be drugs, it will not identify the contents of these packages or what is being said as packages are

19  exchanged.   Surveillance is an investigative technique that is used to confirm meetings and other

20  suspected activities between alleged participants, but often leaves the investigators with insufficient

21  evidence to prove the purpose of the meetings and activities.

22         59.       Your affiant knows from training and experience, and from speaking with other

23  experienced agents and officers, that physical surveillance of high-level members of narcotic

24  trafficking organizations is limited to placing individuals together without knowing the significance

25  of their meeting or the role of each trafficker.  Furthermore, based on my training and experience,

26  surveillance of major narcotics traffickers is often difficult without detection.  Physical surveillance

27  is often limited to watching suspects from a distance, which as an investigative technique, can be

28  problematic.  Your affiant believes that excess random surveillance of a location without knowledge

when a narcotics transaction will be taking place, could expose the identity of the officers and thereby compromise the investigation. Even if blanket, twenty-four hour surveillance were feasible, it would still be limited to providing information only on the movements and whereabouts of the Target Subject(s). If the Target Subject(s) suspected he was being watched by law enforcement personnel, he could abandon his phone and move his activities to a different location, thus effectively ending the current on-going investigation until he was located again. A wire intercept would greatly assist the agents because they could be deployed more effectively knowing about a future narcotics transaction. This would allow surveillance to be set up on strategic locations, thereby lessening the risk of compromising the investigation.

60.     Furthermore, your affiant knows from past investigations that narcotics traffickers use various counter-surveillance driving techniques. These techniques include frequent u-turns, stopping in parking lots to observe traffic, waiting at traffic lights to allow traffic to pass, speed variations, and taking circuitous routes through residential neighborhoods. All of these methods are used for the sole purpose of determining the presence of law enforcement personnel. These methods are frequently successful, as it is extremely difficult to follow suspects who employ these methods without being detected. Once detected, these suspects usually abandon their activities, which mean they may shut down their cellular phones, pagers, and other phones, and flee the jurisdiction or area only to resurface at another unknown location at a later date.

61.     When physical surveillance is combined with interception of wire communications, the purpose of meetings can be revealed and may constitute admissible evidence if the meetings relate to an intercepted conversation of criminal behavior.

62.     Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s). If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed. The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities. By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking

place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

63.     Based on the above-stated facts and on my training and experience, your affiant does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

## SEARCH WARRANTS

64.     On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

65.     On **02-25-2014**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

66.     On **02-27-2014**, SA Baca acquired search warrant #02271412 for a target telephone utilized by members of the ▬▬REDACTED▬▬

67.     On **03-11-2014**, SA Baca acquired search warrant #03111409 for multiple target telephone utilized by members of the ▬▬REDACTED▬▬

68.     On **03-19-2014**, SA Baca acquired search warrant #03191403 for multiple target telephone utilized by members of the ▬▬REDACTED▬▬

69.     On **03-26- 2014**, TFO Carnahan wrote search warrant #03261411 for a target telephone associated with this ongoing investigation.

70.     On **July 1, 2014**, TFO Carnahan wrote search warrant #RI0701201413 for two target telephones associated with this ongoing investigation.

71.     On **July 2, 2014**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force, investigators acquired a Riverside County Search warrant of for ▬▬REDACTED▬▬ ▬▬REDACTED▬▬ Wildomar, California and ▬▬REDACTED▬▬ Wildomar, California. Investigators seized approximately 5 pounds of methamphetamine, small amounts of heroin and 4 pounds of marijuana. In addition to the narcotics, investigators seized three vehicles.

72.     On **July 18, 2014**, SA Emilio Baca write and signed search warrant #RI071820141 for **Target Telephone #25** utilized by ▬▬REDACTED▬▬

73.     On **July 18, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of ▇▇REDACTED▇▇ later identified as ▇▇REDACTED▇▇ located at ▇REDACTED▇ ▇▇REDACTED▇▇ Los Angeles, California.

74.     On **August 13, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of ▇▇REDACTED▇▇ located at ▇▇REDACTED▇▇ Los Angeles, California. This search was a follow up search based on information that developed through intercepted communications.

75.     On **December 3, 2014**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force, investigators acquired a Riverside County Search warrant for ▇▇REDACTED▇▇ ▇REDACTED▇ Nuevo, California and ▇▇REDACTED▇▇ Perris, California. Investigators seized approximately 60 pounds of marijuana, 5 grams of methamphetamine and 5 firearms.

76.     On **February 11, 2015**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force investigators acquired a Riverside County Search Warrant for ▇▇REDACTED▇▇ Perris, California. Investigators seized approximately 1 pound of methamphetamine, one (1) firearm and arrested one subject.

77.     There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant. Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation. Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

78.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation. However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an ongoing law enforcement investigation. Although a seizure of an intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all

members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply. The execution of a search warrant would in all probability terminate the present investigation. Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement. This includes utilizing multiple locations to store narcotics and/or controlled substances and money, and the use of other locations to conduct business. Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

79.     Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers. Your affiant is aware that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences. Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s). Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband. Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate. Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning to the documents and currency. Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the

existence of the investigation.  At this time, it would be counterproductive to make the existence of the investigation public.  Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

### PEN REGISTERS AND TELEPHONE TOLLS

80.     The analysis of data derived from the use of a pen register and telephone tolls are one of the techniques that have been utilized during this investigation.  It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations.  Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones.  Although the review of those records does reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel.  In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial structuring of this organization.  Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

81.     Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

### CLOSED CIRCUIT TELEVISION MONITORING

82.     Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to conversations, agreements, and other arrangements necessary for this investigation.  Additionally, this type of monitoring will not provide identifying information on the individuals entering and exiting the location, making it difficult if not impossible to determine the level of involvement within the organization, if any.

1

## TRASH SEARCHES OF TARGET LOCATIONS

2       83.      Your affiant believes that a trash search could be conducted at some of the locations

3   identified thus far as being associated with the targets subject(s), however, it would risk the

4   detection of law enforcement.  Your affiant is aware that high-level narcotics traffickers and their

5   associates go to great lengths to destroy possible incriminating evidence and are unlikely to use their

6   residence trash containers to dispose of such information.  Your affiant has conferred with other

7   experienced agents and officers who told me that narcotic traffickers will often carry trash away

8   from their residences and place it in commercial dumpsters to avoid having it examined by law

9   enforcement. Furthermore, investigators have considered conducting trash searches of identified

10  residences of known Targets of the investigation and believe that, in considering each location, it

11  would be difficult to conduct a trash search because the neighborhoods are situated where trash cans

12  are placed at the curb in front of the residence for dumping or are located in a rural area where the

13  search would draw suspicion on the law enforcement officers.  A trash search would surely draw the

14  attention of neighbors, who would possibly report this to police, and/or notify the target subject(s) or

15  his/their associates.  Such discovery would likely alert target subjects and his/their associates to the

16  existence of this investigation and risk having it prematurely terminated before the government's

17  objectives have been achieved.  It is difficult for law enforcement officers to justify their presence to

18  any neighbor, without identifying themselves and their purpose for conducting the trash search.

19  Even if trash searches were conducted and evidence of narcotics trafficking was obtained from the

20  trash at this location, the evidence would probably not establish (1) the roles of all participants; (2)

21  the suppliers of the narcotics; (3) the customers; and (4) the full scope of the conspiracy.

22      84.      Regular trash pick-ups at the principal locations identified in this affidavit would be

23  difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They

24  would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is

25  a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for

26  conviction.  Additionally, any time a trash search is conducted; it is possible that officers will be

27  spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

28      85.      Based on my training and experience, there are great risks associated with

conducting trash searches, usually for very minimal possible gain. For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated. This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc. Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation. Further, the risks of such action in this investigation far outweigh any potential rewards.

86.    In addition, I have found that not only are trash searches risky, they are also usually worthless. I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information. I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

87.    I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators. For instance, a trash search might help identify the wrappings used to transport narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

88.    At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation. If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

## FINANCIAL INVESTIGATION

89.    Even if investigators are able to locate accounts and financial records for the

members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and often do not use traditional banking methods. I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns. I know that drug traffickers do not usually maintain records of their illicit earnings. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail and that the majority of the proceeds is transported in bulk via passenger vehicles. During the course of this investigation, investigators have seized bulk currency transported din passenger vehicles. Additionally, DEA HIDTA of Los Angeles, seized bulk currency from passenger vehicle that can be attributed to his DTO. It should be noted, that the DTO has been using traditional banking methods to deposit US Currency below the currency transaction report threshold. In this coordinated effort, DEA Kentucky is working on Grand Jury subpoenas on the accounts identified during the course of their investigation. Additionally, DEA Riverside has identified 10 accounts used by CARILLO to structure proceeds. Investigators intend on submitting Grand Jury subpoenas for these accounts to determine if any assets can be seized.

## GRAND JURY

90.       The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings. It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors. In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity. In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the targets of this investigation.

91.       I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons: (1) the Target Subject, and any

other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.
## CONCLUSION

92.     Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

93.     Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

94.     For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

95.     Your affiant requests that the Court order that Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers

(hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order:

a.      Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), including but not limited to, all wireless digital functions, wireless analog functions, direct connect/digital dispatch/direct dispatch functions, automatic mode switching functions, and "short message service." This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in the Riverside County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

b.      Authorize the installation and/or use of equipment known as pen registers or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to the targeted numbers.

c.      Authorize the installation and/or use of equipment to trap and trace Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to and from the target telephone numbers.

d.      Authorize the installation and/or use of trap equipment to trace and identify the telephone numbers of persons placing calls to the Target Telephone numbers to include the activation of "caller ID" and any calling features such as "call forwarding" and "speed dialing" currently assigned to the Target Telephone numbers.

e.      Your affiant requests the Court to order Sprint/Nextel and Verizon upon request of the applicant, to provide the technical assistance necessary to accomplish this interception unobtrusively and with a minimum of interference with the services said company provides the people whose communications are to be intercepted, and to provide records identifying subscribers and providing subscriber information on any and all telephone and pager numbers identified through this intercept/pen register, and any changed numbers whether published or not, including, but not

limited to past telephone bills and records.

96.      Your affiant requests the Court order Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order, within 48 hours (including after-business hours, weekends, and holidays), and without delay:

a.      Provide any and all information related to any telephone(s), pager(s), text messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted conversation, or otherwise identified in this investigation and the subscriber(s) of any such communication devices(s).  Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other identifier.

b.      Provide Call Data Records (CDR) information, including any and all historical data, originating and terminating call detail, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation.

c.      Provide any and all cell site data, pinging data, and/or GPS location information, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone, without geographical limitations, pursuant to Title 18 USC section

1  2703(D).

2          d.      Provide any and all cell site data, including, but not limited to, cell site

3  location (physical address) of call initiation, call termination, and call progress locations

4  (Automated Message Accounting Data) connected to the use of any and all cellular telephones,

5  which called each Target Telephone, which was called by each Target Telephone, which was

6  identified in an intercepted conversation, or which was otherwise identified in the investigation,

7  without geographical limitations, pursuant to Title 18 USC section 2703(D).

8          e.      Provide access and the access codes to voice mail and voice mail features.

9          f.      Provide all information related to pre-paid cellular telephones called or being

10  called by each Target Telephone number, identified in an intercepted conversation, or otherwise

11  identified in the investigation, including historical, past, present, current, and on-going activity

12  related to hours, minutes, and money left on the pre-paid telephone account.

13        97.      Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all

14  telecommunications providers providing service to the Target Telephone(s) to continue to provide

15  service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances.

16  Additionally, your affiant requests that if the Telecommunication Companies continue to provide

17  service to the Target Telephone(s) regardless of unpaid balances, the Telecommunication

18  Companies be ordered to not disclose to the Target Subject(s) the fact that the service was continued

19  in spite of unpaid balances.  In the event the Telecommunication Companies continue to provide

20  service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not

21  pay for the continued service, the Telecommunication Companies shall be compensated by the

22  agency executing the court order for the cost of the service that was continued regardless of unpaid

23  balances, pursuant to the court's order.

24        98.      Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all

25  telecommunications providers not to disclose to the subscriber or any unauthorized person the fact

26  that the order has authorized this wire interception, or of its existence.

27        99.      Your affiant requests the Court to authorize law enforcement officers use mobile

28  electronic tracking devices to locate and identify the target telephone(s).

100.   Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace officers of the Drug Enforcement Administration and other assisting peace officers be ordered to execute such intercept order.

101.   Your affiant requests that, prior to the sealing of this Application, its affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

102.   Your affiant requests that, pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a showing of good cause before a court of competent jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct.   Executed at Riverside, California.

Dated: February _____, 2015

_____
Special Agent Emilio J. Baca
Drug Enforcement Administration

Sworn to and subscribed before me on February _____, 2015.

_____
HONORABLE HELIOS J. HERNANDEZ
COUNTY OF RIVERSIDE
STATE OF CALIFORNIA

1  MICHAEL A. HESTRIN
   DISTRICT ATTORNEY
2  COUNTY OF RIVERSIDE
3  Deena M. Bennett
   Deputy District Attorney
4  3960 Orange St.
   Riverside, California 92501
5  Telephone: (951) 955-5400
   Fax: (951) 955-9673
6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  IN AND FOR THE COUNTY OF RIVERSIDE

9  **IN THE MATTER OF THE APPLICATION**        )        **WIRETAP NO.  15-108**
   **OF THE DISTRICT ATTORNEY OF THE**          )
10 **COUNTY OF RIVERSIDE FOR AN ORDER**         )
   **AUTHORIZING THE INTERCEPTION OF**          )              **ORDER**
11 **TELEPHONE COMMUNICATIONS**                 )            (SEALED)
                                                )
12 [REDACTED]     **Target Telephone #38**      )
               **Target Telephone #39**         )
13 502-609-5937  **Target Telephone #40**       )

14

15          **ORDER AUTHORIZING THE INTERCEPTION OF COMMUNICATIONS**
                **AS PROVIDED IN PENAL CODE SECTIONS 629.50 et seq.**
16                                      **and**
           **ORDER AUTHORIZING THE OBTAINING OF GLOBAL POSITIONING SYSTEM**
17               **(GPS) TRACKING AND/OR CELLULAR SITE DATA**

18          Michael A. Hestrin, the District Attorney for the County of Riverside, State of California,

19 has made application to this court pursuant to Penal Code Sections 629.50 et seq. requesting

20 authorization to intercept communications to and from certain telephones described below

21 (hereinafter the Target Telephone(s).  The Application was accompanied by the Affidavit of Special

22 Agent Emilio Baca of the Riverside Drug Enforcement Administration, and the review of Special

23 Agent in Charge Anthony D. Williams, who is the designee Chief Executive Officer of the Drug

24 Enforcement Administration.  This Court has read and considered each of those documents,

25 referred to hereinafter as the "Application."

26 **IT APPEARING TO THIS COURT:**

27          (1)      There is probable cause to believe that the individuals identified and/or referred to in

28

                                              1

the Application as Target Subject (s) and their associates, and other co-conspirators (the "Target Subjects") have committed, are committing and are about to commit offenses involving importation, possession for sale, transportation, sale of a controlled substance and possession of narcotics proceeds in violation of Health and Safety Code Sections 11378, 11379, 11370.6 and a Conspiracy to commit said crimes in violation of Penal Code section 182, with respect to a substance containing cocaine  where the substance exceeds three pounds of solid substance by weight and/or ten gallons by liquid volume.  (Penal Code Section 629.52(a))

(2)     There is probable cause to believe that particular communications concerning said crimes (the illegal activities) will be obtained through this interception.   (Penal Code Section 629.52(b))

(3)     There is probable cause to believe that the facilities from which, or the place where the communications are to be intercepted, are being used, or are about to be used, in connection with the commission of said offenses, or are leased to, listed in the name of, or commonly used by the persons whose communications are about to be intercepted, and is within the territorial jurisdiction of this Court.  (Penal Code Section 629.52(c))

(4)     Normal investigative procedures have been tried and have failed and appear to be unlikely to succeed if tried and/or are too dangerous.  (Penal Code Section 629.52(d))

**IT IS HEREBY ORDERED:**

(1)     Interception of the wire, pager and electronic communications to and from the communication devices described below (the "Target Telephones"), including the installation and use of pen registers, dialed number recorders, text messages, digital photographic images, electronic mail ("e-mail") communications, push-to talk communications, and  trap-and-trace devices on the Target Telephones, is hereby authorized.

(2)     The actual interception and listening post shall be in Riverside County. Authorization to intercept communications occurring outside of Riverside County is hereby granted. This authorization extends to communications occurring outside California where the contents of the redirected communications are first heard or accessed in Riverside County. (See

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992))

(3)    Properly trained investigators and monitors working with the Riverside County Sheriff's Department / Drug Enforcement Administration / Southwest Narcotics Corridor Task Force are authorized to intercept the communications of the Target Subjects concerning the above-described offenses to and from the Target Telephone(s) for a period of thirty days (Penal Code Sections 629.54(a) and (b)).  The Target Telephone(s) are described as follows:

REDACTED

c.    **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

(4)    The term "Target Telephone" also refers to any changed telephone number assigned to the same IMSI or SIN or MIN or ESN, or UFMI or MSID with the same subscriber information, and/or any changed IMSI or SIN or MIN or ESN, or UFMI or MSID assigned to the same telephone number with the same subscriber information, and/or any changed subscriber information with the same IMSI or SIN or MIN or ESN, or UFMI or MSID and the same telephone number.

(5)    That the particular types of communications authorized to be intercepted are wire and electronic communications concerning the commission of said offenses.  (Penal Code Section 629.54(c))

(6)     That the United States Drug Enforcement Administration is the agency authorized to intercept the communications.  (Penal Code Section 629.54(d))

(7)     That the District Attorney of Riverside County, State of California, is the applicant for this interception. (Penal Code Section 629.54(d))

(8)     That this Order is valid for thirty days and shall not automatically terminate when the described communication has been first obtained because the Affidavit describes the ongoing nature of the illegal activities.  (Penal Code Section 629.54(e))

(9)     The intercept shall be executed as soon as practical, shall be executed in such a way as to minimize the interception of communications not otherwise subject to interception, and shall terminate upon attainment of the authorized objective, or in any event, no longer than 30 days from the date of this Order, unless an extension is granted. (Penal Code Section 629.58)  In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

(10)    That Sprint Corporation, Verizon Wireless, T Mobile USA, Metro PCS, Cricket Wireless, Virgin Mobile, AT&T, AT&T Wireless Services, AT&T Broadband, Conexone Wireless, Nextel, Nextel Communications, Sprint-Nextel, Sprint PCS, Sprint Spectrum L.P., Sprint Long Distance, U.S. Sprint, Pacific Bell Telephone Company, Pacific Telesis Group, Pacific Bell Wireless, Cingular Wireless, Cingular Wireless West Coast, SBC, General Telephone Company, Allegiance Telecom, Verizon California Inc, Verizon New York, Verizon West Coast Inc, Verizon, Verizon Wireless, Cellco Partnership doing business as Verizon Wireless, Qwest, Qwest Wireless, Qwest Corporation, U.S. West, WorldCom, WorldCom Wireless, MCI, MCI WorldCom, In Touch Communications, Cellular One, U.S. Telepacific Communications, MPower Communications, Time Warner Telecom, Optel Telecom, GST Telecom Inc, XO, XO California Inc, PacWest Telecomm, CCCA Inc, d.b.a. Connect Communications Corporation, BellSouth, Cox, Cox Communications Inc, d.b.a. Cox California Telecom Inc, Citizens Communications, Continental Cablevision, Northwestern Bell, Evans

Telephone Company, Central Wireless Partnership, Arch Wireless, TSR Wireless, Airstar Paging, Winstar Telecommunications, Network Services LLC, Tri State Radio Paging Inc, PageNet, PageMart, Southwest Paging, AirTouch Paging, Metrocall, Weblink Wireless, T-Mobile, Boost Mobile, and any other telephone, long distance, calling card, paging, cellular, wireless or other telecommunication service providers (hereinafter referred to as the Telecommunication Companies) shall, upon **oral or written** request of law enforcement, provide technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services which said companies are providing to the people whose communications are to be intercepted and shall provide caller identification where possible.

(11)    That the Telecommunications Companies, upon oral or written request of law enforcement under this Order, which complies with Section 2703(d) of Title 18 of the United States Code, shall, within 48 hours (including after-business hours, weekends, and holidays), without delay:

a.    Provide any and all information related to any telephone(s), pager(s), text messaging devices, cellular/wireless telephones, calling cards, and other communication devices contacting or being contacted by the Target Devices(s) and, the subscriber(s) of any such communication devices(s).  Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, service and billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), call identification information whether published or non-published, Global Positioning System (GPS) data and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number, universal fleet mobile identifier (UFMI), and any and all encryption keys/codes or other identifier.

b.    Provide toll information, including any and all historical data for any period requested by law enforcement within 48 hours of the request, call detail, including Direct Connect / Push-to-Talk information, call records, originating and terminating call detail, Global Positioning

System (GPS) information, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones calling to or being called by each Target Telephone number.

        c.     Provide cell site data including, but not limited to, cell site location (physical address) of call initiation, Global Positioning System (GPS) data, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone number and any and all cellular telephones called or being called by each Target Telephone number, pursuant to Title 18 USC Section 2703(D).

        d.     Authorize the installation and/or use of equipment known as dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to each Target Telephone number.

        e.     Authorize the installation and/or use of equipment to trap and trace and identify the telephone numbers of persons placing calls to and from the Target Telephone numbers to include the activation of caller identification feature, "caller ID" any calling features such as "call-forwarding" and "speed dialing" currently assigned to the primary telephone numbers, and that the tracing operation and the use of the caller ID service be without geographical limits.

        f.     Provide access and access codes to voice mail and voice mail features.

        g.     Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), and that law enforcement be provided all access necessary to install the necessary equipment required to implement such interception, including but not limited to, all wireless digital functions, wireless analog functions, push-to-talk/direct connect/digital dispatch/direct dispatch functions, voice over IP communications, automatic mode switching functions, "short message service," text messages, packet data services, and instant messages. This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in Riverside County. (See *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992))

h.      Provide all information related to pre-paid cellular telephones including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

i.      Provide pass codes, user ID, passwords, access codes, user names and identify any other features specific to the Target Telephone(s) with GPS capabilities.

j.      Upon request of law enforcement, provide any and all geographic location information at call origination (for outbound calls), call termination (for incoming calls), and Global Positioning System (GPS) tracking and/or pinging data during the progress of a call, on an ongoing and/or real time basis, for the Target Telephone(s) as well as any and all telephones calling into or being called by each Target Telephone number.

k.      Provide all published and non-published subscriber information, including Buddy List information and subscriber information pertaining to the Buddy List, as well as pass codes, user ID, passwords, access codes, and usernames, and identify any other features specific to any and all telephones calling into or being called by each Target Telephone number, **within two business days of each request submitted during the term of this Order**, pursuant to Title 18, USC Sections 2703(C) and 2703(D).

l.      Provide an itemized bill to the law enforcement agency for services rendered for the implementation of this Order.

m.      Upon oral or written request of a law enforcement officer acting under this Order, provide within 24 hours, orally, by facsimile, or by electronic mail, the most recent unbilled call traffic (including date, time and duration) and the latest ESN/ ISMI transaction for the Target Telephone and/ or any telephone in contact with the Target Telephone.

n.      Sprint Corporation, AT&T, Verizon Wireless, Virgin Mobile, T-Mobile, Metro PCS, Cricket Wireless and any and all telecommunications providers providing service to the Target Telephone(s) shall continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances.   Additionally, the Telecommunication Companies shall continue to provide service to the Target Telephone(s) regardless of unpaid

balances.  The Telecommunication Companies are ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances.  In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the Court Order for the cost of the service that was continued regardless of unpaid balances, pursuant to the Court's Order.

(12)    Where applicable, the Federal Bureau of Investigation (FBI) and/or the United States Drug Enforcement Administration (DEA) is authorized to assist with the delivery of call content and data between the Telecommunications Companies and the listening post in Riverside County.

(13)    That there shall be written reports to this court for every ten-day period during the interception showing what progress has been made toward achievement of the authorized objective, or a satisfactory explanation for a lack thereof and the need for continued interception; each ten-day report is to be completed and presented to this Court at the earliest possible time from the end of each ten-day period, or as this Court further directs.  (Penal Code Section 629.60)

(14)    That the Telecommunications Companies shall not disclose to the subscriber or any other unauthorized person any information regarding this interception, or the fact that it exists, unless authorized by further written Order of this Court or of another court of competent jurisdiction.

(15)    This Application, Review, Affidavit, Order(s) and any/all incorporated documents, attachments, and/or exhibits shall be sealed and kept in the custody of the agency executing the Court Order or the District Attorney's Office and to be disclosed only upon a showing of good cause before a Judge of competent jurisdiction.

(16)    Pursuant to Penal Code Section 629.64, the Court Copy of the analog tape recordings shall be sealed on a daily basis and presented to this Court upon expiration of this Order or any extensions thereof.  If, pursuant to Penal Code Section 629.64, the recordings are made on a

digital optical disk or other digital recording media, that recording media shall be presented to this Court upon expiration of this Order or any extensions thereof.

(17)   The agency executing this Order shall maintain records so that an inventory pursuant to Penal Code Section 629.68 can be prepared.  Such an inventory shall be sent to the following classes of individuals:  (1) persons named in the Order or the Application; (2) known parties to intercepted communications; (3) persons for whom telephone subscriber information has been obtained as the result of the telephone being used in an intercepted conversation; (4) persons identified as the result of surveillance based on intercepted conversations; (5) persons arrested as a result of intercepted conversations.

(18)   The agency executing this Order shall maintain a list of all persons described in the previous paragraph who are identified during this wiretap and provide the Asset Forfeiture Division of the District Attorney's Office with said list upon the conclusion of the wiretap.

(19)   The agency executing this Order shall determine the result of an investigation, including the arrest of any individuals, whenever information derived from the wiretap is communicated to another law enforcement agency or to another investigative team.

(20)   The agency executing this Order shall maintain a list of all persons arrested during this wiretap and provide the Asset Forfeiture Division of the District Attorney's Office with said list upon the conclusion of this wiretap.

(21)   The agency executing this Order may make an application in the Six-day Reports for authorization to use the contents of intercepted communications and evidence derived there from, for crimes not specified in the wiretap interception Order, pursuant to Penal Code section 629.82.

///

///

///

///

///

9
Court Order – Wiretap Order No. 15-108

1

2    (22)    Pursuant to Penal Code Section 629.61, the agency executing this Order shall report

3    to the Attorney General, within 10 days after the Order was issued, the persons, facilities, and

4    places that are to be intercepted pursuant to this Order.

5    (23)    This Application, Review, Affidavit, Order(s) and any/all incorporated

6    documents, attachments, and/or exhibits shall be sealed and kept in the custody of the agency

7    executing the Court Order or the District Attorney's Office and to be disclosed only upon a

8    showing of good cause before a Judge of competent jurisdiction.  (Penal Code Section 629.66)

9

10   IT IS SO ORDERED,

11   DATE: February ___ / 9 ___, 2015

12

13   TIME: / ˙3⁻ P.M.

14                                    HONORABLE HELIOS J. HERNANDEZ
                                      JUDGE OF THE SUPERIOR COURT
15                                    COUNTY OF RIVERSIDE

16

17

18

19

20

21

22

23

24

25

26

27

28

1  MICHAEL A. HESTRIN
   District Attorney
2  County of Riverside
   Deena Bennett
3  Deputy District Attorney
   3960 Orange Street
4  Riverside, CA 92501
   Telephone: (951) 955-5400
5  Fax: (951) 955-9673

6

7
             IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
8                   IN AND FOR THE COUNTY OF RIVERSIDE

9  IN THE MATTER OF THE APPLICATION        )      WIRETAP NO. 15-108
   OF THE DISTRICT ATTORNEY OF THE         )
10 COUNTY OF RIVERSIDE FOR AN ORDER        )
   AUTHORIZING THE SEALING OF DOCUMENTS    )      SEALING ORDER
11 AND OPTICAL DISK ACQUIRED DURING THE    )
   THE INTERCEPTION OF WIRE COMMUNICATIONS )
12

13       1.      On February 19, 2015, pursuant to Penal Code section 629.50 et.seq., this Court

14 signed Riverside County Wiretap Order No. 15-108, authorizing the interception of wire and

15 electronic communications to and from cellular telephone number **TT #38:** REDACTED **TT**

16 **#39:** REDACTED **and TT #40: 502-609-5937,** for a period of 30 (thirty) days.  Interception

17 was terminated for **TT #38-40** on March 20, 2015.

18       2.      On March 27, 2015, Drug Enforcement Administration (DEA) Taskforce Officer

19 (TFO) Amado Layos presented the original signed Wiretap Application Packet (to include the

20 Application, Affidavit, CEO Letter, Minimizations, Court Order(s), and 10 Day Reports, Sealing

21 Order) contained in one book for Riverside County Wiretap Order No. 15-108 and associated

22 compact discs containing audio calls and SMS text messages.

23       3.      TFO Layos shall place the original Wiretap Application Packet for the above

24 named Target Telephones, the compact discs and the original signed Sealing Order into one (1)

25 large evidence envelope.

26       4.      The envelope shall be sealed in the presence of the Honorable Judge Becky L.

27 Dugan. TFO Layos shall place the envelope into evidence with the Drug Enforcement

28 Administration Non-Drug Evidence Custodian.

                                      1

5.      The Drug Enforcement Administration shall maintain custody of the envelope in a sealed condition for a period of 10 years, pursuant to Penal Code sections 629.64 and 629.66.

8.      Total number of calls recorded for the authorized interception periods covering the Original Application for **Target Telephone #38** is:



9.      Total number of calls recorded for the authorized interception periods covering the Original Application for **Target Telephone #39** is:



10.     Total number of calls recorded for the authorized interception periods covering the Original Application for **Target Telephone #40** is:

A.      Total number of calls: 3,393

B.      Total number of voice calls: 2,721

C.      Total number of pertinent calls: 225

2

1        D.      Total number of minimized calls: 248

2        E.      Total number of privileged calls: 11

3        F.      Total number of SMS Text messages: 670

4        G.      Total number of pertinent SMS Text Messages: 227

5        H.      Total number of minimized SMS Text messages: 0

6

7      11.     I certify, under penalty of perjury and the laws of the State of California, that the

8  above is true and correct to the best of my knowledge.  Executed in Riverside County, California.

9

10

11  Dated: _3-27-15_

12                                  Taskforce Officer Amado Layos
Drug Enforcement Administration

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    IT IS HEREBY ORDERED THAT:

2         1.    TFO Layos shall place the original Wiretap 15-108 audio recordings into one (1)

3    envelope, along with the original Wiretap 15-108 Affidavit, Application, CEO Letter,

4    Minimizations, Court Order(s), 10 Day Reports and signed Sealing Order, for sealing.

5         2.    The envelope(s) shall be sealed in the presence of the Honorable Judge Becky L.

6               Dugan.

7         3.    TFO Layos shall cause the envelope(s) to be booked into evidence at the evidence

8    room.

9         4.    The Law Enforcement Agency shall maintain custody of the envelope(s) in a

10   sealed condition for a period of 10 years pursuant to Penal Code Sections 629.64 and 629.66.

11

12   DATED: March ___, 2015              _____
                                         Honorable Judge Becky L. Dugan
13                                       Riverside County Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    4

1  MICHAEL A. HESTRIN
   District Attorney
2  County of Riverside
   Deena M. Bennett
3  Deputy District Attorney
   3960 Orange Street
4  Riverside, CA 92501
   Telephone: (951) 955-5400
5  Fax: (951) 955-9673
   State Bar No. 165447
6
7
8              SUPERIOR COURT DISTRICT OF THE STATE OF CALIFORNIA
                      FOR THE COUNTY OF RIVERSIDE
9
10  IN THE MATTER OF WIRETAPS            )   DECLARATION IN SUPPORT OF
    UNSEALING WIRETAP #14-120,           )   UNAVAILABILITY BY THE
11  #14-120 EXTENSION 1, #14-183, #14-558, )   DISTRICT ATTORNEY &
    AND #15-08                            )   AUTHORIZATION OF DESIGNEE
12                                        )
                                          )
13 ──────────────────────────────────────
          DECLARATION OF DEENA M. BENNETT, DEPUTY DISTRICT ATTORNEY:
14
   I, DEENA BENNETT do hereby declare:
15
        1.     I am licensed to practice law in the State of California and am employed by the
16
   Riverside County District Attorney's Office. I have been with this office since September 1993.
17
   I am currently assigned to the Asset Forfeiture Unit and I am the Deputy District Attorney
18
   assigned to handle all wiretaps within the County of Riverside. I have held this assignment since
19
   February 2011. My office location is the Western Division which is located in the City of
20
   Riverside.
21
        2.     Paul E. Zellerbach was sworn in as the District Attorney of the County of
22
   Riverside in January 2011. He was the elected official for four years through December 2014.
23
   Mr. Zellerbach lost his bid for a second term to Michael A. Hestrin, and Mr. Hestrin was sworn
24
   in as the District Attorney on January 5, 2015.
25
        3.     During his tenure in office, and pursuant to the provisions of Penal Code section
26
   629.50(a), District Attorney Paul E. Zellerbach named his second in command as his primary
27
   designee. On February 16, 2011, Mr. Zellerbach issued an office memorandum indicating that
28

                                          1

EXHIBIT
7

1  Assistant District Attorney (ADA) Jeffrey A. Van Wagenen would be the primary designee.  (See

2  Attachment A.)

3       5.      On January 2, 2014, District Attorney Paul E. Zellerbach issued a new designation

4  memorandum in accordance with current case law.  The designation memorandum authorized

5  ADA Jeffrey A. Van Wagenen "to make all decisions necessary to the administration of the

6  District Attorney's Office."  (See Attachment B.)

7       6.      Following the 2014 election and prior to the swearing in of District Attorney-Elect

8  Michael A. Hestrin, ADA Van Wagenen left employment at the District Attorney's Office.  Upon

9  ADA Van Wagenen's departure in October 2014, and pursuant to the provisions of Penal Code

10  section 629.50, District Attorney Zellerbach issued a designation letter, addressed to the Riverside

11  County Superior Court, authorizing Assistant District Attorney Creg G. Datig, his second in

12  command, to act as his primary designee.  (See Attachment C.)

13       7.      At all time, all involved judicial officers who reviewed and authorized the wiretap

14  applications were personally informed of all designees and any changes to the Penal Code section

15  629.50 designation by the District Attorney.

16       8.      On January 5, 2015, Michael A. Hestrin was sworn in as the Riverside County

17  District Attorney.  Following a change in personnel, Michael A. Hestrin issued a designation

18  letter, addressed to the Riverside County Superior Court, indicating that pursuant to the

19  provisions of Penal Code section 629.50, Chief Assistant District Attorney (CADA) John Aki, his

20  second in command, would be the primary designee.  (See Attachment D.)

21       9.      The Riverside County District Attorney's Office received a request from Assistant

22  United States Attorney from the Western District of Kentucky regarding the following wiretap

23  applications:

|  |  |
|---|---|
| 14-120 | Signed by Jeffrey A. Van Wagenen on 03/11/2014 |
| 14-120 Ext. 1 | Signed by Jeffrey A. Van Wagenen on 04/08/2014 |
| 14-183 | Signed by Jeffrey A. Van Wagenen on 04/08/2014 |
| 14-558 | Signed by Creg Datig on 10/27/2014 |
| 15-108 | Signed by John Aki on 02/19/2015 |

26       10.    All of these wiretap affidavits were reviewed by the authorized designee of the

27  District Attorney.  The applications were subsequently signed by the designee and the affidavits

were presented to the court.

11.     District Attorney Hestrin took office on January 5, 2015. District Attorney Hestrin immediately changed a number of the policies, practices and procedures in the administration of the office, including wiretaps.

12.     On February 19, 2015, when Chief Assistant District Attorney John Aki reviewed and signed wiretap #15-108, District Attorney Hestrin was unavailable. His calendar indicates that he was in the Eastern Division of the County and not physically present in the Western end of the county.

13.     Riverside County is the 3rd largest county in the state of California and 10th largest in the nation. Riverside County extends from its Western end, which begins at the borders of Orange and San Bernardino Counties, to its Eastern end at the Arizona border. Riverside County's southern border reaches to San Diego County. The District Attorney's Office is divided into three divisions: Western, Southwest/Mid-County, and Eastern.

14.     Geographically, the Eastern Division's main office in the City of Indio is located approximately 146 miles from the Western Division's main office in the City of Riverside. The designated judicial officer who authorizes and signs wiretap orders is physically located in the Western end of the county, in the City of Riverside.

15.     Pursuant to the provisions of Penal Code section 629.50, Chief Assistant District Attorney John Aki reviewed wiretap #15-108 because District Attorney Hestrin was not available to review and sign the wiretap. District Attorney Hestrin was not physically present in the Western Division's main office in Riverside for the entire day, nor was he in the Western end of the County. District Attorney Hestrin's calendar reflects that he was in the Indio office in the morning hours for scheduled meetings. In the afternoon, he was outside the Indio office but remained in the Eastern end of the County to attend a meeting with another County agency. Given that District Attorney Hestrin was not present in the Western end of the County where wiretap applications are processed and signed, and was instead over two hours away in Indio, District Attorney Hestrin was unavailable to personally review the affidavit and sign the application. Given this unavailability, the Chief Assistant District Attorney reviewed the affidavit

1    and signed the application.

2         16.  In 2014, regarding wiretaps #14-120, #14-120 Extension 1, #14-183, and #14-558,

3    pursuant to the protocol created by District Attorney Paul E. Zellerbach, following the preparation

4    of the wiretap paperwork, all wiretap affidavits and applications were submitted directly to the

5    Assistant District Attorney of the Administrative Division Jeffery A. Van Wagenen.  After

6    Assistant District Attorney Van Wagenen left the office in October of 2014, all wiretap affidavits

7    and applications were submitted directly to ADA Creg G. Datig.  In his letter dated October 14,

8    2014, Paul E. Zellerbach designated Assistant District Attorney Creg G. Datig as the designee

9    pursuant to Penal Code section 629.50 (See Attachment C.)

10        17.  Mr. Zellerbach, Mr. Van Wagenen and Mr. Datig have since departed the office. This

11   declaration is based on my own recollection of the events.  Mr. Zellerbach did not keep records or

12   a calendar that consistently, regularly, or accurately, reflected his day-to-day business.

13        I certify under penalty of perjury and the laws of the State of California, that the above is

14   true and correct to the best of my knowledge.  Executed in Riverside County, California.

15   Dated: January ___, 2016

16                                        DEENA M. BENNETT
                                          Deputy District Attorney
17

18

19

20

21

22

23

24

25

26

27

28

4

# ATTACHMENT  A



OFFICE OF
# THE DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

PAUL E. ZELLERBACH
DISTRICT ATTORNEY

## DISTRICT ATTORNEY DESIGNEE (P.C. Section 629.50)

February 16, 2011

TO:        Asset Forfeiture / Wiretap Staff

FROM:     Paul E. Zellerbach, District Attorney

SUBJECT:   District Attorney Designee authorized to sign wiretap applications pursuant to
Penal Code section 629.50.

---

Effective February 16, 2011, Assistant District Attorney Jeffrey A. Van Wagenen Jr. is my Designee pursuant to Penal Code Section 629.50. In his absence, Assistant District Attorney Cregor Datig will be my designee. My designee is authorized to act in my place pursuant to the provisions outlined in Penal Code Section 629.50 and sign all applications relating to wiretaps.

# ATTACHMENT  B



**PAUL E. ZELLERBACH**
DISTRICT ATTORNEY

OFFICE OF
# THE DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

M E M O R A N D U M

January 2, 2014

TO:        Wiretap Staff

FROM:    Paul Zellerbach

SUBJECT:  Designation Pursuant to Penal Code section 629.50

In my absence, Assistant District Attorney Jeffrey A. Van Wagenen, Jr., is my designee and is authorized to make all decisions necessary to the administration of the District Attorney's Office. If he is unavailable, Assistant District Attorney Greg G. Datig is authorized to act on behalf of the District Attorney's Office.

The above authorization was first made on February 16, 2011, and shall continue until amended, altered, or revoked, in writing by me.

If any questions or concerns arise with respect to wiretap authorization and/or protocol, please feel free to contact me.

# ATTACHMENT C



RIVERSIDE COUNTY
DISTRICT ATTORNEY

October 14, 2014

Honorable Mark Cope
Riverside County Superior Court
4050 Main Street
Riverside, CA 92501

Dear Judge Cope:

Subject: Designation Pursuant to Penal Code section 629.50

In my absence, Assistant District Attorney Creg G. Datig is my designee and is authorized to make all decisions necessary to the administration of the District Attorney's Office. If he is unavailable, Assistant District Attorney Sean Lafferty is authorized to act on behalf of the District Attorney's Office.

This authorization shall continue until amended, altered, or revoked, in writing by the District Attorney.

If any questions or concerns arise with respect to wiretap authorization and/or protocol, please contact Deputy District Attorney Deena Bennett.

Very truly yours,

PAUL E. ZELLERBACH
District Attorney

cc:   Judge Michele Levine
      Judge Helios J. Hernandez

# ATTACHMENT  D



OFFICE OF
# THE DISTRICT ATTORNEY
## COUNTY OF RIVERSIDE
3960 ORANGE STREET
RIVERSIDE. CALIFORNIA 92501-3643

MICHAEL A. HESTRIN
DISTRICT ATTORNEY

January 5, 2015

Presiding Judge Harold W. Hopp
Riverside County Superior Court
4050 Main Street
Riverside, CA 92501

Dear Presiding Judge Hopp:

Re: Designation Pursuant to Penal Code section 629.50

In my absence, Chief Assistant District Attorney John Aki is my designee and is authorized to make all decisions necessary to the administration of the District Attorney's Office.

This authorization shall continue until amended, altered, or revoked, in writing by the District Attorney.

If any questions or concerns arise with respect to wiretap authorization and/or protocol, please contact Deputy District Attorney Deena Bennett.

Sincerely,

Michael A. Hestrin
District Attorney

cc:   Judge Becky Dugan
      Judge Helios J. Hernandez

Zellerbach pleads no contest to sign tampering

Page 1 of 1

# Zellerbach pleads no contest to sign tampering



**Colin Atagi**, The Desert Sun    *5:11 p.m. PST January 8, 2015*

Former Riverside County District Attorney Paul Zellerbach pleaded no contest to vandalism charges involving election signs that belonged to his opponent in last year's district attorney campaign.

Zellerbach entered his plea Wednesday in Riverside County Superior Court in Riverside. He was sentenced to one year probation and 60 hours of community service, according to the California Attorney General's office.

He also must pay an $800 fine and $200 in restitution.

On April 23, a security camera filmed Zellerbach at an Arco gas station at 42-334 Jefferson Street in Indio.

Footage showed him getting out of a county Ford Escape and planting a campaign sign before removing one that belonged to his election opponent, Mike Hestrin.

*(Photo: The Desert Sun)*

Indio police, whose Police Officer's Association backed Hestrin in the election, investigated the incident and requested the state attorney general's office file charges against Zellerbach — recommending two felonies and three misdemeanors. Zellerbach pleaded no contest to one misdemeanor.

"I'm proud of our staff that maintained the integrity of this investigation and followed the law. The detail of their facts and findings presented a complete and comprehensive complaint filing to the California Attorney General's Office," said Indio Police Chief Richard Twiss, in a statement.

"The California Attorney General's Office's determination to file a charge and a subsequent plea of no contest to misdemeanor vandalism validates the integrity of our criminal investigation."

Zellerbach cut the county a $203 personal check on April 25 as reimbursement for the miles he logged in the Ford, which was used to carry around campaign signs during hours that were for official business.

Hestrin, a Riverside County deputy district attorney, won the November election. He was sworn in last week.

Read or Share this story: http://desert.sn/1BF3v1V



EXHIBIT

8