1  PAUL E. ZELLERBACH
2  DISTRICT ATTORNEY
   COUNTY OF RIVERSIDE
3  Deena M. Bennett
   Deputy District Attorney
4  3960 Orange St.
   Riverside, California 92501
5  Telephone: (951) 955-5400
   Fax: (951) 955-9673
6

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              IN AND FOR THE COUNTY OF RIVERSIDE

9  IN THE MATTER OF THE APPLICATION          )    **WIRETAP NO.  14-120**
   OF THE DISTRICT ATTORNEY OF THE           )
10 COUNTY OF RIVERSIDE FOR AN ORDER          )
   AUTHORIZING THE INTERCEPTION OF           )        **APPLICATION**
11 WIRE, PAGER AND ELECTRONIC                )
   COMMMUNICATIONS                           )
12 **Target Telephone #9,** ~~REDACTED~~      )
13 **Target Telephone #10, 502-492-1461**    )
   **Target Telephone #11, 951-570-0461**    )
14 **Target Telephone #12, 951-322-5805**    )
                                             )
15 _____)

16

17     **APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

18          I, Jeffery A. Van Wagenen Jr., Assistant District Attorney for the County of Riverside,

19 declare:

20          1.      Applicant is the District Attorney of the County of Riverside, Paul E. Zellerbach.

21 I am the Riverside County District Attorney's designee, as defined in California Penal Code

22 section 629.50(a).

23          2.      After reviewing the Affidavit In Support Of Application For An Order

24 Authorizing The Interception Of Wire And Electronic Communications of Riverside Police

25 Department, Detective Chris Carnahan, and relying thereon, I approve making this Application

26 and hereby apply to the Riverside County Superior Court for authorization to intercept wire,

27 pager and electronic communications to and from the communication devices (the "Target

28



Device(s)") described below.  The Affidavit is attached hereto and incorporated herein by this reference.

3.    Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

4.    Detective Carnahan, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a).  He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.    Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Riverside Police Department Lt. Cook, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.    Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections 11351, 11352, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone**.

      7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:

      A.     **Target Telephone #9:** [REDACTED] **(TT #9)** is an electronic cellular telephone issued by Sprint Corporation. Subscriber information is unknown at this time. **TT #9** is being utilized by [REDACTED]

      B.     **Target Telephone #10: (502) 492-1461 (TT #10)** is an electronic cellular telephone issued by AT&T.  There is no subscriber information due to the account being a "prepaid customer".  The user address is 17330 Preston Rd. Dallas, TX 75252.  **TT #10** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU).**

      C.  **Target Telephone #11: (951) 570-0461 (TT# 11)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of Eudelia Gonzalez, with an address 1135 W. 7th St. Perris, CA 92570.  **TT #11** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU).**

      D.     **Target Telephone #12: Target Telephone #12: (951) 322-5805 (TT# 12)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of HITE3CH BOOST069, with an address PO Box 54988 Irvine, CA 92619.  **TT #12** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU).**

      8.      The actual interception and monitoring post will be in **Riverside County.**

      9.      The communications to be intercepted are wire and electronic communications between the Target Subjects and other known and unknown associates and/or co-conspirators concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

10. I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

11. Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to maintain this intercept be granted for **thirty (30) days** and request that the authority not be deemed to automatically terminate upon interception of the first communication of the type described above.

12. I request that this Court order **Sprint Corporation,** Verizon Wireless, Virgin Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, **AT&T,** AT&T Wireless, AT&T California Products and Services, T-Mobile USA Inc., Cellco Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., Cingular Wireless, Nextel Communications, Metro PCS, Sprint Spectrum, L.P., Sprint PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any other affected telecommunications companies, subsidiaries, or entities (the "Telecommunications Companies") or electronic mail service providers (the "Email Service Providers") upon request of law enforcement, to provide the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference of the services being provided the Target Subjects. The Telecommunications Companies or the Email Service Providers shall be compensated by the agency executing the court order for the reasonable costs of furnishing the facilities and technical assistance.

13. I request this Court to order the Telecommunications Companies or the Email Service Providers not to disclose to the subscriber or any unauthorized person the fact that the court has authorized this wiretap.

14.     Applicant requests this Application, Review, Affidavit, Order and any/all incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the agency executing the Court Order or the District Attorney's Office and to be disclosed only upon a showing of good cause before a Judge of competent jurisdiction. (Penal Code Section 629.66)

15.     I am unaware of any previous relevant wiretaps other than those set forth in the Affidavit within the meaning of Penal Code Section 629.50(a)(6).

16.     Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED:  3·11·14

By: JEFFREY A. VAN WAGENEN JR.
ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For: PAUL E. ZELLERBACH
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

1

2

3

4

5

6

7

8

9

10

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE OR ELECTRONIC COMMUNICATIONS, AN ORDER AUTHORIZING THE INSTALLATION OF A PEN REGISTER TRAP AND TRACE DEVICE, AND AN ORDER AUTHORIZING THE OBTAINING OF GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA | INTERCEPT ORDER<br><br>14-120<br><br>**REVIEW OF CHIEF EXECUTIVE OFFICER DESIGNEE** |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### REVIEW OF THE CHIEF EXECUTIVE OFFICER DESIGNEE

Assistant Chief Christopher Vicino of the Riverside Police Department, states:

1.     The Chief Executive Officer for the Riverside Police Department is Sergio Diaz.

2.     I am the Assistant Chief of Police in charge of the Riverside Police Department.

3.     I am the Chief Executive Officer's designee for intercept orders, within the meaning of California Penal Code section 629.70(a)(3).

4.     Christopher Carnahan is a Detective with the Riverside Police Department and is currently assigned to the Special Investigations Bureau – DEA TFG2.

**5.**     I have reviewed the Affidavit of Christopher Carnahan, which sets forth the circumstances in support of the application and which requests authority to install a pen register trap and trace device, to obtain global positioning system (GPS) tracking and/or cellular site data of and to intercept wire or electronic communications to and from **Target Telephone #9,** REDACTED REDACTED **Target Telephone #10, 502-492-1461, Target Telephone #11, 951-570-0461, and Target Telephone #12, 951-322-5805.**

I APPROVE THE APPLICATION.

Dated:   3-6-14

Riverside Police Department

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS | ) WIRETAP NO.: 14-120 ) AFFIDAVIT IN SUPPORT ) OF INTERCEPT ORDER ) ) ) ) |

| | |
|---|---|
| REDACTED | Target Telephone #9 ) |
| (502) 492-1461 | Target Telephone #10 ) |
| (951) 570-0461 | Target Telephone #11 ) |
| (951) 322-5805 | Target Telephone #12 ) |

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC
CELLULAR TELEPHONE COMMUNICATIONS
AND
AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING
AND/OR CELLULAR SITE DATA
AND
AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE

I.
INTRODUCTION AND EXPERTISE

I, Christopher Carnahan, being duly sworn do hereby declare and state:

1.      Pursuant to Penal Code Section 629.50 (a), I am a Detective for the Riverside Police Department assigned to the Special Investigations Bureau, and I am currently assigned as a Task Force Officer (TFO) with the Riverside District Office of the Drug Enforcement Administration.  I am the officer who is seeking authorization to intercept wire and electronic cellular telephone communications.  I am an investigator, or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18 of the United States Code.  I am empowered to conduct investigations of, and to make arrests for, the drug offenses enumerated in Title 18, United States Code, and Section 2516.  Additionally, I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court ordered wiretaps. (Penal Code Section 629.50 et seq.)

2.      I have worked as a police officer with the City of Riverside Police Department for the past ten years.  I have held the rank of detective and am currently assigned to the DEA Task Force.  Prior to working for the Riverside Police Department, I worked for the Oceanside Police Department for approximately eight years.  Prior to working for the Oceanside Police Department, I worked for the Los Angeles Police Department for approximately nine years.  While employed by the Oceanside Police Department, I held the rank of Detective.  I worked for a year as a gang detective and three years as a narcotic detective.  The gang unit specializes in gathering intelligence information of gang-related crimes and investigating crimes involving gang members. While working as a narcotic detective, I was selected and assigned to the DEA MET Team. While assigned to the DEA MET Team, we targeted Los Angeles and Oceanside gang members who sold cocaine on North Coast Highway in the City of Oceanside.  While employed by the Los Angeles Police Department, I worked approximately two and a half years with the South Bureau C.R.A.S.H. (Community Resources Against Street Hoodlums) Search Warrant Team. During my employment with Oceanside Police Department and the Los Angeles Police Department, I have participated in numerous narcotics investigations as well as physical and wire surveillance, executed search warrants, and arrested numerous drug traffickers.  I have also spoken, on numerous occasions, to informants and suspects concerning the methods and practices of drug traffickers.  I have received in excess of 360 hours of specialized training involving the use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, and conspiracy investigations regarding violations of California State narcotics laws. I currently investigate domestic and foreign large scale, multiple pound/kilo, poly-drug dealers, traffickers and organizations.   I have conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 843(b), 846, 952(a) and 963, and Title 18, United States Code, §§ 2, 1952, 1956 and 1957.

3.      Currently, I am assigned to the Drug Enforcement Administration- Task Force Group 2, which is a large scale narcotic investigation group.  I am an investigative or law

1   enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is

2   empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18

3   U.S.C. § 2516.

4        4.    I am familiar with the facts and circumstances described herein. This Affidavit

5   is based upon the following: (1) personal knowledge I have derived from my participation in

6   this investigation; (2) conclusions I have reached based upon my training and experience; (3)

7   my conversations with other law enforcement investigators with whom I have discussed this

8   case; (4) and what I believe to be reliable information obtained from the following sources: oral

9   and written reports about this investigation and other investigations which I have received from

10  law enforcement officers; (5) law enforcement databases; (6) telephone records - toll records

11  and subscriber information; (7) public records; and (8) physical surveillances conducted by law

12  enforcement officers, which have been reported to me directly.

13       5.    Unless otherwise noted in this Affidavit, when I assert that a statement was

14  made, the information was provided to me by another law enforcement officer, or other source

15  of information with whom I have spoken or whose reports or statements I have reviewed.

16  Parenthetical explanations of coded or vague communications throughout this Affidavit are

17  based on my interpretation, derived from my training, experience and familiarity with this and

18  previous narcotics investigations.

19       6.    Based upon the information contained herein, I hereby make an application to

20  intercept the wire, pager, and electronic cellular telephone communications for **Target**

21  **Telephones #9, #10, #11, and #12** as described below:

22       A.    **Target Telephone #9:** REDACTED **(TT #9)** is an electronic cellular

23  telephone issued by Sprint Corporation. The subscriber information is still pending. **TT #9** is

24  being utilized by REDACTED

25

26       B.    **Target Telephone #10: (502) 492-1461 (TT #10)** is an electronic

27  cellular telephone issued by AT&T.  There is no subscriber information due to the account

28  being a "prepaid customer".  The user address is REDACTED Dallas, TX 75252.  The

Electronic Serial Number 355697052043860, the Mobile Station Identification Number 310410649733251. TT #11 is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

   C. **Target Telephone #11: (951) 570-0461 (TT# 11)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of Eudelia Gonzalez, with an address ███REDACTED███ St. Perris, CA 92570. The **Electronic Serial Number 268435459707826755, the Mobile Station Identification Number 000002564064260. TT #12** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

   D. **Target Telephone #12: (951) 322-5805 (TT# 12)** is an electronic cellular telephone issued by Sprint Corporation with a subscriber name of HITE3CH BOOST069, with an address PO Box 54988 Irvine, CA 92619. The **Electronic Serial Number 268435462502699737, the Mobile Station Identification Number 000009122485578. TT #13** is being utilized by an unidentified male known as **REY Last Name Unknown (LNU)**.

  7. I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order. The listening post will be in the County of Riverside, California.

  8. Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of possession for sale, transportation, and sale of a controlled substance in violation of sections 11351, 11352,11378 and 11379 of the Health and Safety Code, with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code sections 629.50(a) and 629.50(a) (2)))

9.    Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #9:** **REDACTED** , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications and any background conversations while the telephone instrument is otherwise in use.

### B.
## PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA

10.    I also request the authorization for the installation of a pen register and trap and trace feature on **TT #9:** **REDACTED** , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.** I also request the authorization to obtain and receive cell site data and/or Global Positioning System (GPS) location information including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each target telephone and any and all cellular telephones called or being called by each target number without geographical limitations, related to **TT #9:** **REDACTED** , **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.** The Target Telephone(s) is/are a mobile cellular

1  telephone(s), which makes surveillance difficult if not impossible because the location of the

2  person using the target telephone is often unknown.  However with the assistance of cell site

3  data and/or Global Positioning System (GPS) location information including, but not limited to,

4  cell site location (physical address) of call initiation, call termination, and call progress

5  locations (Automated Message Accounting Data) connected to the use of each target telephone

6  and any and all cellular telephones called or being called by each target number without

7  geographical limitations related to the target telephone(s), law enforcement officers would be

8  able to locate and conduct surveillance of the user of the target telephone(s).  Therefore, your

9  affiant requests an order to obtain and receive cell site data and/or Global Positioning System

10  (GPS) location information including, but not limited to, cell site location (physical address) of

11  call initiation, call termination, and call progress locations (Automated Message Accounting

12  Data) connected to the use of each target telephone and any and all cellular telephones called or

13  being called by each target number without geographical limitations related to the target

14  telephone.

15          a. Your affiant has learned through conversations with other law enforcement

16  officers and by personal knowledge that illegal narcotic traffickers have the potential to disable

17  the GPS function in their telephones if they are aware law enforcement can monitor their real

18  time movements.  Your affiant does not solely rely on GPS locations because your affiant

19  knows, often times GPS requests can fail or revert to cell towers with a 5000 meter locate.  I

20  also know there are many "dead spots" in Southern California as related to cellular service for

21  Verizon.  I have been told by Verizon employees if cellular telephones do not receive a signal, I

22  will receive a failed response when requesting GPS locations.

23          b. I also request that law enforcement officers be given the authorization to use

24  mobile electronic tracking devices to locate and identify. TT #9: ███REDACTED███ TT #10:

25  (502) 492-1461, TT#11: (951) 570-0461, and TT#12: (951) 322-5805.  The Target

26  Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not

27  impossible because the location of the person using the target telephone is often unknown.

28  However with the assistance of mobile electronic tracking devices, law enforcement agents can

1   identify the location of a cellular telephone to a much finer detail than through cellular site data
2   alone.

### III.
### DURATION OF INTERCEPTION
(Penal Code section 629.50(a) (5))

5   11.   This Affidavit is in support of an Application to intercept wire and electronic
6   communications for **a period not to exceed thirty (30) days commencing on the day of the**
7   **initial intercept or ten (10) days after the issuance of the Order, whichever comes first,**
8   **pursuant to California Penal Code section 629.58.**  The goal of this investigation is to prove
9   the full scope, membership and methods of operation of the conspiracy.  I request that the Court
10  order that the interception not terminate when the communications described herein are first
11  intercepted, but may continue to the full extent of California Penal Code section 629.58 or until
12  the full scope of the enterprise is developed, including the identities of all participants, their
13  places and methods of operation and the various activities in which they are engaged in
14  furtherance of the enterprise, whichever comes first.  Based upon your affiant's training and
15  experience, narcotic traffickers extensively use their telephones to conduct their illegal
16  activities.  Therefore, your affiant believes that additional communications of the same type will
17  occur after the interception of the first communication to and from the target telephone(s).

### IV.
### TARGET TELEPHONE(S)
(Penal Code section 629.50(a)(4))

21  12.   The Target Telephones are described as follows:

22       1)   **Target Telephone #9:** [REDACTED] (TT #9) is a Sprint wireless
23  telephone. **TT#10** is being utilized by [REDACTED].

24       2)   **Target Telephone #10: (502) 492-1461 (TT#10)** is an AT&T
25  telephone. **TT#11** is being utilized by **"REY" (TS # 7).**

26       3)   **Target Telephone #11: (951) 570-0461 (TT#11)** is a Sprint Wireless
27  telephone. **TT#12** is being utilized by **"REY" (TS# 7).**

1          4)         **Target Telephone #12: (951) 322-5805 (TT#12) is** a Sprint Wireless

2  telephone. **TT#13** is being utilized by **"REY" (TS# 7).**

3          A.         The term **"Target Telephone #9"**, **"Target Telephone #10"**,

4  **"Target Telephone #11", and "Target Telephone #12"** also refers to any changed telephone

5  number assigned to the same Electronic Serial Number (ESN) and/or International Mobile

6  Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number,

7  Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC),

8  ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target

9  telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same

10  telephone number(s) with the same subscriber information as the target telephone(s) or any

11  additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC

12  whether the changes occur simultaneously or consecutively, listed to the same subscriber and

13  wireless telephone account(s) as the target telephone(s)

14          B.        Based on my training and experience, persons often use fictitious

15  names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law

16  Enforcement. This enables persons involved with criminal activity to operate with a level of

17  comfort knowing that their fictitious information will keep Law Enforcement from immediately

18  knowing their true identities. This delay in identifying these suspects often allows them enough

19  time to either destroy or hide evidence of their crimes and also buys them time to flee the area

20  of the crime.

21

22                                **V.**

23                 **TARGET SUBJECTS**
                    (Penal Code section 629.50(a) (4))

24  13.    The known Target Subject(s) of this investigation are:

25

26

27

28





REDACTED

g.  (**Target Subject 7**) is a Hispanic male identified only as "**REY**", utilizing **TT#11 (502) 492-1461, and TT#12 (951) 570-0461,** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence.   There are no other known identifying characteristics about **REY Last Name Unknown (LNU)** and as a result a records check into the California Department of Motor Vehicles cannot be completed.

## VI.
### COURT'S JURISDICTION
#### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code section 629.52)

14.     *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...." Section 629.52 does not define the phrase "initially intercepted."  However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...."  In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey.   The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey.   The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.   The court held "for the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the taped telephone is located, but

also where the contents of the redirected communication are first to be heard." (*Ibid*, at page 136)  In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap was jurisdictionally defective because it was authorized by a judge outside the judicial district in which the defendants' telephones were located.  The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas.  The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We agree with the reasoning of the Second Circuit and now hold that the interception included both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders.  As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)  Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived and where the criminal conduct was being investigated, could issue a wiretap order for a cellular telephone which was thought to be used by the target subject regardless of where the cellular telephone or the listening post was located, even though the criminal conduct which being investigated was occurring in another district and the listening post was located in another district.  In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order to intercept cellular telephones which were assigned area codes located in another district, because the listening post was located in the same district as the judge who issued the order.

15.     Based upon my training and experience, persons engaged in criminal conduct use cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining cellular phones as a means of preventing detection by law enforcement.  By using other persons' names and creating a fictitious prepaid account, a target subject acquires a

1  certain degree of anonymity, and is one of the reasons for the popularity of pre-paid cellular

2  telephones among those engaged in narcotics trafficking.  This enables persons involved with

3  criminal activity to operate with a level of comfort knowing that their fictitious information will

4  keep law enforcement from immediately knowing their true identities.  This delay in identifying

5  these suspects often allows them enough time to either destroy or hide evidence of their crimes

6  and also provides them time to flee the area of the crime.

7

8

9

10

11

12                                    REDACTED

13

14

15

16

17

18

19        18. **Target Telephone #10: (502) 492-1461 (TT#10)** is an AT&T telephone.  **TT#10** is

20  subscribed to a prepaid customer located at    REDACTED    Dallas, TX 75252 and is being

21  utilized by **"REY"** (TS# 7).

22        19. **Target Telephone #11: (951) 570-0461 (TT#11)** is a Sprint wireless telephone.

23  **TT#12** is subscribed to    REDACTED    St Perris, CA 92570 and is

24  being utilized by **"REY"** (TS#7).

25        20. **Target Telephone #12: (951) 322-5805** is a Sprint wireless telephone.  **TT#12** is

26  subscribed to HITE3CH BOOST069 located at PO Box 54988 Irvine, CA 92619 and is being

27  utilized by **"REY"** (TT# 7).

28

21. Based on GPS pings of **TT #11** and **TT #12**, investigators have identified multiple residences within Riverside County associated to **REY** to include the subscriber address of **TT #12.**

22. Lastly, based on extensive toll analysis of all three target telephones utilized by **REY**, investigators determined that there are multiple connections to ongoing narcotics cases across the continental United States to include Missouri, Georgia, Texas and Kentucky. **REY**, operating in, around and/or through Riverside County which stretches from Orange County to the Colorado River and forms the state border with Arizona. Riverside County lies inland of Los Angeles County and is bordered by Orange County to the west, San Bernardino County to the north and San Diego County and Imperial County to the south. Major Highways that operate thru Riverside County include Interstates 10, 15, 215 and State Routes 60, 91 and 111. The above referenced highways will lead to the other, major counties of California previously mentioned as well as across state lines into Nevada.

23. The interception and listening post will be in **Riverside County.**

## VII.
### PRIOR APPLICATIONS
### (Penal Code section 629.50(a) (6))

24. On March 4, 2014, a review of the California Electronic Intercept Court Order System ("EICOS") and DEA/FBI electronic surveillance ("ELSUR") indices was conducted for **Target Telephone #10 (TT #10), Target Telephone #11 (TT# 11)** , and **Target Telephone # 12 (TT# 12).**



REDACTED

26. Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to

1   intercept wire, oral, or electronic communications involving any of the same persons, facilities,

2   or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

*REDACTED*

*REDACTED*

*REDACTED*

# VIII.
## OBJECTIVES OF THIS INVESTIGATION

27.     Your affiant believes interception of wire communications to and from **Target Telephones #9-12** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

a.     The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.     The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.     The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.     The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.     The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.     The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.     Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

# IX.
## STATEMENT OF PROBABLE CAUSE
### (Penal Code section 629.50(a)(4))

28.     The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

29.     Based upon the investigation in this case, set forth in detail below, I assert that:

a.     There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11351, 11352, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a))

b.     There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications.  (Penal Code section 629.52(b).

30.     There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted. (Penal Code section 629.52(c))

31.     That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained below. (Penal Code section 629.52(d)).

32.     Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering,

1  will be obtained through the interception of wire communications over the **"Target**
2  **Telephones"**.

3      33.    I make this Affidavit, in part, on personal knowledge derived from participation
4  in this investigation and, in part, upon the information from the following sources:

6          a.      Oral and written reports about this and other investigations that I have
7  received from the DEA and other law enforcement officers;

8          b.      Physical surveillance conducted by the West County Narcotic Task Force
9  (WCNTF), Riverside Sheriff Department (RSD), and DEA RDO in this and other
10 investigations, which has been reported to me either directly or indirectly;

11         c.      Pen register and trap and trace information, telephone tolls and other
12 documentary evidence in this and other investigations and,

13         d.      Evidence gathered through other law enforcement investigations.

14         e.      Communications intercepted pursuant to court-authorized intercept
15 orders.

16         f.      Evidence obtained through court-authorized intercept orders.

**A.**
**IDENTIFICATION OF TARGET TELEPHONE #9**

*REDACTED*





REDACTED

**B.**
**IDENTIFICATION OF TARGET TELEPHONE #10**

REDACTED

38.     The following intercepted communications made to or from **(502) 492-1461 (TT #10)** as intercepted over Riverside County Wire 14-79 are indicative of the types of narcotics activates associated with **REY** and indicate that **REY** is a narcotics broker for various distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to further his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **REY** and the target telephone which he utilizes.

a.          **On Monday, February 3, 2014,** at 4:24 p.m., "**REY**" utilizing **TT#10 (502) 492-1461** called REDACTED utilizing REDACTED REDACTED asked **REY** what was going on.  **REY** said the phone didn't have a good signal.

1 REY said he had to get a small phone, but was struggling with it. [REDACTED] said "okay". REY
2 asked if [REDACTED] friend could see them (REY and other unknown defendants). REY then
3 asked if [REDACTED] could meet with him. [REDACTED] asked where they would want to meet.
4 [REDACTED] said at the house. [REDACTED] also said his stuff (narcotics) had not arrived yet. REY
5 then asked [REDACTED] if his buddy had some (referring to narcotics). [REDACTED] said "yes" but it
6 was going to be a little more expensive. [REDACTED] further said that it would be $200 more, but
7 was the same quality as his ( [REDACTED] ). REY said it was alright and [REDACTED] asked REY
8 how many he wanted. REY said he wanted "three". [REDACTED] said he would call the guy and
9 would let REY know. REY also told [REDACTED] to call him on this one (phone TT# 11).
10 [REDACTED] said okay.

11        b.     **On Monday, February 3, 2014,** at 5:02 p.m., [REDACTED]
12 [REDACTED] utilizing Target Telephone # [REDACTED] called "REY" utilizing **TT #10 (502)**
13 **492-1461.** "REY" asked [REDACTED] what was going on. [REDACTED] said that the (narcotics) was
14 ready, but the other guy would be calling soon and let him know when he would be able to
15 bring the (narcotics) either today or tomorrow. REY said it would be better the next morning.
16 [REDACTED] said it would depend on when "they" (other dealer) could bring it. REY said it
17 "they" could do it within the next hour of so then it would be okay. [REDACTED] said he would let
18 REY know when "they" call him. REY then told [REDACTED] to let him know if possible an hour
19 before it would happen and he (REY) would make arrangements.

20
21                                    **C.**
             **IDENTIFICATION OF TARGET TELEPHONE #11**
22       39.     On January 14, 2014, the Honorable Judge Helios J. Hernandez of the Riverside
23 County Superior Court issued Riverside County Intercept Order 14-11, authorizing the
24 interception of the electronic cellular telephone communications to and from Target Telephone
25 [REDACTED] and used by [REDACTED]
26       40.     The following intercepted communications made to or from **(951) 570-0461 (TT**
27 **#11)** as intercepted over Riverside County Wire 14-11 are indicative of the types of narcotics
28 activates associated with REY and indicate that REY is a narcotics broker for various

1  distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to

2  further his narcotics related activities for the DTO. Based on my training an experience, the

3  following pertinent aspects of intercepted communications and parenthetical explanations of

4  language contained therein, are related to and indicative of the narcotics activities associated

5  with **REY** and the target telephone which he utilizes.

6          a.             **On Sunday, January 19, 2014,** at 1:37 p.m., [REDACTED]

7  [REDACTED] utilizing Target Telephone # 4 [REDACTED] called "**REY**" utilizing

8  **TT#11 (951) 570-0461.** [REDACTED] asked for Rey. **REY** said hello. [REDACTED] and **REY**

9  greeted. [REDACTED] asked what the message was about. [REDACTED] said he was running out but he

10  was setting some away for him (**REY**). **REY** said everything was calm (possibly slow), so he

11  would have to see, but he (**REY**) did have enough to pay for one part (one unit of narcotics).

12  **REY** said he had been up and down, and had not been around. [REDACTED] said he only had six

13  left. [REDACTED] said they (narcotics) were flying out the door, at that price. **REY** said they

14  (**REY** and others) had gotten an offer for a "ventilator" (twenty), for super cheap, but said he

15  (**REY**) was not too interested. [REDACTED] asked for what type. **REY** said it was of the same

16  kind ([REDACTED] had). [REDACTED] said he had already sold like six, to one guy. **REY** said he was

17  about to call him ([REDACTED]), but they (**REY** and others) had gotten a call from those guys

18  (third parties/with the "ventilator"), since they (**REY** and others) had worked with those other

19  guys (third party) before. **REY** said he had told them (third parties) they (**REY** and others)

20  were not working. **REY** said they (third parties) would be a good opportunity for [REDACTED],

21  since he was working. [REDACTED] said that was good, and cheap. **REY** said he told the guy

22  (third party) he (**REY**) really did not want to deal with those (possibly types of narcotics)

23  because they were too much trouble. [REDACTED] agreed it was too much at once, even though it

24  was a good deal. **REY** agreed it was always a better price when you got a lot at once.

25  [REDACTED] said the deal was not the same for them ([REDACTED] and **REY**) who dealt with small

26  amounts. **REY** insisted it would be a good deal for [REDACTED]. **REY** said VICTOR could get

27  them (possibly narcotics) for only three, when [REDACTED] was getting them for three-something.

28

1  **REY** said he would take one (possibly narcotics), for Wednesday or Thursday. ▮REDACTED▮ said

2  okay, he would pre-pay it. **REY** said okay.

3          b.         <u>**On Sunday January 19, 2014,**</u> ▮REDACTED▮

4  utilizing Target Telephone #4 ▮REDACTED▮ called "**REY**" utilizing TT#11 **(951) 570-0461.**

5  ▮REDACTED▮ identified himself as ▮REDACTED▮ and told **REY** that there was a guy who had it (possibly

6  narcotics) at that moment, but he (guy) was giving it (possibly narcotics) three points higher

7  (possibly higher price). **REY** said they (third party and others) had already seen somebody

8  yesterday. **REY** said he told them (third party and others) to better wait for the one that

9  belonged to ▮REDACTED▮ (possibly narcotics), adding that he (**REY**) would wait for it (possibly

10  ▮REDACTED▮ narcotics). ▮REDACTED▮ said okay. **REY** mentioned the guy (third party) wanted the

11  "same thing" and **REY** had the same thing that belonged to ▮REDACTED▮ so he gave it to them

12  (third party and others), but **REY** was left almost dry (possibly without narcotics). ▮REDACTED▮

13  said he would call **REY** back when he got... **REY** interrupted and asked ▮REDACTED▮ to call him

14  when ▮REDACTED▮ was ready with his stuff (possibly narcotics). ▮REDACTED▮ said all right.

15          c.         <u>**On Thursday January 23, 2014,**</u> ▮REDACTED▮

16  ▮REDACTED▮utilizing Target Telephone # 4 ▮REDACTED▮ called "**REY**" utilizing TT#11 **(951) 570-**

17  **0461.** ▮REDACTED▮ asked **REY** what he was doing. **REY** said nothing and asked who was calling.

18  ▮REDACTED▮ cursed and identified himself as "Pollo". **REY** said he was having a hard time

19  understanding ▮REDACTED▮. ▮REDACTED▮ said he (▮REDACTED▮) had a dude who had some there, because

20  his (▮REDACTED▮) have not arrived. ▮REDACTED▮ then said those (possibly narcotics) were cheaper

21  than the ones he (▮REDACTED▮) had told **REY** about. **REY** said it was not about being cheaper, he

22  (**REY**) was most interested in getting something that was good. ▮REDACTED▮ said these ones

23  (possibly narcotics) were also good. **REY** said he would need to talk to his buddy because the

24  other guys have not said anything because the lady had not arrived yet. **REY** said he was far

25  right now; he was about two hours away. ▮REDACTED▮ said to call him back and let him

26  (▮REDACTED▮) know how many he (**REY**) needed. **REY** asked if he should jot down this number

27  or should he keep the other one (phone number). ▮REDACTED▮ told **REY** to jot this one (phone

28  number) down since this one was the good one. **REY** asked if this was the one for business or

1  home (phone). **REDACTED** said this one was his business (phone).  **REY** said okay, he would jot

2  it down and would call **REDACTED** from another one.

3

**D.**
**IDENTIFICATION OF TARGET TELEPHONE #12**

**REDACTED**

42.     The following intercepted communications made to or from **(951) 322-5805 (TT #12)** as intercepted over Riverside County Wire 14-11 are indicative of the types of narcotics activates associated with **REY** and indicate that **REY** is a narcotics broker for various distributors, and that **REY** utilizes target telephones to facilitate the transfer of narcotics to further his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **REY** and the target telephone which he utilizes.

a.     **On Thursday January 16, 2014,** **REDACTED** **REDACTED** utilizing Target Telephone TT #4 **REDACTED** received an incoming call from "**REY**" utilizing **Target Telephone TT#12 (951) 322-5805,** **REDACTED** told REY  he called a dude (possibly **REDACTED** and he ( **REDACTED** ) was going to check.  **REY** asked in how many days **REDACTED** would be ready. **REDACTED** said he ( **REDACTED** ) did not know. **REDACTED** said they (third parties) told him ( **REDACTED** ) there was a problem before crossing (possibly border).  **REY** said okay. **REY** asked if **REDACTED** had his (**REY**) other phone. **REDACTED** said yes and told **REY** he had two (phone numbers for **REY**).  **REY** said for **REDACTED** to give him a call on the other one (phone) because where he (**REY**) was going to be at, he (**REY**) was not going to get (any reception).  **REY** said for **REDACTED** to try this one (phone number) first. **REDACTED** said he was going to give the number to the guy (possibly **REDACTED** ) so they (**REY** and **REDACTED** ) could meet. **REY** asked where he was going to see him (possibly **REDACTED** ). **REDACTED** said close by to **REY's**

1  house by the Kikirikis (possibly chicken restaurant).  **REY** asked if the guy ([REDACTED]) was

2  around there.  [REDACTED] said he ([REDACTED]) was not there but he told him ([REDACTED]) somewhat

3  where it was.  **REY** said for the guy to go there so they (**REY** and [REDACTED]) would not be

4  struggling.  [REDACTED] said he was going to call him right now and to meet around there.

5  [REDACTED] said right now he ([REDACTED]) was going to let him know if there was one (possibly

6  narcotics). **REY** told [REDACTED] to give him (**REY**) around 20, 30 minutes to get ready and have

7  the money on hand.  [REDACTED] said he would give **REY** a call when everything was ready.

8  **REY** said okay.

9           b.    __On Thursday, January 30, 2014,__ [REDACTED]

10 [REDACTED] utilizing Target Telephone (TT#4) [REDACTED] called "**REY**" utilizing Target

11 Telephone **TT#12 (951)-322-5805.** [REDACTED] told REY, he called a dude ([REDACTED]) and

12 he ([REDACTED]) was going to check.  **REY** asked in how many days [REDACTED] would be ready.

13 [REDACTED] said he ([REDACTED]) did not know.  [REDACTED] said they (third parties) told him

14 [REDACTED]) there was a problem before crossing (possibly border). **REY** said okay. **REY** asked

15 if [REDACTED] had his (**REY**) other phone.  [REDACTED] said yes, and told **REY** he had two (phone

16 numbers for **REY**).  **REY** said for [REDACTED] to give him a call on the other one (phone) because

17 where he (**REY**) was going to be at, he (**REY**) was not going to get (any reception).  **REY** said

18 for [REDACTED] to try this one (phone number) first.  [REDACTED] said he was going to give the

19 number to the guy (possibly [REDACTED]) so they (**REY** and [REDACTED]) could meet. **REY** asked where

20 he was going to see him (possibly [REDACTED]).  [REDACTED] said close by to **REY's** house by the

21 Kikirikis (possibly chicken restaurant).  **REY** asked if the guy ([REDACTED]) was around there.

22 [REDACTED] said he ([REDACTED]) was not there but he told him ([REDACTED]) somewhat where it was. **REY**

23 said for the guy to go there so they (**REY** and [REDACTED]) would not be struggling.  [REDACTED] said

24 he was going to call him right now and to meet around there.  [REDACTED] said right now he

25 ([REDACTED]) was going to let him know if there was one (possibly narcotics).  **REY** told [REDACTED]

26 to give him (**REY**) around 20, 30 minutes to get ready and have the money on hand.  [REDACTED]

27 said he would give **REY** a call when everything was ready.  **REY** said okay.

28

43.     The above listed calls and parenthetical explanations are based on my training, experience, and intelligence gained during this investigation and is related to narcotics distribution.

## XI.
## SIGNIFICANT EVENTS / SEIZURES

44.     The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations.  While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related.  Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

a.     On **12-12-13**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore.  California Highway Patrol K-9 unit alerted to the rear of the vehicle.  Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds).  Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

b.     On **01-02-14**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

c.     On **03-03-14**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona.  Vehicle was impounded for 30 days and driver released.  Investigators recovered approximately 9.8 pounds of methamphetamine from vehicle truck area.

## X.
## NECESSITY AND EXHAUSTION
### (Penal Code section 629.50(a) (4))

45.     Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather

1  evidence against the Target Subjects because normal investigative techniques have failed,
2  appear reasonably likely to fail if tried, or are too dangerous. Such information is therefore
3  necessary to enable the government to achieve the objectives of this investigation -- to obtain
4  direct evidence that will convince a jury beyond a reasonable doubt of:

5          a.     The full scope and identification of key personnel of the Target
6  Subject(s)' illegal narcotics trafficking organization;

7          b.     The identity and role of all of Target Subject(s)' suppliers of illegal
8  narcotics;

9          c.     The identity of the Target subject(s)' customers and the other
10  unidentified conspirators;

11          d.     The stash locations where Target Subject(s)' supplies of illegal narcotics
12  are stored prior to its distribution;

13          e.     The management and disposition of proceeds generated by the
14  organization's illegal narcotics trafficking;

15          f.     The methods and routes used by the Target subject(s)' illegal narcotics
16  trafficking organization to import illegal narcotics into the United States, to deliver the illegal
17  narcotics to various states; and

18          g.     Providing evidence beyond a reasonable doubt (i.e., that will support a
19  conviction) against the Target Subject(s), and any later identified targets for the alleged
20  violations set forth herein.

21      46.      The following is a list of the investigative techniques which have been used or
22  which I have considered using in this investigation and an explanation of why these techniques
23  are not reasonably likely to succeed in identifying and allowing the government to accomplish
24  its investigative objectives.

25                              **INTERVIEWS**

26      47.      Your affiant believes that interviews of the target subject(s) or his/their
27  known associates would produce insufficient information as to the identities of all of the
28  persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the

1    location of records and drugs and other pertinent information regarding the named crimes.

2    Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would

3    provide agents with a significant number of untruthful statements, diverting the investigation

4    with false leads or otherwise frustrating the investigation. Additionally, any such interviews

5    would also have the effect of alerting the members of the conspiracy, thereby compromising the

6    investigation and resulting in the possible destruction or concealment of documents and other

7    evidence, and the possibility of harm to confidential sources whose identity may become known

8    or whose existence may otherwise be compromised.

9                                    **CONFIDENTIAL INFORMANTS**

10           48.        It appears that this organization is a close-knit organization whose members

11   are either blood relatives, mutual friends and/or very familiar with one another. Your affiant is

12   aware that it is a common concern of large-scale narcotic organizations that neither customers,

13   would-be thieves, nor the police learn the identity of all members of the organization, or the

14   locations where they store large amounts of narcotics or illicit proceeds. Therefore, lower

15   echelon members shield those members higher up on the distribution chain from potential

16   customers, and multiple locations are used to store lesser amounts of narcotics, and/or its

17   proceeds, and additional locations are used to meet with customers. This method of operation

18   allows suspects to minimize the risk of discovery and loss to the organization in the event the

19   customer is an informant.

20           49.        Since it appears that no single informant or informants are available or

21   expected to become available, your affiant is currently unable to determine the scope of this

22   criminal enterprise, the identity of other co-conspirators, the sources and location of the

23   narcotics, and their methods of operation.

24                                **UNDERCOVER OFFICERS / AGENTS**

25           50.        Because the seller of narcotics usually receives a fee for brokering the sale of

26   narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier. If

27   the seller were to introduce the customer to the supplier and the customer were able to deal

28

directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

51.     Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation. Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants.  Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know.  Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

52.     As previously noted, it is a common practice for individuals involved in large scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions.  If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant.  Therefore, it is not reasonable to believe that the introduction of an undercover agent by an informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

## CONTROLLED PURCHASES

53.     Your affiant has considered the benefits and risks associated with a controlled purchase.  It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

54.     If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement.   Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

55.     Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

56.     The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown.  However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s).  Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

57.     As described herein, physical surveillance has been used and will continue to be used during this investigation.

58.     Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a.         On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his

1  identification. The subject was unable to produce any identification, but verbally identified

2  himself as [REDACTED] with a date of birth of [REDACTED] and address of [REDACTED]

3  [REDACTED] where the CI had previously picked up Heroin with [REDACTED]. [REDACTED] also

4  provided a cellular phone number of [REDACTED] Deputy Wicker took

5  a picture of [REDACTED] with his consent, for identification, and subsequently released him. TFO

6  Layos conducted further investigation of [REDACTED] identity. Via Riverside

7  County Sheriff's Departments data base, revealed contacts for [REDACTED]

8  [REDACTED] with a date birth of [REDACTED] and address of [REDACTED] TFO

9  Layos also found DMV records Index number X8725114 for [REDACTED]

10  [REDACTED] with a date of [REDACTED] and address of [REDACTED] Wildomar. Based on the

11  above information, Investigators identified that the person Deputy Wicker stopped was in fact

12  [REDACTED].

13       b.     On **December 12, 2013** members of the DEA TFG-2 and Riverside

14  Sheriff's Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF),

15  conducted surveillance of [REDACTED] residence, located at [REDACTED] Wildomar.

16  During the surveillance, a black Jaguar with paper plates was observed leaving [REDACTED]

17  residence and ultimately stopped by CHP interdiction unit. During this operation, DEA TFG2

18  and SWCNTF seized approximately 5lbs of Methamphetamine, $8,553 in US Currency, and a

19  black 2010 Jaguar. The driver and sole occupant of the vehicle, [REDACTED]

20  [REDACTED] was arrested by CHP Officer Mendenhall for state felony violations of 11378 HS

21  and 11379 HS, CHP agency case # F-532-801-13. A secondary search of the vehicle revealed

22  additional 5 lbs of Heroin and 2 lbs of Methamphetamine, during asset forfeiture proceeding.

23       c.     On **February 27, 2014**, SWNCTF investigators conducted

24  surveillance in the city of Temecula, California to identify a male intercepted over Riverside

25  County Wire Intercept [REDACTED] Investigators identified [REDACTED] as the user of [REDACTED]

26  [REDACTED]

27       d.     On **March 3, 2014**, DEA and SWCNTF conducted surveillance on

28  [REDACTED] in the city of Riverside, California pursuant to intercepted

1  text message conversations as authorized by Riverside County Wire REDACTED which indicated that

2  REDACTED was to acquire narcotics. On the same date, investigators followed REDACTED to

3  Carson, California and back to Riverside County where an interdiction unit made contact and

4  investigators seized 9.8 pounds of methamphetamine.

5           e.      On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and

6  1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators

7  followed two Hispanic adult males to a home depot consistent with GPS pings on multiple

8  phones used by **REY**. One of the subjects was identified as REDACTED DOB:

9  REDACTED. Investigators are still working on determining if REDACTED is **REY** and the user of

10  TT #10-12. Note: REDACTED has been the subject of investigation on secondary DEA narcotics

11  investigations.

12      59.    Surveillance operations have been successful to the extent they have established

13  persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

14  scope of the investigation to additional locations and co-conspirators. However, surveillance

15  operations cannot establish the purpose of any observed meetings, nor identify other

16  conspirators who do not make personal appearances. Therefore, surveillance appears unlikely

17  to yield the sources of the supply of narcotics, fully identify each of the conspirators, their

18  places of operation and the manner in which their operation is conducted.

19      60.    Surveillance of the targets subjects and their associates will not enable the

20  government to achieve its objectives in this investigation. To date, surveillance has failed to

21  allow law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the

22  co-conspirators. While surveillance may show subjects of this investigation with packages

23  suspected to be drugs, it will not identify the contents of these packages or what is being said as

24  packages are exchanged. Surveillance is an investigative technique that is used to confirm

25  meetings and other suspected activities between alleged participants, but often leaves the

26  investigators with insufficient evidence to prove the purpose of the meetings and activities.

27      61.    Your affiant knows from training and experience, and from speaking with other

28  experienced agents and officers, that physical surveillance of high-level members of narcotic

64.     Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s).   If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed.   The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities.   By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

65.     Based on the above-stated facts and on my training and experience, your affiant does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

## SEARCH WARRANTS

66.     On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

67.     On **2-25-14**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

68.     There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant.  Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation.   Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

69.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation.   However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation.   Although a seizure of an

intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply. The execution of a search warrant would in all probability terminate the present investigation. Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement. This includes utilizing multiple locations to store narcotics and/or controlled substances and money, and the use of other locations to conduct business. Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

70. Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers. Your affiant is aware that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences. Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s). Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband. Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate. Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning

to the documents and currency.  Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the existence of the investigation.  At this time, it would be counterproductive to make the existence of the investigation public.  Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

## PEN REGISTERS AND TELEPHONE TOLLS

71.     The analysis of data derived from the use of a pen register and telephone tolls are one of the techniques that have been utilized during this investigation.  It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations.  Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones. Although the review of those records reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel.  In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial structuring of this organization.  Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

72.     Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

## CLOSED CIRCUIT TELEVISION MONITORING

73. Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to

1  conversations, agreements, and other arrangements necessary for this investigation.
2  Additionally, this type of monitoring will not provide identifying information on the individuals
3  entering and exiting the location, making it difficult if not impossible to determine the level of
4  involvement within the organization, if any.

5  ### TRASH SEARCHES OF TARGET LOCATIONS

6       74.     Your affiant believes that a trash search could be conducted at some of the
7  locations identified thus far as being associated with the targets subject(s), however, it would
8  risk the detection of law enforcement. Your affiant is aware that high-level narcotics traffickers
9  and their associates go to great lengths to destroy possible incriminating evidence and are
10 unlikely to use their residence trash containers to dispose of such information. Your affiant has
11 conferred with other experienced agents and officers who told me that narcotic traffickers will
12 often carry trash away from their residences and place it in commercial dumpsters to avoid
13 having it examined by law enforcement. Furthermore, investigators have considered conducting
14 trash searches of identified residences of known Targets of the investigation and believe that, in
15 considering each location, it would be difficult to conduct a trash search because the
16 neighborhoods are situated where trash cans are placed at the curb in front of the residence for
17 dumping or are located in a rural area where the search would draw suspicion on the law
18 enforcement officers. A trash search would surely draw the attention of neighbors, who would
19 possibly report this to police, and/or notify the target subject(s) or his/their associates. Such
20 discovery would likely alert target subjects and his/their associates to the existence of this
21 investigation and risk having it prematurely terminated before the government's objectives have
22 been achieved. It is difficult for law enforcement officers to justify their presence to any
23 neighbor, without identifying themselves and their purpose for conducting the trash search.
24 Even if trash searches were conducted and evidence of narcotics trafficking was obtained from
25 the trash at this location, the evidence would probably not establish (1) the roles of all
26 participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the
27 conspiracy.

28

75.     Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction.   Additionally, any time a trash search is conducted; it is possible that officers will be spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

76.     Based on my training and experience, there are great risks associated with conducting trash searches, usually for very minimal possible gain.  For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated.   This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc.  Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation.  Further, the risks of such action in this investigation far outweigh any potential rewards.

77.     In addition, I have found that not only are trash searches risky, they are also usually worthless.   I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information.  I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.  I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

78.     I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators.  For instance, a trash search might help identify the wrappings used to transport

1  narcotics, but it will not provide us with information as to who is transporting the narcotics,
2  who is distributing the narcotics and where the narcotics are being stashed.

3       79.     At this time, I do not believe that trash searches, even in conjunction with
4  conventional methods of investigation, will achieve the goals of this investigation.    If
5  conversations are intercepted concerning certain locations, agents will be able to evaluate their
6  significance, and trash searches may be conducted at that time if the risk is outweighed by the
7  potential reward.

8                      **FINANCIAL INVESTIGATION**

9       80.     Even if investigators are able to locate accounts and financial records for the
10 members of this Drug Trafficking Organization and its associates at some later date; based on
11 my experience, I know that those involved in drug trafficking conduct business on a cash basis
12 and often do not use traditional banking methods.  I also know that drug traffickers frequently
13 either do not file income tax returns or file false income tax returns.   I know that drug
14 traffickers do not usually maintain records of their illicit earnings.    At best, a financial
15 investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or
16 unusual financial transactions.    However, I know from my training and experience that
17 traffickers go to great lengths to avoid creating and leaving a financial paper trail.

18                           **GRAND JURY**

19      81.     The last technique, which could be employed in the investigation of narcotics
20 offenses, is the initiation of grand jury proceedings.  It is noted that the use of the grand jury to
21 investigate narcotics offenses is not a technique normally employed in the State of California by
22 state prosecutors.  In addition, even if this investigation met existing criteria for submission to a
23 grand jury, there is no reason to believe that any of the principal suspects in this investigation or
24 their co-conspirators would cooperate with the grand jury, with or without grants of immunity.
25 In fact, the mere initiation of a grand jury investigative proceeding would render continued
26 investigation difficult by revealing the existence of the investigation by law enforcement to the
27 targets of this investigation.

28

82.     I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons:  (1) the Target Subject, and any other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.

## CONCLUSION

83.     Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

84.     Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

85.     For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

86.     Your affiant requests that the Court order that Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as

1   listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications

2   Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet

3   Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon

4   request of the law enforcement agency executing the intercept order:

5           a.      Authorize the installation and/or use of all facilities to enable the

6   interception and monitoring of all functions and capabilities of the Target Device(s), including

7   but not limited to, all wireless digital functions, wireless analog functions, direct connect/digital

8   dispatch/direct dispatch functions, automatic mode switching functions, and "short message

9   service." This includes interception of cellular communications occurring outside California

10  where the contents of the redirected communications are first heard or accessed in the Riverside

11  County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S.

12  1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997),

13  *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471

14  F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

15          b.      Authorize the installation and/or use of equipment known as pen registers

16  or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones

17  connected to the targeted numbers.

18          c.      Authorize the installation and/or use of equipment to trap and trace

19  Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to

20  and from the target telephone numbers.

21          d.      Authorize the installation and/or use of trap equipment to trace and

22  identify the telephone numbers of persons placing calls to the Target Telephone numbers to

23  include the activation of "caller ID" and any calling features such as "call forwarding" and

24  "speed dialing" currently assigned to the Target Telephone numbers.

25          e.      Your affiant requests the Court to order Verizon upon request of the

26  applicant, to provide the technical assistance necessary to accomplish this interception

27  unobtrusively and with a minimum of interference with the services said company provides the

28  people whose communications are to be intercepted, and to provide records identifying

1    subscribers and providing subscriber information on any and all telephone and pager numbers
2    identified through this intercept/pen register, and any changed numbers whether published or
3    not, including, but not limited to past telephone bills and records.

4              87.       Your affiant requests the Court order Verizon and any and all
5    telecommunications providers subject to regulation by the Federal Communications
6    Commission to provide telecommunications services within the United States of America, as
7    listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications
8    Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet
9    Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon
10   request of the law enforcement agency executing the intercept order, within 48 hours (including
11   after-business hours, weekends, and holidays), and without delay:

12             a.       Provide any and all information related to any telephone(s), pager(s), text
13   messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication
14   device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted
15   conversation, or otherwise identified in this investigation and the subscriber(s) of any such
16   communication devices(s).  Such information shall include, but not be limited to, all numbers
17   and accounts associated with the primary number/account, billing information (billed and
18   unbilled), activation date, credit information, co-signer information, contact address(es) and
19   telephone number(s), and all information identifying the communication device(s) such as
20   electronic serial number (ESN) international mobile subscriber identifier (IMSI), international
21   mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other
22   identifier.

23             b.       Provide Call Data Records (CDR) information, including any and all
24   historical data, originating and terminating call detail, extended dialed digit information, dialed
25   digit extraction, and/or post cut-through digits from any and all telephones called or being
26   called by each Target Telephone number, identified in an intercepted conversation, or otherwise
27   identified in the investigation.

28

1    c.    Provide any and all cell site data, pinging data, and/or GPS location information, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone, without geographical limitations, pursuant to Title 18 USC section 2703(D).

6    d.    Provide any and all cell site data, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of any and all cellular telephones, which called each Target Telephone, which was called by each Target Telephone, which was identified in an intercepted conversation, or which was otherwise identified in the investigation, without geographical limitations, pursuant to Title 18 USC section 2703(D).

12    e.    Provide access and the access codes to voice mail and voice mail features.

14    f.    Provide all information related to pre-paid cellular telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation, including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

18    88.    Your affiant requests the Court to order Verizon and any and all telecommunications providers providing service to the Target Telephone(s) to continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances.    Additionally, your affiant requests that if the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, the Telecommunication Companies be ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances.    In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the court order

for the cost of the service that was continued regardless of unpaid balances, pursuant to the court's order.

89.     Your affiant requests the Court to order Verizon and any and all telecommunications providers not to disclose to the subscriber or any unauthorized person the fact that the order has authorized this wire interception, or of its existence.

90.     Your affiant requests the Court to authorize law enforcement officers use mobile electronic tracking devices to locate and identify the target telephone(s).

91.     Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace officers of the Drug Enforcement Administration and other assisting peace officers be ordered to execute such intercept order.

92.     Your affiant requests that, prior to the sealing of this Application, its affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

93.     Your affiant requests that, pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a showing of good cause before a court of competent jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Riverside, California.

Dated: March __11__, 2014

_____
Detective Christopher Carnahan
Riverside Police Department

Sworn to and subscribed before me on March ____11____, 2014.

_____
HONORABLE HELIOS J. HERNANDEZ
COUNTY OF RIVERSIDE