PAUL E. ZELLERBACH
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE
Deena M. Bennett
Deputy District Attorney
3960 Orange St.
Riverside, California 92501
Telephone: (951) 955-5400
Fax: (951) 955-9673

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE, PAGER AND ELECTRONIC COMMMUNICATIONS<br>**Target Telephone #13: 502-609-5937**<br>**Target Telephone #14: 702-885-7486**<br>**Target Telephone #15:** REDACTED<br>**Target Telephone #16: 951-322-0063** | **WIRETAP NO. 14-183**<br><br>**APPLICATION** |

**APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

I, Jeffery A. Van Wagenen Jr., Assistant District Attorney for the County of Riverside, declare:

1. Applicant is the District Attorney of the County of Riverside, Paul E. Zellerbach. I am the Riverside County District Attorney's designee, as defined in California Penal Code section 629.50(a).

2. After reviewing the Affidavit In Support Of Application For An Order Authorizing The Interception Of Wire And Electronic Communications of Riverside Drug Enforcement Administration, Special Agent Emilio Baca, and relying thereon, I approve making this Application and hereby apply to the Riverside County Superior Court for authorization to intercept wire, pager and electronic communications to and from the communication devices



EXHIBIT 4

(the "Target Device(s)") described below. The Affidavit is attached hereto and incorporated herein by this reference.

3. Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

4. Special Agent Baca, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a). He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5. Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Special Agent in Charge Anthony D. Williams, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6. Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections 11351, 11352, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses.

There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone**.

7. Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:

A. **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

B. **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

C. **Target Telephone #15** REDACTED **(TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364.**

D. **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU.**

8. The actual interception and monitoring post will be in **Riverside County**.

9. The communications to be intercepted are wire and electronic communications between the Target Subjects and other known and unknown associates and/or co-conspirators concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

10. I have been informed and believe that conventional investigation techniques have been attempted without success or reasonably appear too dangerous or unlikely to succeed if attempted, as set forth in the Affidavit.

11. Due to the ongoing nature of the conspiracy related to the above offenses, and because there is probable cause to believe that multiple communications related to those offenses will occur during the course of interception and monitoring, I request that authority to maintain this intercept be granted for **thirty (30) days** and request that the authority not be

deemed to automatically terminate upon interception of the first communication of the type described above.

12. I request that this Court order **Sprint Corporation,** Verizon Wireless, Virgin Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, **AT&T,** AT&T Wireless, AT&T California Products and Services, **T-Mobile USA Inc.**, Cellco Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., **Cingular Wireless**, Nextel Communications, Metro PCS, Sprint Spectrum, L.P., Sprint PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any other affected telecommunications companies, subsidiaries, or entities (the "Telecommunications Companies") or electronic mail service providers (the "Email Service Providers") upon request of law enforcement, to provide the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference of the services being provided the Target Subjects. The Telecommunications Companies or the Email Service Providers shall be compensated by the agency executing the court order for the reasonable costs of furnishing the facilities and technical assistance.

13. I request this Court to order the Telecommunications Companies or the Email Service Providers not to disclose to the subscriber or any unauthorized person the fact that the court has authorized this wiretap.

14. Applicant requests this Application, Review, Affidavit, Order and any/all incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the agency executing the Court Order or the District Attorney's Office and to be disclosed only upon a showing of good cause before a Judge of competent jurisdiction. (Penal Code Section 629.66)

15. I am unaware of any previous relevant wiretaps other than those set forth in the Affidavit within the meaning of Penal Code Section 629.50(a)(6).

16. Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED: 4.8.14

By: JEFFREY A. VAN WAGENEN JR.
ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For: PAUL E. ZELLERBACH
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF RIVERSIDE**

| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS | | WIRETAP NO.: 14-183 AFFIDAVIT IN SUPPORT OF INTERCEPT ORDER |
|---|---|---|
| (502) 609-5937 | Target Telephone #13 | |
| (702) 885-7486 | Target Telephone #14 | |
| REDACTED | Target Telephone #15 | |
| (951) 322-0063 | Target Telephone #16 | |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS AND AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA AND AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE

## I. INTRODUCTION AND EXPERTISE

I, Emilio J. Baca, being duly sworn do hereby declare and state:

1. I am a Special Agent with the United States Drug Enforcement Administration (DEA), and I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18 of the United States Code.

2. I am empowered by law to conduct investigations and to make arrests for felony offenses as enumerated in 18 U.S.C. 2516. I have been so employed since February 2010 and I am currently assigned to the Riverside District Office Task Force Group 2. I primarily investigate narcotic trafficking and distribution organizations operating in and around Riverside County in California

3. I have received approximately 19 weeks of training at the DEA Academy in Quantico, Virginia and was trained in all aspects of conducting narcotics investigations as well as the methods and techniques commonly used by major narcotics traffickers. I have attended special training in wire and electronic interceptions, toll analysis, and the use of wire and electronic

interception equipment. I am certified by the California State Attorney General's Office in the practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

4. During my employment with the DEA, I have participated in narcotics investigations through the surveillance, execution of search warrants, and arrests of drug traffickers. In addition, I have spoken to informants and suspects regarding the methods and means of drug traffickers. I have debriefed persons arrested for controlled substance trafficking and have debriefed informants on the methods for gathering controlled substance intelligence. I have spoken with experienced narcotics investigators concerning the methods and practices of narcotics traffickers. Through my training, experience and interaction with other Special Agents, Task Force Officers, and other narcotics investigators, I have become familiar with narcotic traffickers' methods of operation, including the distribution, transportation, collection of proceeds and methods of laundering used in an attempt to conceal the nature of narcotic related proceeds. Through these interactions I have become familiar with and developed an understanding for the manner in which controlled substances are imported, manufactured, distributed, and sold, to include the methods of avoiding detection and apprehension by law enforcement officers. I am familiar with the manner in which narcotics traffickers use wireless communication equipment such as cellular telephone technology, pagers, coded communications, false identities, and counter surveillance to determine the presence of law enforcement and other means to facilitate their illegal activities and avoid detection or mislead a narcotics investigation.

5. I am familiar with the facts and circumstances described herein and make this affidavit based upon the following: (1) personal knowledge I have gained from my participation in this investigation; (2) conclusions I have reached based upon my training, experience, and conversations with other law enforcement investigators with whom I have discussed this case; (3) and what I believe to be reliable information obtained from the following sources: oral and written reports about this investigation, received from law enforcement officers; (4) law enforcement databases; (5) Pen register and trap and trace information as well as telephone records - toll records and subscriber information; (6) public records; and (7) physical surveillances conducted by DEA, West County Narcotics Task Force - Riverside County Sheriff's Department, and other law

enforcement officers, which have been reported to me directly.

6. Unless otherwise noted in this Affidavit, when I assert that a statement was made, the information was provided to me by another law enforcement officer, or other source of information with whom I have spoken or whose reports or statements I have reviewed. Parenthetical explanations of coded or vague communications throughout this Affidavit are based on my interpretation, derived from my training, experience and familiarity with this and previous narcotics investigations.

7. Based upon the information contained herein, I hereby make an application to intercept the wire, pager, and electronic cellular telephone communications for **Target Telephones** as described below:

A. **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

B. **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

C. **Target Telephone #15** REDACTED **(TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364.**

D. **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU.**

8. Probable cause exists to believe that **CHRIS LNU** (user of **TT #13** and **TT #14**), **UM8364** (user of **TT #15**) and **REY LNU** (user of **TT#16**) and other identified and unidentified co-conspirators, have committed, are committing, or are about to commit, the crimes as discussed below, and that their communications relate to those and other ongoing crimes.

9. I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order. The listening post will be in the County of Riverside, California.

10. Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of possession for sale, transportation, and sale of a controlled substance in violation of sections 11351, 11352,11378 and 11379 of the Health and Safety Code,

with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER

(Penal Code sections 629.50(a) and 629.50(a) (2))

11. Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #13: 502-609-5937, TT #14: 702-885-7486, TT #15** REDACTED REDACTED **and TT #16: 951-322-0063** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications and any background conversations while the telephone instrument is otherwise in use.

### B.
### PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA

(18 .S.C. Sections 3121 through 3126)

12. I also request the authorization for the installation of a pen register and trap and trace feature on **TT #13: 502-609-5937, TT #14: 702-885-7486, TT #15** REDACTED **and TT #16: 951-322-0063.** I also request the authorization to obtain and receive cell site data and/or Global

b. I also request that law enforcement officers be given the authorization to use mobile electronic tracking devices to locate and identify **TT #13: 502-609-5937, TT #14: 702-885-7486, TT #15** REDACTED **and TT #16: 951-322-0063.** The Target Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the target telephone is often unknown. However with the assistance of mobile electronic tracking devices, law enforcement agents can identify the location of a cellular telephone to a much finer detail than through cellular site data alone.

## III.
## DURATION OF INTERCEPTION
(Penal Code section 629.50(a) (5))

13. This Affidavit is in support of an Application to intercept wire and electronic communications for **a period not to exceed thirty (30) days commencing on the day of the initial intercept or ten (10) days after the issuance of the Order, whichever comes first, pursuant to California Penal Code section 629.58**. The goal of this investigation is to prove the full scope, membership and methods of operation of the conspiracy. I request that the Court order that the interception not terminate when the communications described herein are first intercepted, but may continue to the full extent of California Penal Code section 629.58 or until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation and the various activities in which they are engaged in furtherance of the enterprise, whichever comes first.

14. Based upon your affiant's training and experience, narcotic traffickers extensively use their telephones to conduct their illegal activities. Therefore, your affiant believes that additional communications of the same type will occur after the interception of the first communication to and from the target telephone(s).

**IV.**
**TARGET TELEPHONE(S)**
**(Penal Code section 629.50(a)(4))**

15. The Target Telephones are described as follows:

a. **Target Telephone #13 (502) 609-5937 (TT #13)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

b. **Target Telephone #14 (702) 885-7486 (TT #14)** is a Cingular wireless telephone. Records pending. **TT #13** is being utilized by **CHRIS Last Name Unknown (LNU).**

c. **Target Telephone #15** REDACTED **(TT #15)** is a T-Mobile wireless telephone. Records Pending. **TT #15** is being utilized by **UM8364.**

d. **Target Telephone #16 (951) 322-0063 (TT #16)** is a Sprint wireless telephone. Records pending. **TT #16** is being utilized by **REY LNU.**

1. The term **"Target Telephone #13-16"** also refers to any changed telephone number assigned to the same Electronic Serial Number (ESN) and/or International Mobile Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number, Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC), ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same telephone number(s) with the same subscriber information as the target telephone(s) or any additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC whether the changes occur simultaneously or consecutively, listed to the same subscriber and wireless telephone account(s) as the target telephone(s)

2. Based on my training and experience, persons often use fictitious names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law Enforcement. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep Law Enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also buys them time to flee the area of the crime.

V.

**TARGET SUBJECTS**

(Penal Code section 629.50(a) (4))

16. The known Target Subject(s) of this investigation are:

REDACTED

REDACTED

REDACTED

g. **REY LNU (Last Name Unknown-Target Subject 7)** is a Hispanic male identified only as **"REY"** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. There are no other known identifying characteristics about **REY LNU** and as a result a records check into the California Department of Motor Vehicles cannot be completed. Investigators are working on the identification of **REY LNU** through various surveillances both physical and electronic.

h. **CHRIS LNU (Las Name Unknown – Target Subject 8)** is a Hispanic male identified only as **CHRIS** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. Investigators believe CHRIS is a coordinator for the REDACTED and possible cell head with connections to Kentucky. Investigators are working to identify CHRIS LNU and are communicating with Kentucky DEA case agents.

i. **UM8364 (Target Subject 9)** is a Hispanic male identified only as **UM8364** with an unknown Date of Birth, Hair, Eyes, Weight, Height, or place of residence. In March of 2014, investigators intercepted **UM8364** as a narcotics source of supply that provided approximately 10 pounds of suspected heroin to REDACTED

j.

## VI.
## COURT'S JURISDICTION
### A.
### WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code section 629.52)

17. *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...." Section 629.52 does not define the phrase "initially intercepted." However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...." In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey. The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey. The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders. The court held "for the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." (*Ibid*, at page 136) In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap was jurisdictionally defective because it was authorized by a judge outside the judicial district in which the defendants' telephones were located. The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas. The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders. The court held, "We agree with the reasoning of the Second Circuit and now hold that the interception included both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction

have authority under Title III to issue wiretap orders. As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404) Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived and where the criminal conduct was being investigated, could issue a wiretap order for a cellular telephone which was thought to be used by the target subject regardless of where the cellular telephone or the listening post was located, even though the criminal conduct which being investigated was occurring in another district and the listening post was located in another district. In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order to intercept cellular telephones which were assigned area codes located in another district, because the listening post was located in the same district as the judge who issued the order.

18. Based upon my training and experience, persons engaged in criminal conduct use cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining cellular phones as a means of preventing detection by law enforcement. By using other persons' names and creating a fictitious prepaid account, a target subject acquires a certain degree of anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those engaged in narcotics trafficking. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep law enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also provides them time to flee the area of the crime.

19. **Target Telephone #13 and #14** used by **CHRIS LNU (TS #8)** are Cingular Wireless telephones. Subscriber information pending. **TT #13 and #14** are being utilized by **CHRIS LNU (TS #8).** Since March 2014, investigators began to monitor wire communications of REY LNU (TS #7) as authorized by Riverside County Wire Intercept 14-120. During these intercepted communications, investigators determined that **CHRIS LNU** was a principle member of the

REDACTED specifically a segment operated by REY LNU, and that CHRIS operates as a load driver coordinator and possible cell head in the state of Kentucky. During this period of interception, **CHRIS LNU** coordinated between REY LNU, cell head in the county of Riverside, and an unidentified subject delivery proceeds from an unknown origin into Riverside County, specifically, Perris, California. Investigators have initiated contact with DEA Kentucky to determine if the user of **TT #13**, identified as Chris LEONARD in Kentucky is in fact **TS #7.** Although **CHRIS LNU** may operate a cell in Kentucky, the framework if his illegal narcotics activity originates in Riverside County through REY LNU who operates as a source of supply. Additionally, proceeds acquired through sales of narcotics in Kentucky are eventually transported back into Riverside County.

20. **Target Telephone #15** used by **UM8364 (TS #9)** is a T-Mobile telephone. Subscriber information pending. **TT #15** is being utilized by **UM8364**. Since December of 2013, investigators have been monitoring multiple phones utilized by REDACTED authorized by several Riverside County Wire Intercepts. Currently, investigators are monitoring REDACTED as authorized by Riverside County Wire REDACTED. In March of 2014, investigators intercepted communications between REDACTED and **UM8364 (TS #9)** who was identified as a narcotics source of supply for the REDACTED. Based on these intercepted communications, investigators initiated GPS pings of **TT #15** as authorized by Riverside County Search Warrant 03191403. Investigators identified a possible address for **TS #9** in the city of South Gate, California. Although **TS #9** possibly resides in Los Angeles County, it should be noted that the narcotics **TS #9** distributed were destined to REDACTED in Riverside County. Additionally, on March 20, 2014, investigators identified a vehicle operated by a courier for **UM8364 (TS #9)** who met with REDACTED off the 15 interstate and Bundy Canyon Road in Riverside County.

21. **Target Telephone #16** used by **REY LNU (TS #7)** is a Sprint telephone. Subscriber information pending. **TT #16** is being utilized by **REY LNU (TS #7).** Since March 2014, investigators have been monitoring communications on multiple target telephones utilized by **TS #7** as authorized by Riverside County Wire Intercept 14-120. **REY** has been identified as a cell head for the REDACTED responsible for acquiring and distributing narcotics to various points in the domestic US. **REY** resides at 1135 W. 7th Street, Perris, California and has multiple properties

within Riverside County. **REY** acquires narcotics from various sources, to include REDACTED REDACTED and subsequently distributes them from Riverside County.

22. Lastly, the narcotics distributed and transported by **CHRIS LNU (TS #8), UM8364 (TS #9)** and **REY LNU (TS #7)** and the DTO members they work for, to include REDACTED are distributed in, around and/or through Riverside County, in example **CHRIS LNU (TS #9)** has coordinated a proceeds courier into **Riverside County**. **UM8364 (TS #9)** provided narcotics to REDACTED and coordinated the delivery into Riverside County. Lastly, **REY LNU (TS #7)** resides in Riverside County and distributes therefrom.

23. The interception and listening post will be in **Riverside County**.

**VII.**
**PRIOR APPLICATIONS**
**(Penal Code section 629.50(a) (6))**

24. On April 1, 2014, your affiant requested checks of the California Department of Justice reference the Electronic Intercept Court Order System for **TT #13-16.**

25. On April 1, 2014, your affiant requested checks of the United States Department of Justice wiretap database to determine if any Federal applications had been made to initiate a Title III wiretap intercept of **TT #13-16.**

26. Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

REDACTED

REDACTED

REDACTED

f. **Riverside County Wire Intercept Order 14-120:** On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court, State of California granted and issued Riverside County Intercept Order 14-120, which authorized the interception of the communication to and from **TT #9:** REDACTED**, TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.**

REDACTED

REDACTED

VIII.
**OBJECTIVES OF THIS INVESTIGATION**

27. Your affiant believes interception of wire communications to and from **Target Telephone #13-16** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

a. The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b. The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c. The identity of the Target subject(s)' customers and the other unidentified conspirators;

d. The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e. The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f. The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g. Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

IX.
**STATEMENT OF PROBABLE CAUSE**
**(Penal Code section 629.50(a)(4))**

28. The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

29. Based upon the investigation in this case, set forth in detail below, I assert that:

a. There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses. Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11351, 11352, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a))

b. There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications. (Penal Code section 629.52(b)

30. There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses ~~or are leased to, listed in the name of or commonly used by the **Target Subjects** whose~~ communications are to be intercepted. (Penal Code section 629.52(c))

31. That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained below. (Penal Code section 629.52(d)).

32. Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering, will be obtained

through the interception of wire communications over the **Target Telephones**.

33. I make this Affidavit, in part, on personal knowledge derived from participation in this investigation and, in part, upon the information from the following sources:

a. Oral and written reports about this and other investigations that I have received from the DEA and other law enforcement officers;

b. Physical surveillance conducted by the West County Narcotic Task Force (WCNTF), Riverside Sheriff Department (RSD), and DEA RDO in this and other investigations, which has been reported to me either directly or indirectly;

c. Pen register and trap and trace information, telephone tolls and other documentary evidence in this and other investigations and,

d. Evidence gathered through other law enforcement investigations.

e. Communications intercepted pursuant to court-authorized intercept orders.

f. Evidence obtained through court-authorized intercept orders.

**A.**
**IDENTIFICATION OF TARGET TELEPHONE #13**

34. On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court issued Riverside County Intercept Order 14-120, authorizing the interception of the electronic cellular telephone communications to and from TT #9: REDACTED, TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.

35. Based on intercepted communications between REY (TS #7) and **CHRIS (TS #8),** investigators determined that **TS #8** was the user of **TT #13.**

36. The following intercepted communications made to or from **502-609-5937 Target Telephone #13** as intercepted over Riverside County Wire 14-120 are indicative of the types of narcotics activities associated with **TT #13** and indicate that **CHRIS LNU (TS #8)** will use **TT #13** to facilitate his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of

language contained therein, are related to and indicative of the narcotics activities associated with **CHRIS (TS #9)** and the target telephone which he utilizes.

a. On March 17, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity. At approximately 10:53 a.m., during session number 582, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120). REY and **CHRIS** greeted. **CHRIS** said he had been working. REY asked if **CHRIS** went to Ripley (Possibly Kentucky). **CHRIS** said yes, he won three and lost his fourth one (referring to rooster fights). **CHRIS** told REY about the rooster fight he lost. REY asked if **CHRIS** was fighting a Mexican one (possibly rooster). **CHRIS** said yes. **CHRIS** and REY talked about the blades and boots **CHRIS** used for the fights. **CHRIS** said he used the ones (blades/knife) Richard sent him. REY asked where **CHRIS** was. **CHRIS** said he was not around and would be back later tonight, then asked if he could call REY later tonight. REY said okay. **CHRIS** said he did not have his bill (referring to U.S. Currency) with him. REY asked if that meant that **CHRIS'** buddy (proceeds courier) was going to come (to REY's area-Perris, California) tomorrow. **CHRIS** said yes, and reminded REY that he told **CHRIS** he (REY) needed him (courier) to be there this weekend. REY said yes, he wanted him there (REY's location) as soon as possible, they needed. REY interrupted himself and asked **CHRIS** to call him U/I (Voices overlapped). **CHRIS** said he would call REY back tonight. REY said all right.

b. On March 21, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity. At approximately 10:49 a.m., during session number 970, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120). **CHRIS** said everything was going good, there was no problem. REY asked if **CHRIS** knew when he (REY) was going to see him (referring to proceeds courier). **CHRIS** said probably the day they were planning on. REY said okay. REY asked **CHRIS** to just let him know if he (courier-UM0441) did leave. **CHRIS** said that was no problem. **CHRIS** told REY not to get riled up. REY

said they (REY and others) just wanted to know (Thought unfinished). **CHRIS** said REY had already told him what day it (currency) needed to be there. REY said that was good.

c. On March 22, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity. At approximately 3:04 p.m., during session number 1085, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120). **CHRIS** said he got an ass whooping at the rooster fights. **CHRIS** and REY talked about losing at the rooster fights. REY said they (REY and others) had not done well either. REY asked what was going on. **CHRIS** said he (**CHRIS**) talked to the guy (proceeds courier), and he (possibly UM0441) only had 600 dollars left to spend (referring to miles to cover). REY said he was going to be earlier that he thought then. REY said that was about six... REY said he would be there, and was only going about an hour away because he... (Thought left unfinished). **CHRIS** said it was no problem. REY said he would have somebody there though (to receive the courier). **CHRIS** said alright. REY said he would talk to **CHRIS** tomorrow.

d. The above listed calls and parenthetical explanations are based on my training, experience, and intelligence gained during this investigation and are related to narcotics distribution.

## B.
## IDENTIFICATION OF TARGET TELEPHONE #14

37. On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court issued Riverside County Intercept Order 14-120, authorizing the interception of the electronic cellular telephone communications to and from TT #9: REDACTED, TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.

38. Based on intercepted communications between REY (TS #7) and **CHRIS (TS #8)**, investigators determined that **TS #8** was the user of **TT #14.**

39. The following intercepted communications made to or from **702-885-7486 Target**

**Telephone #14** as intercepted over Riverside County Wire 14-120 are indicative of the types of narcotics activities associated with **TT #14** and indicate that **CHRIS LNU (TS #8)** will use **TT #14** to facilitate his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **CHRIS (TS #8)** and the target telephone which he utilizes.

a. On March 22, 2014, **CHRIS LNU (TS #8)** was intercepted communicating with REY LNU (TS #7) regarding a narcotics proceeds related activity. At approximately 3:04 p.m., during session number 1085, **CHRIS** received an incoming call on **TT #13** from REY who was using 951-570-0461 (TT #11-Riverside County Wire 14-120). **CHRIS** asked what was REY needing. REY asked how much did **CHRIS** have of their's (REY's and possible third party) then said (how much did he have) of his (REY's). **CHRIS** said he had the one that he (third party-courier) had brought and whenever REY was ready, they (**CHRIS** and others) could send whatever REY needed. **CHRIS** said they could send 2, but since he (REY) had not been ready to send it, he (**CHRIS**) had been using it, giving it to them, but there was no problem. REY said he did not need it all, but did want the 195 9referinf to narcotics proceeds). **CHRIS** said okay, and then asked if they could send it the beginning of next week. REY said it would be best on the weekend. **CHRIS** said they (courier) had to go out there (unspecified location) to visit family, so it would be perfect and cool. REY asked if it was the same one (courier) that was coming. **CHRIS** said yes. REY asked **CHRIS** to tell him (third party/possible driver) to go around where he had told **CHRIS** and cut through another freeway and come down through New Mexico. **CHRIS** said he told him. REY said a few guys had gone down there and everybody was getting stopped (referring to Law Enforcement). REY said it did not matter, but he had wanted to see him (courier) this weekend so it could leave this Monday and that was what he needed the money. **CHRIS** said they (courier) could not leave until Monday. REY said alright, and then they would wait until next Monday. REY said he would talk to his brother in law, because he (brother in law) wanted to send a little bit (referring currency). **CHRIS** said he had two (possible money) with that (unspecified).

REY said he (brother in law) would not want to send two, adding he (REY) needed the 195. REY then asked if **CHRIS** was going to send 20. **CHRIS** said right. REY said he did not want to send that much; he needed around two, but would wait a little bit. **CHRIS** said he would send REY 195, adding that was close to two. REY said that was fine. REY said his 195 and (unintelligible) would be perfect. **CHRIS** said 195 and asked REY for a repeat. REY said (195) and **CHRIS'** 20. REY said the 20 for the shipping. **CHRIS** said okay. REY said that way he (**CHRIS**) would get his and REY would pay his. **CHRIS** said he understood. REY said he would be talking to him (brother in law) this weekend and let **CHRIS** know. **CHRIS** said okay. REY asked if **CHRIS** had two for him. **CHRIS** said yes and if they (possibly brother in law) wanted to send Lasador (ph / Possible Lazaro) it would be no problem. REY said okay and told **CHRIS** that he had not talked to him (brother in law) for a while, since they had gone over there.

b. Based on my training, experience and knowledge about this ongoing wiretap investigation, the calls made by/or to **CHRIS** collectively between **TT #13** and **TT #14** indicate that he coordinated with a courier the transportation of proceeds into Riverside County. Additionally, based on information obtained from multiple wiretaps on REDACTED and REY LNU, investigators know that REY acquires multi-pound quantities of narcotics from various sources and that he operates a cell in the state of Kentucky.

**C.**
**IDENTIFICATION OF TARGET TELEPHONE #15**

REDACTED

41. Based on intercepted communications between **UM8364 (TS #9)** and REDACTED REDACTED, investigators determined that **TS #9** was the user of **TT #15.**

42. The following intercepted communications made to or from REDACTED **Target Telephone #15** as intercepted over Riverside County Wire REDACTED (to include Extension 1) are indicative of the types of narcotics activities associated with **TT #15** and indicate that **UM8364 (TS #9)** will use **TT #15** to facilitate his narcotics related activities for the DTO. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics activities associated with **UM8364 (TS #9)** and the target telephone which he utilizes.

REDACTED

REDACTED




REDACTED

REDACTED

D.
**IDENTIFICATION OF TARGET TELEPHONE #16**

REDACTED

REDACTED

44. Based on intercepted communications between **REY (TS #7)** and REDACTED investigators determined that **TS #7** was the user of **TT #16.**

a. On March 18, 2014, **REY (TS #7)** was intercepted communicating with REDACTED regarding a narcotics related activity. At approximately 4:07 p.m., during session number 2673, REY placed an outgoing call on **TT #16** to REDACTED who was using REDACTED REDACTED. **REY** said REDACTED got lost. REDACTED said **REY** could not imagine what happened (referring to narcotics seizures) to him. **REY** said he did not want to know. REDACTED said **REY** could imagine. REDACTED said he was about to call **REY** the other day to find out if **REY** needed those (narcotics) because his buddy had some, but truth was that ugly things were happening there (REDACTED seizures). **REY** said for REDACTED to take it easy. REDACTED said for a while. REDACTED said he could tell his buddy (about narcotics). REDACTED said the "jalecillo" (narcotics type) **REY** took belonged to him (secondary source of narcotics). REDACTED said he could ask him to take it (narcotics) to **REY.** REDACTED told **REY** the price was two higher. **REY** asked if he (buddy) did not have issues (referring to LEO contacts/investigation). REDACTED said he did not have issues. **REY** said he would let REDACTED know later. REDACTED asked **REY** to call back so he (REDACTED) can call the buddy.

b. On March 19, 2014, **REY (TS #7)** was intercepted communicating with REDACTED regarding a narcotics related activity. At approximately 5:20 p.m., during session number 2763, REY placed an outgoing call on **TT #16** to REDACTED who was using REDACTED REDACTED. REDACTED said the guy (narcotics supplier) that was supposed to call had not called yet. **REY** said for REDACTED to call him. REDACTED said he talked to his nephew and they might give him a few (narcotics units) so they (REDACTED and **REY**) would not struggle. **REY** asked when. REDACTED said he did not know but he (nephew) told him there might be some (narcotics) around and he would let him (REDACTED) have them (narcotics). REDACTED said he would let **REY** know. **REY** said he needed to find out about it because he had been dry for a few days and if not, then he would look elsewhere (secondary source) because he was in need of

something (narcotics). REDACTED said that was right, but he would have an answer for **REY** by tomorrow. **REY** asked if anything would get done with the guy (courier). REDACTED said he would call **REY** back if he called him.

c. On March 21, 2014, **REY (TS #7)** was intercepted communicating with REDACTED regarding a narcotics related activity. At approximately 9:04 a.m., during session number 2838, REY received an incoming text message on **TT #16** from REDACTED who was using REDACTED. The following is the direct text: "Hay un vato ke tiene por hay pero las da un poko mas caras wey es que todo aya Abajo subio wey" or "There is a guy (secondary source of narcotics) who has it somewhere around, but he gives it a little more expensive dude. The thing is that everything went up down there, dude.

**XI.**
**SIGNIFICANT EVENTS / SEIZURES**

45. The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations. While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related. Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

a. On **12-12-13**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore. California Highway Patrol K-9 unit alerted to the rear of the vehicle. Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds). Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

b. On **01-02-14**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

c. On **03-03-14**, California Highway Patrol stopped REDACTED REDACTED vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona. Vehicle was impounded for 30 days and driver released. Investigators seized approximately 9.8 pounds of methamphetamine from vehicle truck area.

d. On **03-14-2014,** California Highway Patrol stopped REDACTED REDACTED vehicle in Riverside County. Investigators seized approximately 10 pounds of methamphetamine from the vehicle.

**X.**

**NECESSITY AND EXHAUSTION**

(Penal Code section 629.50(a) (4))

46. Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous. Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

a. The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b. The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c. The identity of the Target subject(s)' customers and the other unidentified conspirators;

d. The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e. The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f. The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g. Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

47. The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

**INTERVIEWS**

48. Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the location of records and drugs and other pertinent information regarding the named crimes. Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would provide agents with a significant number of untruthful statements, diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, any such interviews would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to confidential sources whose identity may become known or whose existence may otherwise be compromised.

**CONFIDENTIAL INFORMANTS**

49. It appears that this organization is a close-knit organization whose members are either blood relatives, mutual friends and/or very familiar with one another. Your affiant is aware that it is a common concern of large-scale narcotic organizations that neither customers, would-be thieves, nor the police learn the identity of all members of the organization, or the locations where they store large amounts of narcotics or illicit proceeds. Therefore, lower echelon members shield those members higher up on the distribution chain from potential customers, and multiple locations are used to store lesser amounts of narcotics, and/or its proceeds, and additional locations are used to meet with customers. This method of operation allows suspects to minimize the risk of discovery

and loss to the organization in the event the customer is an informant.

50. Since it appears that no single informant or informants are available or expected to become available, your affiant is currently unable to determine the scope of this criminal enterprise, the identity of other co-conspirators, the sources and location of the narcotics, and their methods of operation. See Confidential Hobbs section.

**UNDERCOVER OFFICERS / AGENTS**

51. Because the seller of narcotics usually receives a fee for brokering the sale of narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier. If the seller were to introduce the customer to the supplier and the customer were able to deal directly with the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to deal directly with the supplier.

52. Due to the close-knit structure of this organization, infiltration by an undercover police officer appears to be an investigative technique fraught with failure and would most likely jeopardize both the safety of the officer and the progress of this investigation. Drug trafficking organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations through the introduction of undercover officers by informants. Therefore, the leaders of drug trafficking organization routinely refuse to deal directly with any person who they do not personally know. Subsequently, informants are rarely able to introduce undercover officers to drug trafficking organizations.

53. As previously noted, it is a common practice for individuals involved in large scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of strangers, new acquaintances, and individuals with whom they have conducted illegal drug transactions. If an informant introduced an undercover officer to a member of the drug trafficking organization, the informant would have to "vouch" for the undercover officer. Because of the previously mentioned compartmentalization of drug trafficking organizations, if an informant were able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the undercover officer would be able infiltrate the organization any further than the informant. Therefore, it is not reasonable to believe that the introduction of an undercover agent by an

informant to the drug trafficking organization would be either successful or accomplish the goals of this investigation.

**CONTROLLED PURCHASES**

54. Your affiant has considered the benefits and risks associated with a controlled purchase. It is your affiant's opinion that a controlled purchase could result in the arrest and conviction of one or more of the target subject(s), a controlled purchase would not accomplish the previously stated goals of the investigation.

55. If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement. Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

56. Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

**SURVEILLANCE**

57. The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown. However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s). Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

58. As described herein, physical surveillance has been used and will continue to be used during this investigation.

59. Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a. On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his identification. The subject was unable to produce any identification, but verbally identified himself as REDACTED with a date of birth of REDACTED, and address of REDACTED where the CI had previously picked up Heroin with REDACTED. REDACTED also provided a cellular phone number of REDACTED REDACTED. Deputy Wicker took a picture of REDACTED with his consent, for identification, and subsequently released him. TFO Layos conducted further investigation of REDACTED identity. Via Riverside County Sheriff's Departments data base, revealed contacts for REDACTED with a date birth of REDACTED and address of REDACTED Wildomar. TFO Layos also found DMV records Index number X8725114 for REDACTED with a date of REDACTED and address of REDACTED REDACTED, Wildomar. Based on the above information, Investigators identified that the person Deputy Wicker stopped was in fact REDACTED

b. On **December 12, 2013** members of the DEA TFG-2 and Riverside Sheriff's Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF), conducted surveillance of REDACTED residence, located at REDACTED Wildomar. During the surveillance, a black Jaguar with paper plates was observed leaving REDACTED residence and ultimately stopped by CHP interdiction unit. During this operation, DEA TFG2 and SWCNTF seized approximately 5lbs of Methamphetamine, $8,553 in US Currency, and a black 2010 Jaguar. The driver and sole occupant of the vehicle, REDACTED was arrested by CHP Officer Mendenhall for state felony violations of 11378 HS and 11379 HS, CHP agency case # F-532-801-13. A secondary search of the vehicle revealed additional 5 lbs of Heroin and 2 lbs of Methamphetamine, during asset forfeiture proceeding.

c. On **February 27, 2014**, SWNCTF investigators conducted surveillance in the city of Temecula, California to identify a male intercepted over Riverside County Wire REDACTED Investigators identified REDACTED as the user of REDACTED

d. On **March 3, 2014**, DEA and SWCNTF conducted surveillance on REDACTED in the city of Riverside, California pursuant to intercepted text message conversations as authorized by Riverside County Wire 14-79 which indicated that **GUSMAN** was to acquire narcotics. On the same date, investigators followed REDACTED to Carson, California and back to Riverside County where an interdiction unit made contact and investigators seized 9.8 pounds of methamphetamine.

e. On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and 1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators followed two Hispanic adult males to a home depot consistent with GPS pings on multiple phones used by **REY**. One of the subjects was identified as REDACTED DOB: REDACTED. Investigators are still working on determining if REDACTED is **REY** and the user of TT #10-12. Note: REDACTED has been the subject of investigation on secondary DEA narcotics investigations.

f. On **March 19, 2014**, investigators conducted surveillance eon **UM8364** pursuant to GPS pings of TT #15. Investigators identified a possible residence for **UM8364** and an associated vehicle (silver Honda Civic bearing California plate 7ADV247). Additionally, on the same date, investigators located the user of **TT #15 (UM8364)** at a shopping plaza located off Atlantic and Clara. Surveillance units observed **UM8364** and an unidentified Hispanic male conduct counter techniques such as squaring the block and looking into parked vehicle to identify possible surveillance by law enforcement.

g. On **March 20, 2014**, investigators conducted a brief surveillance on REDACTED in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to identify the vehicle operated by the narcotics courier working for **UM8364**. On the same date, investigators acquired the vehicle information.

60. Surveillance operations have been successful to the extent they have established persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

scope of the investigation to additional locations and co-conspirators. However, surveillance operations cannot establish the purpose of any observed meetings, nor identify other conspirators who do not make personal appearances. Therefore, surveillance appears unlikely to yield the sources of the supply of narcotics, fully identify each of the conspirators, their places of operation and the manner in which their operation is conducted.

61. Surveillance of the targets subjects and their associates will not enable the government to achieve its objectives in this investigation. To date, surveillance has failed to allow law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the co-conspirators. While surveillance may show subjects of this investigation with packages suspected to be drugs, it will not identify the contents of these packages or what is being said as packages are exchanged. Surveillance is an investigative technique that is used to confirm meetings and other suspected activities between alleged participants, but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and activities.

62. Your affiant knows from training and experience, and from speaking with other experienced agents and officers, that physical surveillance of high-level members of narcotic trafficking organizations is limited to placing individuals together without knowing the significance of their meeting or the role of each trafficker. Furthermore, based on my training and experience, surveillance of major narcotics traffickers is often difficult without detection. Physical surveillance is often limited to watching suspects from a distance, which as an investigative technique, can be problematic. Your affiant believes that excess random surveillance of a location without knowledge when a narcotics transaction will be taking place, could expose the identity of the officers and thereby compromise the investigation. Even if blanket, twenty-four hour surveillance were feasible, it would still be limited to providing information only on the movements and whereabouts of the Target Subject(s). If the Target Subject(s) suspected he was being watched by law enforcement personnel, he could abandon his phone and move his activities to a different location, thus effectively ending the current on-going investigation until he was located again. A wire intercept would greatly assist the agents because they could be deployed more effectively knowing about a future narcotics transaction. This would allow surveillance to be set up on strategic locations,

thereby lessening the risk of compromising the investigation.

63. Furthermore, your affiant knows from past investigations that narcotics traffickers use various counter-surveillance driving techniques. These techniques include frequent u-turns, stopping in parking lots to observe traffic, waiting at traffic lights to allow traffic to pass, speed variations, and taking circuitous routes through residential neighborhoods. All of these methods are used for the sole purpose of determining the presence of law enforcement personnel. These methods are frequently successful, as it is extremely difficult to follow suspects who employ these methods without being detected. Once detected, these suspects usually abandon their activities, which mean they may shut down their cellular phones, pagers, and other phones, and flee the jurisdiction or area only to resurface at another unknown location at a later date.

64. When physical surveillance is combined with interception of wire communications, the purpose of meetings can be revealed and may constitute admissible evidence if the meetings relate to an intercepted conversation of criminal behavior.

65. Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s). If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed. The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities. By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

66. Based on the above-stated facts and on my training and experience, your affiant does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

**SEARCH WARRANTS**

67. On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

68. On **2-25-14**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

69. On **02-27-214**, SA Baca acquired search warrant #02271412 for a target telephone utilized by members of the REDACTED

70. On **03-11-214**, SA Baca acquired search warrant #03111409 for multiple target telephone utilized by members of the REDACTED

71. On **03-19-2014**, SA Baca acquired search warrant #03191403 for multiple target telephone utilized by members of the REDACTED

72. On **03-26- 2014**, Detective Carnahan wrote search warrant #03261411 for a target telephone associated with this ongoing investigation.

73. There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant. Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation. Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

74. DEA investigators will prepare affidavits to search the principal locations involved in this investigation. However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation. Although a seizure of an intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply. The execution of a search warrant would in all probability terminate the present investigation. Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement. This includes utilizing multiple locations to store narcotics and/or controlled

substances and money, and the use of other locations to conduct business. Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

75. Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers. Your affiant is aware that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences. Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s). Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband. Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate. Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning to the documents and currency. Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the existence of the investigation. At this time, it would be counterproductive to make the existence of the investigation public. Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

**PEN REGISTERS AND TELEPHONE TOLLS**

76. The analysis of data derived from the use of a pen register and telephone tolls are

one of the techniques that have been utilized during this investigation. It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations. Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones. Although the review of those records does reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel. In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial structuring of this organization. Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

77. Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

## CLOSED CIRCUIT TELEVISION MONITORING

78. Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to conversations, agreements, and other arrangements necessary for this investigation. Additionally, this type of monitoring will not provide identifying information on the individuals entering and exiting the location, making it difficult if not impossible to determine the level of involvement within the organization, if any. However, investigators have incorporated this type of monitoring for **REY LNU** in order to gather vehicle information entering and exiting the property/residence. This, in conjunction with wire information can lead to the identification of narcotics and/or proceeds load drivers working for **REY LNU**.

## TRASH SEARCHES OF TARGET LOCATIONS

79. Your affiant believes that a trash search could be conducted at some of the locations

identified thus far as being associated with the targets subject(s), however, it would risk the detection of law enforcement. Your affiant is aware that high-level narcotics traffickers and their associates go to great lengths to destroy possible incriminating evidence and are unlikely to use their residence trash containers to dispose of such information. Your affiant has conferred with other experienced agents and officers who told me that narcotic traffickers will often carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. Furthermore, investigators have considered conducting trash searches of identified residences of known Targets of the investigation and believe that, in considering each location, it would be difficult to conduct a trash search because the neighborhoods are situated where trash cans are placed at the curb in front of the residence for dumping or are located in a rural area where the search would draw suspicion on the law enforcement officers. A trash search would surely draw the attention of neighbors, who would possibly report this to police, and/or notify the target subject(s) or his/their associates. Such discovery would likely alert target subjects and his/their associates to the existence of this investigation and risk having it prematurely terminated before the government's objectives have been achieved. It is difficult for law enforcement officers to justify their presence to any neighbor, without identifying themselves and their purpose for conducting the trash search. Even if trash searches were conducted and evidence of narcotics trafficking was obtained from the trash at this location, the evidence would probably not establish (1) the roles of all participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the conspiracy.

80. Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area. Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction. Additionally, any time a trash search is conducted; it is possible that officers will be spotted. At this time, your affiant feels that the potential returns to be gained do not justify the risks.

81. Based on my training and experience, there are great risks associated with conducting trash searches, usually for very minimal possible gain. For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe

and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated. This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc. Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation. Further, the risks of such action in this investigation far outweigh any potential rewards.

82. In addition, I have found that not only are trash searches risky, they are also usually worthless. I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information. I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

83. I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators. For instance, a trash search might help identify the wrappings used to transport narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

84. At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation. If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

## FINANCIAL INVESTIGATION

85. Even if investigators are able to locate accounts and financial records for the members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and

often do not use traditional banking methods. I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns. I know that drug traffickers do not usually maintain records of their illicit earnings. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail. It should be noted that investigator shave acquired some back account information over intercepted communications for **REY LNU**. Investigators have begun an inquiry into these accounts to determine the extent of monetary transactions, however, it should be noted that based on intercepted communications, your affiant is aware that **REY LNU** operates and transports proceeds in bulk cash.

**GRAND JURY**

86. The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings. It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors. In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity. In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the targets of this investigation.

87. I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons: (1) the Target Subject, and any other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.
## CONCLUSION

88. Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

89. Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

90. For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

91. Your affiant requests that the Court order that Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order:

a. Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), including but not limited to,

all wireless digital functions, wireless analog functions, direct connect/digital dispatch/direct dispatch functions, automatic mode switching functions, and "short message service." This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in the Riverside County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

b. Authorize the installation and/or use of equipment known as pen registers or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to the targeted numbers.

c. Authorize the installation and/or use of equipment to trap and trace Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to and from the target telephone numbers.

d. Authorize the installation and/or use of trap equipment to trace and identify the telephone numbers of persons placing calls to the Target Telephone numbers to include the activation of "caller ID" and any calling features such as "call forwarding" and "speed dialing" currently assigned to the Target Telephone numbers.

e. Your affiant requests the Court to order Sprint/Nextel and Verizon upon request of the applicant, to provide the technical assistance necessary to accomplish this interception unobtrusively and with a minimum of interference with the services said company provides the people whose communications are to be intercepted, and to provide records identifying subscribers and providing subscriber information on any and all telephone and pager numbers identified through this intercept/pen register, and any changed numbers whether published or not, including, but not limited to past telephone bills and records.

92. Your affiant requests the Court order Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to

provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order, within 48 hours (including after-business hours, weekends, and holidays), and without delay:

a. Provide any and all information related to any telephone(s), pager(s), text messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted conversation, or otherwise identified in this investigation and the subscriber(s) of any such communication devices(s). Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number or other identifier.

b. Provide Call Data Records (CDR) information, including any and all historical data, originating and terminating call detail, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation.

c. Provide any and all cell site data, pinging data, and/or GPS location information, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone, without geographical limitations, pursuant to Title 18 USC section 2703(D).

d. Provide any and all cell site data, including, but not limited to, cell site

location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of any and all cellular telephones, which called each Target Telephone, which was called by each Target Telephone, which was identified in an intercepted conversation, or which was otherwise identified in the investigation, without geographical limitations, pursuant to Title 18 USC section 2703(D).

e. Provide access and the access codes to voice mail and voice mail features.

f. Provide all information related to pre-paid cellular telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation, including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

93. Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers providing service to the Target Telephone(s) to continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances. Additionally, your affiant requests that if the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, the Telecommunication Companies be ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances. In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the court order for the cost of the service that was continued regardless of unpaid balances, pursuant to the court's order.

94. Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers not to disclose to the subscriber or any unauthorized person the fact that the order has authorized this wire interception, or of its existence.

95. Your affiant requests the Court to authorize law enforcement officers use mobile electronic tracking devices to locate and identify the target telephone(s).

96. Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace

officers of the Drug Enforcement Administration and other assisting peace officers be ordered to execute such intercept order.

97. Your affiant requests that, prior to the sealing of this Application, its affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

98. Your affiant requests that, pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a showing of good cause before a court of competent jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Riverside, California.

Dated: April 7, 2014

Special Agent Emilio J. Baca
Drug Enforcement Administration

Sworn to and subscribed before me on April 7, 2014.

HONORABLE HELIOS J. HERNANDEZ
COUNTY OF RIVERSIDE
STATE OF CALIFORNIA