MICHAEL A. HESTRIN
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE
Deena M. Bennett
Deputy District Attorney
3960 Orange St.
Riverside, California 92501
Telephone: (951) 955-5400
Fax: (951) 955-9673

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE DISTRICT ATTORNEY OF THE COUNTY OF RIVERSIDE FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE, PAGER AND ELECTRONIC COMMMUNICATIONS | WIRETAP NO. 15-108 |
| | APPLICATION |

Target Telephone #38: REDACTED
Target Telephone #39: REDACTED
Target Telephone #40: 502-609-5937

**APPLICATION PURSUANT TO PENAL CODE SECTION 629.50, Et Seq.**

I, John Aki., Chief Assistant District Attorney for the County of Riverside, declare:

1.      Applicant is the District Attorney of the County of Riverside, Michael A. Hestrin. I am the Riverside County District Attorney's designee, as defined in California Penal Code section 629.50(a).

2.      After reviewing the Affidavit In Support Of Application For An Order Authorizing The Interception Of Wire And Electronic Communications of Riverside Drug Enforcement Administration, Special Agent Emilio Baca, and relying thereon, I approve making this Application and hereby apply to the Riverside County Superior Court for authorization to intercept wire, pager and electronic communications to and from the communication devices (the "Target Device(s)") described below.  The Affidavit is attached hereto and incorporated herein by this reference.

3.      Applicant hereby assigns Deputy District Attorney Deena M. Bennett, or her substitute, to physically present this Application to the Court and to make the required periodic reports required by Penal Code section 629.60.

EXHIBIT
6

4.      Special Agent Baca, assigned to the Department of Justice, Drug Enforcement Administration (DEA) Riverside District Office, is the law enforcement officer seeking authorization to intercept wire and electronic communications pursuant to Penal Code Section 629.50(a).  He is certified by the California State Attorney General's Office in wiretaps, as set forth in the Affidavit.

5.      Pursuant to Penal Code Section 629.50(a)(2), the DEA Riverside District Office, Los Angeles Field Division, is the agency that will execute this Order and, pursuant to Penal Code Section 629.50(a)(3), Special Agent in Charge Anthony D. Williams, reviewed the Affidavit and approves this Application (see Review of the Chief Executive Officer filed herewith).

6.      Based on my review of the Affidavit, I believe there is probable cause to conclude the **Target Subjects** as set forth in the Affidavit have committed, are committing, and will continue to commit the crimes of Importation, Possession for Sale, Transportation and Sales of Controlled Substances in violation of Health and Safety Code Sections, 11378 and 11379 of the Health and Safety Code with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight, and/or ten (10) gallons of liquid by volume, as well as the possession of over $100,000 in proceeds from narcotics transactions in violation of Health and Safety Code Section 11370.6, and conspiracy to commit said offenses in violation of Penal Code Section 182, within the meaning of Penal Code Sections 629.52(a)(1) and 629.52(a)(5), and that intercepted conversation of these persons, along with any additional known and unknown co-conspirators, will provide additional evidence regarding the **Target Subjects'** involvement in said offenses. There is probable cause to believe the **Target Subjects** possess information about the crimes listed herein and will discuss these matters over the **Target Telephone.**

7.      Pursuant to Penal Code Section 629.50(a)(4)(C), following are particular descriptions of the device(s) from which the communications are to be intercepted and their locations:

REDACTED

1
2
3
4          **REDACTED**
5
6

7          c.      **Target Telephone #40: (502) 609-5937 (TT #40)** is an AT&T cellular

8    phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher

9    MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by

10   **MATTINGLY.**

11         8.      The actual interception and monitoring post will be in **Riverside County**.

12         9.      The communications to be intercepted are wire and electronic communications

13   between the Target Subjects and other known and unknown associates and/or co-conspirators

14   concerning the offenses set forth above, as set forth in Penal Code Section 629.52(a).

15         10.     I have been informed and believe that conventional investigation techniques have

16   been attempted without success or reasonably appear too dangerous or unlikely to succeed if

17   attempted, as set forth in the Affidavit.

18         11.     Due to the ongoing nature of the conspiracy related to the above offenses, and

19   because there is probable cause to believe that multiple communications related to those

20   offenses will occur during the course of interception and monitoring, I request that authority to

21   maintain this intercept be granted for **thirty (30) days** and request that the authority not be

22   deemed to automatically terminate upon interception of the first communication of the type

23   described above.

24         12.     I request that this Court order Sprint Corporation, Verizon Wireless, Virgin

25   Mobile U.S.A., Pacific Bell Company, Virgin Mobile, SBC, Verizon Communications, AT&T,

26   AT&T Wireless, AT&T California Products and Services, T-Mobile USA Inc., Cellco

27   Partnership doing business as Verizon Wireless, T-Page Plus Communications, Inc., Cingular

28   Wireless, Nextel Communications, Metro PCS, Cricket Wireless, Sprint Spectrum, L.P., Sprint

     PCS, Sprint-Nextel, Metrocall, PageNet, Tuyo Mobile (an IDT Company), Weblink Wireless, T-

1   Mobile, Google, AOL, Yahoo!, Hotmail, MySpace, HotPop, Apple Inc., Microsoft, and any

2   other affected telecommunications companies, subsidiaries, or entities (the

3   "Telecommunications Companies") or electronic mail service providers (the "Email Service

4   Providers") upon request of law enforcement, to provide the technical assistance necessary to

5   accomplish the interception unobtrusively and with a minimum of interference of the services

6   being provided the Target Subjects.  The Telecommunications Companies or the Email Service

7   Providers shall be compensated by the agency executing the court order for the reasonable costs

8   of furnishing the facilities and technical assistance.

9          13.    I request this Court to order the Telecommunications Companies or the Email

10  Service Providers not to disclose to the subscriber or any unauthorized person the fact that the

11  court has authorized this wiretap.

12         14.    Applicant requests this Application, Review, Affidavit, Order and any/all

13  incorporated documents, attachments, and/or exhibits be sealed and kept in the custody of the

14  agency executing the Court Order or the District Attorney's Office and to be disclosed only upon

15  a showing of good cause before a Judge of competent jurisdiction.  (Penal Code Section 629.66)

16         15.    I am unaware of any previous relevant wiretaps other than those set forth in the

17  Affidavit within the meaning of Penal Code Section 629.50(a)(6).

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

16.   Applicant designates any California Department of Justice certified person(s), selected and supervised by the investigative or law enforcement officer/agency, to provide linguistic interpretation for interception of wire, electronic digital pager and electronic cellular telephone communications, pursuant to Penal Code Section 629.94.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, except as to those matters declared on information and belief, which matters I believe to be true, and that this Application was executed in Riverside, California.

DATED: _2/19/15_

By JOHN AKI
CHIEF ASSISTANT DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

For: MICHAEL A. HESTRIN
DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

1  MICHAEL A. HESTRIN
   DISTRICT ATTORNEY
2  COUNTY OF RIVERSIDE
3  Deena M. Bennett
   Deputy District Attorney
4  3960 Orange St.
   Riverside, California 92501
5  Telephone: (951) 955-5400
   Fax: (951) 955-9673
6

7

8            **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                  **IN AND FOR THE COUNTY OF RIVERSIDE**
9

10 **IN THE MATTER OF THE APPLICATION**        )   **WIRETAP NO.: 15-108**
   **OF THE DISTRICT ATTORNEY OF THE**         )   **AFFIDAVIT IN SUPPORT OF**
11 **COUNTY OF RIVERSIDE FOR AN ORDER**        )   **INTERCEPT ORDER**
   **AUTHORIZING THE INTERCEPTION OF**         )
12 **WIRE ELECTRONIC CELLULAR**                )
   **TELEPHONE COMMUNICATIONS**                )
13           REDACTED        **Target Telephone #38**   )
                             **Target Telephone #39**   )
14 **(502) 609-5937    Target Telephone #40**            )

15          **AFFIDAVIT IN SUPPORT OF APPLICATION**
16 **FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ELECTRONIC**
              **CELLULAR TELEPHONE COMMUNICATIONS**
17                           **AND**
   **AN ORDER OBTAINING GLOBAL POSITIONING SYSTEM (GPS) TRACKING**
18             **AND/OR CELLULAR SITE DATA**
                           **AND**
19 **AN ORDER AUTHORIZING A PEN REGISTER TRAP AND TRACE DEVICE**

20                           **I.**
21            **INTRODUCTION AND EXPERTISE**

22       I, Emilio J. Baca, being duly sworn do hereby declare and state:

23       1.      I am a Special Agent with the United States Drug Enforcement Administration

24 (DEA), and I am an investigative or law enforcement officer of the United States within the

25 meaning of Section 2510 (7) of Title 18 of the United States Code.

26       2.      I am empowered by law to conduct investigations and to make arrests for felony

27 offenses as enumerated in 18 U.S.C. 2516. I have been so employed since February 2010 and I am

28 currently assigned to the Riverside District Office Task Force Group 2. I primarily investigate

1  narcotic trafficking and distribution organizations operating in and around Riverside County in

2  California

3      3.      I have received approximately 19 weeks of training at the DEA Academy in

4  Quantico, Virginia and was trained in all aspects of conducting narcotics investigations as well as

5  the methods and techniques commonly used by major narcotics traffickers. I have attended special

6  training in wire and electronic interceptions, toll analysis, and the use of wire and electronic

7  interception equipment. I am certified by the California State Attorney General's Office in the

8  practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

9      4.      During my employment with the DEA, I have participated in narcotics investigations

10  through the surveillance, execution of search warrants, and arrests of drug traffickers.  In addition, I

11  have spoken to informants and suspects regarding the methods and means of drug traffickers. I have

12  debriefed persons arrested for controlled substance trafficking and have debriefed informants on the

13  methods for gathering controlled substance intelligence.  I have spoken with experienced narcotics

14  investigators concerning the methods and practices of narcotics traffickers.  Through my training,

15  experience and interaction with other Special Agents, Task Force Officers, and other narcotics

16  investigators, I have become familiar with narcotic traffickers' methods of operation, including the

17  distribution, transportation, collection of proceeds and methods of laundering used in an attempt to

18  conceal the nature of narcotic related proceeds.  Through these interactions I have become familiar

19  with and developed an understanding for the manner in which controlled substances are imported,

20  manufactured, distributed, and sold, to include the methods of avoiding detection and apprehension

21  by law enforcement officers.  I am familiar with the manner in which narcotics traffickers use

22  wireless communication equipment such as cellular telephone technology, pagers, coded

23  communications, false identities, and counter surveillance to determine the presence of law

24  enforcement and other means to facilitate their illegal activities and avoid detection or mislead a

25  narcotics investigation.

26      5.      I am familiar with the facts and circumstances described herein and make this

27  affidavit based upon the following: (1) personal knowledge I have gained from my participation in

28  this investigation; (2) conclusions I have reached based upon my training, experience, and

conversations with other law enforcement investigators with whom I have discussed this case; (3) and what I believe to be reliable information obtained from the following sources: oral and written reports about this investigation, received from law enforcement officers; (4) law enforcement databases; (5) Pen register and trap and trace information as well as telephone records - toll records and subscriber information; (6) public records; and (7) physical surveillances conducted by DEA, West County Narcotics Task Force - Riverside County Sheriff's Department, and other law enforcement officers, which have been reported to me directly.

6.     Unless otherwise noted in this Affidavit, when I assert that a statement was made, the information was provided to me by another law enforcement officer, or other source of information with whom I have spoken or whose reports or statements I have reviewed.   Parenthetical explanations of coded or vague communications throughout this Affidavit are based on my interpretation, derived from my training, experience and familiarity with this and previous narcotics investigations.

7.     Based upon the information contained herein, I hereby make an application to intercept the wire, pager, and electronic cellular telephone communications for **Target Telephones** as described below:

*REDACTED*

c.     **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

8.      Probable cause exists to believe that **BETO LNU (TS #20** user of **TT #38 and TT #39), Chris MATTINGLY (TS #8** user of **TT #40)** and other identified and unidentified co-conspirators, have committed, are committing, or are about to commit, the crimes as discussed below, and that their communications relate to those and other ongoing crimes.

9.      I request that the US Drug Enforcement Administration (DEA) be authorized to execute such wire intercept order.  The listening post will be in the County of Riverside, California.

10.     Based on this investigation, set forth in detail below, I assert that there is probable cause to believe that the Target Subjects (as defined below) have committed, are committing, and are about to commit the crimes of  possession for sale, transportation, and sale of a controlled substance in violation of sections 11350, 11351, 11378 and 11379 of the Health and Safety Code, with respect to a substance containing cocaine and/or methamphetamine where the substance exceeds three (3) pounds of solid substance by weight and/or ten (10) gallons of liquid by volume, possession of narcotics proceeds in violation of Health and Safety Code section 11370.6, and a conspiracy to commit said offenses pursuant to Penal Code section 182.

## II.
## PURPOSE OF AFFIDAVIT
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
(Penal Code sections 629.50(a) and 629.50(a) (2))

11.     Based upon the information contained herein, I hereby make application for a thirty-day order to intercept the wire, electronic pager, and/or electronic cellular telephone communications, including any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice communications, to and from **TT #38:** REDACTED **TT #39:** REDACTED **and TT #40: 502-609-5937** between the herein named target suspect(s) and any additional co-conspirators known and unknown and shall include any and all communications to the cellular telephone handset device, to include, but not limited to: voice communications, text messages, digital photographic images, digital video images, electronic mail ("e-mail") communications and push-to-talk voice

1  communications and any background conversations while the telephone instrument is otherwise in

2  use.

3

**B.**

**PEN REGISTER AND TRAP AND TRACE DEVICE AND OBTAINING GLOBAL**
**POSITIONING SYSTEM (GPS) TRACKING AND/OR CELLULAR SITE DATA**
(18 .S.C. Sections 3121 through 3126)

12.    I also request the authorization for the installation of a pen register and trap and trace

feature on **TT #38:** [REDACTED] **TT #39:** [REDACTED] **and TT #40: 502-609-5937** I also

request the authorization to obtain and receive cell site data and/or Global Positioning System (GPS)

location information including, but not limited to, cell site location (physical address) of call

initiation, call termination, and call progress locations (Automated Message Accounting Data)

connected to the use of each target telephone and any and all cellular telephones called or being

called by each target number without geographical limitations, related to **TT #38:** [REDACTED]

**TT #39:** [REDACTED] **and TT #40: 502-609-5937.** The Target Telephone(s) is/are a mobile

cellular telephone(s), which makes surveillance difficult if not impossible because the location of

the person using the target telephone is often unknown.   However with the assistance of cell site

data and/or Global Positioning System (GPS) location information including, but not limited to, cell

site location (physical address) of call initiation, call termination, and call progress locations

(Automated Message Accounting Data) connected to the use of each target telephone and any and

all cellular telephones called or being called by each target number without geographical limitations

related to the target telephone(s), law enforcement officers would be able to locate and conduct

surveillance of the user of the target telephone(s).   Therefore, your affiant requests an order to obtain

and receive cell site data and/or Global Positioning System (GPS) location information including,

but not limited to, cell site location (physical address) of call initiation, call termination, and call

progress locations (Automated Message Accounting Data) connected to the use of each target

telephone and any and all cellular telephones called or being called by each target number without

geographical limitations related to the target telephone.

a. Your  affiant  has  learned  through  conversations  with  other  law  enforcement

officers and by personal knowledge that illegal narcotic traffickers have the potential to disable the

GPS function in their telephones if they are aware law enforcement can monitor their real time movements. Your affiant does not solely rely on GPS locations because your affiant knows, often times GPS requests can fail or revert to cell towers with a 5000 meter locate. I also know there are many "dead spots" in Southern California as related to cellular service for Sprint/Nextel. I have been told by Sprint/Nextel employees if cellular telephones do not receive a signal, I will receive a failed response when requesting GPS locations.

b. I also request that law enforcement officers be given the authorization to use mobile electronic tracking devices to locate and identify **TT #38:** REDACTED **TT #39:** REDACTED REDACTED **and TT #40: 502-609-5937.** The Target Telephone(s) is/are a mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the target telephone is often unknown. However with the assistance of mobile electronic tracking devices, law enforcement agents can identify the location of a cellular telephone to a much finer detail than through cellular site data alone.

### III.
### DURATION OF INTERCEPTION
(Penal Code section 629.50(a) (5))

13.    This Affidavit is in support of an Application to intercept wire and electronic communications for **a period not to exceed thirty (30) days commencing on the day of the initial intercept or ten (10) days after the issuance of the Order, whichever comes first, pursuant to California Penal Code section 629.58**. The goal of this investigation is to prove the full scope, membership and methods of operation of the conspiracy. I request that the Court order that the interception not terminate when the communications described herein are first intercepted, but may continue to the full extent of California Penal Code section 629.58 or until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation and the various activities in which they are engaged in furtherance of the enterprise, whichever comes first.

14.    Based upon your affiant's training and experience, narcotic traffickers extensively use their telephones to conduct their illegal activities. Therefore, your affiant believes that additional communications of the same type will occur after the interception of the first

communication to and from the target telephone(s).

## IV.
## TARGET TELEPHONE(S)
### (Penal Code section 629.50(a)(4))

15.   The Target Telephones are described as follows:

**REDACTED**

c.   **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

1.   The term **"Target Telephone #38-40"** also refers to any changed telephone number assigned to the same Electronic Serial Number (ESN) and/or International Mobile Subscriber Identification (IMSI) number, Urban Fleet Mobile Identifier (UFMI) number, Internet Protocol (IP) Address and/or Push-to-talk (PTT) number, and/or Direct-Connect (DC), ESN, IMSI, UFMI, IP, PTT and/or DC with the same subscriber information as the target telephone(s), and/or any changed ESN, IMSI, UFMI, IP, PTT and/or DC assigned to the same telephone number(s) with the same subscriber information as the target telephone(s) or any additional changed telephone number(s) and/or ESN and/or IMSI, UFMI, IP, PTT and/or DC whether the changes occur simultaneously or consecutively, listed to the same subscriber and wireless telephone account(s) as the target telephone(s).

2.   Based on my training and experience, persons often use fictitious names when obtaining Pre-Paid cellular phones as a means of preventing detection by Law Enforcement. This enables persons involved with criminal activity to operate with a level of comfort knowing that

their fictitious information will keep Law Enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also buys them time to flee the area of the crime.

## V.
## TARGET SUBJECTS
(Penal Code section 629.50(a) (4))

16.     The known Target Subject(s) of this investigation are:

REDACTED

REDACTED



g. **Raymundo CARILLO aka CEJAS (Target Subject 7)** previously listed as Daniel Navarro CHAVEZ.   Investigators previously had identified the target subject known as "REY" as CHAVEZ based on information obtained from GPS pings, secondary narcotics investigation indicating CHAVEZ was associated with 1135 W. 7th Street, Perris, California, the residence identified from GPS pings on phones utilized by "REY" and physical surveillances. It should be noted that CHAVEZ has a listed address of 1111 W. 7th Street, Perris, California 92570. However, further investigative analysis indicated the subject known as "REY" was actually **CARILLO**. On October 23, 2014, investigators initiated surveillance in Perris, California pursuant to GPS pings of **TT #32**, used by **CARILLO**. On the same date, investigators positively identified "REY" as **CARILLO** from a state of California booking photo. It should be noted that surveillance observations on CARILLO's movements were also concurrent to GPS pings of **TT #32**. **CARILLO** is a Hispanic male with a Date of Birth of ▮REDACTED▮ and has been the subject of Riverside County Wire Intercepts 14-120, 14-183 and ▮REDACTED▮ **CARILLO's** criminal history

includes arrests for HS 11377 from 2001 and records indicate police contacts for **CARILLO** at 23802 Lake Drive, Perris, California. Investigators have obtained vehicle plates observed at this residence which come back to [REDACTED] a member of this DTO.

    h.  **Chris MATTINGLY (Target Subject 8)**  is a described as a white male with a Date of Birth: [REDACTED] Hair: Blonde, Eyes: Blue, Weight: 250, Height: 6'3, and listed residence of 661 Old Highway 245, Shepherdsville, KY.

[REDACTED]

    j.  **Ronald Ashley SHEWMAKER (Target Subject 10):** is described as a White male, with a date of birth of [REDACTED] Hair: Red, Eyes: Brown, Weight: 220 lbs., Height: 5, 7." According to Department of Motor Vehicles, **SHEWMAKER** is issued Kentucky Driver's License # [REDACTED] with an address of [REDACTED] Lebanon Jct, Kentucky 40150. Your affiant found no documented criminal history for **SHEWMAKER.**

[REDACTED]



REDACTED

REDACTED

REDACTED

*REDACTED*

*REDACTED*

*REDACTED*



*REDACTED*

# VI.
## COURT'S JURISDICTION
### A.
## WIRE, ELECTRONIC PAGER, AND/OR ELECTRONIC CELLULAR TELEPHONE COMMUNICATIONS INTERCEPT ORDER
### (Penal Code section 629.52)

17.     *California Penal Code* section 629.52, in part, states "The judge may enter an ex parte order ... authorizing interception of wire, electronic page, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting...." Section 629.52 does not define the phrase "initially intercepted." However, federal courts have ruled on similar language found in 18 USC 2518(3), which, at the time of the rulings, stated, "the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...." In *United States v. Rodriguez*, 968 F.2d 130 (2nd Cir. 1992), *cert. denied* 506 U.S. 847, 113 S.Ct. 140, 1212 L.Ed.2d 92, a federal magistrate of Southern District of New York issued an intercept order for the telephones of a cafe located in New Jersey. The defendants contended that the intercept order was improperly issued and argued that only a New Jersey magistrate could issue an intercept order for a telephone located in New Jersey. The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders. The court held "for

the purposes of [the] jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." (*Ibid*, at page 136)  In *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, the defendants contended that the wiretap was jurisdictionally defective because it was authorized by a judge outside the judicial district in which the defendants' telephones were located.  The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas.  The court rejected the defendant's contention and explained the jurisdiction issue as it pertains to intercept orders.  The court held, "We agree with the reasoning of the Second Circuit and now hold that the interception included both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders.  As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district." (*Ibid*, at pages 403-404)  Also see *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, which held a judge, sitting in the district where the target subject lived and where the criminal conduct was being investigated, could issue a wiretap order for a cellular telephone which was thought to be used by the target subject regardless of where the cellular telephone or the listening post was located, even though the criminal conduct which being investigated was occurring in another district and the listening post was located in another district.  In *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531, the Court of Appeals held that a judge sitting in one district could issue an order to intercept cellular telephones which were assigned area codes located in another district, because the listening post was located in the same district as the judge who issued the order.

    18.    Based upon my training and experience, persons engaged in criminal conduct use cellular telephone(s), use fictitious names, facilitators or facilitating agencies when obtaining cellular phones as a means of preventing detection by law enforcement.  By using other persons' names and creating a fictitious prepaid account, a target subject acquires a certain degree of

anonymity, and is one of the reasons for the popularity of pre-paid cellular telephones among those engaged in narcotics trafficking. This enables persons involved with criminal activity to operate with a level of comfort knowing that their fictitious information will keep law enforcement from immediately knowing their true identities. This delay in identifying these suspects often allows them enough time to either destroy or hide evidence of their crimes and also provides them time to flee the area of the crime.

19.    This investigation into the ▮▮▮REDACTED▮▮▮ specifically the segment operated by **CARILLO (TS #7)** encompasses the distribution of narcotics to multiple states across the continental United States to include, but not limited to, Missouri, Texas, Georgia and Kentucky. There are several narcotics investigations involving multiple segments/cells for this DTO currently being investigated by DEA (St. Louis and Lexington) as well as by Local Narcotics Teams (Louisville, KY area).

*REDACTED*

21.    **Target Telephone #40** used by **Christopher MATTINGLY (TS #8)**, identified as Kentucky cell head for the ▮▮▮REDACTED▮▮▮ working with CARILLO (TS #7). Although **MATTINGLY** is physically in Kentucky, he routine coordinates with DTO members operating out of Riverside County and which transport narcotics from Riverside County to Kentucky. Additionally, the proceeds from the sale of narcotics filters back to Riverside County via proceeds couriers operating passenger vehicles. In May of 2014, investigators seized approximately $420,000 which was sent by **MATTINGLY**.

22.    The interception and listening post will be in **Riverside County**. This is sufficient in and of itself to confer jurisdiction to this court.

# VII.
## PRIOR APPLICATIONS
### (Penal Code section 629.50(a) (6))

23.     On February 13, 2015, your affiant requested checks of the California Department of Justice reference the Electronic Intercept Court Order System for **TT #38-40.**

24.     On February 13, 2015, your affiant requested checks of the United States Department of Justice wiretap database to determine if any Federal applications had been made to initiate a Title III wiretap intercept of **TT #38-40.**

25.   Other than those Applications described herein, your affiant is not aware of any other applications that have been made to any court in the United States for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this Application, within the meaning of *Penal Code* section 629.50(f).

*REDACTED*

*REDACTED*

*REDACTED*

f.     **Riverside County Wire Intercept Order 14-120:** On March 11, 2014, the Honorable Judge Helios J. Hernandez of the Riverside County Superior Court, State of California granted and issued Riverside County Intercept Order 14-120, which authorized the interception of the communication to and from **TT #9:** *REDACTED* **TT #10: (502) 492-1461 , TT#11: (951) 570-0461 , and TT#12: (951) 322-5805.**

*REDACTED*

h.     **Riverside County Wire Intercept Order 14-183:** on April 7, 2014, the Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed wire Order 14-183, authorizing the initiation of State wire intercept for 30 days for **Target Telephone #13 502-609-5967, Target Telephone #14 702-885-7486, Target Telephone #15** *REDACTED* and **Target Telephone #16 951-322-0063.**

i.     **Riverside County Wire Intercept Order 14-120 Extension 1:** On April 8, 2014, Honorable Judge Helios J. Hernandez of the Superior Court, County Of Riverside, signed wire Order 14-120 Ext 1, authorizing the initiation of State wire intercept for 30 days for **Target Telephone #11 951-570-0461.**

*REDACTED*



REDACTED

REDACTED

REDACTED

r.        **Riverside County Wire Intercept Order 14-558:** On November 5, 2014, the Honorable Judge Helios J. Hernandez of the Superior Court, County of Riverside, signed wire Order 14-558, authorizing the initiation of State wire intercept for 30 days for **TT #31:** REDACTED REDACTED **TT #32: 909-994-2290, TT #33:** REDACTED **TT #34:** REDACTED **and TT #35:** REDACTED

REDACTED

# VIII.
## OBJECTIVES OF THIS INVESTIGATION

26.        Your affiant believes interception of wire communications to and from **Target Telephone #38-40** is necessary for the government to fully achieve the objectives of this investigation which include discovering:

a.        The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.        The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.        The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.        The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.        The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.        The methods and routes used by the Target subject(s)' illegal narcotics

trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

## IX.
## STATEMENT OF PROBABLE CAUSE
### (Penal Code section 629.50(a)(4))

27.    The following statement of facts and circumstances detail the historical involvement of the Target Subjects in drug trafficking and their current use of the Target Telephones to facilitate drug trafficking.

28.    Based upon the investigation in this case, set forth in detail below, I assert that:

a.      There is probable cause to believe that the Target Subjects are committing, have committed, or are about to commit particular offenses.  Those offenses are Possession for Sale, Sale and Transportation of Controlled Substances in violation of Health and Safety Code 11350, 11351, 11378, 11379, possession of narcotics proceeds in violation of Health and Safety Code Section 11370.6, and Conspiracy to commit those offenses in violation of Penal Code Section 182, with respect to a substance containing methamphetamine in an amount exceeding three pounds of solid substance by weight or ten gallons of liquid by volume. (Penal Code section 629.52(a).

b.      There is probable cause to believe that particular communications concerning the above-named offenses will be obtained through the interception of the wire, electronic pager, and/or electronic cellular telephone communications.  (Penal Code section 629.52(b)

29.    There is probable cause to believe that the facilities from which, or the places where, the wire, electronic pager, and/or electronic cellular telephone communications are to be intercepted are being used, or about to be used, in connection with the commission of the above-named offenses or are leased to, listed in the name of or commonly used by the **Target Subjects** whose communications are to be intercepted.  (Penal Code section 629.52(c))

30.    That normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous, as more fully explained

below. (Penal Code section 629.52(d)).

31.    Based upon the investigation in this case, set forth in detail below, I further assert that there is probable cause to believe evidence of the aforementioned offenses including evidence regarding (1) the identities and roles of participants in the illegal narcotics trafficking and money laundering activities; (2) the sources of supply of the narcotics; (3) the locations utilized in furtherance of the narcotics trafficking and money laundering activities; (4) the methods of distribution of contraband and money laundering and the identities of the persons and places involved in the manufacturing and distribution of narcotics and money laundering, will be obtained through the interception of wire communications over the **Target Telephones**.

32.    I make this Affidavit, in part, on personal knowledge derived from participation in this investigation and, in part, upon the information from the following sources:

a.    Oral and written reports about this and other investigations that I have received from the DEA and other law enforcement officers;

b.    Physical surveillance conducted by the Riverside Sheriff Department (RSD), and DEA RDO in this and other investigations, which has been reported to me either directly or indirectly;

c.    Pen register and trap and trace information, telephone tolls and other documentary evidence in this and other investigations and,

d.    Evidence gathered through other law enforcement investigations.

e.    Communications intercepted pursuant to court-authorized intercept orders.

f.    Evidence obtained through court-authorized intercept orders.

## A.

## IDENTIFICATION OF TARGET TELEPHONE #38 and #39

*REDACTED*



*REDACTED*

*REDACTED*



REDACTED

REDACTED

REDACTED



1
2
3
4
5
6
7
8   *REDACTED*
9
10
11
12
13
14
15
16
17
18
19
20   *REDACTED*
21
22
23
24
25
26
27   *REDACTED*
28



REDACTED

REDACTED

REDACTED



*REDACTED*

*REDACTED*

**A.**

**IDENTIFICATION OF TARGET TELEPHONE #40**

Affidavit – Wiretap Order No. 15-108
Page 26

39.     On April 7, 2014 the Honorable Judge Helios J. Hernandez signed Riverside County Wire Intercept 14-183 for TT #13 (**502-609-5937-now TT #40**) used by **Christopher MATTINGLY**. Investigators monitored the communications for **MATTINGLY** while using **TT #40** (marked TT #13 for Wire Intercept 14-183) for a 30 day period. During that interception period, investigators seized approximately $420,000 US Currency from a narcotics proceeds courier identified as Ronald SHEWMAKER. The proceeds transport was coordinated between CARILLO (TS #7) and **MATTINGLY (TS #8)**.   Since the last interception period on **MATTINGLY**, investigators have been coordinating with DEA Louisville and Lexington in an effort to dismantle these cells working under the [REDACTED] and at the direction of CARILLO. Investigators determined that **TT #40** is still active and is being utilized by **MATTINGLY** based on GPS pings initiated by a local Narcotics Task Force investigating **MATTINGLY**.   The below reference calls are outlined to demonstrate historical narcotics communications on **TT #40**. Based on my training an experience, the following pertinent aspects of intercepted communications and parenthetical explanations of language contained therein, are related to and indicative of the narcotics related activities associated with **MATTINGLY** and the target telephone which he utilizes.

a.       On April 9, 2014, at approximately 10:33 a.m., **Target Telephone #40**, used by **Christopher MATTINGLY (TS #8)** received an incoming call from telephone number 270-547-9757, session number 223 used by UM9757. UM9757 asked where **MATTINGLY** was. **MATTINGLY** said he was at his house, and then asked where UM9757 was.  UM9757 said he was at the office. **MATTINGLY** asked UM9757 to go up there (to **MATTINGLY'** location) because he (**MATTINGLY**) had gotten some nicer shit (narcotics) for UM9757.  UM9757 said he had some deals and some cash, then asked where **MATTINGLY** wanted him to put it.  **MATTINGLY** said to give it to Leslie, because she would be back here and that she (Leslie) should be there (at UM9757's location) in a second because she was walking back there (to UM9757's location) from the house. UM9757 said alright.

b.       On April 19, 2014, at approximately 7:46 a.m., **Target Telephone #40**, used by **Christopher MATTINGLY (TS #8)** received an incoming call from telephone number 270-859-0111, session number 665 used by UM0111. UM0111 said he (third party) had made him

(UM0111) a shot. **MATTINGLY** asked what he (third party) said. UM0111 said he (third party) wanted one of those Hardinsburg specials, and laughed. UM0111 said 1,590, 100 of them (ph). **MATTINGLY** said 1,700 for 100 of them. UM0111 said U/I. **MATTINGLY** said they would not be U/I. **MATTINGLY** said 1,700 and if he did not want them, it was alright. UM0111 said okay.

c.     On May 4, 2014, at approximately 10:42 a.m, **MATTINGLY** placed and outgoing call to Raymundo CARILLO (TS #7). The following highlights the pertinent aspects of the conversation which, based on my training and experience relates to narcotics activity. REY asked what was happening. **MATTINGLY** said not a whole lot. **MATTINGLY** said he meant to call REY last night, but he had gotten busy. REY said he went to a party. **MATTINGLY** asked if REY had gotten wild. **REY** asked if **MATTINGLY** knew how long... (thought not finished by REY). REY asked if **MATTINGLY** knew where RONNIE (proceeds courier) was at that moment. **MATTINGLY** said not exactly and he (RONNIE) probably would not tell him exactly. REY said alright. **MATTINGLY** said he (RONNIE) would be there (at **REY's** area) later this afternoon for sure. REY said that was what he was thinking. REY said he had to go out to do something right now, but would try to be there (at REY's location) U/I. **MATTINGLY** said there was no problem. **REY** said he would call **MATTINGLY** back when he (Ronnie) was there (REY's location). **MATTINGLY** said alright

1)     **Investigators Note:** On May 4, 2014, investigators seized approximately 420,000 US Currency from Ronald SHEWMAKER in Perris, California. This currency was coordinated between CARILLO and MATTINGLY.

40.  Although, the aforementioned intercepted communications are dated, recent investigative information and seizures indicate that **MATTINGLY** continues to operate as a cell head in Kentucky. In November of 2014, investigators were monitoring intercepted communications for Raymundo CARILLO as authorized by Riverside County Wire Intercept 14-558. On or about November 11, 2014, investigators began to intercept communications between CARILLO and a proceeds courier for the DTO. The courier was provided the following address: 521 Old Highway 60, Hardinsburg, Kentucky. On the same date, your affiant, working with agents in Kentucky, learned that the aforementioned address was a property owned by **MATTINGLY**. Investigators in Kentucky

initiated surveillance and ultimately conducted a vehicle stop which contained approximately 60,000 US Currency. Based on intercepted communications, surveillance and proceeds seizure, your affiant believes that **MATTINGLY** continues to distribute narcotics for the DTO.

**Toll Analysis of TT #40:**

41.    On January 29, 2015, your affiant conducted a telephone toll analysis of **Target Telephone #40. TT #40** placed or received 24 calls between 01-07-2015 and 01-26-2014 to 502-921-0299, which is associated to [REDACTED] a multi-pound methamphetamine trafficker in Louisville, Kentucky.

## XI.
## SIGNIFICANT EVENTS / SEIZURES

42.    The information described in this section exhibits law enforcement's activity and/or actions taken while investigating drug trafficking organizations. While the described events may not be directly connected to the Target Subject(s) of this Affidavit, unless otherwise noted, all seizures described herein are associated with these drug trafficking organizations to which the Target Subject(s) are related. Investigators believe the following events demonstrate the activity, sophistication, and ability of these organizations.

a.    On **December 12, 2013**, California Highway Patrol conducted a vehicle stop at Highway 15 in Lake Elsinore. California Highway Patrol K-9 unit alerted to the rear of the vehicle. Investigators recovered 5 individually wrapped packages of methamphetamine (approximately 5 pounds). Investigators also recovered $8,553.00 from arrestee in his front pants pocket.

b.    On **January 1, 2014**, investigators made a subsequent search of the vehicle impounded on 12-12-13 and recovered an additional 2 pounds of methamphetamine and 5 pounds of heroin.

c.    On **March 3, 2014**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle (6ZOV570) at the 91 Fwy and Green River Rd in Corona. Vehicle was impounded for 30 days and driver released. Investigators seized approximately 9.8 pounds of methamphetamine from vehicle truck area.

d.      On **March 14, 2014**, California Highway Patrol stopped [REDACTED] [REDACTED] vehicle in Riverside County. Investigators seized approximately 10 pounds of methamphetamine from the vehicle.

e.      On **May 4, 2014**, Riverside County Sheriff's Department stopped Ronald SHEWMAKER in Perris, California pursuant to information developed from wire communications on Daniel Navarro "REY" CHAVEZ (TS #7) which indicated that proceeds were to be delivered. On the same date, investigators seized approximately $420,000 U.S. Currency concealed within the vehicle operated by SHEWMAKER. In addition to the currency, investigator seized the transport vehicle.

f.      On **June 18, 2014**, pursuant to information developed through this investigation, a search warrant was executed at the residence of [REDACTED] located at [REDACTED] Perris, California. The search produced approximately 1 pound of methamphetamine.

g.      On **July 2, 2014**, pursuant to information developed through this investigation into [REDACTED] a search warrant was executed at three locations identified as narcotics, proceeds and processing locations for [REDACTED] The search produced approximately 5 pounds of methamphetamine and small amounts of heroin and marijuana. Addition to the narcotics, investigators seized three vehicles.

h.      On **July 15, 2014**, investigators initiated surveillance in the vicinity of [REDACTED] [REDACTED] Riverside, California on [REDACTED] Surveillance units observed [REDACTED] operating a follow vehicle in tandem with a secondary vehicle believe to be a load car. On the same date, investigators seized approximately 40 pounds of marijuana and arrested one target subject.

i.      On **July 18, 2014**, investigators initiated surveillance in the vicinity of Whittier Blvd., and Gerhart in the city of Los Angeles, California pursuant to intercepted communications on [REDACTED] Riverside County Wire Intercept [REDACTED] which indicated that [REDACTED] was to receive a narcotics shipment. On the same date, investigators conduct a vehicle stop of a white BMW and executed a Los Angeles County search warrant at the primary residence of

[REDACTED] identified as [REDACTED] los Angeles, California. At the residence, investigators seized approximately $30,000.00 US Currency, 3 guns, and small amounts of methamphetamine and arrested [REDACTED] identified as [REDACTED] On July 21, 2014, a search of the vehicle produced approximately 45 pounds of methamphetamine concealed within the floorboard of the vehicle and accessed through aftermarket trap compartment from the driver and passenger side floorboards.

j.      In **November of 2014**, investigators of DEA Louisville, Kentucky DEA seized approximately 60,000 US Currency from proceeds runner directed by **CARILLO**. The information was developed by Riverside County Wire Intercept 14-558, Target Telephone #32, used by **CARILLO**.

k.      On **December 3, 2014**, investigators seized approximately 60 pounds marijuana, 5 grams of methamphetamine, 5 firearms and arrest 3 subjects, to include [REDACTED] [REDACTED]

l.      On **February 11, 2015**, investigators executed a Riverside County Warrant at [REDACTED] Perris, California at the residence of [REDACTED] On the same date, investigators seized one (1) pound of methamphetamine and 1 firearm.

## X.
## NECESSITY AND EXHAUSTION
### (Penal Code section 629.50(a) (4))

43.      Interception of the electronic cellular telephone and electronic digital pager communications over the Target Devices is the only reasonable, viable means to gather evidence against the Target Subjects because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too dangerous.  Such information is therefore necessary to enable the government to achieve the objectives of this investigation -- to obtain direct evidence that will convince a jury beyond a reasonable doubt of:

a.      The full scope and identification of key personnel of the Target Subject(s)' illegal narcotics trafficking organization;

b.      The identity and role of all of Target Subject(s)' suppliers of illegal narcotics;

c.      The identity of the Target subject(s)' customers and the other unidentified conspirators;

d.      The stash locations where Target Subject(s)' supplies of illegal narcotics are stored prior to its distribution;

e.      The management and disposition of proceeds generated by the organization's illegal narcotics trafficking;

f.      The methods and routes used by the Target subject(s)' illegal narcotics trafficking organization to import illegal narcotics into the United States, to deliver the illegal narcotics to various states; and

g.      Providing evidence beyond a reasonable doubt (i.e., that will support a conviction) against the Target Subject(s), and any later identified targets for the alleged violations set forth herein.

44.      The following is a list of the investigative techniques which have been used or which I have considered using in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying and allowing the government to accomplish its investigative objectives.

**INTERVIEWS**

45.      Your affiant believes that interviews of the target subject(s) or his/their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the narcotics, the proceeds and financing, the location of records and drugs and other pertinent information regarding the named crimes. Your affiant also believes that if the target subject(s) was/were interviewed, he/she/they would provide agents with a significant number of untruthful statements, diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, any such interviews would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to confidential sources whose identity may become known or whose existence may otherwise be compromised.

## CONFIDENTIAL INFORMANTS

46.     It appears that this organization is a close-knit organization whose members are either blood relatives, mutual friends and/or very familiar with one another.  Your affiant is aware that it is a common concern of large-scale narcotic organizations that neither customers, would-be thieves, nor the police learn the identity of all members of the organization, or the locations where they store large amounts of narcotics or illicit proceeds.  Therefore, lower echelon members shield those members higher up on the distribution chain from potential customers, and multiple locations are used to store lesser amounts of narcotics, and/or its proceeds, and additional locations are used to meet with customers.  This method of operation allows suspects to minimize the risk of discovery and loss to the organization in the event the customer is an informant.

47.     In October of 2014, your affiant became aware that a Confidential Source has information on members of this DTO and was capable of providing information on members of this DTO.  Your affiant has been communicating with respective Law Enforcement Officers directing the CS to gather Intel on members of this DTO. Based on my communications with CS controlling investigators it appears that the CS will be unable to determine the scope of this criminal enterprise, the sources and location of the narcotics, and their full methods of operation. The **REDACTED** and is a compartmentalized DTO that layers its distribution network between organizational members across various states. At this time, it appears the CS can affirm the identity of key members of the DTO, however, investigators cannot obtain enough information on the modus operandi for the importation, distribution, acquisition of narcotics proceeds, and the identity of cell heads operating on their behalf in California, Texas, Kentucky, Georgia, Missouri etc. A wire intercept on key members of this DTO, coupled with CS information can provide the best result for obtaining the goals of this investigation.  As of today, the aforementioned CS has become unavailable to provide information on this DTO. Your affiant has learned that the CS has been held account for seized proceeds is currently not in a position to provide investigators with investigative or enforcement information.

## UNDERCOVER OFFICERS / AGENTS

48.     Because the seller of narcotics usually receives a fee for brokering the sale of

1  narcotics, the seller will rarely permit a customer to meet or deal directly with the supplier.  If the

2  seller were to introduce the customer to the supplier and the customer were able to deal directly with

3  the supplier, the seller would be cut out of any future purchases by the buyer, who would seek to

4  deal directly with the supplier.

5        49.      Due to the close-knit structure of this organization, infiltration by an undercover

6  police officer appears to be an investigative technique fraught with failure and would most likely

7  jeopardize both the safety of the officer and the progress of this investigation.  Drug trafficking

8  organizations are aware of law enforcement efforts to infiltrate drug trafficking organizations

9  through the introduction of undercover officers by informants.  Therefore, the leaders of drug

10  trafficking organization routinely refuse to deal directly with any person who they do not personally

11  know.  Subsequently, informants are rarely able to introduce undercover officers to drug trafficking

12  organizations.

13        50.      As previously noted, it is a common practice for individuals involved in large

14  scale illegal money laundering, drug smuggling, and drug distribution to remain highly suspicious of

15  strangers, new acquaintances, and individuals with whom they have conducted illegal drug

16  transactions.  If an informant introduced an undercover officer to a member of the drug trafficking

17  organization, the informant would have to "vouch" for the undercover officer.  Because of the

18  previously mentioned compartmentalization of drug trafficking organizations, if an informant were

19  able to introduce an undercover officer to a drug trafficking organization, it is unlikely that the

20  undercover officer would be able infiltrate the organization any further than the informant.

21  Therefore, it is not reasonable to believe that the introduction of an undercover agent by an

22  informant to the drug trafficking organization would be either successful or accomplish the goals of

23  this investigation.

24  **CONTROLLED PURCHASES**

25        51.      Your affiant has considered the benefits and risks associated with a controlled

26  purchase.  It is your affiant's opinion that a controlled purchase could result in the arrest and

27  conviction of one or more of the target subject(s), a controlled purchase would not accomplish the

28  previously stated goals of the investigation.

52.     If a Confidential Source (CS) or an undercover officer were to make a controlled buy from the target subject that would limit the investigation to the target subject and not his source of supply because the leaders of the organization are a tight-knit group whom only has contact with certain members of the organization to help avoid detection by law enforcement.  Based upon my training and experience, if a CS or an undercover officer attempted to find out the target subject's source of supply it would be met with negative results.

53.     Law enforcement would be required to make several smaller purchases over a period of time to work up to the level at which the target subject(s) deals narcotics and it is very unlikely that anyone within the law enforcement community would receive approval from their management to allow tens of thousands of dollars to be handed over to a target subject in an attempt to facilitate a larger transaction.

## SURVEILLANCE

54.     The target telephone(s) is/are mobile cellular telephone(s), which makes surveillance difficult if not impossible because the location of the person using the Target Telephone is often unknown.  However with the assistance of real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s), law enforcement officers will be able to locate and conduct surveillance of the users of the target telephone(s). Therefore, your affiant has requested an order to obtain and receive real precision location, global positioning system (GPS) coordinates tracking and/or pinging data related to the target telephone(s).

55.     As described herein, physical surveillance has been used and will continue to be used during this investigation.

56.     Surveillance has been conducted of subject(s) and at address(es) identified during this investigation, the results of which are reported below:

a.      On **November 18, 2013**, about 1452 hours, Deputy Wicker, conducted a vehicle stop of the vehicle for a minor vehicle violation, located at the 15 freeway and Cajalco Exit. Wicker contacted the driver and sole occupant, and asked for his identification. The subject was unable to produce any identification, but verbally identified himself as ▮▮▮REDACTED▮▮▮ with a date of birth of ▮REDACTED▮ and address of ▮▮REDACTED▮▮, where the CI had previously picked

1    up Heroin with [REDACTED]. [REDACTED] also provided a cellular phone number of [REDACTED]

2    [REDACTED] Deputy Wicker took a picture of [REDACTED] with his consent, for

3    identification, and subsequently released him. TFO Layos conducted further investigation of

4    [REDACTED] identity. Via Riverside County Sheriff's Departments data base,

5    revealed contacts for [REDACTED] with a date birth of [REDACTED] and

6    address of [REDACTED] Wildomar. TFO Layos also found DMV records Index number

7    X8725114 for [REDACTED] with a date of [REDACTED] and address of [REDACTED]

8    [REDACTED] Wildomar. Based on the above information, Investigators identified that the person

9    Deputy Wicker stopped was in fact [REDACTED]

10            b.      On **December 12, 2013** members of the DEA TFG-2 and Riverside Sheriff's

11   Department (RSD) - South West Corridor Narcotics Task Force (SWCNTF), conducted surveillance

12   of [REDACTED] residence, located at [REDACTED] Wildomar. During the surveillance, a black

13   Jaguar with paper plates was observed leaving [REDACTED] residence and ultimately stopped by

14   CHP interdiction unit. During this operation, DEA TFG2 and SWCNTF seized approximately 5lbs

15   of Methamphetamine, $8,553 in US Currency, and a black 2010 Jaguar. The driver and sole

16   occupant of the vehicle, [REDACTED] was arrested by CHP Officer

17   Mendenhall for state felony violations of 11378 HS and 11379 HS, CHP agency case # F-532-801-

18   13. A secondary search of the vehicle revealed additional 5 lbs of Heroin and 2 lbs of

19   Methamphetamine, during asset forfeiture proceeding.

20            c.      On **February 27, 2014,** SWNCTF investigators conducted surveillance in the

21   city of Temecula, California to identify a male intercepted over Riverside County Wire Intercept 11-

22   79. Investigators identified [REDACTED] as the user of [REDACTED].

23            d.      On **March 3, 2014,** DEA and SWCNTF conducted surveillance on

24   [REDACTED] in the city of Riverside, California pursuant to intercepted text

25   message conversations as authorized by Riverside County Wire 14-79 which indicated that

26   [REDACTED] was to acquire narcotics. On the same date, investigators followed [REDACTED] to Carson,

27   California and back to Riverside County where an interdiction unit made contact and investigators

28   seized 9.8 pounds of methamphetamine.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

e.      On **March 5, 2014**, SWCNTF conducted surveillance at 1135 and 1111 W. 7th Street, Perris, California on two houses associated with **REY**. Investigators followed two Hispanic adult males to a home depot consistent with GPS pings on multiple phones used by **REY**. One of the subjects was identified as Daniel Navarro CHAVEZ, DOB: [REDACTED] Investigators are still working on determining if CHAVEZ is **REY** and the user of TT #10-12. Note: CHAVEZ has been the subject of investigation on secondary DEA narcotics investigations.

f.      On **March 19, 2014**, investigators conducted surveillance eon **UM8364** pursuant to GPS pings of TT #15. Investigators identified a possible residence for **UM8364** and an associated vehicle (silver Honda Civic bearing California plate 7ADV247). Additionally, on the same date, investigators located the user of **TT #15 (UM8364)** at a shopping plaza located off Atlantic and Clara. Surveillance units observed **UM8364** and an unidentified Hispanic male conduct counter techniques such as squaring the block and looking into parked vehicle to identify possible surveillance by law enforcement.

g.      On **March 20, 2014**, investigators conducted a brief surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to identify the vehicle operated by the narcotics courier working for **UM8364**. On the same date, investigators acquired the vehicle information.

h.      On **June 25, 2014**, investigators conducted a follow up with Motel 6 off the 210 and the 215 freeways pursuant to information obtained from wire communications which indicated that [REDACTED] was to acquire narcotics at that location. Investigators identified [REDACTED] through information provided to Motel 6 staff and subsequently conducted a drive by of the listed address to acquire additional information.

i.      In **June and July of 2014**, investigators conducted surveillance on [REDACTED] in the county of Riverside off the 15 interstate and Bundy Canyon Road in order to refresh information used in furtherance of a Riverside County search warrant for his residence and associated locations. On July 1, 2014, investigators observed a vehicle enter [REDACTED] residence, and deliver two 5 gallon bails. On the same date, intercepted communication indicated that [REDACTED] was in possession of narcotics.



1           j.      On **July 2, 2014**, investigators conducted surveillance on REDACTED in

2   the vicinity of Bundy Canyon between the 15 and 215 freeways pursuant to information obtained

3   from wire communications which indicated that REDACTED was to acquire narcotics from an

4   unidentified third party. On the same date, investigators observed a Hispanic male operating a red

5   Mercedes enter the REDACTED residence. Shortly thereafter, investigators executed a Riverside

6   County search warrant on three locations associated with REDACTED

7           k.      On **July 15, 2014**, investigators conducted surveillance in the vicinity of REDACTED

8   REDACTED Riverside, California on REDACTED Investigators ultimately seized

9   approximately 40 pounds of marijuana.

10          l.      On **July 17, 2014**, investigators initiated surveillance in the vicinity of REDACTED

11  REDACTED Los Angeles, California, the primary residential location of REDACTED

12  REDACTED as identified by Global Positioning System (GPS) pings of Target Telephone REDACTED authorized

13  by Riverside County Wire Intercept REDACTED as well as in the vicinity of the K-mart/ Dearden's

14  parking lot located off Whittier Blvd., and S. Gerhart Avenue, Los Angeles, California. At the

15  residence was a black lifted Yukon consistent with intercepted communications during which

16  PACAS states that he drives a "black lift Yukon". At approximately 4:15 p.m., surveillance units of

17  CAL-MET observed a black Expedition in the K-Mart/Dearden's lot bearing California plate

18  4EUG401 (Target Vehicle 1) operated by an unidentified Hispanic male (HM#1) in the vicinity.

19  Surveillance units maintained constant surveillance of TV#1. Shortly thereafter, surveillance units

20  observed an unidentified Hispanic male (HM#2) arrive in a pedal bicycle approach the vehicle, meet

21  with HM#1, open the trunk space of TV#1 and look into the rear trunk space of TV#1. Shortly

22  thereafter, HM#2 entered the driver seat of TV#1 and leaves the K-Mart/Dearden's lot. Surveillance

23  units maintained observations on TV#1 and followed TV#1 to REDACTED Los Angeles,

24  California, the primary residence of REDACTED consistent with intercepted communications

25  which indicated that REDACTED was to take possession of REDACTED vehicle to load it with narcotics.

26  Shortly thereafter, surveillance units observed an unidentified Hispanic male move a work vehicle

27  form the driveway and place TV#1 into the garage of REDACTED Los Angeles,

28  California. Surveillance units lost the primary load vehicle.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

m.     On **July 18, 2014**, investigators initiated surveillance in Los Angeles, California pursuant to intercepted communications that ⬛REDACTED⬛ was to receive a narcotics shipment. On the same date, investigators seized approximately 30 pounds of methamphetamine and arrested ⬛REDACTED⬛

n.     On **October 6, 2014**, investigators initiated surveillance in the vicinity of ⬛REDACTED⬛ ⬛REDACTED⬛ Perris, California, residence of ⬛REDACTED⬛ On the same date, investigators followed a Hispanic male driver and female passenger (identified as ⬛REDACTED⬛ west on 4th Street from the residence in a silver Nissan Pathfinder to a school. Shortly thereafter, investigators continued surveillance as the vehicle continued west on 4th Street and began conducting counter surveillance driving techniques. The operator of the vehicle conducted multiple U-turns and drove into and through desolate streets to identify any follow vehicles. At that point investigators pulled surveillance. Shortly thereafter, your affiant observed ⬛REDACTED⬛ and the Hispanic male operator walks back to the residence from 7th street. Your affiant believes that ⬛REDACTED⬛ and unidentified male subject ditched the vehicle to avoid law enforcement.

o.     On **October 14, 2014**, South West Corridor Narcotics Taskforce and DEA Taskforce Group 2, conducted surveillance at the ⬛REDACTED⬛ address. Your affiant observed the White Nissan Altima license plate # 5UUN878 driver up to the residence and park on the street. A male Hispanic exited the driver's door and walked into the house. Your affiant identified this subject as the same person who was observed at ⬛REDACTED⬛ residence on October 9, 2014. During the surveillance, team member utilized current electronic technology to obtain the driver of the white Nissan Altima's phone number, authorized by Riverside County Superior Judge, on October 10, 2014, SW # R1101020147

p.     On **October 23, 2014**, investigators conduct surveillance in the vicinity of Ellis and Burton Road, pursuant to GPS pings of **TT #32** in order to confirm the user of **TT #32** as **CARILLO (TS #7).** On the same date, investigators observed an Arcadia bearing California plate 7CPL313 leave the target residence and proceed west on 4th street. Investigators followed the vehicle to a Subway restaurant located off 4th Street and Wilkerson Ave, Perris, California. Investigators G. Rohn of SWCNTF conducted foot surveillance and observed **CARILLO (TS #7)**

1   inside the Subway restaurant, consistent with GPS results on **TT #32**. At that point surveillance was

2   terminated.

3           q.      On **February 10, 2105**, investigators conducted surveillance in Perris,

4   California in an attempt to identify the user of [REDACTED] Investigators have GPS surveillance

5   on the aforementioned phone and are working to identify the user. Surveillance was terminated after

6   an extended period of time and the phone could not be located.

7       57.     Surveillance operations have been successful to the extent they have established

8   persons and/or vehicles arriving at, and/or departing from principal locations; and extended the

9   scope of the investigation to additional locations and co-conspirators.   However, surveillance

10  operations cannot establish the purpose of any observed meetings, nor identify other conspirators

11  who do not make personal appearances.   Therefore, surveillance appears unlikely to yield the

12  sources of the supply of narcotics, fully identify each of the conspirators, their places of operation

13  and the manner in which their operation is conducted.

14      58.     Surveillance of the targets subjects and their associates will not enable the

15  government to achieve its objectives in this investigation.   To date, surveillance has failed to allow

16  law enforcement to prove beyond a reasonable doubt the identity and roles of all of all the co-

17  conspirators.   While surveillance may show subjects of this investigation with packages suspected to

18  be drugs, it will not identify the contents of these packages or what is being said as packages are

19  exchanged.   Surveillance is an investigative technique that is used to confirm meetings and other

20  suspected activities between alleged participants, but often leaves the investigators with insufficient

21  evidence to prove the purpose of the meetings and activities.

22      59.     Your affiant knows from training and experience, and from speaking with other

23  experienced agents and officers, that physical surveillance of high-level members of narcotic

24  trafficking organizations is limited to placing individuals together without knowing the significance

25  of their meeting or the role of each trafficker.   Furthermore, based on my training and experience,

26  surveillance of major narcotics traffickers is often difficult without detection.   Physical surveillance

27  is often limited to watching suspects from a distance, which as an investigative technique, can be

28  problematic.   Your affiant believes that excess random surveillance of a location without knowledge

when a narcotics transaction will be taking place, could expose the identity of the officers and thereby compromise the investigation. Even if blanket, twenty-four hour surveillance were feasible, it would still be limited to providing information only on the movements and whereabouts of the Target Subject(s). If the Target Subject(s) suspected he was being watched by law enforcement personnel, he could abandon his phone and move his activities to a different location, thus effectively ending the current on-going investigation until he was located again. A wire intercept would greatly assist the agents because they could be deployed more effectively knowing about a future narcotics transaction. This would allow surveillance to be set up on strategic locations, thereby lessening the risk of compromising the investigation.

60.     Furthermore, your affiant knows from past investigations that narcotics traffickers use various counter-surveillance driving techniques. These techniques include frequent u-turns, stopping in parking lots to observe traffic, waiting at traffic lights to allow traffic to pass, speed variations, and taking circuitous routes through residential neighborhoods. All of these methods are used for the sole purpose of determining the presence of law enforcement personnel. These methods are frequently successful, as it is extremely difficult to follow suspects who employ these methods without being detected. Once detected, these suspects usually abandon their activities, which mean they may shut down their cellular phones, pagers, and other phones, and flee the jurisdiction or area only to resurface at another unknown location at a later date.

61.     When physical surveillance is combined with interception of wire communications, the purpose of meetings can be revealed and may constitute admissible evidence if the meetings relate to an intercepted conversation of criminal behavior.

62.     Your affiant believes that without the aid of wire intercepts, regular surveillance will compromise the investigation because prolonged, regular surveillance increases the opportunities for detection by the Target Subject(s). If surveillance were to be detected, I believe the traffickers' perpetual suspicions that they are the subjects of law enforcement investigations would in their minds be confirmed. The subjects would not only likely flee the area, they would also engage in wholesale abandonment of their communication facilities. By using the wiretap, agents will be able to initiate selective surveillance when it appears that criminal activity is taking

place. This selectivity will reduce the chances of having surveillance compromised and will help maintain the integrity of the investigation.

63.     Based on the above-stated facts and on my training and experience, your affiant does not believe that surveillance of the above-referenced locations, absent a wiretap on the Target Telephone, will enable the government to achieve the objectives of this investigation.

## SEARCH WARRANTS

64.     On **01-22- 2014**, Detective Carnahan wrote search warrant #01221417 for a target telephone associated with this ongoing investigation, signed by Judge David Gunn.

65.     On **02-25-2014**, SA Baca wrote search warrant #02251403 for multiple target telephones associated with this ongoing investigation, signed by Judge Irma Poole Asberry.

66.     On **02-27-2014**, SA Baca acquired search warrant #02271412 for a target telephone utilized by members of the [REDACTED]

67.     On **03-11-2014**, SA Baca acquired search warrant #03111409 for multiple target telephone utilized by members of the [REDACTED]

68.     On **03-19-2014**, SA Baca acquired search warrant #03191403 for multiple target telephone utilized by members of the [REDACTED]

69.     On **03-26- 2014**, TFO Carnahan wrote search warrant #03261411 for a target telephone associated with this ongoing investigation.

70.     On **July 1, 2014**, TFO Carnahan wrote search warrant #RI0701201413 for two target telephones associated with this ongoing investigation.

71.     On **July 2, 2014**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force, investigators acquired a Riverside County Search warrant of for [REDACTED] [REDACTED] Wildomar, California and [REDACTED] Wildomar, California. Investigators seized approximately 5 pounds of methamphetamine, small amounts of heroin and 4 pounds of marijuana. In addition to the narcotics, investigators seized three vehicles.

72.     On **July 18, 2014**, SA Emilio Baca write and signed search warrant #RI071820141 for **Target Telephone #25** utilized by [REDACTED]

73.     On **July 18, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of [REDACTED] later identified as [REDACTED] located at [REDACTED] [REDACTED] Los Angeles, California.

74.     On **August 13, 2014**, SA Emilio Baca acquired a Los Angeles County search warrant for the primary residence of [REDACTED] located at [REDACTED] Los Angeles, California. This search was a follow up search based on information that developed through intercepted communications.

75.     On **December 3, 2014**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force, investigators acquired a Riverside County Search warrant for [REDACTED] [REDACTED] Nuevo, California and [REDACTED] Perris, California. Investigators seized approximately 60 pounds of marijuana, 5 grams of methamphetamine and 5 firearms.

76.     On **February 11, 2015**, Riverside County Sheriff's Office, Southwest Corridor Narcotics Task Force investigators acquired a Riverside County Search Warrant for [REDACTED] Perris, California. Investigators seized approximately 1 pound of methamphetamine, one (1) firearm and arrested one subject.

77.     There is always a danger associated with the service of search warrants. That danger is that the service of search warrants causes the target subject(s) to conduct their own investigation in an effort to determine how law enforcement was able to develop the probable cause for the search warrant. Your affiant will continue to consider the use of search warrants after carefully weighing the potential danger the service of search warrant can have to the overall investigation. Generally, it is more effective to serve search warrants when the investigation has been completed and the targets subjects are being arrested.

78.     DEA investigators will prepare affidavits to search the principal locations involved in this investigation. However, execution of a search warrant at any one of the multiple locations involved would only serve to alert members of this organization that they are the subject of an on-going law enforcement investigation. Although a seizure of an intermediate quantity of narcotics and/or controlled substances might result, such action would not likely lead to a successful conclusion of this investigation since the primary objective of this investigation is to identify all

members of this organization, all locations used to store narcotics and/or controlled substances and/or illicit proceeds, and the organization's source of supply. The execution of a search warrant would in all probability terminate the present investigation. Experience has demonstrated that large-scale narcotic traffickers adapt their routines to investigative procedures utilized by law enforcement. This includes utilizing multiple locations to store narcotics and/or controlled substances and money, and the use of other locations to conduct business. Execution of a search warrant at one or more locations would in all probability terminate the present investigation and preclude identification of other associates, additional locations, and the organization's sources of supply.

79. Your affiant believes that the execution of search warrants at this stage of the investigation would unlikely reveal the total scope of the illegal operation and produce evidence which would identify the members of drug trafficking organization, the organizational structure, the full scope of the narcotics conspiracy, the locations used to store narcotics and/or controlled substances, the sources of supply, and the customers or the money launderers. Your affiant is aware that higher-level members of narcotics organizations usually do not store narcotics and/or controlled substances at their residences. Although surveillance has identified residence(s), your affiant does not know at this time whether or not the target subject(s) store narcotics and/or controlled substances and proceeds from the sale thereof at his/their home(s). Moreover, assuming investigators do locate one or more "stash" locations, without intercepted wire communications, the investigators will be unable to determine when a given location will contain contraband. Even if identifiable locations were searched and narcotics records were seized, those records are often in code and rarely contain information beyond that necessary for the maintenance of the particular location to which they relate. Moreover, even if items such as large amounts of currency, documents listing addresses and telephone numbers and other papers are seized, they generally have far less probative value by themselves than when they are introduced in conjunction with conversations between the conspirators, which give full meaning to the documents and currency. Additionally, if locations were targeted for the execution of search warrants and the warrants were served, the members of the targeted organization would likely be placed on notice regarding the

existence of the investigation.  At this time, it would be counterproductive to make the existence of the investigation public.  Rather, it would be more productive to execute search warrants at the end of the investigation, once the goals of the investigation are met.

## PEN REGISTERS AND TELEPHONE TOLLS

80.     The analysis of data derived from the use of a pen register and telephone tolls are one of the techniques that have been utilized during this investigation.  It has been helpful in determining patterns, if any, of telephone activity and confirming the volume of telephone calls between telephones, suspects and locations already identified in this investigation through surveillance, as well as new locations.  Your affiant has also learned that members of this organization communicate primarily through the use of pagers and cellular telephones.  Although the review of those records does reveal the names of subscribers to the number called, your affiant knows from experience that drug traffickers often list their residential telephones, cellular telephones, and pagers in the names of other persons in an attempt to avoid identification from law enforcement personnel.  In addition, the information derived from the pen register and telephone tolls are insufficient as a basis for successful prosecution, especially in light of the familial structuring of this organization.  Specifically, the details of the involvement of the participants, and the dates, times, and places that narcotics transactions are to occur must be revealed before successful surveillance operations, prosecutions or both may be initiated.

81.     Based on the above, your affiant believes that pen registers, toll analysis, and subscriber information, without the aid of a wire intercept, will not help your affiant achieve the objectives of the investigation.

## CLOSED CIRCUIT TELEVISION MONITORING

82.     Exterior closed circuit monitoring shows that people who are entering or leaving the location. It is your affiant's opinion that this type of monitoring does not gather evidence as to conversations, agreements, and other arrangements necessary for this investigation.  Additionally, this type of monitoring will not provide identifying information on the individuals entering and exiting the location, making it difficult if not impossible to determine the level of involvement within the organization, if any.

## TRASH SEARCHES OF TARGET LOCATIONS

83.     Your affiant believes that a trash search could be conducted at some of the locations identified thus far as being associated with the targets subject(s), however, it would risk the detection of law enforcement.  Your affiant is aware that high-level narcotics traffickers and their associates go to great lengths to destroy possible incriminating evidence and are unlikely to use their residence trash containers to dispose of such information.  Your affiant has conferred with other experienced agents and officers who told me that narcotic traffickers will often carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement. Furthermore, investigators have considered conducting trash searches of identified residences of known Targets of the investigation and believe that, in considering each location, it would be difficult to conduct a trash search because the neighborhoods are situated where trash cans are placed at the curb in front of the residence for dumping or are located in a rural area where the search would draw suspicion on the law enforcement officers.  A trash search would surely draw the attention of neighbors, who would possibly report this to police, and/or notify the target subject(s) or his/their associates.  Such discovery would likely alert target subjects and his/their associates to the existence of this investigation and risk having it prematurely terminated before the government's objectives have been achieved.  It is difficult for law enforcement officers to justify their presence to any neighbor, without identifying themselves and their purpose for conducting the trash search.  Even if trash searches were conducted and evidence of narcotics trafficking was obtained from the trash at this location, the evidence would probably not establish (1) the roles of all participants; (2) the suppliers of the narcotics; (3) the customers; and (4) the full scope of the conspiracy.

84.     Regular trash pick-ups at the principal locations identified in this affidavit would be difficult, if not impossible, based upon the physical placement of the locations on cul-de-sacs. They would be conspicuous to the residents of the location and/or persons living in the area.  Further, it is a limited investigative tool, which is unlikely to result in the recovery of evidence sufficient for conviction.  Additionally, any time a trash search is conducted; it is possible that officers will be spotted.  At this time, your affiant feels that the potential returns to be gained do not justify the risks.

85.     Based on my training and experience, there are great risks associated with

conducting trash searches, usually for very minimal possible gain.  For example, if one of the Target Subjects were to observe (or a neighbor of or associate of one of the Target Subjects were to observe and disclose to the Target Subject) law enforcement rummaging through his trash, that Target Subject, already suspicious of law enforcement, could likely conclude that he was being investigated.  This could lead to the adverse consequences discussed above, including the Target Subject fleeing, warning co-conspirators, destroying evidence, etc.  Based on my training and experience, it is highly unlikely that rummaging through someone's garbage is going to yield evidence sufficient to achieve the goals of this investigation.  Further, the risks of such action in this investigation far outweigh any potential rewards.

86.     In addition, I have found that not only are trash searches risky, they are also usually worthless.  I have learned that narcotics traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information.  I know that it is not uncommon for the traffickers to carry trash away from their residences and place it in commercial dumpsters to avoid having it examined by law enforcement.  I know it is common for traffickers to burn items that contain evidence and they utilize shredders to completely destroy any evidence of substantial value to a law enforcement investigation.

87.     I find it extremely unlikely that evidence obtained from a trash search would be sufficient, by itself, to prosecute the **Target Subjects**, let alone identify their co-conspirators.  For instance, a trash search might help identify the wrappings used to transport narcotics, but it will not provide us with information as to who is transporting the narcotics, who is distributing the narcotics and where the narcotics are being stashed.

88.     At this time, I do not believe that trash searches, even in conjunction with conventional methods of investigation, will achieve the goals of this investigation.  If conversations are intercepted concerning certain locations, agents will be able to evaluate their significance, and trash searches may be conducted at that time if the risk is outweighed by the potential reward.

## FINANCIAL INVESTIGATION

89.     Even if investigators are able to locate accounts and financial records for the

members of this Drug Trafficking Organization and its associates at some later date; based on my experience, I know that those involved in drug trafficking conduct business on a cash basis and often do not use traditional banking methods. I also know that drug traffickers frequently either do not file income tax returns or file false income tax returns. I know that drug traffickers do not usually maintain records of their illicit earnings. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, I know from my training and experience that traffickers go to great lengths to avoid creating and leaving a financial paper trail and that the majority of the proceeds is transported in bulk via passenger vehicles. During the course of this investigation, investigators have seized bulk currency transported din passenger vehicles. Additionally, DEA HIDTA of Los Angeles, seized bulk currency from passenger vehicle that can be attributed to his DTO. It should be noted, that the DTO has been using traditional banking methods to deposit US Currency below the currency transaction report threshold. In this coordinated effort, DEA Kentucky is working on Grand Jury subpoenas on the accounts identified during the course of their investigation. Additionally, DEA Riverside has identified 10 accounts used by CARILLO to structure proceeds. Investigators intend on submitting Grand Jury subpoenas for these accounts to determine if any assets can be seized.

### GRAND JURY

90.     The last technique, which could be employed in the investigation of narcotics offenses, is the initiation of grand jury proceedings. It is noted that the use of the grand jury to investigate narcotics offenses is not a technique normally employed in the State of California by state prosecutors. In addition, even if this investigation met existing criteria for submission to a grand jury, there is no reason to believe that any of the principal suspects in this investigation or their co-conspirators would cooperate with the grand jury, with or without grants of immunity. In fact, the mere initiation of a grand jury investigative proceeding would render continued investigation difficult by revealing the existence of the investigation by law enforcement to the targets of this investigation.

91.     I believe the issuance of grand jury subpoenas would not be successful in achieving the goals of this investigation for the following reasons: (1) the Target Subject, and any

other associates when they are identified, would likely invoke his fifth amendment privilege; (2) it would be unwise to seek grand jury immunity for any of the co-conspirators, when they are identified, as that would likely foreclose prosecution of the most culpable individuals; (3) the issuance of grand jury subpoenas to lower level members of the organization, if they are identified, would likely alert the other members to the existence of the investigation, thereby severely hampering, if not entirely impeding the investigation.

## XI.
## CONCLUSION

92.     Based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing and are about to commit the aforementioned crimes and that particular communications of the Target Subject(s) over the target telephone(s) concerning those offenses will be obtained through the requested interception applied for herein.

93.     Normal investigative techniques have been and will continue to be used. However, it is your affiant's opinion that these techniques alone will not allow investigators to obtain the critical information, which your affiant believes will be discussed over the described Target Telephone. Interception of wire and electronic communications over the Target Telephone and Target Pagers are necessary in this matter to enable your affiant to achieve the objectives of this investigation.

94.     For reasons set out in this affidavit, it is your affiant's opinion that the only reasonable and effective way to develop the necessary evidence to discover and prosecute the person(s) involved in this conspiracy is to obtain authorization for the interceptions requested herein.

95.     Your affiant requests that the Court order that Sprint/Nextel, Verizon and any and all telecommunications providers subject to regulation by the Federal Communications Commission to provide telecommunications services within the United States of America, as listed on an ongoing basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers

(hereinafter referred to as VOIP) and any other service providers shall, upon request of the law enforcement agency executing the intercept order:

a.     Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), including but not limited to, all wireless digital functions, wireless analog functions, direct connect/digital dispatch/direct dispatch functions, automatic mode switching functions, and "short message service." This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in the Riverside County area. (See *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996, *cert. denied* 520 U.S. 1121, 117 S.Ct. 1256, 137 L.Ed.2d 336, *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), *cert. denied* 522 U.S. 892, 118 S.Ct. 232, 139 L.Ed.2d 163, and *United States v. Luong*, 471 F.3d 1107 (9th Cir., 2006) *cert. denied* 552 U.S. 1009, 169 L.Ed.2d 371, 128 S.Ct. 531).

b.     Authorize the installation and/or use of equipment known as pen registers or dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to the targeted numbers.

c.     Authorize the installation and/or use of equipment to trap and trace Direct Connect/Dispatch Service and identify the telephone numbers of persons placing calls to and from the target telephone numbers.

d.     Authorize the installation and/or use of trap equipment to trace and identify the telephone numbers of persons placing calls to the Target Telephone numbers to include the activation of "caller ID" and any calling features such as "call forwarding" and "speed dialing" currently assigned to the Target Telephone numbers.

e.     Your affiant requests the Court to order Sprint/Nextel and Verizon upon request of the applicant, to provide the technical assistance necessary to accomplish this interception unobtrusively and with a minimum of interference with the services said company provides the people whose communications are to be intercepted, and to provide records identifying subscribers and providing subscriber information on any and all telephone and pager numbers identified through this intercept/pen register, and any changed numbers whether published or not, including, but not

1   limited to past telephone bills and records.

2           96.     Your affiant requests the Court order Sprint/Nextel, Verizon and any and all

3   telecommunications providers subject to regulation by the Federal Communications Commission to

4   provide telecommunications services within the United States of America, as listed on an ongoing

5   basis on FCC Form 499-A (hereinafter referred to as "Telecommunications Companies"), Internet

6   Service Providers (hereinafter referred to as ISP), or Voice Over Internet Protocol Providers

7   (hereinafter referred to as VOIP) and any other service providers shall, upon request of the law

8   enforcement agency executing the intercept order, within 48 hours (including after-business hours,

9   weekends, and holidays), and without delay:

10          a.     Provide any and all information related to any telephone(s), pager(s), text

11   messaging device(s), cellular/wireless telephone(s), calling card(s), and other communication

12   device(s) contacting or being contacted by the Target Devices(s), identified in an intercepted

13   conversation, or otherwise identified in this investigation and the subscriber(s) of any such

14   communication devices(s). Such information shall include, but not be limited to, all numbers and

15   accounts associated with the primary number/account, billing information (billed and unbilled),

16   activation date, credit information, co-signer information, contact address(es) and telephone

17   number(s), and all information identifying the communication device(s) such as electronic serial

18   number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment

19   identifier (IMEI), subscriber identity module (SIM) number or other identifier.

20          b.     Provide Call Data Records (CDR) information, including any and all

21   historical data, originating and terminating call detail, extended dialed digit information, dialed digit

22   extraction, and/or post cut-through digits from any and all telephones called or being called by each

23   Target Telephone number, identified in an intercepted conversation, or otherwise identified in the

24   investigation.

25          c.     Provide any and all cell site data, pinging data, and/or GPS location

26   information, including, but not limited to, cell site location (physical address) of call initiation, call

27   termination, and call progress locations (Automated Message Accounting Data) connected to the use

28   of each Target Telephone, without geographical limitations, pursuant to Title 18 USC section

2703(D).

d.     Provide any and all cell site data, including, but not limited to, cell site location (physical address) of call initiation, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of any and all cellular telephones, which called each Target Telephone, which was called by each Target Telephone, which was identified in an intercepted conversation, or which was otherwise identified in the investigation, without geographical limitations, pursuant to Title 18 USC section 2703(D).

e.     Provide access and the access codes to voice mail and voice mail features.

f.     Provide all information related to pre-paid cellular telephones called or being called by each Target Telephone number, identified in an intercepted conversation, or otherwise identified in the investigation, including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

97.     Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers providing service to the Target Telephone(s) to continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances. Additionally, your affiant requests that if the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, the Telecommunication Companies be ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances.  In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the court order for the cost of the service that was continued regardless of unpaid balances, pursuant to the court's order.

98.     Your affiant requests the Court to order Sprint/Nextel, Verizon and any and all telecommunications providers not to disclose to the subscriber or any unauthorized person the fact that the order has authorized this wire interception, or of its existence.

99.     Your affiant requests the Court to authorize law enforcement officers use mobile electronic tracking devices to locate and identify the target telephone(s).

100.    Your affiant requests, pursuant to Penal Code section 629.50(a) (2) that peace officers of the Drug Enforcement Administration and other assisting peace officers be ordered to execute such intercept order.

101.    Your affiant requests that, prior to the sealing of this Application, its affidavit, and the Court Order pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be kept in the custody of the Drug Enforcement Administration.

102.    Your affiant requests that, pursuant to Penal Code section 629.66, this Application, its affidavit, and the Court Order be ordered sealed and kept in the custody of the Drug Enforcement Administration, the agency executing this Court's Order, and be disclosed only upon a showing of good cause before a court of competent jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Riverside, California.

Dated: February _19_, 2015

_____
Special Agent Emilio J. Baca
Drug Enforcement Administration

Sworn to and subscribed before me on February ___19___, 2015.

_____
HONORABLE HELIOS J. HERNANDEZ
COUNTY OF RIVERSIDE
STATE OF CALIFORNIA

1  MICHAEL A. HESTRIN
   DISTRICT ATTORNEY
2  COUNTY OF RIVERSIDE
3  Deena M. Bennett
   Deputy District Attorney
4  3960 Orange St.
   Riverside, California 92501
5  Telephone: (951) 955-5400
   Fax: (951) 955-9673
6
                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                         IN AND FOR THE COUNTY OF RIVERSIDE
8
9  **IN THE MATTER OF THE APPLICATION**        )        **WIRETAP NO.  15-108**
   **OF THE DISTRICT ATTORNEY OF THE**         )
10 **COUNTY OF RIVERSIDE FOR AN ORDER**        )
   **AUTHORIZING THE INTERCEPTION OF**         )           **ORDER**
11 **TELEPHONE COMMUNICATIONS**                )          (SEALED)
                                              )
12   REDACTED    **Target Telephone #38**      )
              **Target Telephone #39**         )
13 **502-609-5937  Target Telephone #40**      )

14
15       **ORDER AUTHORIZING THE INTERCEPTION OF COMMUNICATIONS**
              **AS PROVIDED IN PENAL CODE SECTIONS 629.50 et seq.**
16                                    **and**
      **ORDER AUTHORIZING THE OBTAINING OF GLOBAL POSITIONING SYSTEM**
17              **(GPS) TRACKING AND/OR CELLULAR SITE DATA**

18          Michael A. Hestrin, the District Attorney for the County of Riverside, State of California,

19  has made application to this court pursuant to Penal Code Sections 629.50 et seq. requesting

20  authorization to intercept communications to and from certain telephones described below

21  (hereinafter the Target Telephone(s).  The Application was accompanied by the Affidavit of Special

22  Agent Emilio Baca of the Riverside Drug Enforcement Administration, and the review of Special

23  Agent in Charge Anthony D. Williams, who is the designee Chief Executive Officer of the Drug

24  Enforcement Administration.  This Court has read and considered each of those documents,

25  referred to hereinafter as the "Application."

26  **IT APPEARING TO THIS COURT:**

27          (1)     There is probable cause to believe that the individuals identified and/or referred to in

28

                                              1
                          Court Order – Wiretap Order No. 15-108

the Application as Target Subject (s) and their associates, and other co-conspirators (the "Target Subjects") have committed, are committing and are about to commit offenses involving importation, possession for sale, transportation, sale of a controlled substance and possession of narcotics proceeds in violation of Health and Safety Code Sections 11378, 11379, 11370.6 and a Conspiracy to commit said crimes in violation of Penal Code section 182, with respect to a substance containing cocaine  where the substance exceeds three pounds of solid substance by weight and/or ten gallons by liquid volume. (Penal Code Section 629.52(a))

(2)     There is probable cause to believe that particular communications concerning said crimes (the illegal activities) will be obtained through this interception.  (Penal Code Section 629.52(b))

(3)     There is probable cause to believe that the facilities from which, or the place where the communications are to be intercepted, are being used, or are about to be used, in connection with the commission of said offenses, or are leased to, listed in the name of, or commonly used by the persons whose communications are about to be intercepted, and is within the territorial jurisdiction of this Court. (Penal Code Section 629.52(c))

(4)     Normal investigative procedures have been tried and have failed and appear to be unlikely to succeed if tried and/or are too dangerous. (Penal Code Section 629.52(d))

**IT IS HEREBY ORDERED:**

(1)     Interception of the wire, pager and electronic communications to and from the communication devices described below (the "Target Telephones"), including the installation and use of pen registers, dialed number recorders, text messages, digital photographic images, electronic mail ("e-mail") communications, push-to talk communications, and   trap-and-trace devices on the Target Telephones, is hereby authorized.

(2)     The actual interception and listening post shall be in Riverside County. Authorization to intercept communications occurring outside of Riverside County is hereby granted. This authorization extends to communications occurring outside California where the contents of the redirected communications are first heard or accessed in Riverside County. (See

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992))

(3)     Properly trained investigators and monitors working with the Riverside County Sheriff's Department / Drug Enforcement Administration / Southwest Narcotics Corridor Task Force are authorized to intercept the communications of the Target Subjects concerning the above-described offenses to and from the Target Telephone(s) for a period of thirty days (Penal Code Sections 629.54(a) and (b)).  The Target Telephone(s) are described as follows:

REDACTED

c.     **Target Telephone #40: (502) 609-5937 (TT #40)** is an ATT&T cellular phone being utilized by **Christopher MATTINGLY (TS #8)** and subscribed to Christopher MATTINGLY at 661 Old Highway 245, Shepherdsville, Kentucky. **TT #40** is being utilized by **MATTINGLY**.

(4)     The term "Target Telephone" also refers to any changed telephone number assigned to the same IMSI or SIN or MIN or ESN, or UFMI or MSID with the same subscriber information, and/or any changed IMSI or SIN or MIN or ESN, or UFMI or MSID assigned to the same telephone number with the same subscriber information, and/or any changed subscriber information with the same IMSI or SIN or MIN or ESN, or UFMI or MSID and the same telephone number.

(5)     That the particular types of communications authorized to be intercepted are wire and electronic communications concerning the commission of said offenses.  (Penal Code Section 629.54(c))

3

(6)     That the United States Drug Enforcement Administration is the agency authorized to intercept the communications.  (Penal Code Section 629.54(d))

(7)     That the District Attorney of Riverside County, State of California, is the applicant for this interception. (Penal Code Section 629.54(d))

(8)     That this Order is valid for thirty days and shall not automatically terminate when the described communication has been first obtained because the Affidavit describes the ongoing nature of the illegal activities.  (Penal Code Section 629.54(e))

(9)     The intercept shall be executed as soon as practical, shall be executed in such a way as to minimize the interception of communications not otherwise subject to interception, and shall terminate upon attainment of the authorized objective, or in any event, no longer than 30 days from the date of this Order, unless an extension is granted. (Penal Code Section 629.58)  In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

(10)     That Sprint Corporation, Verizon Wireless, T Mobile USA, Metro PCS, Cricket Wireless, Virgin Mobile, AT&T, AT&T Wireless Services, AT&T Broadband, Conexone Wireless, Nextel, Nextel Communications, Sprint-Nextel, Sprint PCS, Sprint Spectrum L.P., Sprint Long Distance, U.S. Sprint, Pacific Bell Telephone Company, Pacific Telesis Group, Pacific Bell Wireless, Cingular Wireless, Cingular Wireless West Coast, SBC, General Telephone Company, Allegiance Telecom, Verizon California Inc, Verizon New York, Verizon West Coast Inc, Verizon, Verizon Wireless, Cellco Partnership doing business as Verizon Wireless, Qwest, Qwest Wireless, Qwest Corporation, U.S. West, WorldCom, WorldCom Wireless, MCI, MCI WorldCom, In Touch Communications, Cellular One, U.S. Telepacific Communications, MPower Communications, Time Warner Telecom, Optel Telecom, GST Telecom Inc, XO, XO California Inc, PacWest Telecomm, CCCA Inc, d.b.a. Connect Communications Corporation, BellSouth, Cox, Cox Communications Inc, d.b.a. Cox California Telecom Inc, Citizens Communications, Continental Cablevision, Northwestern Bell, Evans

Telephone Company, Central Wireless Partnership, Arch Wireless, TSR Wireless, Airstar Paging, Winstar Telecommunications, Network Services LLC, Tri State Radio Paging Inc, PageNet, PageMart, Southwest Paging, AirTouch Paging, Metrocall, Weblink Wireless, T-Mobile, Boost Mobile, and any other telephone, long distance, calling card, paging, cellular, wireless or other telecommunication service providers (hereinafter referred to as the Telecommunication Companies) shall, upon **oral or written** request of law enforcement, provide technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services which said companies are providing to the people whose communications are to be intercepted and shall provide caller identification where possible.

(11) That the Telecommunications Companies, upon oral or written request of law enforcement under this Order, which complies with Section 2703(d) of Title 18 of the United States Code, shall, within 48 hours (including after-business hours, weekends, and holidays), without delay:

a. Provide any and all information related to any telephone(s), pager(s), text messaging devices, cellular/wireless telephones, calling cards, and other communication devices contacting or being contacted by the Target Devices(s) and, the subscriber(s) of any such communication devices(s). Such information shall include, but not be limited to, all numbers and accounts associated with the primary number/account, service and billing information (billed and unbilled), activation date, credit information, co-signer information, contact address(es) and telephone number(s), call identification information whether published or non-published, Global Positioning System (GPS) data and all information identifying the communication device(s) such as electronic serial number (ESN) international mobile subscriber identifier (IMSI), international mobile equipment identifier (IMEI), subscriber identity module (SIM) number, universal fleet mobile identifier (UFMI), and any and all encryption keys/codes or other identifier.

b. Provide toll information, including any and all historical data for any period requested by law enforcement within 48 hours of the request, call detail, including Direct Connect / Push-to-Talk information, call records, originating and terminating call detail, Global Positioning

System (GPS) information, extended dialed digit information, dialed digit extraction, and/or post cut-through digits from any and all telephones calling to or being called by each Target Telephone number.

        c.      Provide cell site data including, but not limited to, cell site location (physical address) of call initiation, Global Positioning System (GPS) data, call termination, and call progress locations (Automated Message Accounting Data) connected to the use of each Target Telephone number and any and all cellular telephones called or being called by each Target Telephone number, pursuant to Title 18 USC Section 2703(D).

        d.      Authorize the installation and/or use of equipment known as dialed number recorders to detect and record all numbers dialed or pulsed by the telephones connected to each Target Telephone number.

        e.      Authorize the installation and/or use of equipment to trap and trace and identify the telephone numbers of persons placing calls to and from the Target Telephone numbers to include the activation of caller identification feature, "caller ID" any calling features such as "call-forwarding" and "speed dialing" currently assigned to the primary telephone numbers, and that the tracing operation and the use of the caller ID service be without geographical limits.

        f.      Provide access and access codes to voice mail and voice mail features.

        g.      Authorize the installation and/or use of all facilities to enable the interception and monitoring of all functions and capabilities of the Target Device(s), and that law enforcement be provided all access necessary to install the necessary equipment required to implement such interception, including but not limited to, all wireless digital functions, wireless analog functions, push-to-talk/direct connect/digital dispatch/direct dispatch functions, voice over IP communications, automatic mode switching functions, "short message service," text messages, packet data services, and instant messages. This includes interception of cellular communications occurring outside California where the contents of the redirected communications are first heard or accessed in Riverside County. (See *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992))

h.      Provide all information related to pre-paid cellular telephones including historical, past, present, current, and on-going activity related to hours, minutes, and money left on the pre-paid telephone account.

i.      Provide pass codes, user ID, passwords, access codes, user names and identify any other features specific to the Target Telephone(s) with GPS capabilities.

j.      Upon request of law enforcement, provide any and all geographic location information at call origination (for outbound calls), call termination (for incoming calls), and Global Positioning System (GPS) tracking and/or pinging data during the progress of a call, on an ongoing and/or real time basis, for the Target Telephone(s) as well as any and all telephones calling into or being called by each Target Telephone number.

k.      Provide all published and non-published subscriber information, including Buddy List information and subscriber information pertaining to the Buddy List, as well as pass codes, user ID, passwords, access codes, and usernames, and identify any other features specific to any and all telephones calling into or being called by each Target Telephone number, **within two business days of each request submitted during the term of this Order**, pursuant to Title 18, USC Sections 2703(C) and 2703(D).

l.      Provide an itemized bill to the law enforcement agency for services rendered for the implementation of this Order.

m.      Upon oral or written request of a law enforcement officer acting under this Order, provide within 24 hours, orally, by facsimile, or by electronic mail, the most recent unbilled call traffic (including date, time and duration) and the latest ESN/ ISMI transaction for the Target Telephone and/ or any telephone in contact with the Target Telephone.

n.      Sprint Corporation, AT&T, Verizon Wireless, Virgin Mobile, T-Mobile, Metro PCS, Cricket Wireless and any and all telecommunications providers providing service to the Target Telephone(s) shall continue to provide service to the Target Telephone(s) for the duration of the intercept, regardless of unpaid balances. Additionally, the Telecommunication Companies shall continue to provide service to the Target Telephone(s) regardless of unpaid

balances. The Telecommunication Companies are ordered to not disclose to the Target Subject(s) the fact that the service was continued in spite of unpaid balances. In the event the Telecommunication Companies continue to provide service to the Target Telephone(s) regardless of unpaid balances, and the Target Subject(s) do not pay for the continued service, the Telecommunication Companies shall be compensated by the agency executing the Court Order for the cost of the service that was continued regardless of unpaid balances, pursuant to the Court's Order.

(12)     Where applicable, the Federal Bureau of Investigation (FBI) and/or the United States Drug Enforcement Administration (DEA) is authorized to assist with the delivery of call content and data between the Telecommunications Companies and the listening post in Riverside County.

(13)     That there shall be written reports to this court for every ten-day period during the interception showing what progress has been made toward achievement of the authorized objective, or a satisfactory explanation for a lack thereof and the need for continued interception; each ten-day report is to be completed and presented to this Court at the earliest possible time from the end of each ten-day period, or as this Court further directs. (Penal Code Section 629.60)

(14)     That the Telecommunications Companies shall not disclose to the subscriber or any other unauthorized person any information regarding this interception, or the fact that it exists, unless authorized by further written Order of this Court or of another court of competent jurisdiction.

(15)     This Application, Review, Affidavit, Order(s) and any/all incorporated documents, attachments, and/or exhibits shall be sealed and kept in the custody of the agency executing the Court Order or the District Attorney's Office and to be disclosed only upon a showing of good cause before a Judge of competent jurisdiction.

(16)     Pursuant to Penal Code Section 629.64, the Court Copy of the analog tape recordings shall be sealed on a daily basis and presented to this Court upon expiration of this Order or any extensions thereof. If, pursuant to Penal Code Section 629.64, the recordings are made on a

digital optical disk or other digital recording media, that recording media shall be presented to this Court upon expiration of this Order or any extensions thereof.

(17) The agency executing this Order shall maintain records so that an inventory pursuant to Penal Code Section 629.68 can be prepared. Such an inventory shall be sent to the following classes of individuals: (1) persons named in the Order or the Application; (2) known parties to intercepted communications; (3) persons for whom telephone subscriber information has been obtained as the result of the telephone being used in an intercepted conversation; (4) persons identified as the result of surveillance based on intercepted conversations; (5) persons arrested as a result of intercepted conversations.

(18) The agency executing this Order shall maintain a list of all persons described in the previous paragraph who are identified during this wiretap and provide the Asset Forfeiture Division of the District Attorney's Office with said list upon the conclusion of the wiretap.

(19) The agency executing this Order shall determine the result of an investigation, including the arrest of any individuals, whenever information derived from the wiretap is communicated to another law enforcement agency or to another investigative team.

(20) The agency executing this Order shall maintain a list of all persons arrested during this wiretap and provide the Asset Forfeiture Division of the District Attorney's Office with said list upon the conclusion of this wiretap.

(21) The agency executing this Order may make an application in the Six-day Reports for authorization to use the contents of intercepted communications and evidence derived there from, for crimes not specified in the wiretap interception Order, pursuant to Penal Code section 629.82.

///

///

///

///

///

1

2    (22)    Pursuant to Penal Code Section 629.61, the agency executing this Order shall report

3    to the Attorney General, within 10 days after the Order was issued, the persons, facilities, and

4    places that are to be intercepted pursuant to this Order.

5    (23)    This Application, Review, Affidavit, Order(s) and any/all incorporated

6    documents, attachments, and/or exhibits shall be sealed and kept in the custody of the agency

7    executing the Court Order or the District Attorney's Office and to be disclosed only upon a

8    showing of good cause before a Judge of competent jurisdiction.  (Penal Code Section 629.66)

9

10   IT IS SO ORDERED,

11   DATE: February ___ *1 9* ___, 2015

12

13   TIME: *1:3—*P.M.

14   _____
     HONORABLE HELIOS J. HERNANDEZ
15   JUDGE OF THE SUPERIOR COURT
     COUNTY OF RIVERSIDE

16

17

18

19

20

21

22

23

24

25

26

27

28

1  MICHAEL A. HESTRIN
   District Attorney
2  County of Riverside
   Deena Bennett
3  Deputy District Attorney
   3960 Orange Street
4  Riverside, CA 92501
   Telephone: (951) 955-5400
5  Fax: (951) 955-9673

6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
8                   IN AND FOR THE COUNTY OF RIVERSIDE

9  IN THE MATTER OF THE APPLICATION        )        WIRETAP NO. 15-108
   OF THE DISTRICT ATTORNEY OF THE         )
10 COUNTY OF RIVERSIDE FOR AN ORDER        )
   AUTHORIZING THE SEALING OF DOCUMENTS    )        SEALING ORDER
11 AND OPTICAL DISK ACQUIRED DURING THE    )
   THE INTERCEPTION OF WIRE COMMUNICATIONS )
12
13         1.      On February 19, 2015, pursuant to Penal Code section 629.50 et.seq., this Court

14 signed Riverside County Wiretap Order No. 15-108, authorizing the interception of wire and

15 electronic communications to and from cellular telephone number **TT #38:** ▮▮▮REDACTED▮▮▮ **TT**

16 **#39:** ▮▮REDACTED▮▮ **and TT #40: 502-609-5937,** for a period of 30 (thirty) days.  Interception

17 was terminated for **TT #38-40** on March 20, 2015.

18         2.      On March 27, 2015, Drug Enforcement Administration (DEA) Taskforce Officer

19 (TFO) Amado Layos presented the original signed Wiretap Application Packet (to include the

20 Application, Affidavit, CEO Letter, Minimizations, Court Order(s), and 10 Day Reports, Sealing

21 Order) contained in one book for Riverside County Wiretap Order No. 15-108 and associated

22 compact discs containing audio calls and SMS text messages.

23         3.      TFO Layos shall place the original Wiretap Application Packet for the above

24 named Target Telephones, the compact discs and the original signed Sealing Order into one (1)

25 large evidence envelope.

26         4.      The envelope shall be sealed in the presence of the Honorable Judge Becky L.

27 Dugan. TFO Layos shall place the envelope into evidence with the Drug Enforcement

28 Administration Non-Drug Evidence Custodian.

                                            1

1      5.     The Drug Enforcement Administration shall maintain custody of the envelope in a

2 sealed condition for a period of 10 years, pursuant to Penal Code sections 629.64 and 629.66.

3      8.     Total number of calls recorded for the authorized interception periods covering the

4 Original Application for **Target Telephone #38** is:



9.     Total number of calls recorded for the authorized interception periods covering the

Original Application for **Target Telephone #39** is:



10.     Total number of calls recorded for the authorized interception periods covering the

Original Application for **Target Telephone #40** is:

     A.     Total number of calls: 3,393

     B.     Total number of voice calls: 2,721

     C.     Total number of pertinent calls: 225

1      D.      Total number of minimized calls: 248

2      E.      Total number of privileged calls: 11

3      F.      Total number of SMS Text messages: 670

4      G.      Total number of pertinent SMS Text Messages: 227

5      H.      Total number of minimized SMS Text messages: 0

6

7      11.     I certify, under penalty of perjury and the laws of the State of California, that the

8      above is true and correct to the best of my knowledge.  Executed in Riverside County, California.

9

10

11     Dated: 3-27-15

12     Taskforce Officer Amado Layos
       Drug Enforcement Administration

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1   IT IS HEREBY ORDERED THAT:

2          1.       TFO Layos shall place the original Wiretap 15-108 audio recordings into one (1)

3   envelope, along with the original Wiretap 15-108 Affidavit, Application, CEO Letter,

4   Minimizations, Court Order(s), 10 Day Reports and signed Sealing Order, for sealing.

5          2.       The envelope(s) shall be sealed in the presence of the Honorable Judge Becky L.

6                    Dugan.

7          3.       TFO Layos shall cause the envelope(s) to be booked into evidence at the evidence

8   room.

9          4.       The Law Enforcement Agency shall maintain custody of the envelope(s) in a

10  sealed condition for a period of 10 years pursuant to Penal Code Sections 629.64 and 629.66.

11

12  DATED: March ___27___, 2015                _____

13                                              Honorable Judge Becky L. Dugan
                                                Riverside County Superior Court
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4